**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| CARBON HEALTH TECHNOLOGIES, INC., et al., | Case No. 26-90306 (CML) |
| Debtors. [1] | (Joint Administration Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF AN ORDER
AUTHORIZING THE DEBTORS TO (I) PAY AND/OR HONOR PREPETITION
WAGES, SALARIES, INCENTIVE PAYMENTS, EMPLOYEE BENEFITS, AND
OTHER COMPENSATION; (II) REMIT WITHHOLDING OBLIGATIONS AND
DEDUCTIONS; (III) MAINTAIN EMPLOYEE COMPENSATION AND BENEFITS
PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS; AND (IV)
HAVE APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS RECEIVE,
PROCESS, HONOR, AND PAY CERTAIN CHECKS PRESENTED FOR
PAYMENT AND HONOR CERTAIN FUND TRANSFER REQUESTS**

**Emergency relief has been requested. Relief is requested not later than February 3, 2026.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on February 3, 2026, at 2:00 p.m. (prevailing Central Time). Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's homepage. The meeting code is "JudgeLopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's homepage. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1]   A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/CarbonHealth.The location of Carbon Health Technologies, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 500 East Remington Drive, Suite 20, Sunnyvale, CA 94087.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this motion (this "Motion"):

## RELIEF REQUESTED

1.    By this Motion, the Debtors seek to minimize the personal hardship to their employees (collectively, the "Employees") as a result of the filing of these Chapter 11 Cases and to minimize the disruption to the Debtors' operations. To accomplish this, the Debtors respectfully request entry of an order, in substantially the form attached hereto (the "Order"), (i) authorizing the Debtors, in their sole discretion: (a) to pay and honor, *inter alia*, certain prepetition claims of their Employees for wages, salaries, reimbursable expenses, and other obligations on account of the Compensation and Benefits Programs (as defined herein) in the ordinary course of business as provided herein; and (b) continue to administer the Compensation and Benefits Programs and (ii) granting related relief.

2.    Pursuant to sections 105(a) and 363(b)(1) and (c)(1) of title 11 of the United States Code (the "Bankruptcy Code"), and the "necessity of payment" doctrine, the Debtors seek authority to pay or honor, in their sole discretion, the following, subject to the limits noted in the chart below (collectively, the "Prepetition Employee Obligations"):

| Compensation and Benefits Program | Amount |
|---|---|
| Employee Compensation | $1,150,000 |
| Commission Compensation | $10,000 |
| Supplemental Workforce Compensation | $160,000 |
| Payroll Processing Fees | $40,000 |
| Withholding Obligations | $690,000 |
| Employee Reimbursable Expenses | de minimus |

| Compensation and Benefits Program | Amount |
|---|---|
| Health Insurance Programs, including IBNR Claims | $650,000 |
| Life Insurance and Disability Programs | $12,000 |
| 401(k) Plan | $130,000 |
| Paid Leave | $111,000 |
| Severance Benefits | $80,000 |
| Non-Insider Incentive Programs | $830,000 |
| **Total** | $3,863,000 |

3.     The Debtors represent that, except as specifically requested below in Paragraph 4: (a) they will not distribute any amounts over $17,150 directly to any individual Employee on account of the sum of unpaid: (i) prepetition Employee Compensation, (ii) prepetition Commission Compensation (as defined below), (iii) prepetition Non-Insider Incentive Programs (as defined below), and (iv) contributions to employee benefit programs by the Debtors' Employees as provided under section 507(a)(5) of the Bankruptcy Code; and (b) they will not pay any amounts in excess of the estimated outstanding prepetition cap amounts for each category of prepetition claims identified in the chart above and in the proposed Order, as applicable, without further order from this Court, except to the extent required under state law.

4.     The chart above includes three proposed payments in excess of the $17,150 cap with respect to the two current Employees and one that was recently terminated prior to the Petition Date. For the two current Employees, the Debtors request authorization to pay the first Employee  $9,329 in prepetition wages and $14,661 in Non-Insider Incentives and the second Employee $7,100 in wages and $13,337 in Non-Insider Incentives, which when viewed individually means the proposed payments to each will be $6,840 and $3,286, respectively, over

the cap. As for former Employee, the Debtors are requesting authority to pay $22,966 in earned and accrued PTO, which is $5,816 over the cap and required to be paid under applicable non-bankruptcy law.

