**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| CARBON HEALTH TECHNOLOGIES, INC., *et al.*, | Case No. 26-90306 (CML) |
| Debtors.[1] | (Joint Administration Requested)<br>(Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION
SECURED FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY
CODE; (II) AUTHORIZING THE DEBTORS TO USE CERTAIN CASH
COLLATERAL; (III) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS; (IV) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES; (V) MODIFYING THE AUTOMATIC STAY;
(VI) SCHEDULING A FINAL HEARING; AND (VII) GRANTING RELATED RELIEF**

> **EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT
> LATER THAN FEBRUARY 3, 2026.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT
> EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR
> AT THE HEARING IF ONE IS SET OR FILE A WRITTEN RESPONSE PRIOR TO
> THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH.
> OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND
> GRANT THE RELIEF REQUESTED.**
>
> **A HEARING WILL BE CONDUCTED ON THIS MATTER ON FEBRUARY 3, 2026,
> AT 2:00 P.M. (PREVAILING CENTRAL TIME). PARTICIPATION AT THE
> HEARING WILL ONLY BE PERMITTED BY AN AUDIO AND VIDEO
> CONNECTION.**
>
> **AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN
> FACILITY. YOU MAY ACCESS THE FACILITY AT (832) 917-1510. ONCE
> CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM
> NUMBER. JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO
> COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM.
> CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE
> LINK ON JUDGE LOPEZ'S HOMEPAGE. THE MEETING CODE IS**

---

[1]     A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors'
proposed claims and noticing agent at https://restructuring.ra.kroll.com/CarbonHealth.The location of Carbon
Health Technologies, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases
is 500 East Remington Drive, Suite 20, Sunnyvale, CA 94087.

> **"JUDGELOPEZ". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**
>
> **HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LOPEZ'S HOMEPAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Carbon Health") state as follows in support of this motion (the "Motion"):[2]

## Relief Requested

1.    The Debtors file this Motion, pursuant to sections 105, 361, 362, 363, 364, 503, 506, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), seeking entry of interim and final orders, substantially in the form of the interim order attached hereto as **Exhibit 1** and a final order to be submitted at a later date (respectively, the "Interim Order" and "Final Order" and collectively, the "DIP Orders"):

    a.    authorizing the Debtors to obtain post-petition loans, advances, and other financial accommodations up to **$9,000,000** on an interim basis for a period through and including the date of the Final Hearing (as defined herein), and up to an aggregate of **$19,500,000** following entry of the Final Order, from Future Solution Investments LLC ("FSI"), in its capacities as administrative agent and collateral agent (the "DIP Agent") for itself and the DIP Lenders (as defined herein) and from the DIP Lenders (as defined herein), in accordance with all of the lending formulae, sublimits, terms, and conditions set forth in the DIP Loan Documents (as defined herein), secured by security interests in and liens upon all of the DIP Collateral (as defined herein) pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code;

---

[2]    Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Kerem Ozkay in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), filed contemporaneously herewith.

b.      authorizing the Debtors to enter into, be bound by, and perform under the debtor-in-possession credit facility (the "<u>DIP Facility</u>"), entitled "Senior Secured Superpriority Debtor-in-Possession Financing Agreement," dated as of February 2, 2026, by and among the Debtors, the DIP Agent, and the lenders from time to time party thereto (the "<u>DIP Lenders</u>"), which agreement is attached as <u>Exhibit A</u> to the Interim Order (as it may be modified, supplemented, amended, or restated from time to time, the "<u>DIP Financing Agreement</u>" and together with the other Loan Documents, as defined in the DIP Financing Agreement, the "<u>DIP Loan Documents</u>");

c.      modifying the automatic stay;

d.      granting to the DIP Agent, for its benefit and the benefit of the DIP Lenders, of superpriority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all Obligations (as defined in the DIP Financing Agreement) (the "<u>DIP Obligations</u>");

e.      authorizing the Debtors to use the DIP Collateral (as defined herein) (including "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "<u>Cash Collateral</u>") in accordance with the Approved Budget (as defined herein) and subject to the terms, restrictions, and other conditions of the DIP Loan Documents);

f.      authorizing the Debtors to use the proceeds of the loans under the DIP Facility, subject to the terms, restrictions, and other conditions of the DIP Loan Documents, to (a) pay fees and expenses related to the DIP Loan Documents and these chapter 11 cases, and (b) fund working capital of the Debtors and other general corporate purposes, in each case, to the extent set forth in and limited by the Approved Budget and permitted under the DIP Loan Documents;

g.      subject to the Carve-Out (as defined herein) and any Permitted Prior Liens (as defined in the DIP Financing Agreement), to provide Adequate Protection (as defined herein) of the liens and security interests (such liens and security interests, the "<u>Prepetition Secured Liens</u>") of the lenders (the "<u>Prepetition Lenders</u>") under that certain Loan and Security Agreement, dated as of November 14, 2025, as amended by that certain First Amendment to Loan and Security Agreement, dated as of November 24, 2025, that certain Second Amendment to Loan and Security Agreement, dated as of January 13, 2026 and that certain Third Amendment to Loan and Security Agreement, dated as of January 20, 2026 (and as the same may be further amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Loan and Security Agreement</u>" and together with all other related documents, guarantees, and agreements, including, without limitation, security agreements, mortgages, pledge agreements, assignments, financing statements, and other agreements, documents, instruments, or certificates executed in connection with the Prepetition Loan and Security Agreement, collectively, the "<u>Prepetition Loan Documents</u>"), by and among the Debtors as borrowers or guarantors (the "<u>Prepetition Loan Parties</u>"), FSI, as lender

and agent for itself and the other lenders or entities thereto (in such capacity, the "Prepetition Agent" and together with the Prepetition Lenders, the "Prepetition Secured Parties"), on the terms as more fully set forth in the DIP Orders;

h.    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion; and

i.    granting related relief.

