**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| CARBON HEALTH TECHNOLOGIES, INC., et al., | Case No. 26-90306 (CML) |
| Debtors.[1] | (Joint Administration Requested) |

**DECLARATION OF KEREM OZKAY IN SUPPORT OF THE
DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, Kerem Ozkay, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Executive Officer ("CEO"), the Chief Operating Officer ("COO") and the Chief Marketing Officer of Carbon Health Technologies, Inc. ("CHTI").  I have served as the CEO since August of 2024 and the COO since January of 2023 and as the Senior Vice President of Marketing since August of 2019. Previously, from June of 2008 to June of 2019, I served in various marketing roles for Z Gallerie culminating in the role of Vice President of Marketing and head of eCommerce.

2.      On February 2, 2026 (the "Petition Date"), CHTI, together with its affiliates (collectively, the "Debtors"), commenced these cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

---

[1]   A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/CarbonHealth.The location of Carbon Health Technologies, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 500 East Remington Drive, Suite 20, Sunnyvale, CA 94087.

3.     I submit this declaration to provide an overview of the Debtors' business, the Chapter 11 Cases, and in support of the Debtors' "first day" applications and motions (collectively, the "First Day Pleadings").[2]  I am over the age of 18, competent to testify, and authorized to submit this declaration on behalf of the Debtors.

4.     In my roles as CEO and COO, I am familiar with the Debtors' businesses, financial affairs, and day-to-day operations. Except as otherwise noted, I have personal knowledge of the matters set forth herein.  All facts set forth in this declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management and the Debtors' employees, my review of relevant documents, and/or my opinion based on my experience and knowledge of the Debtors' operations and financial condition.   In making this declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing this declaration.  If I were called to testify as a witness in this matter, I could and would testify competently to the facts set forth herein.

## I.

## PRELIMINARY STATEMENT

5.     CHTI is a health technology and management services organization ("MSO").  CHTI provides non-clinical, administrative, and operational support to urgent care and primary care medical service providers (the "Physician Owned Debtors") at approximately 93 locations across eight states. CHTI also supports other clients through its strategic partnerships and operating system.   The Physician Owned Debtors provide comprehensive healthcare services, including urgent care, primary case, pediatric care, workplace health and clinical research, complemented with virtual care access.

---

[2] Capitalized terms used but not defined herein shall have the meanings set forth in the applicable First Day Pleadings.

Together, the Debtors provide a fully integrated primary and urgent care system that serves as the entry path for many consumers of medical care.

6.     Since their founding, the Debtors have provided quality healthcare to their patients. Through their proprietary software system (described further below), the Debtors enhance the patient experience by streamlining access to care, reducing wait times, simplifying scheduling, and supporting a more personalized and patient-friendly care delivery model.  The Debtors' system helps physicians and care teams work more efficiently by simplifying scheduling, billing, and day-to-day operations so they can focus on the care that matters to patients. The Debtors' objective is to provide high-quality health care that couples a "patient first" consumer-grade experience with efficiency and productivity on the provider side.

7.     In light of ongoing liquidity constraints arising from a cost structure built to support a larger enterprise in a materially different capital markets environment, the Debtors commenced these Chapter 11 Cases to implement an operational and balance sheet restructuring while preserving continuity of patient care. While the Debtors' aggregate revenues in 2025 are lower than in 2024, that reduction is primarily attributable to the deliberate sale of clinics and the wind-down of certain programs undertaken to reduce indebtedness and right-size the business, rather than a decline in underlying demand.