5.      To enable the Debtors to accomplish the foregoing, the Debtors request that the Court authorize and direct the Debtors' banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing.

6.      Notwithstanding the authority requested in this Motion, the Debtors, in the ordinary course of business, may modify, change, and discontinue employee programs and implement new employee programs, may continue to do so during these Chapter 11 Cases, and will provide notice thereof to the extent required by applicable rules and law.

## JURISDICTION AND VENUE

7.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory bases for the relief requested herein are sections 105(a), 362(d), 363(b), and 507(a) of the Bankruptcy Code, Bankruptcy Rules 6003, 6004, and 9013, and Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of Texas (the "Local Rules").

## GENERAL BACKGROUND

10.      On the date hereof (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to

continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.

11.     Carbon Health Technologies, Inc. ("CHTI") is a leading urgent care ("UC") and primary care ("PC") medical service provider, with  approximately 93 locations nationwide offering comprehensive services, including UC, PC, pediatric care, workplace health and clinical research, complemented with virtual care access. CHTI serves as a primary entry point to the healthcare ecosystem, offering a comprehensive array of services that cater to diverse patient communities, enhancing accessibility and quality of care.

12.     CHTI leverages its proprietary platform, CarbyOS, to implement a digital strategy that enhances patient engagement and drives operating efficiency. This approach enables Carbon to provide a versatile range of services across care locations through improved operational efficiency.

13.     Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Kerem Ozkay, in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"),[2] which has been filed with the Court contemporaneously herewith and is incorporated by reference herein.

## THE COMPENSATION AND BENEFITS PROGRAMS

### A.    General Employee Overview

14.     The Debtors employ (a) approximately 1,400 Employees in 21 states across the United States, and (b) approximately 20 Employees combined abroad in the United Arab Emirates

---

[2]    A capitalized term used but not otherwise defined herein shall have the meaning ascribed to it in the First Day Declaration.

("UAE") and Turkey.[3] Approximately 810 are employed on a full-time basis, approximately 130 on a part-time basis, and approximately 480 on a per diem basis. Approximately 960 Employees are paid on an hourly basis, and approximately 460 Employees are salaried. No Employees are party to collective bargaining agreements or other similar labor agreements, and no Employees are members of labor unions.

15.     In addition to the Employees, the Debtors also utilize the services of a limited number of independent contractors and temporary workers sourced from various staffing agencies to provide critical temporary support services (the "Supplemental Workforce" and, with the Employees, the "Workforce"). The Supplemental Workforce provides back office finance services, revenue collection efforts, and data analytics, all of which are critical to the Debtors' daily operations.

16.     The Workforce performs a wide variety of functions that are critical to the Debtors' operations and to maximizing the value of the Debtors' assets. Many of these individuals are highly trained and have an essential working knowledge of the Debtors' business that cannot easily be replicated. Failure to maintain the continued, uninterrupted services of their Workforce could upend the Debtors' goal to maximize recoveries for the benefit of all stakeholders.

---

[3]  The Debtors also indirectly fund payroll for employees of certain non-Debtor affiliates in Colombia (the "Colombian Non-Debtor Affiliates") via monthly intercompany transfers. The Debtors believe that they have prefunded payroll for the Colombian Non-Debtor Affiliates through the Petition Date: Pursuant to that certain *Debtors' Emergency Motion for Entry of Interim and Final Orders (i) Authorizing Maintenance of Existing Bank Accounts; (ii) Authorizing Continuance of Existing Cash Management System; (iii) Granting Limited Waiver of Section 345(b) Deposit Requirements; (iv) Authorizing Continued Performance of Intercompany Transactions and Funding; and (v) Granting Related Relief* (the "Cash Management Motion"), the Debtors have requested the authority to continue such funding in the ordinary course subject to their budget.]

B.      **Compensation, Withholding Obligations, and Employee Expenses**

(i)      *Payroll Structure and Payroll Timing*

17.     The Debtors pay their Employees (collectively, the "Employee Compensation"),
on several different payment cycles as follows:

18.     Domestic Payroll. Approximately 1,200 Employees are paid bi-weekly, one week
in arrears, and approximately 200 Employees are paid bi-weekly on a current basis in the U.S. U.S.
Employee payroll is paid through direct deposits or checks issued on scheduled pay dates and both
pay cycles are paid on the same 26 annual pay dates.