2.    In further support of this Motion, the Debtors submit the First Day Declaration and the Declarations of Reilly Olson of Alvarez & Marsal North America, LLC and Vladimir Moshinsky of Stifel, Nicolaus & Company, Incorporated (together, the "DIP Declarations"), which contain specific facts regarding the Debtors' need for the DIP Facility, access to Cash Collateral, the reasonableness of the Debtors' proposed budget, and the lack of any available financing alternatives.

## Jurisdiction and Venue

3.    The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court.

4.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.    The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, Local Rules 4002-1 and 9013-1, and the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Case Procedures").

**Background**

A.    **General Background**

6.    On February 2, 2026 (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been appointed in these chapter 11 cases.

7.    Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

8.    Carbon Health is a leading urgent care ("UC") and primary care ("PC") medical service provider, with 93 locations nationwide offering comprehensive services, including UC, PC, pediatric care, workplace health, and clinical research, complemented with virtual care access. Carbon Health serves as a primary entry point to the healthcare ecosystem, offering a comprehensive array of services that cater to diverse patient communities, enhancing accessibility and quality of care. Carbon Health leverages its proprietary platform, "CarbyOS," to implement a digital strategy that enhances patient engagement and drives operating efficiency. This approach enables Carbon Health to provide a versatile range of services across care locations through improved operational efficiency.

B.    **Prepetition Secured Obligations**

9.    As of the Petition Date, the Prepetition Loan Parties were indebted and liable to the Prepetition Secured Parties under the Prepetition Loan Documents, for (a) an aggregate principal amount of not less than $77 million, and (b) accrued and unpaid interest, fees (including, without limitation, Agency Fees (as defined therein, if any)), and costs, expenses (including any reasonable

attorneys' and financial advisors' fees), charges, indemnities, and all other obligations incurred or accrued with respect to the foregoing pursuant to, and in accordance with, the Prepetition Loan Documents (including, without limitation, the MOIC Amount (as defined in the Prepetition Loan and Security Agreement)) (collectively, the "Prepetition Secured Obligations").

10.     The Prepetition Loan Parties granted to the Prepetition Agent, for the benefit of the Prepetition Secured Parties, to secure the Prepetition Secured Obligations, Prepetition Secured Liens on the Collateral (as defined in the Prepetition Loan Documents), including assets of the Prepetition Loan Parties as more fully described in the Prepetition Loan Documents, including all of the Prepetition Loan Parties' rights, titles, and interests in the Collateral (as defined in the Prepetition Loan Documents, such collateral, collectively, the "Prepetition Collateral").

11.     The Debtors propose to stipulate through the DIP Orders that the Prepetition Secured Liens (a) are valid, binding, perfected, duly recorded, and enforceable liens on, and security interests in, the Prepetition Collateral, (b) were granted to the Prepetition Secured Parties for fair consideration and reasonably equivalent value, (c) are not subject to, pursuant to the Bankruptcy Code or other applicable law (foreign or domestic), avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual, or otherwise), attachment, set-off, offset, recoupment, counterclaim, defense, "claim" (as defined in the Bankruptcy Code), impairment, or any other challenge of any kind, and (d) are subject and subordinate only to valid, perfected, and unavoidable liens permitted under the applicable Prepetition Loan Documents, but only to the extent that (x) such liens are permitted by the applicable Prepetition Loan Documents to be senior to the applicable Prepetition Secured Liens and (y) such liens are actually senior to the applicable Prepetition Secured Liens under applicable law.

12.     The Debtors further propose to stipulate through the DIP Orders that the Prepetition Secured Obligations constitute legal, valid, and binding obligations of the Debtors, enforceable in accordance with the terms of the applicable Prepetition Loan Documents. In connection with the foregoing, (1) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition Secured Obligations exist, and (2) no portion of the Prepetition Secured Obligations or any payments made to or for the benefit of the Prepetition Secured Parties are subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

## C.     Clinic Level Debt

13.     Certain of the Debtors borrowed from three separate lenders for the purpose of developing and opening primary care and urgent care clinics in various locations around the country.

### i.     John Muir Debt

14.     Carbon Health East Bay Medical Group, P.C. ("CH East Bay Med."), as borrower, and Carbon Health East Bay Primary Care, P.C. ("CH East Bay Primary"), as guarantor, and John Muir Health ("John Muir"), as lender, are party to a *Delayed Draw Term Loan Credit and Guaranty Agreement*, dated November 5, 2021 (the "John Muir Credit Agreement"), under which John Muir agreed to provide a $20,000,000 secured delayed draw term loan.

15.     The payment obligations of the John Muir Credit Agreement are guaranteed by CH East Bay Primary and secured by a general all asset lien against the assets of CH East Bay Med. and CH East Bay Primary, all as set forth in that certain *Security Agreement*, dated November 5, 2021.

16.     As of the Petition Date, the outstanding principal obligations under the John Muir Credit Agreement total approximately $3.9 million.