8.     Following months of extensive good faith and arm's length negotiations, the Debtors and the Agent[3] reached agreement on the terms of a dual-track comprehensive restructuring process

---

[3]   As used herein, the term "Agent" means Future Solution Investments LLC, in its capacity as agent for: (i) the lenders (the "Prepetition Lenders") under that certain *Loan and Security Agreement*, dated as of November 14, 2025 (as amended, restated, amended and restated, modified, or supplement from time to time, the "Prepetition Loan and Security Claims") (the claims arising thereunder, the "Prepetition Secured Claims"), and (ii) the lenders (the "DIP Lenders") under that certain *Senior Secured Superpriority Debtor-In-Possession Financing Agreement*, dated as of February 2, 2026 (as amended in accordance with the terms thereof and any orders of the Court related thereto) (the claims arising thereunder, the "DIP Claims").

that would enable the Debtors to pursue in parallel confirmation of a chapter 11 plan premised on a debt-for-equity exchange (the "Plan") and conduct a postpetition marketing and sale process for their assets, in whole or in part (the "Assets"), in one or more sale transactions (each, a "Sale Transaction").

9.      Through these Chapter 11 Cases, the Debtors will continue the extensive prepetition marketing process for the sale of some or all of their assets while also pursuing confirmation of the Plan supported by the Prepetition Lenders who are also the proposed DIP Lenders (in both capacities, the "Lenders").  Accordingly, in addition to routine first day motions, the Debtors have filed the Bid Procedures Motion (defined below) requesting that the Court establish procedures for the sale of some or substantially all of their Assets.

10.     Shortly after the Petition Date, the Debtors plan to file the proposed combined Plan and disclosure statement. As stated in more detail below, the Plan provides for an internal reorganization where the Lenders exchange their secured debt (or a portion thereof) for equity in the reorganized Debtors in the event that there is not an acceptable Sale Transaction for substantially all of the Debtors' enterprise.

11.     This declaration is organized in three sections to familiarize the Court with the Debtors and the relief they seek on the first day of the Chapter 11 Cases.  The first section provides background information with respect to the Debtors' business and corporate history, as well as their prepetition capital structure.  The second section describes the circumstances surrounding the commencement of the Chapter 11 Cases and the Debtors' plan of action in the Chapter 11 Cases.  The last section sets forth or incorporates the relevant facts in support of each of the First Day Pleadings.

## II.

## GENERAL BACKGROUND

**A.    The Debtors' Businesses**

      **a.    Overview**

12.    The Debtors provide a fully integrated primary and urgent care system to over 800,000 patients each year.   The Debtors utilize a proprietary software platform, CarbyOS, to execute a digital strategy that enhances patient engagement and drives operating efficiency.   The CarbyOS platform enables the Debtors to provide a flexible range of services tailored to patient needs across locations while maintaining consistent and efficient operations.

13.    CHTI was founded in San Francisco in 2015 and is currently headquartered in Sunnyvale, California.   CHTI began as a software platform and mobile application development company for medical records, tele-health, doctor-patient messaging and scheduling.   At the time, CHTI's goal was to build software for medical practices.

14.    Soon after being founded, CHTI expanded into clinic care for patients.   In 2017, the Debtors launched their first urgent care clinics in the San Francisco Bay Area. In the years that followed, through a series of strategic partnerships and geographic expansion, the Debtors grew an extensive network of clinics in the United States, currently consisting of approximately 93 clinics across eight states with approximately 480 health care providers and approximately 1,400 employees. The Debtors seek to grow by expanding the number of providers using CHTI's technology to operate clinics more efficiently, while delivering high-quality patient care on a sustainable and profitable basis.

            **b.**       **Corporate Structure and Operations**

15.     CHTI is a privately owned company incorporated in Delaware. CHTI has approximately 41 active subsidiaries and affiliates, 28 of which are Debtors in these cases.[4] An organizational chart is attached hereto as **Exhibit A**.

16.     As of the Petition Date, the Debtors operate approximately 93 urgent care or primary care clinics in the states of Texas, Washington, California, Colorado, Kansas, Missouri, New Jersey and Massachusetts.

            **c.**       **Financial Condition**

17.     The Debtors recorded revenues of approximately $166 million in 2024 and approximately $154 million for the trailing twelve months ended November 30, 2025. CHTI's principal assets are the CarbyOS software platform, rights under its contracts with the Physician Owned Debtors, cash and receivables, and furniture, fixtures and equipment. In most instances, the Physician Owned Debtors hold real property leases; in a few locations, CHTI holds the leases used by the Physician Owned Debtors.