19.     Foreign Payroll. Payroll for Employees in the UAE and Turkey are funded by the
U.S. Debtors on a monthly basis via direct payments to the respective non-Debtor affiliate abroad
for distribution to Employees.

20.     The Debtors' next pay date in the U.S. is February 13, 2026 (with funding for U.S.
Employees sent to the payroll provider on February 11, 2026). Because a portion of Employee
Compensation is paid in arrears, the Debtors will owe certain Employees accrued but unpaid
Employee Compensation as of the Petition Date.[4] Except as set forth in Paragraph 4 above, the
Debtors do not seek to pay unpaid Employee Compensation to any Employee in excess of the
$17,150 priority wage cap imposed by section 507(a)(4) of the Bankruptcy Code.  As of the
Petition Date, the Debtors estimate that they owe approximately $1,150,000 in Employee
Compensation.

(ii)      *Commissions*

21.     Historically, the Debtors have from time-to-time awarded commissions
("Commission Compensation") to members of the Debtors' salesforce. Amounts owing on account

---

[4]   Compensation also may be due as of the Petition Date for a variety of other reasons, such as Employees holding
      issued but uncashed paychecks as of the Petition Date.

of prepetition Commission Compensation obligations are de minimis. In an abundance of caution, the Debtors seek authorization to pay up to $10,000 of unpaid prepetition Commission Compensation and to continue to offer and pay Commission Compensation in the ordinary course of business postpetition.

### (iii)  *Supplemental Workforce*

22.     To compensate the Supplemental Workforce, the Debtors either pay members of the Supplemental Workforce directly or pay staffing agencies, which then make payments to the Supplemental Workforce on the Debtors' behalf (the "Supplemental Workforce Compensation"). As of the Petition Date, the Debtors estimate that they owe approximately $160,000 in Supplemental Workforce Compensation.

### (iv)  *Payroll Processing*

23.     The Debtors utilize ADP, Inc. ("ADP") to administer payroll and several other employee-related benefits programs. ADP provides, among other things, the Debtors' payroll processing system, ensures proper tax and benefits withholding, and provides electronic timesheet management for Employees paid on an hourly basis. As of the Petition Date, the Debtors estimate that they owe ADP approximately $40,000 in fees (the "Payroll Processing Fees").

### (v)  *Withholding Obligations*

24.     During applicable pay periods, either the Debtors or ADP deducts certain amounts from Employees' paychecks, including garnishments, levies, child support and related fees, contributions to Health Insurance Programs, Life Insurance and Disability Programs, and other Health and Welfare Programs (each as defined herein) (collectively, the "Deductions"). The Debtors and/or ADP transfer the amounts comprising such Deductions to various designated third-party recipients. The Debtors estimate that, as of the Petition Date, an aggregate of approximately

$160,000 has been withheld on account of Deductions but has not yet been remitted to the designated third-party recipients.

25.      The Debtors also are required by law to withhold from Employees' paychecks amounts related to, among other things, federal, state, and local income taxes and Social Security and Medicare taxes for remittance to applicable federal, state, and local taxing authorities. The Debtors must then match these taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (such taxes, including Company matches, the "<u>Payroll Taxes</u>"). The Debtors estimate that, as of the Petition Date, approximately $530,000 in Payroll Taxes have accrued but have not yet been remitted to the designated third-party recipients.

26.      As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unremitted Deductions and Payroll Taxes (together, the "<u>Withholding Obligations</u>") is approximately $690,000. By this Motion, the Debtors seek authority to forward to the appropriate third-party recipients, consistent with historical practice, any unremitted Withholding Obligations and to continue to honor the Withholding Obligations in the ordinary course of business on a postpetition basis.