17.     CH East Bay Med. and CH East Bay Primary do not operate any primary care or urgent care clinics. As a result, those entities do not generate any revenues that could be the proceeds of John Muir's collateral. Instead, the clinics that provide services to patients in the East Bay of San Francisco are administered by Carbon Health Medical Group of California or Carbon Health Primary Care of California, and John Muir does not have a security interest against the assets of those entities. In addition, John Muir holds deposit account control agreements for certain bank accounts in the name of either CH East Bay Med. or CH East Bay Primary, but such accounts are dormant

**ii.     Stanford Debt**

18.     Carbon Health South Bay Medical Group, P.C. ("CH South Bay Med."), as borrower, and Carbon Health South Bay Primary Care, P.C. ("CH South Bay Primary"), as guarantor, and Stanford Health Care ("Stanford"), as lender, are party to a *Delayed Draw Term Loan Credit and Guaranty Agreement*, dated May 23, 2022 (the "Stanford Credit Agreement"), under which Stanford agreed to provide a $25,000,000 secured delayed draw term loan.

19.     The payment obligations of the Stanford Credit Agreement are guaranteed by CH South Bay Primary and secured by a general all asset lien against both CH South Bay Med. and CH South Bay Primary, all as set forth in that certain *Security Agreement*, dated May 23, 2022.

20.     As of the Petition Date, the outstanding principal obligations under the Stanford Credit Agreement total approximately $3.8 million.

21.     Similarly, CH South Bay Med. and CH South Bay Primary do not operate any primary care or urgent care clinics. As a result, those entities do not generate any revenues that

could be the proceeds of Stanford's collateral. Instead, the clinics that provide services to patients in the South Bay of San Francisco are administered by Carbon Health Medical Group of California or Carbon Health Primary Care of California, and Stanford does not have a security interest against the assets of those entities. Stanford holds deposit account control agreements for an interest reserve bank account. The Debtors are not intending to use such cash because it is subject to a control agreement and located in a restricted account.

### iii.    Prime Health Debt

22.    Carbon Health Alpha Medical Group of Florida, P.A., Carbon Health Alpha Primary Care of Florida, P.A., Carbon Health Alpha Medical Group of California, P.C., Carbon Health Alpha Primary Care of California, P.C., Carbon Health Alpha Medical Group of Kansas, P.A., and Carbon Health Alpha Primary Care of Kansas, P.A. (collectively, the "Prime Borrowers") and Prime Healthcare Services, Inc. ("Prime"), as lender, are party to a *Credit Agreement*, date October 20, 2021, as amended on May 29, 2024 (the "Prime Credit Agreement"), under which Prime agreed to provide $1,250,000 for each healthcare clinic that is developed by the Prime Borrowers.

23.    The payment obligations under the Prime Credit Agreement are secured by a general all asset lien against the Prime Borrowers, all as set forth in that certain *Security Agreement*, dated October 19, 2021.

24.    As of the Petition Date, the outstanding principal obligations under the Prime Credit Agreement total approximately $7.6 million.

25.    Like the others, the Prime Borrowers do not operate any primary care or urgent care clinics.[3]  As a result, those entities do not generate any revenues that could be the proceeds of

---

[3]    The one clinic in Nevada that billed under one of the Prime Borrowers was closed in August 2024.

Prime's collateral. Instead, the clinics that provide services to patients are administered by Carbon Health Medical Group of California or Carbon Health Primary Care of California, and Prime does not have a security interest against the assets of those entities. In addition, Prime might hold deposit account control agreements for certain bank accounts in the name of certain Prime Borrowers Primary, but such accounts are dormant. In addition, Prime's lien is not perfected because Prime never recorded a UCC-1 statement.

**D.**   **Execution of Judgment Levy**

26.     Pursuant to that certain Writ of Garnishment, dated January 2, 2026, issued to SVB by the Circuit Court in the Fifteenth Judicial Circuit in and for Palm Beach County, Florida Civil Division, in favor of RPT Realty, L.P., a Delaware limited partnership (the "Judgment Creditor") and received by SVB on January 5, 2026, SVB froze the sum of approximately $1.9 million in a bank account (the "Frozen Funds") maintained in the name of Debtor CHT (the "Judgment Levy"). The Judgment Creditor is a former landlord of certain Debtors.

27.     On January 12, 2026, the Prepetition Agent delivered a letter to SVB (with a copy to the Judgment Creditor) challenging the Judgment Levy on the basis that the Frozen Funds constitute the prior existing collateral of the Prepetition Agent.

28.     The Debtors also submit that the Judgment Levy was executed within the 90 days prior to the Petition Date and such execution constitutes an avoidable preferential transfer. The Debtors are prepared to bring an adversary proceeding against the Judgment Creditor in order to avoid the Judgment Levy.

29.     The Debtors therefore dispute that the Judgment Creditor has any valid or enforceable lien against any of the Debtors' assets and the Frozen Funds should be released. The Prepetition Lenders have also asserted that their liens are senior to the Judgement Creditor as proceeds of the Prepetition Lenders' collateral.

**Proposed DIP Facility**

30.     As set forth in the First Day Declaration and the DIP Declarations, the Debtors have limited liquidity to continue business in the ordinary course and satisfy accruing administrative expenses. The Debtors require debtor-in-possession financing and use of Cash Collateral to fund their proposed chapter 11 plan and sale process and ensure the administrative solvency of their estates. Absent the funding available under the DIP Facility and immediate access to Cash Collateral, the Debtors would be unable to sustain operations, pay their employees or vendors, or achieve a successful restructuring through the chapter 11 process. Accordingly, the Debtors have an urgent and immediate need for entry of the Interim Order as requested herein.