            **d.**       **Key Employees**

18.     The Debtors' leadership team includes:

- Kerem Ozkay (Chief Executive Officer & Chief Operating Officer)

- Sujal Mandavia (Chief Medical Officer)

- Eren Bali (Chief Technology Officer)

- Ian Toner (Vice President of Clinical Operations and Program Development)

- Christina Solomon (Vice President of Strategy and Chief of Staff for CEO)

---

[4] CHTI has three foreign subsidiaries: (a) Carbon Health Colombia S.A.S, a Colombian corporation, (b) Carbon Health Turkiye, a Turkish corporation, and (c) Avante Limited, a United Arab Emirates corporation. No foreign subsidiary is a Debtor in these Chapter 11 Cases.

19.     As of the Petition Date, CHTI's board of directors consists of the following five members:

- Robert Warshauer (independent)

- Eren Bali

- Alex James

- James Kim

20.     Mr. Warshauer is an independent director and was appointed to CHTI's board shortly prior to the Petition Date. He also is the sole member of the strategic transactions committee of the board charged with soliciting, evaluating, negotiating and making recommendations to the board regarding strategic transactions involving the Debtors.

21.     As addressed further below, Sujal Mandavia is the sole owner and officer of all the Physician Owned Debtors except one. Caesar Djavaherian is the sole owner and officer of Djavaherian Medical Practice, PLLC.

## III.

## THE DEBTORS' CAPITAL STRUCTURE[5]

### A.     Secured Term Debt

22.     The Debtors and the Agent are party to the Prepetition Loan and Security Agreement dated as of November 14, 2025, under which the Prepetition Lenders originally advanced to CHTI an initial term loan in the original principal amount of $10,000,000.

23.     On November 24, 2025, CHTI, certain of the Physician Owned Debtors, the Prepetition Agent and the Prepetition Lenders amended the Prepetition Loan and Security Agreement, to provide for an additional term loan in the original principal amount of $61,926,948.67, the proceeds

---

[5]    Defined terms used in this section have the same meaning ascribed in DIP Financing Motion (as defined below).

of which were used to pay off CHTI's secured credit facility with Fearless Capital Management, LLC, as successor-in-interest to Hercules Capital, Inc., in its capacity as administrative agent and collateral agent.

24.     On January 20, 2026, CHTI, certain of the Physician Owned Debtors, the Prepetition Agent, and the Prepetition Lenders further amended the Prepetition Loan and Security Agreement to provide for an additional term loan in the original committed principal amount of $6,000,000.

25.     As of the Petition Date, the applicable Debtors were indebted and liable to the Prepetition Secured Parties under the Prepetition Loan Documents, for (a) an aggregate principal amount of not less than $77 million, and (b) accrued and unpaid interest, fees, and costs, expenses (including any reasonable attorneys' and financial advisors' fees), charges, indemnities, all obligations incurred or accrued with respect to the foregoing pursuant to, and in accordance with, the Prepetition Loan Documents and all other Secured Obligations (as defined in the Prepetition Loan and Security Agreement) (including, without limitation, the Exit fee and the MOIC Amount (each as defined therein)).

26.     The obligations under the Prepetition Loan Documents are secured by first priority liens on substantially all of CHTI's assets, including, but not limited to, goods, accounts, equipment, inventory, investment property, general intangibles (including intellectual property), cash, deposit accounts, and rights to payment and proceeds from the sale, licensing or disposition of all or any part, or rights, in, intellectual property, all as set forth in the Prepetition Loan Documents. The obligations under the Prepetition Loan Documents are also secured by the accounts, cash and deposit accounts, books and records related to the foregoing, and proceeds thereof of certain of the Physician Owned Debtors.

**B.** **Clinic Level Secured Debt**

27.     Certain of the Debtors borrowed from three separate lenders for the purpose of developing and opening primary care and urgent care clinics in various locations around the country.