### (vi)    *Employee Reimbursable Expenses*

27.      In the ordinary course of business, the Debtors make payments to credit card companies for accounts which are co-signed by Employees on account of purchases made by Employees for work-related expenses (the "<u>Employee Expenses</u>"), including meals and entertainment, lodging, airfare, automobile rentals, tolls and parking, mileage, phone bills, uniforms, postage/courier fees, printing costs, miscellaneous office expenses, and various dues and subscriptions. As of the Petition Date, the Debtors believe there are no amounts owing for Employee Expenses. The Debtors seek, in an abundance of caution, authorization to continue to

pay prepetition obligations with respect to Employee Expenses as they come due postpetition and to continue such funding in the ordinary course subject to their budget.[5]

### (vii)    Severance

28.     In the ordinary course of business, the Debtors historically have provided severance benefits to certain Employees upon termination of employment by the Debtors without cause, whereby eligible Employees are given a cash payment or payments generally determined by a combination of the Employee's salary, job title, and length of time employed by the Debtors (the "Severance Benefits"). As of the Petition Date, the Debtors estimate that approximately $80,000 of Severance Benefits have been incurred and remain unpaid by the Debtors. The maintenance of the Severance Benefits and satisfaction of the Severance Benefits in the ordinary course postpetition may be critical to maintaining Employee morale and loyalty. The Debtors hereby seek authority, in their discretion, to maintain and to pay the Severance Benefits in the ordinary course postpetition.

### C.    Employee Benefit Programs

29.     In the ordinary course of business, the Debtors offer certain Employees various benefits programs (each as defined herein and, collectively, the "Employee Benefits Programs"). By this Motion, the Debtors seek authority to continue to administer the Employee Benefits Programs in the ordinary course of business and to pay any prepetition obligations owed on account of the Employee Benefits Programs.

### (i)    Health and Welfare Programs

30.     The Debtors offer several health and welfare benefits programs to eligible Employees, including the Health Insurance Programs and Life Insurance and Disability Programs

---

[5]   The Debtors' credit card program is described in additional detail in the Cash Management Motion.

(each as defined herein and, collectively, the "<u>Health and Welfare Programs</u>"). In addition, the Debtors pay certain routine administrative fees to third-party service providers in connection with administering the Health and Welfare Programs.

### a. Health Insurance Programs

31.     Full-time and part-time Employees are eligible to participate in a number of the Health and Welfare Programs, including the Medical Plans, the HSA, the Vision Plans, and the Dental Plans (each as defined herein and, collectively, the "<u>Health Insurance Programs</u>"). The Debtors also subsidize or continue to provide health benefits to certain current and former Employees, including benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985.

32.     As of the Petition Date, the Debtors have Health and Welfare Programs that are self-insured. The Debtors fund the Health and Welfare Programs through a combination of regular deductions from Employee wages and Debtor contributions.  As of the Petition Date, the Debtors estimate that they have approximately $650,000 of accrued and unremitted amounts owing to Health Insurance Programs.

### 1. Medical Plans

33.     The Debtors offer certain full-time Employees medical and prescription drug benefit programs (the "<u>Medical Plans</u>") through Cigna and Kaiser Permanente ("<u>Kaiser</u>"). The coverage in the Medical Plans differs depending on the level of coverage an Employee elects to receive from Cigna or Kaiser, and monthly health care premiums differ depending on the Medical Plan in which an Employee is enrolled, and whether the Employee has dependents covered by the applicable plan.

34.     As noted above, as of the Petition Date, the Debtors' Health and Welfare Programs are partially fully insured and partially self-insured, and the Debtors fund the Health and Welfare

Programs through a combination of regular deductions from Employee wages and Debtor contributions. The portion of the Debtors' healthcare plan that is self-insured is administered by Cigna Health and Life Insurance Company ("Cigna") and backed above a certain limit by a stop-loss policy with Sun Life Assurance Company of Canada ("Sun Life"). As of the Petition Date, the Debtors estimate that they still have approximately $632,000 of stop loss premiums and insured but not reported claims ("IBNR Claims") owing on account of the former self-insured plan.

### 2.     Health Savings Account ("HSA")

35.     Employees who participate in certain Medical Plans may establish a health savings account in connection therewith and contribute a portion of their compensation each pay period to the HSA. Participating Employees can make pre-tax payroll contributions for themselves and their dependents to an HSA up to the maximum amount permitted by the Internal Revenue Service (the "IRS"). Each payroll period, the Debtors add a portion of the funding for the HSA. The funds of the HSA may be used for incidental medical expenses. The HSAs are maintained with Navia Benefit Solutions ("NBS"). As of the Petition Date, the Debtors believe they have accrued and unremitted amounts totaling approximately $4,000 related to the HSA program.