31.     The Debtors negotiated with the DIP Lenders and the Prepetition Lenders to develop a 13-week budget approved by such lenders, which sets forth, among other things, projected cash receipts and cash disbursements (the "Approved Budget"), a copy of which is attached as Annex 1 to the Interim Order. The Approved Budget induced the DIP Lenders to commit to the DIP Facility and the Prepetition Lenders to consent to the use of Cash Collateral in light of the Debtors' circumstances. After good faith and arms' length negotiations, the Debtors and the DIP Lenders and the Prepetition Lenders ultimately agreed on the terms of the DIP Facility and consensual use of Cash Collateral.

32.     The Debtors believe that the financing available under DIP Facility, along with consensual access to Cash Collateral, all in accordance with the projections in the Approved Budget, will allow the Debtors to have adequate liquidity to satisfy their accruing administrative expenses during the course of these chapter 11 cases while they pursue a value-maximizing chapter 11 plan and/or sale of their assets, and the Debtors believe that the terms of the proposed financing are reasonable, appropriate, and consistent with market standards.

**A.**    <u>**Financing Efforts**</u>

33.     The Debtors exercised their business judgment in the selection and negotiation of the DIP Facility. Prior to the Petition Date, the Debtors' advisors prepared a teaser describing the DIP loan opportunity and approached various alternative funding sources. None of these potential third party lenders were prepared to offer debtor-in-possession financing to the Debtors, particularly on a junior basis to the existing Prepetition Secured Liens.

34.     The Debtors therefore engaged in good faith, arms-length negotiations with the DIP Lenders and Prepetition Lenders regarding the proposed terms of the DIP Facility and use of Cash Collateral.

35.     The proposed DIP Facility and the authorization to use Cash Collateral as offered by the DIP Lenders and Prepetition Lenders are the best financing options that the Debtors could obtain under the circumstances. Fully unsecured postpetition financing was not available to the Debtors, and other potential sources of debtor-in-possession financing, including on a junior secured basis, were also unavailable.

36.     The Debtors believe that it is essential to the success of their chapter 11 cases, and the culmination of their plan and sale process, that the Debtors receive immediate authority to access the DIP Facility and use Cash Collateral.

**B.**    **Concise Statement Pursuant to**
       <u>**Complex Case Procedures and Bankruptcy Rule 4001**</u>

37.     In accordance with paragraph 8 of the Complex Case Procedures and Bankruptcy Rule 4001(b), the proposed DIP Facility and Interim Order contain the following provisions:[4]