  **a.** **John Muir Debt**

28.     Carbon Health East Bay Medical Group, P.C. ("CH East Bay Med."), as borrower, and Carbon Health East Bay Primary Care, P.C. ("CH East Bay Primary"), as guarantor, and John Muir Health ("John Muir"), as lender, are party to a *Delayed Draw Term Loan Credit and Guaranty Agreement*, dated November 5, 2021 (the "John Muir Credit Agreement"), under which John Muir agreed to provide a $20,000,000 secured delayed draw term loan.

29.     The payment obligations of the John Muir Credit Agreement are guaranteed by CH East Bay Primary and secured by a general all asset lien against the assets of CH East Bay Med. and CH East Bay Primary, all as set forth in that certain *Security Agreement*, dated November 5, 2021.

30.     As of the Petition Date, the outstanding principal obligations under the John Muir Credit Agreement totals approximately $3.9 million.

31.     CH East Bay Med. and CH East Bay Primary do not operate any primary care or urgent care clinics. As a result, those entities do not generate any revenues that could be the proceeds of John Muir's collateral. Instead, the clinics that provide services to patients in the East Bay of San Francisco are administered by Carbon Health Medical Group of California or Carbon Health Primary Care of California, and John Muir does not have a security interest against the assets of those entities. In addition, John Muir holds deposit account control agreements for certain bank accounts in the name of either CH East Bay Med. or CH East Bay Primary, but such accounts are dormant.

       **b.**     **Stanford Debt**

32.     Carbon Health South Bay Medical Group, P.C. ("<u>CH South Bay Med.</u>"), as borrower, and Carbon Health South Bay Primary Care, P.C. ("<u>CH South Bay Primary</u>"), as guarantor, and Stanford Health Care ("<u>Stanford</u>"), as lender, are party to a *Delayed Draw Term Loan Credit and Guaranty Agreement*, dated May 23, 2022 (the "<u>Stanford Credit Agreement</u>"), under which Stanford agreed to provide a $25,000,000 secured delayed draw term loan.

33.     The payment obligations of the Stanford Credit Agreement are guaranteed by CH South Bay Primary and secured by a general all asset lien against both CH South Bay Med. and CH South Bay Primary, all as set forth in that certain Security Agreement, dated May 23, 2022.

34.     As of the Petition Date, the outstanding principal obligations under the Stanford Credit Agreement totals approximately $3.8 million.

35.     Similarly, CH South Bay Med. and CH South Bay Primary do not operate any primary care or urgent care clinics. As a result, those entities do not generate any revenues that could be the proceeds of Stanford's collateral. Instead, the clinics that provide services to patients in the South Bay of San Francisco are administered by Carbon Health Medical Group of California or Carbon Health Primary Care of California, and Stanford does not have a security interest against the assets of those entities. Stanford holds deposit account control agreements for an interest reserve bank account. The Debtors are not intending to use such cash because it is subject to a control agreement and located in a restricted account.

       **c.**     **Prime Health Debt**

36.     Carbon Health Alpha Medical Group of Florida, P.A., Carbon Health Alpha Primary Care of Florida, P.A., Carbon Health Alpha Medical Group of California, P.C., Carbon Health Alpha Primary Care of California, P.C., Carbon Health Alpha Medical Group of Kansas, P.A., and Carbon

Health Alpha Primary Care of Kansas, P.A. (collectively, the "Prime Borrowers") and Prime Healthcare Services, Inc. ("Prime"), as lender, are party to a *Credit Agreement*, date October 20, 2021, as amended on May 29, 2024 (the "Prime Credit Agreement"), under which Prime agreed to provide $1,250,000 for each healthcare clinic that is developed by the Prime Borrowers.

37.     The payment obligations under the Prime Credit Agreement are secured by a general all asset lien against the Prime Borrowers, all as set forth in that certain *Security Agreement*, dated October 19, 2021.

38.     As of the Petition Date, the outstanding principal obligations under the Prime Credit Agreement totals approximately $7.6 million.