### 3.     Vision Plans

36.     Certain of the Debtors' Employees are eligible to participate in fully-insured vision insurance plans (the "Vision Plans"), which are administered by Metropolitan Life Insurance Company ("MetLife"). Except for a small administrative fee, all of the costs of the Vision Plans are paid by Employees. As of the Petition Date, the Debtors believe that they have accrued and unremitted amounts totaling approximately $4,000 related to the Vision Plans.

### 4.     Dental Plans

37.     Similarly, the Debtors offer certain of their Employees the option to participate in fully-insured dental insurance plans (the "Dental Plans"), which are administered by Delta Dental.

As of the Petition Date, the Debtors believe they owe approximately $10,000 related to the Dental Plans.

### 5. <u>COBRA</u>

38.    As required by law, the Debtors also offer coverage under certain of the Health Insurance Programs to their former employees who have elected COBRA coverage. In the case of the former employees who have elected COBRA coverage, the Debtors do not pay any premiums on behalf of the Employees. Instead, such former employees pay the full amount of the premiums directly to the Debtors. As part of the relief requested hereunder, the Debtors request authority to pay any prepetition premium payments relating to COBRA coverage (which are fully paid by the former employees) and to continue to make such payments in the ordinary course of business.

### b.    Life Insurance and Disability Programs

39.    The Debtors offer their Employees various life insurance and disability insurance coverage (the "<u>Life Insurance and Disability Programs</u>") described below.  As of the Petition Date, the Debtors estimate that they have approximately $12,000 of accrued and unremitted amounts owing to Life Insurance and Disability Programs.

### 1.    <u>Life and AD&D Insurance Programs</u>

40.    The Debtors provide life and accidental death and dismemberment insurance coverage (the "<u>Basic Life and AD&D Insurance Prog</u>ram") to Employees through insurer The Prudential Insurance Company of America ("<u>PICA</u>"). The Basic Life and AD&D Insurance Program is fully-insured and provides financial protection to the beneficiaries of the insured in the event of an Employee's death or dismemberment. Current Employees also may purchase supplemental life insurance and voluntary accidental death and dismemberment insurance (together with the Basic Life and AD&D Insurance Program, the "<u>Life and AD&D Insurance Programs</u>") to cover themselves, their spouses, and their children through PICA. As of the Petition

Date, the Debtors believe that they have accrued and unremitted amounts totaling approximately $5,000 related to the Basic Life and AD&D Insurance Program.

**2.      Disability Insurance**

41.      The Debtors provide Employees with short-term and long-term disability benefits (the "Disability Benefits") through PICA.

42.      For full-time Employees, the short-term disability benefit (the "Short-Term Disability Benefits") replaces a portion of the Employee's income (60% of weekly earnings up to a maximum weekly amount of $2,308) if the Employee is unable to work due to injury or sickness. The short-term disability benefit lasts for twelve (12) weeks at which time an Employee may begin receiving a long-term disability benefit. The Debtors believe that they owe accrued and unremitted amounts totaling approximately $3,000 related to the Short-Term Disability Benefits.

43.      The long-term disability benefit plan (the "Long-Term Disability Insurance Plan") is funded by the Debtors. Once an Employee has exhausted their short-term disability coverage and are still unable to return to work, Employees are eligible for long-term disability coverage. The long-term disability benefit replaces a portion of the Employee's income (60% of base salary with a maximum cap of $10,000 per month). Eligibility begins after a 90-day waiting period. The Debtors believe that they owe accrued and unremitted amounts totaling approximately $4,000 related to the Long-Term Disability Benefits.

*(ii)      Flexible Spending Accounts*

44.       The Debtors permit their employees to set aside pre-tax earnings to establish two types of flexible spending accounts (the "Flexible Spending Accounts" or "FSAs"): an account to pay eligible dependent daycare expenses (a "Dependent Care Account") and an account to reimburse expenses not covered by the Debtors' Health Insurance Programs (a "Medical FSA"), such as deductibles, copays, and dental/vision care expenses. The FSAs are maintained with NBS.