---

[4]    This statement is qualified in its entirety by reference to the applicable provisions of the DIP Loan Documents. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Loan Documents or the DIP Orders, the provisions of the DIP Loan Documents or the DIP Orders, as applicable, will control. Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Interim Order or the DIP Loan Documents, as applicable.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **DIP Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Each of the Debtors. |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Certain lenders from time to time party to the DIP Financing Agreement (collectively, the "Lenders" and each, a "Lender"). |
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Future Solution Investments LLC, a Wyoming limited liability company, as administrative and collateral agent for the Lenders (in such capacities, the "Agent"). |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | Definition of "Maturity Date" in the DIP Financing Agreement means, in respect to the Loans and the other Obligations, the date which is the earliest of:<br>(a)      Thirty-five (35) days after the Petition Date, if the Final DIP Order has not been entered by the Bankruptcy Court on or prior to such date;<br>(b)      the effective date or the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of any plan of reorganization or liquidation in the Chapter 11 Cases for the Borrowers, including any Carbon Health Plan;<br>(c)      the date on which the sale of all or substantially all of the Borrowers' assets and/or Equity Interests, in one or more series of transactions, including any Carbon Health Sale(s), as the case may be, have been consummated under Section 363 of the Bankruptcy Code;<br>(d)      the date that is six (6) months from the date of the DIP Financing Agreement; and<br>(e)      such earlier date on which the Loans and the other Obligations for the payment of money shall become due and payable in accordance with the terms of the DIP Financing Agreement and the other Loan Documents. |
| **DIP Commitments**<br>Bankruptcy Rule 4001(c)(1)(B) | Delayed-draw term loans to the Borrowers (collectively, the "Term Loans" and each, a "Term Loan") in the amount of such Lender's Pro Rata share of Term Loans (not to exceed such Lender's Term Loan Commitment in effect on the Interim Facility Effective Date or the Final Facility Effective Date, as applicable) as follows:<br>(i)      from and after the Interim Facility Effective Date up to the Maturity Date, a delayed-draw term loan in an aggregate original principal amount up to **$9,000,000**; and<br>(ii)      from and after the Final Facility Effective Date up to the Maturity Date, delayed-draw term loans in an aggregate original principal amount up to **$19,500,000** in accordance with, and subject to the timing set forth in, the Approved Budget. |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B) | As specified in Section 4 of the DIP Financing Agreement. |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B) | Definition of "Interest Rate" in the DIP Financing Agreement means for any day a per annum rate of interest equal to 11.5%.<br><br>Upon the occurrence and during the continuation of an Event of Default under the DIP Financing Agreement, all Obligations, including principal, and unpaid Lender Expenses, shall bear interest at a rate per annum equal to the Interest Rate plus three percent (3%) per annum. Such default interest shall be payable on demand and in the event such interest is not paid when due hereunder, delinquent interest shall be added to principal and shall bear interest on interest, compounded at the Interest Rate. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Use of DIP Facility and Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(ii) | To provide working capital and for other general corporate purposes of the Debtors, and to fund the administrative expenses of the Chapter 11 Cases, pursuant to the Approved Budget. |
| **Entities with Interests in Cash Collateral** Bankruptcy Rule 4001(b)(l)(B)(i) | FSI, as lender and agent, and the other lenders under the Prepetition Loan and Security Agreement and related documents, the obligations of which are the Prepetition Secured Obligations. |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) | None. |
| **Budget** Bankruptcy Rule 4001(c)(1)(B) | The Initial DIP Budget is attached as <u>Annex 1</u> to the Interim Order. |
| **Reporting Information** Bankruptcy Rule 4001(c)(l)(B) | Section 7.1 of the DIP Financing Agreement provides for reporting and budgeting information. |
| **Chapter 11 Milestones** Bankruptcy Rule 4001(c)(1)(B) | The DIP Financing Agreement lists the Milestones for events such as the entry of the order approving bid procedures for the sale(s) of the Borrowers' assets and closing of such sale(s) and orders approving a disclosure statement and confirming a chapter 11 plan. |
| **Liens and Priorities** Bankruptcy Rule 4001(c)(l)(B)(i) | Section 2 of the Interim Order specifies the DIP Liens and the DIP Superpriority Claims granted for the benefit of the Lenders. The term "<u>DIP Collateral</u>" means all of each Borrower's right, title, and interest in, to and under all such Borrower's personal property and other assets, including, without limitation, the following whether now existing or hereafter acquired: (a) all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, investment property, (including, without limitation, all equity interests owned by such Borrower in its current and future subsidiaries), commercial tort claims, claims under insurance policies for the benefit of officers and directors, arbitration awards, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, fixtures, all interests in leaseholds and real properties, all patents, copyrights, trademarks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), together with all books and records relating to the foregoing, all proceeds, and all products, accessions, rents and profits of or in respect of any of the foregoing (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New York), (b) all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of the foregoing and any proceeds thereof, and (c) subject to entry of the Final Order, any proceeds or property recovered as a result of any claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, the "<u>Avoidance Actions</u>"), whether by judgment, settlement or otherwise (the "<u>Avoidance Proceeds</u>"); provided, however, that notwithstanding anything to the contrary in this Interim Order or the DIP Financing Agreement, the term "DIP Collateral" and any components thereof) shall exclude all |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Excluded Assets (as defined in the DIP Financing Agreement) and shall not include Avoidance Actions themselves. |
| **Carve Out** <br> Bankruptcy Rule 4001(c)(1)(B) | Section 2.6 of the Interim Order defines the Carve-Out. |
| **Challenge Period** <br> Bankruptcy Rule 4001(c)(l)(B) | Section 11.1 of the Interim Order sets forth a customary challenge period for any objection that seeks to challenge the existence, validity, perfection, enforceability, non-avoidability, priority, or amount of Prepetition Lien and Claim Matters. |
| **Adequate Protection** <br> Bankruptcy Rules 4001(b)(l)(B)(iv), <br> 4001(c)(1)(B)(ii) | Section 12 of the Interim Order sets forth the Adequate Protection Liens and the Adequate Protection Superpriority Claims granted as adequate protection to the Prepetition Secured Parties. |
| **Events of Default** <br> Bankruptcy Rule 4001(c)(l)(B) | Section 9 of the DIP Financing Agreement defines and lists "Events of Default." |
| **Waiver/Modification of the Automatic Stay** <br> Bankruptcy Rule 4001(c)(1)(B)(iv) | Section 7.4 of the Interim Order contemplates that the automatic stay imposed by section 362(a) of the Bankruptcy Code will be modified, to the extent necessary, to implement and effectuate the terms and conditions of the Interim Order. |
| **Indemnification** <br> Bankruptcy Rule 4001(c)(1)(B)(ix) | Section 6.3 of the DIP Financing Agreement contemplates that the Borrowers indemnify and hold harmless the Agent and the Lenders. |

## C. <u>Statement Regarding Significant Provisions</u>

38.   In accordance with paragraph 8 of the Complex Case Procedures, the Debtors

disclose as follows:

(i) ***Plan Confirmation Milestone***. The DIP Facility contemplates deadlines for entry of a Disclosure Statement Order and entry of a Sale Order or Confirmation Order.

(ii) ***DIP Roll-Up Obligations***. The DIP Facility does not contemplate any roll-up obligations.

(iii) ***No-Cross Collateralization***. The DIP Facility does not contemplate the cross-collateralization of prepetition obligations, except to the extent of any diminution in value.

(iv) ***Requirement that Postpetition Loans Be Used to Repay Prepetition Debt***. The DIP Facility does not contemplate that DIP Obligations will be used to repay any prepetition obligations.

(v)     ***Liens on Proceeds of Avoidance Actions***. The DIP Collateral includes proceeds of avoidance actions provided that an appropriate Final Order is entered.

(vi)    ***Default Provisions and Remedies***. Upon the occurrence and during the continuance of an Event of Default, (i) the Debtors shall be bound by all restrictions, prohibitions, and other terms as provided in the Interim Order and the DIP Loan Documents, (ii) the DIP Agent, on behalf of itself and the DIP Lenders, shall be entitled to take any act or exercise any right or remedy (subject to Section 7.4 of the Interim Order) as provided in the Interim Order or the DIP Loan Documents, and (iii) subject to Section 7.4 of the Interim Order, the Debtors' right to use Cash Collateral shall thereupon and without further action of any kind terminate pending further order of the Court; *provided, however*, that none of the foregoing shall restrict the payment of the Carve-Out or post-petition accrued and unpaid payroll expenses to the extent set forth in the Budget as of the date of such Event of Default. The DIP Agent and the DIP Lenders shall have no obligation to lend or advance any additional funds to or on behalf of the Debtors, or to provide any other financial accommodations to the Debtors, immediately upon the occurrence of any act, event, or condition that, with the giving of notice or the passage of time, or both, would constitute an Event of Default, except to the extent to fund the Carve-Out and post-petition accrued and unpaid payroll expenses to the extent set forth in the Budget as of the date of such Event of Default.