39.     Like the others, the Prime Borrowers do not operate any primary care or urgent care clinics.[6] As a result, those entities do not generate any revenues that could be the proceeds of Prime's collateral. Instead, the clinics that provide services to patients are administered by Carbon Health Medical Group of California or Carbon Health Primary Care of California, and Prime does not have a security interest against the assets of those entities. In addition, Prime might hold deposit account control agreements for certain bank accounts in the name of certain Prime Borrowers Primary, but such accounts are dormant. In addition, Prime's lien is not perfected because Prime never recorded a UCC-1 statement.

## C.     **Unsecured Debt**

40.     As of the Petition Date, the Debtors estimate that they owe approximately $36 million in unsecured obligations, primarily to trade creditors arising in the ordinary course of business operations and including approximately $7 million of unsecured promissory notes.

---

[6] The one clinic in Nevada that billed under one of the Prime Borrowers was closed in August 2024.

## D.    Equity Interests

41.    CHTI's amended and restated certificate of incorporation, as amended, authorizes the issuance of 295,022,359 shares of common stock and 175,893,445 shares of preferred stock.

42.    As of the Petition Date, there were 137,595,516 shares of common stock issued and outstanding and there were 83,463,228 shares of preferred stock issued and outstanding.

43.    Under laws regulating the corporate practice of medicine and the MSO Agreements, the Physician Owned Debtors are each solely owned by a licensed physician, Dr. Sujal Mandavia.

44.    Dr. Madavia is a board-certified emergency medicine physician and also serves as the Chief Medical Officer of CHTI.  Each Physician Owned Debtor is party to a respective Management Services Agreement with CHTI.  These agreements provide for the practice management services that CHTI provides to the respective Physician Owned Debtor and the compensation CHTI receives in return.  Such services include, but are not limited to, non-clinical personnel and staffing, technology, administrative and fiscal services, billing and collection, and banking. CHTI does not control or dictate any Physician Owned Debtor's clinical operations, professional judgment or healthcare professional services. In connection with the Management Services Agreements with CHTI, Dr. Mahdavia granted CHTI an assignable option over his ownership interest in each respective Physician Owned Debtor.

### IV.

### EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A.    Financial and Operational Challenges

45.    During 2020 and 2021, the Debtors expanded their operations in response to increased demand for accessible healthcare services in the communities they serve. This expansion included investments in technology, clinical footprint, and personnel to support efficient delivery of care,

including—but not limited to—Covid-related testing and vaccinations. These efforts were undertaken to meet community needs and to validate and scale the Debtors' broader care delivery model.

46.     Beginning in 2022, as pandemic-related demand subsided and capital markets tightened significantly for healthcare growth companies, the Debtors experienced a material decline in revenue and access to external financing. In response, the Debtors implemented cost-reduction initiatives, including workforce reductions, clinic closures, and the discontinuation of certain service lines. Despite these measures, the Debtors continued to face liquidity constraints as the scale of the business no longer aligned with available capital. Ongoing operating losses and limited financing alternatives ultimately led to the present liquidity challenge.

## B.     Execution of Judgment Levy

47.     Perhaps as evidence of the continued deterioration of the Debtors' financial condition, pursuant to that certain *Writ of Garnishment*, dated January 2, 2026, issued to Silicon Valley Bank ("SVB") by the Circuit Court in the Fifteenth Judicial Circuit in and for Palm Beach County, Florida Civil Division, in favor of RPT Realty, L.P., a Delaware limited partnership (the "Judgment Creditor") and received by SVB on January 5, 2026, SVB froze the sum of approximately $1.9 million in a bank account (the "Frozen Funds") maintained in the name of Debtor CHTI (the "Judgment Levy").  The Judgment Creditor is a former landlord of certain Debtors.

48.     On January 12, 2026, the Agent delivered a letter to SVB (with a copy to the Judgment Creditor) challenging the Judgment Levy on the basis that the Frozen Funds constitute the prior existing collateral of the Agent.