Case 26-90306 Document 6 Filed in TXSB on 02/02/26 Page 15 of 25

The annual contribution limits for each employee are $3,300 for the Medical FSA and $5,000 for the Dependent Care Account. Employees must designate their participation in these programs during an annual enrollment period. Unused funds in both accounts are forfeited at the end of the year if not utilized. The prepetition amount owed by the Debtors as of the Petition Date are captured in the amount of the Deductions set forth above. The Debtors intend to continue the Flexible Spending Accounts in the ordinary course of business.

### *(iii)* *401(k) Plan*

45.     The Debtors provide all eligible Employees with the ability to participate in a defined contribution 401(k) profit sharing plan (the "401(k) Plan"), which is administered by Leading Retirement Solutions ("LRS"). The Debtors pay LRS an annual administrative fee of approximately $106,000 in connection with the 401(k) Plan (the "401(k) Administrative Fees"). Employees generally are eligible to participate in the 401(k) Plan immediately upon employment. The 401(k) Plan generally provides for pre-tax deductions of compensation up to limits set by the Internal Revenue Code, as well as for certain post-tax deductions. Employee contributions to the 401(k) Plan are deducted automatically from each paycheck and transferred to a trust established under the 401(k) Plan (collectively, the "401(k) Deductions," and together with the 401(k) Administrative Fees, the "401(k) Obligations"). The 401(k) Plan immediately vests at a rate of 100 percent. As of the Petition Date, approximately 1,200 Employees contribute to the 401(k) Plan and approximately 1,300 former Employees hold balances in the 401(k) Plan[6]. Historically, the Debtors have matched Employee annual contributions up to 2%.

46.     As of the Petition Date, the Debtors believe that they have accrued and unremitted amounts totaling approximately $130,000 on account of the 401(k) Plan (the "Unpaid 401(k)

---

[6]   The Debtors are in the process of transferring anyone who has accounts less than $7,000 to be transferred to a third-party administrator.

4920-6587-7637.7 12854.00001                                    15

Obligations"). The Debtors seek authority to remit and/or pay any Unpaid 401(k) Obligations in the ordinary course of business and consistent with past practices, and, out of an abundance of caution, to continue remitting and/or paying the 401(k) Obligations on a postpetition basis in the ordinary course of business.

### (iv)    Workers' Compensation Program

47.     The Debtors maintain workers' compensation insurance for their Employees at the statutorily required level for each state in which the Debtors have Employees (collectively, the "Workers' Compensation Program"). The Debtors maintain coverage for the Workers' Compensation Program through a comprehensive policy with Sentinel Insurance Company Ltd. ("Sentinel"), and state-specific policies with North Dakota, Ohio, Washington and Wyoming. The Workers' Compensation Program is provided on a guaranteed cost basis with no deductible nor self-insured retention. The Debtors pay a fixed premium, regardless of the number or the amount of workers' compensation claims.

48.     The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements. There are 13 open claims under the Workers' Compensation Program (the "Workers' Compensation Claims").

49.     Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that disrupt the restructuring process. The Debtors seek authority, but not direction, to (a) continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis and (b) modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program.

### (vii)    Paid Leave

50.    The Debtors maintain certain paid leave benefit programs for Employees, providing paid leave for PTO and Other Leave (each as defined below, and collectively, the "Leave Benefits").

51.    All Employees accrue paid time off ("PTO") per hour worked, with accruals capped based on tenure:[7]

| Employee Tenure | Maximum Annual Accrual |
|---|---|
| 0-2 years | Up to 160 hours |
| 2-4 years | Up to 200 hours |
| 4+ years | Up to 240 hours |

52.    As of the Petition Date, the Debtors believe they owe approximately $111,000 in accrued and unpaid PTO or Cash-Out Obligations (the "Unpaid PTO Cash-Out Obligations"). The Debtors seek authority to honor its prepetition policies with respect to Unpaid PTO Cash-Out Obligations in the ordinary course of business and consistent with past practices and applicable law.

53.    In the ordinary course of business, the Debtors provide certain other paid and unpaid leave, including holidays, bereavement, jury duty, voting leave, military leave, leave provided for under the Family Medical Leave Act, a paid sabbatical for full-time urgent care clinicians and staff, and all legally required leaves (collectively, the "Other Leave"). Employees are not entitled to any cash payments in connection with the Other Leave.