(vii)   ***Limitations on the Use of Cash Collateral***. None of the proceeds of the Loans, portion of the Carve-Out, cash collateral, or other DIP Collateral proceeds may be used for any purpose prohibited by the Interim Order or the Final Order, as applicable, including to challenge, as opposed to investigate, the validity, perfection, priority, extent, or enforceability of the DIP Financing Agreement and any other Loan Documents, the Prepetition Loan Documents, or the liens or security interests securing the obligations under the DIP Financing Agreement and any other Loan Documents, the Prepetition Loan and Security Agreement, or any other Prepetition Loan Documents or to pursue any causes of action of any kind against the Agent, any Lender, the Prepetition Agent, or any Prepetition Lender solely in their respective capacities as agent or lenders under the DIP Financing Agreement and any other Loan Documents or the Prepetition Loan and Security Agreement and any other Prepetition Loan Documents, as applicable, or to object to or to oppose any action authorized under the DIP Financing Agreement or under the Interim Order and the Final Order, as applicable, and the Borrowers waive their right to challenge and investigate each of the foregoing. No more than **$50,000** of any proceeds under the DIP Financing Agreement, any DIP Collateral (including cash collateral), or the Carve-Out may be used by any official committee of unsecured

creditors appointed in these chapter 11 cases to investigate (but not to prosecute) the validity, perfection, priority, extent, or enforceability of the Prepetition Loan Documents or the liens or security interests securing the obligations under the Prepetition Loan Documents; *provided* that any party in interest with standing and requisite authority shall have the right to commence any action against the Prepetition Agent and/or the Prepetition Lenders within sixty (60) days from the date of formation of an official committee of unsecured creditors, as may be extended, in writing, by the Prepetition Agent in its sole discretion.

(viii) ***Priming Liens.*** The DIP Financing Agreement contemplates that the liens in favor of the DIP Facility shall be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually or otherwise, including, without limitation, the Prepetition Secured Liens, liens or interests granted in favor of third parties in conjunction with section 363, 364 or any other section of the Bankruptcy Code or other applicable law, but subject only to the Carve-Out (as defined on the DIP Orders) and Permitted Prior Liens (as defined in the DIP Financing Agreement).

(ix) ***No Limitation on the Ability of Estate Fiduciaries to Fulfill their Duties.*** Except insofar as the Interim Order contains restrictions on the use of the Carve-Out, proceeds from the DIP Facility, and Cash Collateral as described above, there is no further limitation on the ability of estate fiduciaries to fulfill their duties.

**D.**    **Need for Financing and Use of Cash Collateral**

39.    As described herein, the Debtors have an immediate and critical need to use Cash Collateral and obtain the DIP Facility to, among other things:  (a) pay the fees, costs, and expenses incurred in connection with these chapter 11 cases, (b) fund any obligations benefitting from the Carve-Out, (c) permit the orderly continuation of the operation of the Debtors' businesses, (d) maintain business relationships with patients, vendors, and suppliers, (e) make payroll, and (f) satisfy other working capital and operational needs. The Debtors' ability to maintain business relationships with their patients, vendors, and suppliers requires the availability of working capital from the DIP Facility and Cash Collateral, the absence of which would immediately and irreparably harm the Debtors, their estates, and parties in interest. The Debtors do not have

sufficient available sources of working capital and financing to operate their business in the ordinary course throughout these chapter 11 cases without access to the DIP Facility and authorized use of Cash Collateral. In the absence of the DIP Facility and the use of Cash Collateral, the Debtors' business and estates would suffer immediate and irreparable harm. Access to the DIP Facility and Cash Collateral will provide the Debtors with sufficient working capital and liquidity to operate during these chapter 11 cases and is vital to the continuation of the Debtors' ongoing chapter 11 plan and sale process. Without access to the DIP Facility and Cash Collateral, the Debtors would run out of money and their ability to maintain operations and value will be significantly impaired.

40.     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors also are unable to obtain secured credit allowable under sections 364(c)(1)–(3) of the Bankruptcy Code without granting to the DIP Lenders the DIP Obligations, in each case subject to the Carve-Out to the extent set forth herein, under the terms and conditions set forth in the Interim Order and the DIP Loan Documents.

## Basis for Relief

## I.     The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code

41.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(l) of this title as an administrative expense."  11 U.S.C. § 364(c).

42.     In evaluating proposed postpetition financing under section 364(c) of the

Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors,

including whether:

>   a.     unencumbered credit or alternative financing without superpriority status is available to the debtor;
>
>   b.     the credit transactions are necessary to preserve assets of the estate;
>
>   c.     the terms of the credit agreement are fair, reasonable, and adequate;
>
>   d.     the proposed financing agreement was negotiated in good faith and at arm's length, and entry thereto is an exercise of sound and reasonable business judgment and in the best interests of the debtor's estate and its creditors; and
>
>   e.     the proposed financing agreement adequately protects the lender.

*See, e.g.*, *In re Aqua Assocs.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors

in making a determination under section 364(c)).

43.     For the reasons discussed below, the Debtors satisfy the standards required to obtain

postpetition financing in these chapter 11 cases on a senior secured superpriority basis as to the

DIP Collateral under sections 364(c)(1), (c)(2), and (d)(1) of the Bankruptcy Code.