49.     The Debtors also submit that the Judgment Levy was executed within the 90 days prior to the Petition Date and such execution constitutes an avoidable preferential transfer.  The Debtors

are prepared to bring an adversary proceeding against the Judgment Creditor in order to avoid the Judgment Levy.

50.     The Debtors therefore dispute that the Judgment Creditor has any valid or enforceable lien against the Debtors' the Frozen Funds and should be released either consensually or through Court adjudication.

51.     The Lenders have also asserted that their liens are senior to the Judgement Creditor as proceeds of the Lenders' collateral.

52.     Faced with multiple challenges, including the Judgment Levy, the Debtors have developed a strategy to restructure and preserve their businesses and assets for the benefit of the creditors.  The Debtors prioritize continuing to provide excellent care to their patients.

53.     To that end, over the past several months, the Debtors have: (a) retained the services of financial advisors to help develop strategies to manage its cash position and assess liquidity needs in the future; (b) consulted with restructuring counsel in order to explore options to strengthen the Debtors' financial condition and operations; (c) participated in a robust process to identify and evaluate strategic transactions and other financing options in the best interest of the Debtors and all of their stakeholders; (d) negotiated both out-of-court and Court-approved acquisition transaction models; and (e) engaged in extensive discussions with the Agent in an effort to give the Debtors relief from liquidity constraints and provide sufficient capital to fund its operations while it pursues a potential transaction.

54.     Ultimately, the Debtors commenced these Chapter 11 Cases in order to effectuate a value-maximizing debt-for-equity Plan and concurrent marketing and sale process that will benefit all stakeholders.

## V.

## SALE TRANSACTION AND CHAPTER 11 PLAN

55.     Shortly after the Petition Date, the Debtors anticipate filing the *Debtors' Emergency Motion for an Order (A) Approving Bid Procedures for the Sale of Debtors' Assets, (B) Scheduling Sale Process Deadlines, Auction, Objection Deadlines, and Sale Hearing, (C) Establishing Assumption and Assignment Procedures, (D) Approving the Form and Manner of Notice of Sale, Auction, Sale Hearing, and Assumption and Assignment Procedures, and (E) Granting Related Relief* (the "Bid Procedures Motion"), which also will include a request to approve the sale.

56.     As set forth above, following months of extensive good faith and arm's length negotiations, the Debtors and the Agent agreed on the terms of a dual-track comprehensive restructuring process that would enable the Debtors to pursue in parallel confirmation of the Plan and a postpetition marketing and sale process for the Debtors' assets.  Accordingly, the Debtors seek to build upon the efforts undertaken as part of their months-long prior marketing process that ended in November 2025.  Prior to the Petition Date, the Debtors' investment banker commenced a new comprehensive marketing effort for the Debtors' assets.

57.     As part of this sale process, the Debtors have filed the Bid Procedures Motion.  The proposed Bid Procedures provide the Debtors with the flexibility to pursue an Enterprise Sale or one or more Partial Sales on a timeline consistent with the milestones agreed upon with the Agent, along with the option to "toggle" to a Plan process in the event the sale process does not yield actionable results.

58.     I believe that the sale process governed by the Bid Procedures will facilitate the sale of the Debtors' assets, in whole or in part as a possible alternative to the Plan or concurrent therewith, for the highest or otherwise best bid and maximize value for the Debtors' estates on an efficient

timeline.  In the exercise of my sound business judgment, I submit that the Bid Procedures will allow the Debtors to adequately test the market for their assets and constitute reasonable and appropriate procedures  under the circumstances.

## VI.

## EVIDENCE IN SUPPORT OF FIRST DAY PLEADINGS

59.     Contemporaneously herewith, the Debtors have filed a number of First Day Pleadings seeking orders that grant various forms of relief intended to stabilize the Debtor's business operations, facilitate the efficient administration of these Chapter 11 Cases, and expedite a swift and smooth restructuring process.