54.    The Debtors believe that the continuation of the Leave Benefits in the ordinary course of business and consistent with past practices is essential to maintaining Employee morale

---

[7]    Once an employee hits the maximum, PTO stops accruing.

during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend. As a result, the Debtors seek authority, out an abundance of caution, to continue offering and honoring the Leave Benefits on a postpetition basis and in the ordinary course of business.

### (vii)    *Non-Insider Incentive Programs*

55.    The non-insider incentive programs (the "Non-Insider Incentive Programs") are comprised of the following components:

- *Clinic Leadership Incentive Program* ("CLIP"). The CLIP is offered to Center and Area Managers. CLIP incentives are tied to clinic gross margin performance under a defined tier structure.

- *Clinic Support Proft Share* ("CSPS"). The CSPS is offered to non-provider clinic staff. The CSPS is a self-funding incentive that rewards teamwork and sharing profits.

- *Relative Value Unit* ("wRVU"). The wRVU provides monetary incentives for clinicians to meet certain quality metrics. The wRVU is tied to clinicians' quality care measure scores at the Debtors' center locations.

- *Quality Bonus Program* ("Quality Bonus Program"). The Quality Bonus Program rewards health providers for meeting certain quality metrics. Similar to the wRVU, the Quality Bonus Program, is tied to certain health care quality metrics based on the health and admissions rates for a population of patients in a given region.

- *Clinic Medical Director Stipend Program* ("CMD Stipend Program"). The CMD Stipend Program rewards clinic medical directors with a stipend for achieving certain staff attendance metrics, provider score card ratings, and clinic closure minimization goals.

- *Annual Corporate Bonus Plan* ("Annual Corporate Bonus Plan"). The Annual Corporate Bonus Program is an incentive program designed for corporate personnel. The Debtors have not paid this bonus in several years, and does not expect to make any annual bonus payments in the current period.

As of the Petition Date, the Debtors believe that they have accrued, but not earned, unremitted amounts totaling approximately $830,000 on behalf of the Non-Insider Incentive Programs.

## BASIS FOR RELIEF

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Compensation and Benefits Programs.

#### A. Certain of the Compensation and Benefits Programs Are Entitled to Priority Treatment

56. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Compensation and Benefits Programs to priority treatment. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B). To the extent that an Employee receives no more than the statutory prescribed limit of $17,150 on account of claims entitled to priority, the relief sought with respect to compensation only affects the timing of payments to Employees and does not have any material negative impact on recoveries for general unsecured creditors. The Debtors submit that payment of the Compensation and Benefits Programs at this time enhances value for the benefit of all interested parties. Finding, attracting, and training new qualified talent would be extremely difficult and would most likely require higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Employees.

#### B. Payment of Certain Compensation and Benefits Programs Is Required by Law

57. The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party payees. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' wages. Certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' wages on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Further, federal law requires the Debtors to withhold certain tax payments from Employees' wages and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding

that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request authorization to transmit the Withholding Obligations to the proper parties in the ordinary course of business.

58.     Similarly, the laws of some jurisdictions in which the Debtors operate require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, the laws of those jurisdictions may prohibit the Debtors from continuing to operate in those jurisdictions. Payment of all obligations related to the Workers' Compensation Program is crucial to the Debtors' continued operations and the success of these Chapter 11 Cases.

## II.     Payment of the Compensation and Benefits Programs and the Relief Sought Herein Is a Sound Exercise of the Debtors' Business Judgment and Necessary to Preserve the Value of the Estates.

59.     Courts generally acknowledge that it is appropriate to authorize the payment (or other special treatment) of prepetition obligations in appropriate circumstances. *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages). In authorizing payments of certain prepetition obligations, courts have relied on several legal theories, rooted in sections 1107(a), 1108, 363(b), 507, and 105(a) of the Bankruptcy Code.

60.     Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor in possession

is the obligation to "protect and preserve the estate, including an operating business's going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.*

61.     The *CoServ* court specifically noted that satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.*

62.     Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986).

63.     Courts also apply section 105(a) pursuant to the "doctrine of necessity," which functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein. *See CoServ*, 273 B.R. at 497. Moreover, the doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs*, 98 B.R. at 176.