**II.     The Debtors are Unable to Obtain Financing on More Favorable Terms**

44.     As described herein and in the First Day Declaration and the DIP Declarations, the

Debtors have carefully considered their financing options, and no alternative higher or better viable

financing offers are available. The Debtors have thus determined that the DIP Facility provides the

Debtors with the best postpetition financing option available and should be approved.

45.     The Debtors respectfully submit that their efforts to obtain postpetition financing

satisfy the standard required under section 364(c) of the Bankruptcy Code. *See, e.g.*, *In re Sky*

*Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (finding that, where few lenders can or

will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

## III.     The Proposed DIP Facility is Necessary
to Maximize the Value of the Debtors' Estates

46.      The Debtors seek to use the DIP Facility for general working capital purposes, ordinary business expenses such as payroll, and bankruptcy-related costs and expenses, in accordance with the Approved Budget, to maximize value through an orderly chapter 11 plan and sale process. The DIP Facility represents the best economic alternative for a new debtor-in-possession lending arrangement.

47.      Without immediate use of Cash Collateral and access to DIP Facility, the Debtors cannot continue to operate their business, which would irreparably damage the Debtors' efforts to effectuate a chapter 11 plan and/or a sale for the benefit of all constituents. Accordingly, the Debtors request authority to access the DIP Facility and use Cash Collateral on the terms contemplated herein.

## IV.     The Terms of the Proposed DIP Facility are Fair, Reasonable, and Appropriate

48.      In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also In re Ellingsen MacLean Oil Co.*, 65 B.R. 358, 365 (W.D. Mich. 1986) (stating that debtors may have to enter into hard bargains to acquire funds).

49.      The terms of the DIP Facility were negotiated in good faith and at arm's length between the Debtors, the DIP Lenders, and the Prepetition Lenders, resulting in an agreement that is designed to permit the Debtors to maximize the value of their assets. The Debtors submit that the proposed terms of the DIP Facility are fair, reasonable, and appropriate under the

circumstances. *See, e.g., In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender); *In re W. Pac. Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997) (authorizing postpetition financing that would preserve the value of the debtor's assets). Further, the DIP Lenders consent to the DIP Facility on the terms set forth in the DIP Loan Documents, and the Prepetition Lenders consent to the use of Cash Collateral. Accordingly, the terms of the DIP Facility represent an appropriate exercise of the Debtors' business judgment and should be approved.

## V.   <u>The Carve-Out is Appropriate</u>

50.     The DIP Obligations, along with prepetition liens and claims, are subject and subordinate to the Carve-Out, which contains similar terms to others that this Court has found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from their advisors. Without the Carve-Out, the Debtors' estates may be deprived of possible rights and powers if the services for which professionals may be compensated are restricted. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of these cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees. Accordingly, the Carve-Out is appropriate and should be approved.

## VI.   <u>The DIP Lenders Should Be Deemed Good Faith Lenders</u>

51.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

52.     The Debtors believe the DIP Facility embodies the most favorable terms on which the Debtors could obtain postpetition financing. All negotiations of the terms of the DIP Facility with the DIP Lenders were conducted in good faith and at arms' length. The terms and conditions of the DIP Loan Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code and in accordance with the proposed DIP Orders and the DIP Loan Documents, including the Approved Budget. Any consideration being provided to any of the DIP Lenders is described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded thereby.

## VII.   The Proposed DIP Facility Reflects the Debtors' Sound Business Judgment

53.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (approving postpetition financing on an interim basis as an exercise of the debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38

(stating that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

54.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. *See, e.g.*, *Grp. of Inst. Inv'rs v. Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the debtor's business judgment); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."). Further, as one court has noted, "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

55.     Bankruptcy courts generally defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *See In re Curlew Valley Assocs.*, 14 B.R. 506, 511–13 (Bankr. D. Utah 1981); *see also Trans World Airlines, Inc.*, 163 B.R. at 974 (approving an interim loan, receivables facility, and asset-based facility based on the debtor's prudent business judgment). Generally, courts will not second-guess a debtor's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley*, 14 B.R. at 513–14.

56.     The Debtors believe that the economics underlying the DIP Facility are fair and reasonable and are consistent with, or better than, market norms. For these reasons and those set forth herein and in the First Day Declaration and the DIP Declarations, the Debtors' exercise of their business judgment supports approval of the DIP Facility. Use of Cash Collateral and access

to the DIP Facility will allow the Debtors to continue to operate, thus maximizing value for all of their constituents.

**VIII.    Section 363 of the Bankruptcy Code Authorizes the Debtors' Use of Cash Collateral**

57.    Section 363(c) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless: "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use . . . in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

58.    Neither section 361 nor any other provision of the Bankruptcy Code defines the nature and extent of the "interest in property" of which a secured creditor is entitled to adequate protection under section 361. However, the statute plainly provides that a qualifying interest demands protection only to the extent that the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such property." 11 U.S.C. §§ 361, 363(e); *see also General Elec. Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.)*, 25 B.R. 987, 989-90 & n.4 (Bankr. D. Utah 1982).

59.    The phrase "value of such entity's interest," although not defined in the Bankruptcy Code, was addressed by the Supreme Court in the landmark *Timbers* decision. *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs, Ltd.*, 484 U.S. 365, 108 S.Ct. 626 (1988). For the meaning of "value of such entity's interest," the Supreme Court was guided by section 506(a), which defines a creditor's allowed secured claim: "The phrase 'value of such creditor's interest' in § 506(a) means 'the value of the collateral.' H.R. Rep. No. 950-595, pp. 181, 356 (1977); see also S. Rep. No. 95-989, p. 68 (1978), U.S. Code Cong. & Admin. News, 1978

pp. 5787, 5854, 6141, 6312. We think the phrase 'value of such entity's interest' in § 361(1) and (2), when applied to secured creditors, means the same." *Id.* at 630 (emphasis added).