60.     Key among the First Day Pleadings is the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Secured Financing Pursuant to Section 364 of  the Bankruptcy Code; (II) Authorizing the Debtors to Use Certain Cash Collateral; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Granting Adequate Protection to the Prepetition Secured Parties; (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* (the "DIP Financing Motion").

61.     Through the DIP Financing Motion, the Debtors seek to obtain postpetition financing for the Chapter 11 Cases and use of Cash Collateral.  Without this authority, the Debtors would not have sufficient liquidity to continue operations.

62.     The Debtors exercised their business judgment in the selection and negotiation of the DIP Facility.

63.     The Debtors engaged in good faith, arms-length negotiations with the Lenders regarding the proposed terms of the DIP Facility and use of Cash Collateral.

64.     The proposed DIP Facility and the authorization to use Cash Collateral as offered by the Lenders are the best financing options that the Debtors could obtain under the circumstances.

65.     The Debtors believe that it is essential to the success of their Chapter 11 Cases, and the culmination of the Plan and sale process, that the Debtors receive immediate authority to access the DIP Facility and use Cash Collateral.

66.     On or around the Petition Date, in addition to the DIP Financing Motion, the Debtors also filed the following First Day Pleadings:

- **Cash Management Motion.** *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Maintenance of Existing Bank Accounts; (II) Authorizing Continuance of Existing Cash Management System; (III) Granting Limited Waiver of Section 345(b) Deposit Requirements; (IV) Authorizing Continued Performance of Intercompany Transactions and Funding; and (V) Granting Related Relief*

- **Wages Motion.** *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to (I) Pay and/or Honor Prepetition Wages, Salaries, Incentive Payments, Employee Benefits, and Other Compensation; (II) Remit Withholding Obligations and Deductions; (III) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests*

- **NOL Motion.** *Debtors' Emergency Motion for Entry of Orders (I) Establishing Notification Procedures and Approving Restrictions on (A) Certain Transfers of Interests In Debtors and (B) Certain Worthless Stock Deduction Claims; (II) Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Claims Against Debtors; and (III) Granting Related Relief*

- **Patient Programs Motion.** *Debtors' Emergency Motion for the Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Patient Programs and Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief*

- **Utilities Motion.** *Debtors' Emergency Motion for the Entry of an Order (I) Approving the Proposed Adequate Assurance Deposit for Future Utility Services, (II) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Services, (III) Approving the Proposed Adequate Assurance*

Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief

- **Insurance Motion.** *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Honor and Renew the Premium Financing Agreement Entered Into Prepetition and Satisfy Obligations Related Thereto, and (C) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies; and (II) Granting Related Relief*

- **Creditors Matrix and Noticing Motion.** *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (II) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (III) Granting Related Relief*

- **Lease Rejection Motion.** *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Reject Certain Unexpired Leases and Executory Contracts Pursuant to 11 U.S.C. § 365, (II) Authorizing Abandonment of Personal Property Located At Leased Premises, and (III) Granting Related Relief*

- **Schedules and SOFA's Motion.** *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Executory Contracts and Unexpired Leases, (C) Statements of Financial Affairs, and (D) Bankruptcy Rule 2015.3 Reports, and (II) Granting Related Relief*

- **Claims Agent Retention Motion**. *Debtors' <u>Emergency</u> Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent*

67. Certain of the First Day Pleadings request authority to pay certain prepetition claims. I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored its requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estate. Other relief will be deferred for consideration at a later hearing.

68.    I am familiar with the information contained in each First Day Pleading and believe that the factual averments contained therein are true and correct to the best of my knowledge and that the relief sought in each such motion (a) is necessary to enable the Debtors to undertake certain postpetition activities in connection with its restructuring efforts, (b) constitutes a critical element for the Debtors to successfully implement the foregoing chapter 11 objectives, and (c) best serves the Debtors' estates and creditors' interests.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated:  February 2, 2026

*/s/ Kerem Ozkay*
Kerem Ozkay

# EXHIBIT A

# Carbon Health Technologies, Inc. Organizational Chart

**Corporate Structure**