64.     Many Employees may live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses. These Employees may be exposed to significant financial and healthcare-related problems if the Debtors are not permitted to pay and/or honor the Compensation

and Benefits Programs, and the expenses associated therewith, in the ordinary course of the Debtors' business.  Moreover, the Debtors believe that if they are unable to honor accrued Compensation and Benefits Programs described above, including honoring prepetition PTO and Other Leave by allowing Employees to use accrued prepetition PTO and Other Leave on a postpetition basis, Employee morale and loyalty will be jeopardized at a time when Employee support is critical. The Debtors believe that any uncertainty with regard to continuation of Compensation and Benefits Programs will cause significant anxiety at precisely the time the Debtors need their Employees to perform their jobs at peak efficiency.

65.     The Employees have an intimate knowledge of the operation of the Debtors' business and are critical components to the successful reorganization of the Debtors' business. Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to sustain their operations. Satisfaction of the Compensation and Benefits Programs, as described herein, is necessary to maintain the Employees' morale during the cases and to insure continued, efficient operation in order to maximize value for all creditors.

## EMERGENCY CONSIDERATION

66.     The Debtors request emergency consideration of the Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first twenty-one days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and any delay in granting the relief requested could hinder such operations and cause irreparable harm. The failure to receive the requested relief during the first twenty-one days of these Chapter 11 Cases could disrupt the Debtors' operations at this critical juncture and add needless costs to the administration of these cases.  The Debtors

have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested herein on an emergency basis.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

67.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## NO ASSUMPTION OR ASSIGNMENT OF EMPLOYEE BENEFITS

68.     To the extent any Benefits or related agreement is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not, at this time, seek to assume any such contract. Accordingly, if the Court authorizes the payments described above, such payments should not be deemed to constitute a postpetition assumption or adoption of the programs, policies, or agreements as executory contracts pursuant to section 365 of the Bankruptcy Code. Moreover, authorization to pay all amounts on account of Compensation and Benefits Programs shall not affect the Debtors' rights to contest the amount or validity of these obligations.

## REQUEST FOR FINANCIAL INSTITUTIONS TO HONOR CHECKS

69.     The Debtors request that all applicable banks and other financial institutions be authorized to receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors to Employees (and other third parties described herein), whether such checks were presented or fund transfer requests were submitted prior to, on, or after the Petition Date. Nothing contained in this Motion, however, shall constitute a request for authority to assume any agreements, policies, or procedures relating to Compensation and Benefits Programs.  Further, the Debtors seek to retain the discretion to decide which Compensation and Benefits Programs it will pay and honor, and nothing in this Motion shall be deemed an admission by the Debtors that any Compensation and Benefits Programs will in fact be paid or honored.

70.     Finally, the Debtors request authority to pay all of the processing fees associated with payment of the Compensation and Benefits Programs  including, but not limited to, any fees owed to any third-party administrators of Benefits Programs as described in the Motion.

## **NOTICE**

71.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules and Local Rules. The Debtors will provide notice of this motion to the following: (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the DIP Lenders; (d) the Prepetition Secured Parties; (e) the United States Attorney's Office for the Southern District of Texas; (f) the Internal Revenue Service; (g) the parties holding secured claims against the Debtors; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Local Rule 9013-1(d). No other or further notice is needed in light of the nature of the relief requested.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

WHEREFORE, the Debtors request that the Court enter the Order granting the relief requested herein and such other and further relief as may be just and proper under the circumstances.

Dated: February 2, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Maxim B. Litvak*

Maxim B. Litvak (SBT 24002482)
Theodore S. Heckel (SBT 24133488)
700 Louisiana Street, Suite 4500
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile:  (713) 691-9407
mlitvak@pszjlaw.com
theckel@pszjlaw.com

-and-

Debra I. Grassgreen (*pro hac vice* pending)
John W. Lucas (*pro hac vice* pending)
One Sansome Street, 34th Floor, Suite 3430
San Francisco, CA 94104
Telephone: (415) 263-7000
Facsimile:  (415) 263-7010
dgrassgreen@pszjlaw.com
jlucas@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## Certificate of Service

I certify that on February 2, 2026 I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Maxim B. Litvak*

Maxim B. Litvak