60.     *Timbers* teaches that a secured creditor is entitled to "adequate protection" only against diminution in the value of the collateral securing the creditor's allowed secured claim. Under *Timbers*, therefore, where the "value of the collateral" is not diminishing by its use, sale, or lease, the creditor's interest is adequately protected. This conclusion flows directly from the equivalency of "value of such entity's interests" with "value of the collateral."

61.     Here, the DIP Lenders and the Prepetition Lenders consent to the use of Cash Collateral on the terms set forth in the Interim Order and to be set forth in the Final Order.

62.     Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 14-day period following the filing of a motion requesting authorization to use cash collateral only as is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., In re Simasko Prod. Co.*, 47 B.R. at 449; *In re Ames Dep't Stores Inc.*, 115 B.R. at 38. After the 14-day period, the request for use of cash collateral is not limited to those amounts necessary to prevent harm to the debtor's business.

63.     In order to continue operating and satisfy accruing administrative expenses, the Debtors require access to the DIP Facility and the use of Cash Collateral. Such use will provide the Debtors with the necessary funds to remain administratively solvent while the Debtors pursue a value-maximizing chapter 11 plan and/or sale of their assets.

64.     Absent access to Cash Collateral, the Debtors would face immediate and irreparable harm. The Debtors would likely be forced to cease operations and convert these chapter 11 cases

to cases under chapter 7 of the Bankruptcy Code, leading to substantial destruction of value. Therefore, immediate access to Cash Collateral is essential to the Debtors' ability to maximize value for the benefit of all constituents.

## IX.     The Automatic Stay Should Be Modified on a Limited Basis

65.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Agent, on behalf of itself and the DIP Lenders, among other things, to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order. The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant liens to the DIP Agent, on behalf of itself and the DIP Lenders, and the Prepetition Agent, on behalf of itself and the Prepetition Lenders, and to incur all liabilities and obligations set forth in the Interim Order. The automatic stay should be modified to allow the Debtors, the DIP Agent and the DIP Lenders to effectuate the terms of the Interim Order.

## Approval of Interim Relief

66.     Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than 14 days after the service of such motion. However, upon request the Court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). Section 363(c)(3) of the Bankruptcy Code authorizes the Court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]."  11 U.S.C. § 363(c)(3). Moreover, the

Complex Case Procedures provide that on motion by a debtor, a hearing will "routinely be conducted as a first-day hearing to consider either cash collateral use and/or interim debtor-in-possession financing."  Complex Case Procedures ¶ 5.

67.     The Debtors require immediate access to the DIP Facility and Cash Collateral to, among other things, avoid disruption to the Debtors' businesses and to the operation and maintenance of the Debtors' properties, maintain ordinary-course relationships with patients, vendors, and suppliers, support orderly case administration, allow the Debtors to meet their working capital needs in the ordinary course, communicate a solid financial position despite these chapter 11 cases, and pay the fees and expenses of administering these chapter 11 cases. Given the immediate and irreparable harm to be suffered by the Debtors, their estates, and their creditors absent interim relief, the Debtors request that, pending the Final Hearing, the Court schedule an interim hearing within one day of the Petition Date or as soon thereafter as practicable to consider the interim relief requested in this Motion.

## Request for a Final Hearing

68.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing within thirty-five (35) days following entry of the Interim Order and fix the time and date before the Final Hearing for parties to file objections to this Motion.

## Emergency Consideration

69.     The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003 and Local Rule 9013-1, which authorize the Court to grant relief within the first 21 days after the commencement of a chapter 11 case to the extent that relief is necessary to avoid immediate and irreparable harm. As described herein and in the First Day Declaration and the DIP Declarations, immediate and irreparable harm would result if the relief requested herein

is not granted. Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

70.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

71.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with the Bankruptcy Rules and Local Rules. The Debtors will provide notice of this Motion to the following parties, or their counsel if known:  (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the parties holding secured claims against the Debtors; (d) the United States Attorney's Office for the Southern District of Texas; (e) the Internal Revenue Service; (f) the state attorneys general for states in which the Debtors conduct business; (g) governmental agencies having a regulatory or statutory interest in these cases; (h) the DIP Lenders; (i) the Prepetition Secured Parties; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Local Rule 9013-1(d). No other or further notice is needed in light of the nature of the relief requested.

*[Remainder of Page Intentionally Left Blank]*

## No Prior Request

72.     No prior request for the relief sought herein has been made to this Court or any other court.

**WHEREFORE**, the Debtors respectfully request entry of the Interim Order and, after the Final Hearing, the Final Order, granting the relief requested herein and such other relief as the Court deems just and proper.

Dated: February 2, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Maxim B. Litvak*

Maxim B. Litvak (SBT 24002482)
Theodore S. Heckel (SBT 24133488)
700 Louisiana Street, Suite 4500
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile:  (713) 691-9407
mlitvak@pszjlaw.com
theckel@pszjlaw.com

-and-

Debra I. Grassgreen (*pro hac vice* pending)
John W. Lucas (*pro hac vice* pending)
One Sansome Street, 34th Floor, Suite 3430
San Francisco, CA 94104
Telephone: (415) 263-7000
Facsimile:  (415) 263-7010
dgrassgreen@pszjlaw.com
jlucas@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## Certificate of Service

I certify that on February 2, 2026 I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Maxim B. Litvak*

Maxim B. Litvak