## SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION
## FINANCING AGREEMENT

THIS **SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION FINANCING AGREEMENT** (the "**Agreement**"), dated as of February 2, 2026 is entered into by and among CARBON HEALTH TECHNOLOGIES, INC., a Delaware corporation ("**Carbon Health**"), as a borrower, debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (as defined herein), the other borrowers signatory hereto, each as a borrower, debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (the "**Medical Group Borrowers**" and together with Carbon Health, the "**Borrowers**" and each, a "**Borrower**"), certain lenders from time to time party hereto (collectively, the "**Lenders**", and each, a "**Lender**"), and Future Solution Investments LLC, a Wyoming limited liability company, as administrative and collateral agent for the Lenders (in such capacities, the "**Agent**").

## RECITALS

**WHEREAS**, each Borrower has commenced a case (the "**Chapter 11 Cases**") under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), and each Borrower has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its business and operations as a debtor in possession.

**WHEREAS,** each Borrower has requested that the Lenders provide, and the Lenders have agreed to make available on the terms and conditions set forth herein a delayed-draw term loan facility in an original principal amount up to $19,500,000; provided that until the Final DIP Order shall have been entered by the Bankruptcy Court, no loans or advances shall be made or issued, other than delayed-draw term loans in an aggregate original principal amount not to exceed $9,000,000. The proceeds of the delayed-draw term loans shall be used, subject to the other terms and conditions of this Agreement, to (a) pay fees and expenses related to this Agreement and the Chapter 11 Cases and (b) fund the operating expenditures and any other amounts owed by the Borrowers consistent with the Approved Budget that arise in the ordinary course of the Borrowers' business. The Lenders are severally, and not jointly, willing to extend such credit to the Borrowers subject to the terms and conditions hereinafter set forth.

**WHEREAS**, each Borrower desires to secure the Loans and all other Obligations, as applicable, under the Loan Documents by granting to the Agent, for its own benefit and the benefit of the Lenders, a security interest in and lien upon its specified property and assets, as provided herein and in the DIP Order.

**NOW THEREFORE**, in consideration of the mutual agreements, provisions and covenants contained herein, the parties hereto agree as follows:

## AGREEMENT

## SECTION 1. DEFINITIONS AND RULES OF CONSTRUCTION.

**1.1** **Definitions.** Unless otherwise defined herein, the following capitalized terms shall have the following meanings:

"**Account Control Agreement(s)**" means any control agreement entered into by and among the Agent, a Borrower and a third party bank or other institution in which such Borrower maintains a Deposit Account, Securities Account, Commodity Account or other investment account.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 20% or more of the shares or other equity interests having ordinary voting power for the election of members of the board of directors or similar managing body of such Person or (b) direct or cause the direction of the management and policies of such Person whether by contract or otherwise. Each Medical Group shall be considered an Affiliate of Carbon Health. Notwithstanding anything herein to the contrary, in no event shall the Agent or any Lender be considered an "Affiliate" of any Borrower.

"**Agent Indemnitees**" means the Agent and its officers, directors, employees, affiliates, agents and Agent Professionals.

"**Agent Professionals**" means attorneys, accountants, appraisers, auditors, business valuation experts, environmental engineers or consultants, financial advisors, turnaround consultants, and other professionals and experts retained by the Agent.

"**Agreement**" means this Senior Secured Superpriority Debtor-In-Possession Financing Agreement, including all amendments, modifications and supplements and any exhibits or schedules to any of the foregoing, and shall refer to this Agreement as the same may be in effect at the time such reference becomes operative.

"**Anti-Corruption Laws**" means all laws, rules, and regulations of any jurisdiction applicable to any Borrower from time to time concerning or relating to bribery or corruption, including without limitation the United States Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2010 and other similar legislation in any other jurisdictions.

"**Anti-Terrorism Laws**" means any laws, rules, regulations or orders relating to terrorism or money laundering, including without limitation Executive Order No. 13224 (effective September 24, 2001), the USA PATRIOT Act, the laws comprising or implementing the Bank Secrecy Act, and the laws administered by OFAC.

"**Approved Budget**" means (a) a 13-week cash flow forecast, prepared in form and substance satisfactory to, and as approved by, the Agent and Lenders in their absolute discretion, setting forth cash receipts, if any, and the disbursements (including payment of trade payables and expenses, fees and expenses of the Professionals, and working capital and other general corporate needs) of each Borrower for the period covered thereby, delivered by Carbon Health to the Agent and the Lenders on or before the Interim Facility Effective Date pursuant to Section 4.1(i), and (b) pursuant to Section 7.1(c), any updated rolling 13-week cash flow forecast in substantially the same form as the initial Approved Budget and which such updated cash flow forecast shall constitute the "Approved Budget" once approved by the Agent and the Lenders (provided, that, until the Agent and Lenders approve any such updated cash flow forecast, the most recent 13-week

cash flow forecast approved by the Agent and the Lenders shall continue to be the Approved Budget).

"**Assignee**" has the meaning given to it in Section 10.13.

"**Available Term Loan Commitment**" has the meaning specified therefor in Section 2.1(b)(i).

"**Avoidance Actions**" has the meaning specified therefor in the DIP Order.

"**Authorized Officer**" means, with respect to any Person, the chief executive officer, chief operating officer, chief financial officer, treasurer or other financial officer performing similar functions, president or any vice president of such Person and any other authorized signatory appointed by the Board of Directors.

"**Bankruptcy Code**" means Title 11 of the United States Code (11 U.S.C. § 101 et seq.).

"**Bankruptcy Court**" has the meaning specified therefor in the recitals hereto, or any other court having jurisdiction over the Chapter 11 Cases from time to time.

"**Bid Procedures Order**" means that certain bid procedures order to be entered by the Bankruptcy Court, providing for, among other things, the bid procedures for the Carbon Health Sale(s), such order to be in form and substance satisfactory to the Agent and the Lenders, as the same may be amended, supplemented or otherwise modified from time to time with the prior written consent of the Agent.

"**Blocked Person**" means any Person: (a) listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (b) a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (c) a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law, (d) a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224, or (e) a Person that is named a "specially designated national" or "blocked person" on the most current list published by OFAC or other similar list.

"**Board of Directors**" means the applicable board of directors or other governing body, manager, or member of each Borrower.

"**Borrowers**" has the meaning specified therefor in the preamble hereto.

"**Business Day**" means any day, except Saturday, Sunday or legal holiday on which banking institutions in the State of New York are authorized or obligated by law or executive order to close.

"**Carbon Health Products**" means all products, software, service offerings, technical data or technology currently being designed, manufactured or sold by Carbon Health or which Carbon Health intends to sell, license, or distribute in the future including any products or service offerings under development, collectively, together with all products, software, service offerings, technical

data or technology that have been sold, licensed or distributed by Carbon Health since its incorporation.

"**Carbon Health Sale(s)**" means one or more transactions involving a sale of any Borrower's assets or equity interests pursuant to Section 363 of the Bankruptcy Code.

"**Carbon Health Plan**" means a chapter 11 plan for any of the Borrowers pursuant to Section 1129 of the Bankruptcy Code.

"**Carve-Out**" has the meaning specified therefor in the DIP Order.

"**Carve-Out Trigger Date**" has the meaning specified therefor in the DIP Order.

"**Cash Equivalents**" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency or any State thereof maturing within one year from the date of acquisition thereof currently having a rating of at least A-2 or P-2 from either Standard & Poor's Corporation or Moody's Investors Services, (b) commercial paper maturing no more than one year from the date of creation thereof and currently having a rating of at least A-2 or P-2 from either Standard & Poor's Corporation or Moody's Investors Services, (c) certificates of deposit issued by any bank with assets of at least $500,000,000 maturing no more than one year from the date of investment therein, (d) money market accounts, and (e) any Investments permitted by Borrower's investment policy, as amended from time to time, provided that such investment policy (and any such amendment thereto) has been approved in writing by Agent.

"**Change in Control**" means (i) any reorganization, recapitalization, consolidation or merger (or similar transaction or series of related transactions) of Carbon Health, sale or exchange of outstanding shares (or similar transaction or series of related transactions) of Carbon Health in which the holders of Carbon Health's outstanding shares immediately before consummation of such transaction or series of related transactions do not, immediately after consummation of such transaction or series of related transactions, retain shares representing more than fifty percent (50%) of the voting power of the surviving entity of such transaction or series of related transactions (or the parent of such surviving entity if such surviving entity is wholly owned by such parent), in each case without regard to whether Carbon Health is the surviving entity, or (ii) at any time, Parent shall cease to own and control, of record and beneficially, directly or indirectly, one hundred percent (100%) of each class of outstanding capital stock (other than any directors' qualifying shares or other similar share that are required to be issued under applicable law) of any Subsidiary.

"**Chapter 11 Cases**" has the meaning specified therefor in the recitals hereto.

"**CMS**" means the federal Centers for Medicare and Medicaid Services (formerly the federal Health Care Financing Administration), and any successor Governmental Authority.

"**Collections Accounts**" has the meaning specified therefor in Section 7.18(b).

"**Colombian Subsidiary**" means Carbon Health Colombia S.A.S., an entity formed under the laws of Colombia or any successor entity and a wholly-owned Subsidiary of Carbon Health.

"**Committee**" has the meaning specified therefor in the DIP Order.

"**Confirmation Order**" means that certain confirmation order to be entered by the Bankruptcy Court approving the Carbon Health Plan, such order to be in form and substance satisfactory to the Agent and the Lenders, as the same may be amended, supplemented or otherwise modified from time to time with the prior written consent of the Agent.

"**Contingent Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any Indebtedness of another, including any such obligation directly or indirectly guaranteed, endorsed, co-made or discounted or sold with recourse by that Person; (ii) any obligations with respect to undrawn letters of credit, corporate credit cards or merchant services issued for the account of that Person; and (iii) all obligations arising under any interest rate, currency or commodity swap agreement, interest rate cap agreement, interest rate collar agreement, or other agreement or arrangement designated to protect a Person against fluctuation in interest rates, currency exchange rates or commodity prices; provided, however, that the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Contingent Obligation described in clauses (i) and (ii) above, shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith; provided, however, that such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"**Copyright License**" means any written agreement granting any right to any Borrower to use any Copyright or Copyright registration, now owned or hereafter acquired by any Borrower or in which any Borrower now holds or hereafter acquires any interest.

"**Copyrights**" means all copyrights, whether registered or unregistered, held pursuant to the laws of the United States, any State thereof, or of any other country.

"**Default**" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"**DIP Collateral**" has the meaning specified therefor in the DIP Order.

"**DIP Liens**" has the meaning specified therefor in the DIP Order.

"**DIP Order**" means (a) the Interim DIP Order at all times from and after the entry of the Interim DIP Order and until (but excluding) the entry of the Final DIP Order and (b) the Final DIP Order at all times from and after the entry of the Final DIP Order.

"**DIP Superpriority Claim**" has the meaning specified therefor in the DIP Order.

"**Disclosure Statement Order**" means that certain order to be entered by the Bankruptcy Court conditionally approving the disclosure statement for the Carbon Health Plan, such order to

be in form and substance satisfactory to the Agent and the Lenders, as the same may be amended, supplemented or otherwise modified from time to time with the prior written consent of the Agent.

"**Dollar**," "**Dollars**" and the symbol "**$**" each means lawful money of the United States of America.

"**Enforcement Action**" means any action to enforce any Obligations or Loan Documents or to exercise any rights or remedies relating to any DIP Collateral (whether by judicial action, self-help, notification of Account Debtors, exercise of setoff or recoupment, exercise of any right to vote or act in the Borrowers' Insolvency Proceeding, or otherwise).

"**Equity Interests**" means, with respect to any Person, the capital stock, partnership or limited liability company interest, or other equity securities or equity ownership interests of such Person.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, and its regulations, in each case, as amended from time to time.

"**Event of Default**" means any of the events set forth in Section 9.1.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any similar Federal statute, and the rules and regulations of the SEC thereunder, all as the same shall be in effect from time to time.

"**Excluded Account**" means (i) Deposit Accounts used solely to fund payroll or employee benefits to or for the benefit of any Borrower's employees and identified to Agent as such, provided that such Deposit Accounts are maintained in the ordinary course of business and that the aggregate balance maintained in such Deposit Accounts shall not exceed the amount to be paid to such employees in the then-next two payroll periods, (ii) Collections Accounts subject to Section 7.18(b) and identified to Agent as such, and (iii) any Deposit Account to the extent entering into an Account Control Agreement in favor of Agent would violate the prohibition against assignment of governmental receivables, provided such Deposit Account is identified to Agent as such.

"**Excluded Assets**" means any assets that, after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions), the Bankruptcy Code or any other applicable law, cannot be pledged or assigned as collateral under applicable law or regulation, including, without limitation, any laws, regulations or administrative guidance relating to the corporate practice of medicine in any jurisdiction in which any Borrower or Medical Group operates, and any licenses or permits that are non-assignable by applicable law, in each case solely to the extent of such legal prohibition provided, however, that (a) to the extent any such asset is severable only such portion subject to such legal prohibition shall constitute an Excluded Asset; (b) any proceeds, substitutions or replacements of any Excluded Asset shall not constitute Excluded Assets to the extent not otherwise constituting an Excluded Asset; and (c) if and to the extent any such legal prohibition ceases to apply to any Excluded Asset, such asset shall automatically cease to be an Excluded Asset.

6

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to the Agent or any Lender or required to be withheld or deducted from a payment to or on behalf of the Agent or any Lender: (a) Taxes imposed on or measured by net income and franchise taxes (imposed in lieu of net income taxes), in each case, imposed by the jurisdiction (or any political subdivision thereof) under the laws of which the Agent or such Lender is organized or in which its principal office is located, or imposed as a result of a present or former connection between the Agent or such Lender and the jurisdiction imposing such net income or franchise tax (other than connections arising from the Agent or such Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan Document), (b) taxes imposed by FATCA and (c) Taxes attributable to any Lender's failure to comply with Section 2.6(e) of this Agreement, other than any failure attributable to a change in applicable law occurring after the date hereof.

"**Existing Account Control Agreements**" means each of the account control agreements in effect as of the Petition Date between the applicable Borrower, the Prepetition Agent and a third party bank or other institution in which such Borrower maintains a Deposit Account, Securities Account, Commodity Account or other investment account. For the avoidance of doubt, each Existing Account Control Agreement is deemed to apply for the benefit of the Agent, on behalf of the Lenders under this Agreement and the DIP Order.

"*Extraordinary Receipts*" means any cash received by any Person not in the ordinary course of operations (and not consisting of proceeds described in Section 2.4(b)(i)), including (a) proceeds of insurance (other than as provided in clause (c) herein), (b) condemnation awards (and payments in lieu thereof) and (c) subject to and in accordance with the DIP Order, proceeds of Avoidance Actions, proceeds of commercial tort claims, and proceeds of claims under insurance policies for the benefit of officers and directors.

"**Facility Effective Date**" means the Business Day on which all of the conditions precedent set forth in Section 4.1 are satisfied or waived in accordance therewith.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

"**FDA**" means the U.S. Food and Drug Administration or any successor thereto.

"**FDA Laws**" means all applicable statutes, rules, regulations, and orders and Requirements of Law administered, implemented, enforced or issued by FDA.

"**Federal Health Care Program Laws**" means collectively, federal Medicare or federal or state Medicaid statutes, the exclusion laws (42 U.S.C. § 1320a-7), the civil monetary penalties law (42 U.S.C. § 1320a-7a), all federal and state fraud and abuse laws, including, without limitation, the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b), the Physician Payments Sunshine Act (42 U.S.C. § 1320a-7h), the civil False Claims Act of 1863 (31 U.S.C. § 3729 et seq.), criminal false claims statutes (e.g., 18 U.S.C. §§287 and 1001), the Program Fraud Civil

Remedies Act of 1986 (31 U.S.C. § 3801 et seq.), HIPAA, or related regulations or other Requirements of Law applicable to any Borrower that directly or indirectly govern the health care industry, programs of governmental authorities related to healthcare, health care professionals or other health care participants, or relationships among health care providers, suppliers, distributors, manufacturers and patients.

"**Final DIP Order**" means the final order of the Bankruptcy Court, substantially in the form of the Interim DIP Order and otherwise in form and substance satisfactory to the Agent and the Lenders, as the same may be amended, supplemented or otherwise modified from time to time with the prior written consent of the Agent.

"**Final Facility Effective Date**" has the meaning specified therefor in Section 4.2.

"**Final Period**" means the period commencing on the Final Facility Effective Date and ending on the Maturity Date.

"**GAAP**" means generally accepted accounting principles in the United States of America, as in effect from time to time

"**Governmental Authority**" means the government of the United States of America or of any other nation, or any political subdivision of any of them, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Governmental Payor Collections Account**" has the meaning specified therefor in Section 7.18(b).

"**Healthcare Laws**" means all applicable laws relating to the operation or management of healthcare providers, the provision of healthcare items and services, participation in Third Party Payor Programs, proper billing and collection practices relating to the payment for healthcare items and services, insurance law (including law related to payment for "no-fault" claims) and workers compensation law as they relate to the provision of, and billing and payment for, healthcare services, patient healthcare, patient healthcare information, patient abuse, the quality and adequacy of care, rate setting, equipment, personnel, operating policies, fee splitting, including, without limitation, (a) all federal and state fraud and abuse laws, including, without limitation, the federal Anti-Kickback Statute (42 U.S.C. §1320a-7b(b)), the Stark Law (42 U.S.C. §1395nn), the civil False Claims Act (31 U.S.C. §3729 et seq.), the administrative False Claims Law (42 U.S.C. § 1320a-7b(a)), the Anti-Inducement Law (42 U.S.C. § 1320a-7a(a)(5)), the exclusion laws (42 U.S.C. § 1320a-7) and the Eliminating Kickbacks in Recover Act (18 U.S.C. §220); (b) the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009; (c) all laws, regulations, rule and applicable payor policies governing Medical Reimbursement Programs, including, without limitation, the Medicare Regulations and the Medicaid Regulations; (d) quality, safety and accreditation standards and requirements of all applicable state laws or regulatory bodies; (e) all laws, policies, procedures, requirements and regulations pursuant to which Healthcare Permits are issued; (f) any laws, regulations or administrative guidance relating to the corporate practice of

medicine in any jurisdiction in which any Borrower or Medical Group operates, including the unauthorized or unlicensed practice of a licensed health profession by any Person, the organization or ownership of Persons that employ healthcare professionals, the management or control of healthcare professionals by unlicensed Persons, and the manner in which healthcare professionals may split, divide or share fees generated from the provision of professional services; (g) all laws, regulations and Governmental Authority policies governing the use of telehealth technologies and the provision of telehealth services; (h) the Food, Drug and Cosmetic Act of 1938 (21 U.S.C. § 301, et seq.), the Controlled Substances Act (21 U.S.C. § 801, et seq.) and all other laws, regulations and Governmental Authority policies governing the securing, sale, marketing, rebating, administering, dispensing and prescribing (including e-prescribing) of drugs, devices and controlled substances;  and (i) any and all comparable state or local laws and other applicable health care laws, regulations, manual provisions, policies and administrative guidance, each of (a) through (h) as may be amended from time to time and the regulations promulgated pursuant to each such law.

"**Healthcare Permit**" means a permit (a) issued or required under Healthcare Laws applicable to the business of any Borrower or any of its Subsidiaries or necessary in the possession, ownership, warehousing, marketing, promoting, sale, labeling, furnishing, distribution or delivery of goods or services under Healthcare Laws applicable to the business of any Borrower or any of its Subsidiaries , and/or (b) issued by any Person from which any Borrower has, as of the Facility Effective Date, received an accreditation.

"**HIPAA**" means the Health Insurance Portability and Accountability Act of 1996, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"**HIPAA Compliant**" shall mean that the applicable Person (a) has adopted and implemented policies and procedures, and has trained its personnel, in compliance with each of the applicable requirements of the so-called "Administrative Simplification" provisions of HIPAA, and (b) is not and could not reasonably be expected to become subject to any deficiency with respect to HIPAA.

"**Immaterial Subsidiary**" means each of Carbon Health Laboratory Holding Co., LLC, Carbon Health Laboratories, Inc., Direct Healthcare Services, Inc., Steady Health, LLC, Alertive, LLC,  Prairie Health, Inc., Aaliya H. Yaqub, M.D., P.C., Prairie Medical Associates, Inc., RiteCare Physical Therapy, LLC and Carbon Health Medical Group of Washington, P.C.

"**Indebtedness**" means, with respect to any Person, (a) all indebtedness of such Person for borrowed money or the deferred purchase price of property or services (excluding trade credit entered into in the ordinary course of business from and after the Petition Date for which payment thereof is not past due), including reimbursement and other obligations with respect to surety bonds, bankers acceptances or letters of credit; (b) all obligations evidenced by notes, bonds evidencing borrowed money, debentures or similar instruments or upon which interest payments are customarily made; (c) all capital lease obligations; (d) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession

or sale of such property; (e) all Contingent Obligations with respect to Indebtedness, and (f) all obligations referred to in clauses (a) through (e) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness (provided, that, to the extent that such Indebtedness is non-recourse to such Person, the outstanding principal amount of such Indebtedness at any time of determination thereof shall be deemed to be an amount equal to the lesser at such time of (i) the then unpaid principal amount of such Indebtedness and (ii) the fair market value of the property subject to such Lien).

"**Indemnified Claims**" has the meaning given to it in Section 6.3.

"**Indemnified Taxes**" means (a) Taxes other than Excluded Taxes and (b) to the extent not otherwise encompassed by clause (a), Other Taxes.

"**Insolvency Proceeding**" is any proceeding by or against any Person as a debtor under the Bankruptcy Code, or any other state, federal or foreign bankruptcy or insolvency law, including assignments of all or substantially all of such Person's assets for the benefit of creditors, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"**Intellectual Property**" means all of each Borrower's Copyrights, Trademarks, Patents, Licenses, trade secrets, proprietary information and inventions, mask works; each Borrower's applications therefor and reissues, extensions, or renewals thereof; and each Borrower's goodwill associated with any of the foregoing, together with each Borrower's rights to sue for past, present and future infringement of Intellectual Property and the goodwill associated therewith.

"**Interest Rate**" means for any day a per annum rate of interest equal to 11.5%.

"**Interim DIP Order**" means an order of the Bankruptcy Court, substantially in the form of Exhibit A and otherwise in form and substance satisfactory to the Agent and the Lenders, as the same may be amended, supplemented or otherwise modified from time to time with the prior written consent of the Agent.

"**Interim Facility Effective Date**" means the date on which all of the conditions precedent set forth in Section 4.1 are satisfied or waived in accordance therewith.

"**Interim Period**" means the period commencing on the Interim Facility Effective Date and ending on the earlier to occur of (a) the Final Facility Effective Date and (b) the Maturity Date.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

"**Investment**" means with respect to any Person, (a) any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances or other extensions of credit (excluding accounts receivable arising in the ordinary course of business), transfers of cash or other property, capital contributions or acquisitions of Indebtedness or any beneficial ownership (including any Equity Interests) of or in any Person, or the acquisition of all, or

substantially all, of the assets of another Person or business unit of another Person or (b) any investment in any other items that are or would be classified as investments on a balance sheet of such Person prepared in accordance with GAAP.

"**John Muir**" means John Muir Health.

"**John Muir Loan Parties**" means Carbon East Bay Medical Group, P.C., as borrower, and Carbon East Bay Primary Care, P.C., as guarantor.

"**John Muir Debt Facility**" means the Indebtedness under that certain Delayed Draw Term Loan Credit and Guaranty Agreement, dated November 5, 2021, between John Muir and the John Muir Loan Parties.

"**John Muir Debt Facility Liens**" means the Liens on the property and assets of the John Muir Loan Parties in favor of John Muir, securing the John Muir Debt Facility.

"**Lender**" and "**Lenders**" have the meanings specified therefor in the preamble hereto.

"**Lender Expenses**" means all reasonable audit fees and expenses, reasonable costs and expenses (including reasonable and documented (in summary invoice form) attorneys' fees and expenses and other professionals' fees and expenses) incurred by the Agent or any Lender in connection with this Agreement, the Loan Documents, any other document or agreement described in or related to this Agreement, and the transactions contemplated by this Agreement and the other Loan Documents, including, without limitation, all such reasonable costs, expenses and fees: (a) incurred in connection with the preparation, negotiation, execution, delivery, amendment, administration, performance, collection, defense and enforcement of the Loan Documents and the Indebtedness arising thereunder (including, without limitation, those incurred in connection with appeals or Insolvency Proceedings); (b) incurred in connection with the creation, perfection, protection, satisfaction, foreclosure, or enforcement of any security interest granted under the Loan Document (including, without limitation, those incurred in connection with appeals or Insolvency Proceedings); (c) incurred in connection with any legal, litigation, administrative, arbitration, or out of court proceeding in connection with or related to any Borrower or any DIP Collateral, and any appeal or review thereof; and (d) incurred in connection with the Chapter 11 Cases or any other action related to any Borrower, any DIP Collateral, the Loan Documents, a Carbon Health Plan, including representation of the Agent or any Lender in any adversary proceeding or contested matter in connection therewith, commenced or continued by or on behalf of any Borrower or its estate, and any appeal or review thereof and (e) otherwise incurred with respect to any Borrower.

"**License**" means any Copyright License, Patent License, Trademark License or other Intellectual Property license of rights or interests.

"**Lien**" means any mortgage, deed of trust, pledge, lien (statutory or otherwise), security interest, charge or other encumbrance or security or preferential arrangement of any nature, including any conditional sale or title retention arrangement, any capital lease obligation and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security.

"**Loan**" means, as the context may require, any loan made or deemed made by any Lender hereunder, including, without limitation, the Term Loans.

"**Loan Documents**" means this Agreement, any Account Control Agreement (including any Existing Account Control Agreement), the Interim DIP Order, the Final DIP Order, any mortgage, any guaranty, any security agreement or any pledge agreement entered into by any Borrower or any other Person with respect to the Obligations, and any other agreement, instrument, certificate, report and other document executed and delivered pursuant hereto or thereto or otherwise evidencing, pertaining to or securing any Loan or any other Obligation.

"**Management Services Agreements**" means each agreement (administrative services, management, business support services agreement, management services agreement, professional services or otherwise titled) under which Carbon Health agrees to provide management, administrative, business or similar services to a Medical Group.

"**Material Adverse Effect**" means the occurrence of an event that has a material adverse effect upon any of: (i) the business, operations, results of operations, properties, assets, liabilities or condition (financial or otherwise) of any Borrower (except for the commencement of the Chapter 11 Cases and events that typically result from the commencement of a case under Chapter 11 of the Bankruptcy Code); (ii) the ability of any Borrower to perform any of its obligations under the Loan Documents, including, without limitation, repayment of the Obligations, as applicable, when due in accordance with the terms of the Loan Documents; (iii) the rights or remedies of the Agent or any Lender under the Loan Documents, or the ability of the Agent or any Lender to exercise or enforce such rights and remedies, with respect to the Obligations or the DIP Collateral in accordance with this Agreement and the DIP Order; or (iv) the DIP Collateral or the status, existence, perfection, priority, or enforceability of any Lien in favor of the Agent on the DIP Collateral.

"**Material Regulatory Liabilities**" means (i) any liabilities arising from the violation of applicable Public Health Laws, Healthcare Laws, Federal Health Care Program Laws, and other applicable comparable Requirements of Law, or from any requirements imposed relative to any Registrations (including costs of actions required under applicable Requirements of Law, including FDA Laws and Federal Health Care Program Laws, or necessary to remedy any violation of any terms or conditions applicable to any Registrations), including, but not limited to, withdrawal of approval, recall, revocation, suspension, import detention and seizure of any Carbon Health Product, and (ii) any loss of recurring annual revenues as a result of any loss, suspension or limitation of any Registrations, which, in the case of the foregoing clauses (i) and (ii), could reasonably be expected to result in a Material Adverse Effect.

"**Maturity Date**" means, in respect to the Loans and the other Obligations, the date which is the <u>earliest</u> of:

> (a)     Thirty-five (35) days after the Petition Date, if the Final DIP Order has not been entered by the Bankruptcy Court on or prior to such date;

(b)     the effective date or the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of any plan of reorganization or liquidation in the Chapter 11 Cases for the Borrowers, including any Carbon Health Plan;

(c)     the date on which the sale of all or substantially all of the Borrowers' assets and/or Equity Interests, in one or more series of transactions, including any Carbon Health Sale(s), as the case may be, have been consummated under Section 363 of the Bankruptcy Code;

(d)     the date that is six (6) months from the date of this Agreement; and

(e)     such earlier date on which the Loans and the other Obligations for the payment of money shall become due and payable in accordance with the terms of this Agreement and the other Loan Documents.

"**Maximum Rate**" shall have the meaning assigned to such term in Section 2.2.

"**Measurement Period**" means the trailing two-week period ending on every second Friday.

"**Medicaid**" means the medical assistance programs administered by state agencies and approved by CMS pursuant to the terms of Title XIX of the Social Security Act, codified at 42 U.S.C. 1396 et seq.

"**Medical Group**" means a Person providing medical services with which Carbon Health or its Subsidiaries has a Management Services Agreement (excluding clinics that Carbon Health manages for a Person unaffiliated with Carbon Health) which, as of the Facility Effective Date, includes (i) Carbon Health Medical Group of Florida, P.A., a Florida professional service corporation, (ii) Carbon Health Medical Group of New Jersey, P.A., a New Jersey professional service corporation, (iii) Djavaherian Medical Practice, PLLC, a New York professional service limited liability company, (iv) Carbon Health Primary Care of California, P.C. (f/k/a Carbon Health Medical Group, Inc.), a California professional medical corporation, (v) Carbon Health Medical Group of California, P.C. (f/k/a Direct Urgent Care, Inc.), a California professional corporation, (vi) Carbon Health Medical Group of Kansas, P.A., a Kansas professional service corporation, (vii) Carbon Health Primary Care of Kansas, P.A., a Kansas professional association, (viii) Carbon Health Primary Care of New Jersey, P.A., a New Jersey professional corporation, (ix) Carbon Health Primary Care of Florida, P.A., a Florida professional corporation, (x) Central Jersey Urgent Care Limited Liability Company, a New Jersey limited liability company, (xi) RiteCare Physical Therapy, LLC, a Florida limited liability company, (xii) RiteCare Medical Center, LLC, a Florida limited liability company, (xiii) Carbon Health Medical Group of Massachusetts, P.C., a Massachusetts professional corporation, (xiv) Carbon Health Medical Group of Sunnyvale, Inc., a California professional corporation, (xv) Carbon Health Medical Group of Texas, PLLC, a Texas professional limited liability company, (xvi) Hillcrest Urgent Care of Alabama PC, an Alabama professional corporation, (xvii) RiteCare Medical Center, LLC, a Florida limited liability company, (xviii) Treat Medical, Inc., a California corporation, (xix) Carbon Health South Bay Medical Group, P.C., a California professional corporation, (xx) Carbon Health South Bay Primary Care, P.C., a California professional corporation,

(xxi) Carbon Health Medical Group of Wisconsin, S.C., a Wisconsin service corporation, (xxii) Carbon Health Primary Care of Wisconsin, S.C., a Wisconsin service corporation, (xxiii) Carbon Health Alpha Medical Group of California, P.C., a California professional corporation, (xxiv) Carbon Health Alpha Medical Group of Florida, P.A., a Florida professional service corporation, (xxv) Carbon Health Alpha Medical Group of Kansas, P.A., a Kansas professional association, (xxvi) Carbon Health Alpha Primary Care of California, P.C., a California professional corporation, (xxvii) Carbon Health Alpha Primary Care of Florida, P.A., a Florida professional service corporation, (xxviii) Carbon Health Alpha Primary Care of Kansas, P.A., a Kansas professional association, (xxix) Carbon Health East Bay Medical Group, P.C., a California professional corporation, and (xxx) Carbon Health East Bay Primary Care, P.C., a California professional corporation.

"**Medical Group Borrowers**" has the meaning specified therefor in the preamble hereto.

"**Medical Group Document**" means any (i) Management Services Agreement, (ii) deficit funding agreement, revolving credit agreement, or similar agreement allowing Carbon Health or its Subsidiaries to make funds available on credit to any Medical Group, (iii) Securities Transfer Restriction Agreement, (iv) clinical liaison agreement, medical director agreement, or any other medico-administrative agreement between the owner of a Medical Group and Carbon Health or its Subsidiaries, (v) the governing documents of any Medical Group, including but not limited to any bylaws, operating agreement, shareholder's agreement, articles of incorporation, and any side letters related thereto, and (vi) any agreement requiring the indemnification of any equityholder of a Medical Group by Carbon Health, its Subsidiaries, or any Medical Group.

"**Medicare**" means the program of health benefits for the aged and disabled administered by CMS pursuant to the terms of Title XVIII of the Social Security Act, codified at 42 U.S.C. 1395 et seq.

"**Milestones**" means the following milestone dates; provided that any amendment to such date in the Final DIP Order or any other order of the Bankruptcy Court, with the prior written consent of the Agent, shall be deemed an amendment of such dates below:

| Milestone | Deadline |
|---|---|
| Entry of Interim DIP Order | February 5, 2026 |
| Entry of Bid Procedures Order | February 12, 2026 |
| Entry of Disclosure Statement Order | March 19, 2026 |
| Entry of Final DIP Order | March 9, 2026 |
| Bid submission deadline | March 6, 2026 |
| Auction, if any | March 11, 2026 |
| Entry of Sale Order | March 25, 2026 |
| Voting Deadline for Carbon Health Plan | April 22, 2026 |
| Entry of Confirmation Order | May 1, 2026 |
| Closing of Qualifying Cash Sale(s) (if applicable) | May 1, 2026 |

| Effective Date of Carbon Health Plan (if applicable) | May 8, 2026 |

"**Net Cash Proceeds**" means, with respect to any sale or disposition of any asset by any Person or receipt by an Person of Extraordinary Receipts, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Person, in connection therewith after deducting therefrom only, and in all instances subject to the limitations under and provisions of the DIP Order, (a) the amount of any Indebtedness secured by any Permitted Prior Lien on any asset (other than Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection with such sale or disposition (other than the Obligations and the Prepetition Secured Obligations), (b) reasonable expenses related thereto incurred by such Person in connection therewith, (c) transfer taxes paid to any taxing authorities by such Person in connection therewith, and (d) net income taxes to be paid in connection with such sale or disposition (after taking into account any tax credits or deductions and any tax sharing arrangements); in each case, to the extent that the amounts so deducted are (x) actually paid to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such Person and (y) properly attributable to such transaction or to the asset that is the subject thereof.

"**Non-Governmental Payor Collections Account**" has the meaning specified therefor in Section 7.18(b).

"**Obligations**" means the Term Loans and all other present and future indebtedness, obligations, and liabilities of each Borrower to the Agent and the Lenders under the Loan Documents and, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged, stayed or otherwise affected by the Chapter 11 Cases. Without limiting the generality of the foregoing, the obligations of each Borrower under the Loan Documents include (a) the obligation to pay principal, interest, charges, fees, Lender Expenses, indemnities and other amounts payable by the Borrowers under the Loan Documents, and (b) the obligation of the Borrowers pursuant to the Loan Documents to reimburse any amount in respect of any of the foregoing that the Agent or any Lender may elect to pay or advance on behalf of the Borrowers.

"**OFAC**" means the U.S. Department of Treasury Office of Foreign Assets Control.

"**OFAC Lists**" means, collectively, the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) and/or any other list of terrorists or other restricted Persons maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Executive Orders.

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement, the Loans or any other Loan Document.

"**Patent License**" means any written agreement granting any right to any Borrower with respect to any invention on which a Patent is in existence or a Patent application is pending, in which agreement any Borrower now holds or hereafter acquires any interest.

"**Patents**" means all letters patent of, or rights corresponding thereto, in the United States or in any other country, all registrations and recordings thereof, and all applications for letters patent of, or rights corresponding thereto, in the United States or any other country.

"**Permitted Dispositions**" means (i) sales of Inventory at fair market value for cash in the ordinary course of business, (ii) non-exclusive licenses and similar arrangements for the use of Intellectual Property in the ordinary course of business and licenses that could not result in a legal transfer of title of the licensed property that may be exclusive in respects other than territory or may be exclusive as to territory but only as to discreet geographical areas outside of the United States of America in the ordinary course of business, and (iii) other Transfers of assets having a fair market value of not more than $250,000 in the aggregate in any fiscal year, (vi) Indebtedness which is strictly intercompany indebtedness between Carbon Health or its Subsidiaries and any Medical Group to the minimum extent necessary for such Medical Group to meet its payroll obligations and (vii) Transfers in connection with any Project Medical Group Clinic Closures.

"**Permitted Indebtedness**" means (i) Indebtedness of each Borrower in favor of the Agent or Lenders arising under this Agreement or any other Loan Document, (ii) the Prepetition Secured Obligations, (iii) other Indebtedness existing on the Interim Facility Effective Date which is disclosed in Schedule 7.11; provided that there shall be no increase to the principal amount of any Indebtedness listed on such Schedule; (iv) Indebtedness to trade creditors incurred in the ordinary course of business (due within 120 days), in each case consistent with the Approved Budget, (v) Indebtedness incurred in the ordinary course of business with respect to corporate credit cards and other banking services, in each case consistent with the Approved Budget, (vi) the Project Medical Group Debt Facilities.

"**Permitted Investment**" means (i) Investments existing on the Interim Facility Effective Date, which are disclosed in Schedule 7.13 (but only to the extent such Investments are not increased, extended, renewed or otherwise modified after such date); (ii) cash and Cash Equivalents; (iii) Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business; (iv) Investments consisting of Deposit Accounts, Securities Accounts or Commodity Accounts (but only to the extent that Borrower is permitted to maintain such accounts pursuant to Section 7.18 of this Agreement) in which Agent has a perfected security interest to the extent required pursuant to the terms of this Agreement; (v) Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of Borrowers' business; and (vi) Investments consisting of notes receivable of, or prepaid royalties and other credit extensions, to customers and suppliers who are not Affiliates of any Borrower, in the ordinary course of business, provided that this subparagraph (vi) shall not apply to Investments of any Borrower in any Subsidiary. For the avoidance of doubt, in no event shall any Investment in any Subsidiary or Affiliate of a Borrower which is not itself a Borrower under this Agreement constitute a Permitted Investment.

"**Permitted Liens**" means (i) Liens in favor of the Agent securing the Obligations; (ii) the Prepetition Secured Liens and other Liens existing on the Interim Facility Effective Date which are disclosed in Schedule 7.12; provided that there shall be no extension of coverage of the Liens listed on such Schedule to other property or the increase of the Indebtedness secured thereby (other than with the consent of the Required Lenders); (iii) Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings; (iv) Liens securing claims or demands of materialmen, artisans, mechanics, carriers, warehousemen, landlords and other like Persons arising in the ordinary course of any Borrower's operations and imposed without action of such parties; provided, that the payment thereof is not yet required or is being contested in good faith by appropriate proceedings; (v) Liens arising from judgments, decrees or attachments in circumstances which do not constitute an Event of Default hereunder; (vi) the following deposits, to the extent made in the ordinary course of operations: deposits under worker's compensation, unemployment insurance, social security and other similar laws, to secure statutory obligations (other than liens securing a material obligation and arising under ERISA or environmental laws), deposits for utilities, deposits to a landlord pursuant to a leasehold agreement, or surety or appeal bonds, or to secure indemnity, performance or other similar bonds or obligations in an aggregate amount not to exceed One Million Dollars ($1,000,000); (vii) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of custom duties that are promptly paid on or before the date they become due; (viii) leasehold interests in leases or subleases and licenses granted in the ordinary course of business and not interfering in any material respect with the business of the licensor; (ix) Liens in favor of other financial institutions arising in connection with any Borrower's or any Subsidiary's Deposit Accounts, Securities Accounts or Commodity Accounts held at such institutions, provided that Agent has a perfected security interest in the amounts held in such accounts to the extent required pursuant to Section 7.18 of this Agreement; (x) Permitted Prior Liens, and (xi) any adequate protection liens so long as junior to the DIP Liens and in effect on or prior to the Interim Facility Effective Date.

"**Permitted Prior Liens**" means valid, enforceable, properly perfected and non-avoidable Liens in existence as of the Petition Date that are senior in priority to the Prepetition Secured Liens (subject only to Liens senior by operation of law or otherwise permitted by the Prepetition Loan Documents), or such Liens that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, including (i) solely as to the property and assets of the John Muir Loan Parties, the John Muir Debt Facility Liens, (ii) solely as to the property and assets of the Prime Health Loan Parties, the Prime Health Debt Facility Liens and (iii) solely as to the property and assets of the Stanford Health Loan Parties, the Stanford Health Credit Debt Liens.

"**Permitted Variances**" has the meaning set forth in Section 7.23.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, professional corporation, limited liability company, institution, other entity or Governmental Authority.

"**Petition Date**" means February 2, 2026. "**Prepetition Agent**" means the "Agent" as defined under the Prepetition Loan and Security Agreement.

"**Prepetition Lenders**" means the "Lenders" as defined under the Prepetition Loan and Security Agreement.

"**Prepetition Loan and Security Agreement**" means that certain Loan and Security Agreement, dated as of November 14, 2025, by and among, Carbon Health and the other Borrowers and Future Solution Investments LLC, a Wyoming limited liability company, as administrative agent and collateral agent, and the lenders from time to time party thereto, as amended prior to the Petition Date.

"**Prepetition Loan Documents**" means the "Loan Documents" as defined under the Prepetition Loan and Security Agreement.

"**Prepetition Secured Liens**" means (a) the valid, enforceable, properly perfected, and non-avoidable Liens securing the Prepetition Secured Obligations as of the Petition Date, and (b) any Liens afforded to Prepetition Secured Parties in the DIP Order.

"**Prepetition Secured Obligations**" has the meaning specified therefor in the DIP Order.

"**Prepetition Secured Parties**" means the Prepetition Agent and the Prepetition Lenders.

"**Prime Health**" means Prime Healthcare Services Inc.

"**Prime Health Loan Parties**" means Carbon Health Alpha Medical Group of Florida, P.A., Carbon Health Alpha Primary Care of Florida, P.A., Carbon Health Alpha Medical Group of California, P.C., Carbon Health Alpha Primary Care of California, P.C., Carbon Health Alpha Medical Group of Kansas, P.A., and Carbon Health Alpha Primary Care of Kansas, P.A.

"**Prime Health Debt Facility**" means the Indebtedness under that certain Credit Agreement, dated October 20, 2021, between Prime Health (as lender) and the Prime Health Loan Parties.

"**Prime Health Debt Facility Liens**" means the Liens on the property and assets of the Prime Health Loan Parties in favor of Prime Health, securing the Prime Health Debt Facility.

"**Pro Rata**" means, with respect to any Lender, a percentage (rounded to the ninth decimal place) determined (a) while Term Loan Commitments are outstanding, by dividing (i) the aggregate amount of such Lender's Available Term Loan Commitment plus the aggregate amount of such Lender's outstanding Loans by (ii) the Total Available Term Loan Commitments plus the aggregate amount of all outstanding Loans; and (b) at any other time, by dividing (i) the aggregate amount of such Lender's outstanding Loans by (ii) the aggregate amount of all outstanding Loans.

"**Professionals**" means the attorneys, accountants, and other professionals retained, by (a) any Borrower with the approval of the Bankruptcy Court, (b) the Committee, with the approval of the Bankruptcy Court, (c) the Agent, and (d) the Lenders.

"**Project Medical Groups**" means each of (i) the John Muir Loan Parties, (ii) the Prime Health Loan Parties and (iii) and the Stanford Health Loan Parties. .

"**Project Medical Group Clinic Closures**" has the meaning set forth in Section 4.5(b).

"**Project Medical Group Debt Facility**" means each of the John Muir Debt Facility, the Prime Health Debt Facility and the Stanford Health Debt Facility.

"**Public Health Laws**" means all Requirements of Law relating to the procurement, development, clinical and non-clinical evaluation, product approval or licensure, manufacture, production, analysis, distribution, dispensing, importation, exportation, use, handling, quality, sale, labeling, promotion, clinical trial registration or post market requirements of any drug product (including, without limitation, any ingredient or component of the foregoing products) subject to regulation under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.) and the Public Health Service Act (42 U.S.C. § 282(j)), including without limitation all applicable regulations promulgated by the FDA at Title 21 of the Code of Federal Regulations and all applicable regulations promulgated by the National Institutes of Health ("**NIH**") and codified at Title 42, Part 11 of the Code of Federal Regulations.

"**Qualifying Cash Sale**" means any Carbon Health Sale to include, among other things, that such sale shall be on terms and pursuant to definitive documentation, acceptable to the Agent.

"**Receivables**" means, with respect to Carbon Health (i) all Accounts, Instruments, Documents, Chattel Paper, Supporting Obligations, letters of credit, proceeds of any letter of credit, and Letter-of-Credit Rights, and (ii) all customer lists, software, and business records related thereto.

"**Registrations**" shall mean authorizations, approvals, licenses, permits, certificates, registrations, listings, certificates, or exemptions of or issued by any governmental authority that are required for the research, development, manufacture, commercialization, distribution, marketing, storage, transportation, pricing, governmental authority reimbursement, use and sale of Carbon Health Products.

"**Regulatory Action**" means an administrative or regulatory enforcement action, proceeding or investigation, warning letter, untitled letter, Form 483 or similar inspectional observations, other written notice of violation letter, recall, seizure, "Section 305 notice" or other similar written communication, or consent decree, issued or required by the FDA or the NIH under the Public Health Laws or by a comparable governmental authority under similar Requirements of Law in any other regulatory jurisdiction.

"**Required Lenders**" means Lenders having (a) in excess of 50% of the sum of the Total Available Term Loan Commitments plus the aggregate amount of all outstanding Loans; and (b) if all Term Loan Commitments have terminated, in excess of 50% of the aggregate amount of all outstanding Loans.

"**Requirements of Law**" means, with respect to any Person, collectively, the common law and all federal, state, provincial, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities), in each case that are applicable to

and binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Sale Order**" means that certain sale order to be entered by the Bankruptcy Court approving the Carbon Health Sale(s) to the winning bidder(s), such order to be in form and substance satisfactory to the Agent and the Lenders, as the same may be amended, supplemented or otherwise modified from time to time with the prior written consent of the Agent.

"**Sanctioned Country**" means, at any time, a country or territory which is the subject or target of any Sanctions.

"**Sanctioned Person**" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or by the United Nations Security Council, the European Union or any EU member state, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person controlled by any such Person.

"**Sanctions**" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"**SEC**" means the Securities and Exchange Commission or any other similar or successor agency of the Federal government administering the Securities Act or the Exchange Act.

"**Securities Act**" means the Securities Act of 1933, as amended, or any similar Federal statute, and the rules and regulations of the SEC thereunder, all as the same shall be in effect from time to time.

"**Securities Transfer Restriction Agreement**" means a securities transfer restriction agreement, stock transfer restriction agreement, continuity agreement, assignable option agreement, or other agreement pursuant to which Carbon Health or its Subsidiaries restricts the transfer of equity interests in any Medical Group.

"**Stanford Health**" means Stanford Health Care.

"**Stanford Health Loan Parties**" means Carbon Health South Bay Medical Group, P.C. as borrower, and Carbon Health South Bay Primary Care, P.C., as guarantor.

"**Stanford Health Debt Facility**" means the Indebtedness under that certain Delayed Draw Term Loan Credit and Guaranty Agreement, dated May 23, 2022, between Stanford Health and the Stanford Health Loan Parties.

"**Stanford Health Debt Facility Liens**" means the Liens on the property and assets of the Stanford Health Loan Parties in favor of Stanford Health, securing the Stanford Health Debt Facility.

"**Subsidiary**" means an entity, whether corporate, partnership, limited liability company, joint venture or otherwise, in which a Person owns or controls, directly or indirectly, more than 50% of the outstanding voting securities of such entity, provided that the Medical Groups will not be considered a subsidiary of Carbon Health.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges in the nature of a tax imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Loan**" means a term loan made by a Lender to a Borrower pursuant to Section 2.1(a), as the same may be assigned in accordance with Section 10.13.

"**Term Loan Commitment**" means, with respect to each Lender, the commitment of such Lender to make Term Loans to the Borrowers, in each case, in the amount set forth opposite such Lender's name on Schedule 1.1(A).

"**Term Loan Date**" means the funding date of any Term Loan.

"**Third Party Payor**" means Medicare, Medicaid, and other state or federal health care programs, private insurers, managed care plans and any other Person or entity which presently or in the future maintains Third Party Payor Programs.

"**Third Party Payor Programs**" means all payment and reimbursement programs, sponsored by a Third Party Payor, in which a Borrower, Subsidiary or a Medical Group participates.

"**Total Available Term Loan Commitments**" means the sum of the amounts of the Lenders' Available Term Loan Commitments.

"**Total Term Loan Commitments**" means the sum of the amounts of the Lenders' Term Loan Commitments; provided that (a) prior to the Final Facility Effective Date such aggregate amount shall not exceed $9,000,000, and (b) on and after the Final Facility Effective Date such aggregate amount shall not exceed $19,500,000. For the avoidance of doubt, the Total Term Loan Commitment amount on the Final Facility Effective Date includes and is not in addition to the Total Term Loan Commitment amount in effect on the Interim Facility Effective Date.

"**Trademark License**" means any written agreement granting any right to any Borrower to use any Trademark or Trademark registration, now owned or hereafter acquired by any Borrower or in which any Borrower now holds or hereafter acquires any interest.

"**Trademarks**" means all trademarks (registered, common law or otherwise) and any applications in connection therewith, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof.

"**Transfer**" has the meaning set forth in Section 7.15.

21

"**Treasury Regulation**" means the regulations (including any proposed and temporary regulations) promulgated by the United States Department of Treasury with respect to the Internal Revenue Code or other United States federal Tax statutes.

"**Turkish Subsidiary**" means Inofab Saghk Teknolojileri Anonim Sirketi, a company existing under the laws of the Republic of Turkey or any successor entity and a wholly-owned Subsidiary of Carbon Health.

"**UCC**" means the Uniform Commercial Code as the same is, from time to time, in effect in the State of New York; provided, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, the Agent's Lien on any DIP Collateral is governed by the Uniform Commercial Code as the same is, from time to time, in effect in a jurisdiction other than the State of New York, then the term "UCC" shall mean the Uniform Commercial Code as in effect, from time to time, in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"**U.S. Trustee**" means the United States Trustee for the Southern District of Texas.

"**Variance Report**" has the meaning specified therefor in Section 7.1(c).

**1.2    Certain Matters of Construction**.

The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Any reference herein to any Person shall be construed to include such Person's successors and assigns. The words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof. Unless otherwise specified, all references in this Agreement or any Annex or Schedule hereto to a "Section," "subsection," "Exhibit," "Annex," or "Schedule" shall refer to the corresponding Section, subsection, Exhibit, Annex, or Schedule in or to this Agreement. Unless otherwise specifically provided herein, any accounting term used in this Agreement or the other Loan Documents shall have the meaning customarily given such term in accordance with GAAP, and all financial computations hereunder shall be computed in accordance with GAAP, consistently applied.

Unless otherwise defined herein or in the other Loan Documents, terms that are used herein or in the other Loan Documents and defined in the UCC shall have the meanings given to them in the UCC, including: "Accounts", "Account Debtor", "Cash Proceeds", "Certificate of Title", "Chattel Paper", "Commercial Tort Claim", "Commodity Account", "Commodity Contracts", "Deposit Account", "Documents", "Electronic Chattel Paper", "Equipment", "Fixtures", "General Intangibles", "Goods", "Instruments", "Inventory", "Investment Property", "Letter-of-Credit Rights", "Noncash Proceeds", "Payment Intangibles", "Proceeds", "Promissory Notes", "Record", "Security Account", "Software", "Supporting Obligations" and "Tangible Chattel Paper". The words "asset" and "property" shall be construed to have the same meaning and effect and to refer

to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

References in this Agreement to "determination," "satisfaction," "waiver," "consent," "approval" or words of similar import with respect to any action by the Agent or any Lender shall, in each case, be in the Agent's or such Lender's sole and absolute discretion unless otherwise expressly modified by a different standard. A Default or Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing by the Lenders or Required Lenders, as the case may be, pursuant to the terms and conditions this Agreement or, only in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the Lenders or the Required Lenders, as the case may be. Any Lien referred to in this Agreement or any other Loan Document as having been created in favor of the Agent, any agreement entered into by the Agent pursuant to this Agreement or any other Loan Document, any payment made by or to or funds received by the Agent pursuant to or as contemplated by this Agreement or any other Loan Document, or any act taken or omitted to be taken by the Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of the Agent and the Lenders. Wherever the phrase "to the knowledge of any Borrower" or words of similar import relating to the knowledge or the awareness of any Borrower are used in this Agreement or any other Loan Document, such phrase shall mean and refer to (i) the actual knowledge of a senior officer of such Borrower or (ii) the knowledge that a senior officer would have obtained if such officer had engaged in good faith and diligent performance of such officer's duties, including the making of such reasonably specific inquiries as may be necessary of the employees or agents of such Borrower and a good faith attempt to ascertain the existence or accuracy of the matter to which such phrase relates. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists. In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder. Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern daylight saving time, as in effect in City of New York on such day. For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; provided, however, that with respect to a computation of fees or interest payable to any Agent or any Lender, such period shall in any event consist of at least one full day.

## SECTION 2.  THE LOANS.

**2.1**    **Term Loan Commitments**.

(a)    Term Loans. Subject to the terms and conditions of, and relying on the representations and warranties set forth in, this Agreement, each Lender severally agrees to make the

delayed-draw term loans to the Borrowers (collectively, the "**Term Loans**" and each, a "**Term Loan**") in the amount of such Lender's Pro Rata share of Term Loans (not to exceed such Lender's Term Loan Commitment in effect on the Interim Facility Effective Date or the Final Facility Effective Date, as applicable) as follows:

(i)     from and after the Interim Facility Effective Date up to the Maturity Date, a delayed-draw term loan in an aggregate original principal amount up to $9,000,000 in accordance with, and subject to the timing set forth in, the Approved Budget; and

(ii)    from and after the Final Facility Effective Date up to the Maturity Date, delayed-draw term loans in an aggregate original principal amount up to $19,500,000 in accordance with, and subject to the timing set forth in, the Approved Budget;

it being understood and agreed, that any amount of such delayed-draw terms loans not made in any of the above noted periods (i)-(ii), may be carried forward to the next succeeding period and available to be drawn prior to the Maturity Date.

(b)     Notwithstanding the foregoing and for the avoidance of doubt:

(i)     The available Term Loan Commitment for each Lender in effect from time to time for the making of Term Loans (during the Interim Period or the Final Period, as applicable), shall be the Term Loan Commitment <u>minus</u> an amount equal to the sum of the original principal amount of all Term Loans made on and after the Interim Facility Effective Date by such Lender (such available commitment amount, the "**Available Term Loan Commitment**").

(ii)    The aggregate principal amount of outstanding Term Loans at any time shall not exceed the Total Term Loan Commitment.

(iii)   No Term Loan may be reborrowed.  The Available Term Loan Commitment of each Lender, if any, shall automatically and permanently be reduced to zero on the Maturity Date.

(c)     <u>Making the Term Loans</u>.     The applicable Borrower shall give the Agent prior telephonic notice (immediately confirmed in writing, in substantially the form of Exhibit B hereto (a "**Notice of Borrowing**")), not later than 12:00 p.m. noon (Eastern time) on the date which is two (2) Business Days prior to the date of the proposed Term Loan (or such shorter period as the Agent is willing to accommodate from time to time).  Such Notice of Borrowing shall be irrevocable and shall specify (i) the principal amount of the proposed Term Loan not to exceed the aggregate maximum amount of such Term Loans for the period set forth in Section 2.1(a), (ii) the proposed borrowing date which shall occur within the applicable period set forth in Section 2.1(a), unless an earlier date is consented to in writing by the Agent; provided that if such date is not a Business Day, such funding date shall be the next succeeding Business Day, (iii) the disbursements to be funded with the proposed Term Loan, in accordance with the line items in the Approved Budget, and (iv) confirming wire instructions that the proceeds of the proposed

Term Loan shall be funded in the manner specified in the Notice of Borrowing. The disbursements to be funded and paid with the proposed Term Loan shall only be the disbursements set forth in such Notice of Borrowing, consistent with the Approved Budget. The Agent and the Lenders may act without liability upon the basis of written, faxed or telephonic notice believed by the Agent in good faith to be from the applicable Borrower (or from any Authorized Officer thereof designated in writing purportedly from such Borrower to the Agent). Each Borrower hereby waives the right to dispute the Agent's record of the terms of any such telephonic notice. The Agent and each Lender shall be entitled to rely conclusively on any Authorized Officer's authority to request a Term Loan on behalf of the applicable Borrower until the Agent receives written notice to the contrary. The Agent and the Lenders shall have no duty to verify the authenticity of the signature appearing on any written Notice of Borrowing. Notwithstanding the foregoing, if a Default or Event of Default has occurred and is continuing, no Lender shall have any obligation to make any requested Term Loan hereunder.

(d) <u>Interest; Payments</u>.

    (i) The principal balance of each Loan shall bear interest thereon from the applicable Term Loan Date at the Interest Rate based on a year consisting of 365 days, with interest computed daily based on the actual number of days elapsed.

    (ii) The Borrowers will pay interest on the Loans in kind on the first Business Day of each calendar month and such interest will be added as principal Obligations as of such date, beginning on the first day of the month immediately following the Interim Facility Effective Date.

    (iii) The entire principal balance of the Loans and all other Obligations, including all accrued but unpaid interest hereunder and all fees and Lender Expenses, shall be due and payable on the Maturity Date. The Borrowers jointly and severally hereby unconditionally promise to make all payments under this Agreement without setoff, recoupment or deduction and regardless of any counterclaim or defense. Payments to each Lender hereunder shall be made to such Lender at the account from time to time designated by such Lender by written notice to the Borrowers. Each installment or other payment on account of any Loan shall be paid to the Lenders in accordance with their Pro Rata shares.

**2.2**   **Maximum Interest.** Notwithstanding any provision in this Agreement or any other Loan Document, it is the parties' intent not to contract for, charge or receive interest at a rate that is greater than the maximum rate permissible by law that a court of competent jurisdiction shall deem applicable hereto (which under the laws of the State of New York shall be deemed to be the laws relating to permissible rates of interest on commercial loans) (the "**Maximum Rate**"). If a court of competent jurisdiction shall finally determine that any Borrower has actually paid to the Lenders an amount of interest in excess of the amount that would have been payable if all of the Obligations had at all times borne interest at the Maximum Rate, then such excess interest actually paid by such Borrower shall be applied as follows: <u>first</u>, to the payment of principal outstanding on the Loans, as applicable; <u>second</u>, after all principal is repaid, to the payment of the Lenders' accrued

interest, costs, expenses, professional fees and any other applicable Obligations; and <u>third</u>, after all applicable Obligations are repaid, the excess (if any) shall be refunded to such Borrower.

**2.3**   **Default Interest**.  Upon the occurrence and during the continuation of an Event of Default hereunder, all Obligations, including principal, and unpaid Lender Expenses, shall bear interest at a rate per annum equal to the Interest Rate plus three percent (3%) per annum.  Such default interest shall be payable on demand and in the event such interest is not paid when due hereunder, delinquent interest shall be added to principal and shall bear interest on interest, compounded at the Interest Rate.

**2.4**   **Prepayment.**

(a)   <u>Optional Prepayment</u>.  At its option and with five (5) Business Days' prior written notice to the Agent and the Lenders, any Borrower may prepay, without penalty or premium, all or a portion of its outstanding applicable Loans by paying such principal amount and all accrued and unpaid interest thereon.

(b)   <u>Mandatory Prepayment</u>.

(i)   <u>Dispositions</u>.  Subject to the DIP Order and the priorities set forth in this Agreement, upon any sale or disposition of any Borrower's property or assets constituting DIP Collateral (including upon a Carbon Health Sale but other than a disposition described under clauses (i), (ii) and (iii) of the definition of Permitted Dispositions), such Borrower shall promptly, and in any event with two (2) Business Days thereof, apply 100% of the Net Cash Proceeds of such sale or disposition in accordance with Section 9.2.  Nothing contained in this clause shall permit any Borrower to sell or dispose of its property or assets other than in accordance with Section 7.15.

(ii)   <u>Extraordinary Receipts</u>.  Subject to the DIP Order, promptly upon the receipt by any Borrower of any Extraordinary Receipts, and in any event within two (2) Business Days, such Borrower shall prepay the outstanding principal amount of the applicable Loans in accordance with Section 9.2 in an amount equal to 100% of the Net Cash Proceeds from such Extraordinary Receipts.

(iii)   <u>DIP Orders</u>.   Without limiting any other provision of this Agreement or any other Loan Document permitting or requiring prepayment of any Loans, in whole or in part, each Borrower shall repay its Obligations in full in cash, if the Final DIP Order has not been entered by the date required in the Interim DIP Order.

(c)   <u>Interest and Fees</u>.   Any prepayment made pursuant to this Section 2.4 shall be accompanied by the payment of (i) accrued interest on the principal amount being prepaid to the date of prepayment and (ii) if such prepayment would reduce the amount of the outstanding Loans to zero at a time when the Total Term Loan Commitments have been reduced to zero, such prepayment by any Borrower shall be accompanied by the payment of all fees accrued to such date and all Lender Expenses.

**2.5**     **Payment of Other Obligations**.  Other Obligations shall be paid by each Borrower as provided in the Loan Documents or, if no payment date is specified, on demand.

**2.6**     **Taxes.**

    (a)     <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any Loan or any other obligation of any Borrower under this Agreement or any other Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law requires the deduction or withholding of any Tax from any such payment by any Borrower, then such Borrower shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, the sum payable by such Borrower to the Agent and each Lender shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.6) the Agent and each Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

    (b)     <u>Payment of Other Taxes by the Borrowers</u>.  Each Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

    (c)     <u>Evidence of Payment</u>.  As soon as practicable after any payment of Taxes or Other Taxes by any Borrower to a Governmental Authority pursuant to this Section 2.6, such Borrower shall deliver to the Agent and each Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment, or other evidence of such payment reasonably satisfactory to the Agent and each Lender.

    (d)     <u>Indemnification by the Borrowers</u>.  Each Borrower shall indemnify the Agent and each Lender for (i) any Indemnified Taxes that are paid or payable by the Agent or such Lender in connection with or relating to any Loan of such Borrower and the other transactions contemplated by this Agreement or any other Loan Documents (including amounts paid or payable as a result of any additional payments made under this Section 2.6), (ii) any Taxes that are paid or payable by the Agent or such Lender as a result of any breach by any Borrower of any of its covenants under this Agreement, and (iii) any costs or expenses incurred by the Agent or such Lender with respect to a Tax described in clause (i) or (ii) immediately above.  The indemnity under this Section 2.6(d) shall be paid within 10 days after the Agent or any Lender delivers to any Borrower a certificate stating the amount of any Taxes so paid or payable by the Agent or such Lender together with a statement of any related costs or expenses, and shall be payable by such Borrower whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; provided that each Borrower is given a reasonable opportunity to contest such Taxes (at the sole cost and expense of such Borrower).  Such certificate shall be conclusive of the amount so paid or payable and of the costs or expenses related thereto absent manifest error.

(e) <u>Status of Lenders</u>.  Each Lender shall have delivered, and any Assignee shall deliver, to the Borrowers an original duly completed (i) Internal Revenue Service Form W-9 (or any successor form) or (ii) U.S. Internal Revenue Service Form W-8BEN, W-8ECI or W-8IMY or other applicable form or documentation (or any subsequent versions thereof or successors thereto), if claiming complete exemption from, or reduced rate of, U.S. Federal withholding tax and payments of interest hereunder.  In addition, upon the request of any Borrower, a Lender or any Assignee shall deliver such other documentation prescribed by applicable law or reasonably requested by such Borrower as will enable such Borrower to determine whether or not such Lender or Assignee is subject to backup withholding or information reporting requirements.  Each Lender and Assignee agrees that, upon the occurrence of any change in circumstances which would modify or render invalid any such claimed exemption or reduction or form delivered by such Person, will, if requested by any Borrower, use reasonable efforts to designate another lending office for the Loans with the object of avoiding the consequences of such event; provided that such designation is made on terms that shall not cause (in the sole judgment of such Lender or such Assignee) such Lender or Assignee and its lending office to suffer any material economic, legal or regulatory disadvantage.

(f) <u>FATCA</u>.  If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to the applicable Borrower and the Agent at the time or times prescribed by law and at such time or times reasonably requested by such Borrower or the Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by such Borrower or the Agent as may be necessary for such Borrower and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (f), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(g) <u>Survival</u>.  Each party's obligations under this Section 2.6 shall survive any assignment of rights by, or the replacement of, a Lender, and shall survive the repayment, satisfaction or discharge of all of the Loans and the other obligations under this Agreement or under any other Loan Document, subject only to the limitation on the rights of an Assignee as specifically set forth in Section 10.13 of this Agreement.

**2.7** **Pro Rata.**  All principal, interest, and fees (other than fees under Section 10.11 or otherwise as expressly provided herein) due and payable hereunder shall be paid by the Borrowers jointly and severally to each Lender on a Pro Rata basis.

**SECTION 3.  SECURITY INTERESTS.**

**3.1** **<u>DIP Collateral; Grant of Liens and Security Interests</u>**.

Subject to the entry thereof, the DIP Order creates legal and valid Liens on all of the DIP Collateral in favor of the Agent, for the benefit of the Agent and the Lenders and the other holders of the Secured Obligations and such Liens shall constitute perfected and continuing Liens on the DIP Collateral, securing the Obligations, enforceable against the applicable Borrower and all third parties, and having priority over all other Liens on the DIP Collateral, in each case, except to the extent set forth in the DIP Order.

## 3.2 **Administrative Priority**.

Subject to the entry thereof, pursuant to the DIP Order, the Agent, for the benefit of itself and the other Lenders, is granted an allowed DIP Superpriority Claim.

## 3.3 **Survival**.

The Liens, lien priority, administrative priorities and other rights and remedies granted to the Agent and the Lenders pursuant to this Agreement, the DIP Order and the other Loan Documents (specifically including the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by any Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Chapter 11 Cases, or any successor bankruptcy case, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, successor bankruptcy case act or omission:

(a) except for (i) the Carve-Out, and (ii) the claims of any other secured parties in respect of obligations secured by the Permitted Prior Liens, in any other case, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on parity with any claim of the Agent and the Lenders against any Borrower in respect of any Obligation;

(b) upon entry of the DIP Order, the DIP Liens in favor of the Agent and the Lenders referred to in Section 3.1 shall constitute valid and perfected first priority Liens and security interests to which all other Liens and security interests shall be subordinate and junior, and which such Liens and security interests shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever, subject only to the Carve-Out and the Permitted Prior Liens as and to the extent expressly provided in the DIP Order; and

(c) the Liens in favor of the Agent and the Lenders set forth herein, in the DIP Order and in the other Loan Documents shall continue to be valid and perfected without the necessity that the Agent file financing statements, mortgages, Certificates of Title, notices of Lien or other similar instruments or otherwise perfect its Lien under applicable non-bankruptcy law.

## 3.4 **Further Assurances**.

29

Each Borrower shall take any other actions reasonably requested by the Agent from time to time to cause the attachment, perfection and first priority of, and the ability of the Agent and the Lenders to enforce, the security interest of the Agent and the Lenders in any and all of the DIP Collateral, including, (a) executing and delivering any requested security agreement, pledge agreement or mortgage, (b) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC or other applicable law, to the extent, if any, that any Borrower's signature thereon is required therefor, (c) causing the Agent's name to be noted as secured party on any Certificate of Title for a titled good if such notation would be a condition, if not for the Chapter 11 Cases, to attachment, perfection or priority of, or ability of the Agent to enforce, the security interest of the Agent in such DIP Collateral, (d) complying with any provision of any statute, regulation or treaty of the United States as to any DIP Collateral if compliance with such provision would be a condition, if not for the Chapter 11 Cases, to attachment, perfection or priority of, or ability of the Agent to enforce, the security interest of the Agent in such DIP Collateral, (e) using commercially reasonable efforts to obtain the consent and approval of any Governmental Authority or third party, including any consent of any licensor, lessor or other Person obligated on the DIP Collateral, and taking all actions required by any earlier versions of the UCC or by other law, as applicable in any relevant jurisdiction, and (f) complying with any changing requirements to effectuate the provisions of Section 10.9. For the avoidance of doubt, the failure to execute, deliver, obtain or file any agreement or other document, obtain any consent, approval or compliance by any Person or Governmental Authority or any other action, as further described above, shall not impair or otherwise affect the Liens and security interests granted by or pursuant to this Agreement, the DIP Order, or any other Loan Document.

## SECTION 4. CONDITIONS PRECEDENT.

**4.1     Conditions Precedent to the Interim Period Effectiveness**.   This Agreement shall become effective as of the Business Day (the "**Interim Facility Effective Date**") when each of the following conditions precedent shall have been satisfied in a manner satisfactory to the Agent and the Lenders or waived by the Agent and the Lenders:

(a)     Interim DIP Order.  The Interim DIP Order shall have been entered by the Bankruptcy Court within three (3) Business Days after the Petition Date, and the Agent shall have received a true and complete copy of such order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, or vacated, absent prior written consent of the Agent and the Borrowers.  The Interim DIP Order shall, among other things, (i) find and conclude that the Loan Documents were negotiated in good faith and that the Agent and the Lenders are entitled to the protections of Section 364(e) of the Bankruptcy Code and (ii) order that, during the Interim Period, the Liens and security interests in favor of the Agent referred to in Section 3.1 hereof shall be valid and perfected Liens and security interests in the DIP Collateral prior to all other Liens and security interests in such DIP Collateral, subject only to the Carve-Out and the Permitted Prior Liens as and to the extent expressly provided in the Interim DIP Order.

(b)     [Reserved].

(c)     Fees and Expenses.  Each Borrower shall have (i) paid in full in cash, notwithstanding anything in Section 10.11 to the contrary, all fees and expenses incurred by the Agent,

including all legal fees, and (ii) reimbursed each Lender for such Lender's current expenses reimbursable pursuant to this Agreement (including all Lender Expenses), in each case which amounts may be deducted or paid substantially concurrently from the initial Term Loans, as applicable, if made on the Interim Facility Effective Date.

(d) <u>Delivery of Loan Documents</u>.  Each Borrower shall have delivered to the Agent an executed copy of this Agreement, together with all schedules and exhibits thereto, and all other documents and instruments required by the Agent and the Lenders to effectuate the transactions contemplated hereby, in all cases in form and substance acceptable to the Agent and the Lenders.

(e) <u>Representation and Warranties; No Event of Default</u>.  The representations and warranties set forth in Section 5 of this Agreement shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the Interim Facility Effective Date.  No Event of Default shall have occurred and be continuing.

(f) <u>Closing Certificate</u>.  A certificate of an Authorized Officer of each Borrower, certifying as to the matters set forth in clause (e) of this Section.

(g) <u>Company Certificate</u>.  A certificate of an Authorized Officer of each Borrower, certifying (i) a copy of the resolutions of the Board of Directors, evidencing approval of this Agreement, the borrowings hereunder, the grant of the security interests and Liens and the other transactions evidenced by the Loan Documents, and (ii) certifying the names and true signatures of the representatives of each Borrower authorized to sign each Loan Document to which it is or will be a party and the other documents to be executed and delivered by such Borrower in connection herewith and therewith, together with evidence of the incumbency of such Authorized Officers.

(h) <u>Good Standing</u>.  Each Borrower shall have delivered to the Agent a certificate of good standing for such Borrower from its state of incorporation and similar certificates from all other jurisdictions in which it does business and where the failure to be qualified would have a Material Adverse Effect.

(i) <u>Approved Budget</u>.  Carbon Health shall have delivered a copy of the Approved Budget together with a certificate of an  Authorized Officer of Carbon Health, stating that such Approved Budget has been prepared on a reasonable basis and in good faith and is based on assumptions believed by Carbon Health to be reasonable at the time made and from the best information then available to Carbon Health, which Approved Budget shall be in form and substance satisfactory to the Agent and the Lenders.

(j) <u>Insurance</u>.  Each Borrower shall have provided evidence of the insurance coverage required by Section 6 and such other insurance coverage with respect to the operations and property of such Borrower as the Agent may request together with evidence of the payment of all premiums due in respect thereof for such period as the Agent may request.

(k) [Reserved].

(l) [Reserved].

(m) <u>Material Adverse Effect</u>.  The Agent shall have determined in its sole judgment that no event or development shall have occurred, which could reasonably be expected to have a Material Adverse Effect.

(n) <u>Lien Priority</u>.  The Agent shall be satisfied that it has been granted, and holds for the benefit of the Agent and the Lenders, perfected, first priority Liens on, and security interests in, all of the DIP Collateral, subject to the Carve-Out and Permitted Prior Liens as and to the extent expressly provided in the Interim DIP Order.

(o) <u>Approvals</u>.  All consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required in connection with the making of the Loans or the conduct of each Borrower's operations shall have been obtained and shall be in full force and effect.

(p) <u>Chapter 11 Cases</u>.  No trustee, examiner or receiver shall have been appointed or designated in the Chapter 11 Cases with respect to any Borrower's operations, properties or assets and no motion shall be pending seeking any relief or seeking any other relief in the Bankruptcy Court to exercise control over any of the DIP Collateral with an aggregate value in excess of $250,000.

(q) <u>Proceedings; Receipt of Documents</u>.  All proceedings in connection with the making of the initial Term Loans and the other transactions contemplated by this Agreement and the other Loan Documents, and all documents incidental hereto and thereto, shall be satisfactory to the Agent and its counsel, and the Agent and such counsel shall have received all such information and such counterpart originals or certified or other copies of such documents as the Agent or such counsel may reasonably request.

**4.2**  **Conditions Precedent to Final Period Effectiveness**.  The obligation of any Lender to make any Loan during the Final Period shall commence as of the Business Day (the "**Final Facility Effective Date**") when each of the following conditions precedent shall have been satisfied in a manner satisfactory to the Agent and the Lenders or waived by the Agent and the Lenders:

(a) <u>Final DIP Order</u>.  The Final DIP Order shall have been signed and entered by the Bankruptcy Court within thirty-five (35) days after the Petition Date, and the Agent shall have received a true and complete copy of such order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, or vacated, absent prior written consent of the Agent and the Borrowers.  The Final DIP Order shall, among other things, (i) find and conclude that the Loan Documents were negotiated in good faith and that the Agent and the Lenders are entitled to the protections of Section 364(e) of the Bankruptcy Code, and (ii) order that, on the Final Facility Effective Date, the Liens and security interests in favor of the Agent referred to in Section 3.1 hereof shall be valid and perfected Liens and security interests in the DIP Collateral prior to all

other Liens and security interests in the DIP Collateral subject only to the Carve-Out and the Permitted Prior Liens as and to the extent expressly provided in the Final DIP Order.

(b) <u>Bid Procedures Order</u>. The Bid Procedures Order shall have been signed and entered by the Bankruptcy Court by the applicable Milestone date.

(c) <u>Disclosure Statement Order</u>. The Disclosure Statement Order shall have been signed and entered by the Bankruptcy Court by the applicable Milestone date.

(d) <u>Fees and Expenses</u>. The Borrowers shall have (i) paid in full in cash all fees and expenses incurred by the Agent, including all legal fees, and (ii) reimbursed each Lender for such Lender's current expenses reimbursable pursuant to this Agreement (including all Lender Expenses), in each case which amounts may be deducted or paid substantially concurrently from the Term Loans.

(e) <u>Representation and Warranties; No Default or Event of Default</u>. The representations and warranties set forth in Section 5 of this Agreement shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the Final Facility Effective Date. No Default or Event of Default shall have occurred and be continuing.

(f) <u>Lien Priority</u>. The Agent shall be satisfied that it has been granted, and continues to hold, for the benefit of the Agent and the Lenders, perfected, first priority Liens on, and security interests in, all of the DIP Collateral, subject to the Carve-Out and Permitted Prior Liens as and to the extent expressly provided in the Final DIP Order, as the case may be.

(g) <u>Material Adverse Effect</u>. The Agent shall have determined in its sole judgment that no event or development shall have occurred, which could reasonably be expected to have a Material Adverse Effect.

**4.3 Delivery of Documents**. The Agent shall have received such other agreements, instruments, approvals and other documents, each in form and substance satisfactory to the Agent, as any Agent may reasonably request.

**4.4 Conditions Precedent to Term Loans**. In addition to the conditions precedent under Section 4.1 and Section 4.2, as applicable, the obligation of any Lender to make any Term Loan upon and after the Interim Facility Effective Date is subject to the fulfillment, in a manner satisfactory to the Agent, of each of the following conditions precedent:

(a) <u>Fees and Expenses</u>. The Borrowers shall have (i) paid in full in cash all fees and expenses incurred by the Agent, including all legal fees, and (ii) reimbursed each Lender for such Lender's current expenses reimbursable pursuant to this Agreement (including all Lender Expenses), in each case which amounts may be deducted or paid substantially concurrently from the Term Loans.

(b)  <u>Representation and Warranties; No Default or Event of Default</u>.  The representations and warranties set forth in Section 5 of this Agreement shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the Term Loan Date.  No Default or Event of Default shall have occurred and be continuing as of the Term Loan Date.

(c)  <u>Notice of Borrowing</u>.  The Agent shall have received a Notice of Borrowing pursuant to Section 2.1(c) hereof.

(d)  <u>Delivery of Documents</u>.  The Agent shall have received such other agreements, instruments, approvals and other documents, each in form and substance satisfactory to the Agent, as any Agent may reasonably request.

**4.5**    **Conditions Subsequent to Effectiveness**

As an accommodation to the Borrowers, the Agent and the Lenders have agreed to execute this Agreement and to make Terms Loans on and after the Interim Facility Effective Date notwithstanding the failure by the Borrowers to satisfy the conditions set forth below on or before the Interim Facility Effective Date.  In consideration of such accommodation, each Borrower agrees that, in addition to all other terms, conditions and provisions set forth in this Agreement and the other Loan Documents, including those conditions set forth in Section 4.1 and Section 4.3, each Borrower shall satisfy each of the conditions subsequent set forth below on or before the date applicable thereto (it being understood that (i) the failure by any Borrower to perform or cause to be performed any such condition subsequent on or before the date applicable thereto shall constitute an immediate Event of Default (not subject to any grace or cure period) and (ii) to the extent that the existence of any such condition subsequent would otherwise cause any representation, warranty or covenant in this Agreement or any other Loan Document to be breached, the Lenders hereby waive such breach for the period from the Interim Facility Effective Date until the date on which such condition subsequent is required to be fulfilled pursuant to this Section 4.5):

(a)  Within thirty (30) days after the Interim Facility Effective Date (or such later date as consented to by the Agent), the Borrowers shall deliver an Account Control Agreement in respect of each Deposit Account, Securities Account and Commodity Account of each Borrower (other than Excluded Accounts or any such accounts for which an Existing Account Control Agreement exists, in each case as identified in writing to the Agent), in form and substance reasonably satisfactory to the Agent; and

(b)  Within fourteen (14) days after the Interim Facility Effective Date (or such later date as consented to by the Agent), the Borrowers shall deliver to the Agent a written status report setting forth in reasonable detail the plans of the Project Medical Groups to wind down operations of certain clinics operated by a Project Medical Group (the "**Project Medical Group Clinic Closures**"), including the proposed clinics to be closed and the timeline for such closures.  The clinics proposed to be closed and the form and substance of such report shall be subject to the prior approval of the Agent.

## SECTION 5.  REPRESENTATIONS AND WARRANTIES OF THE BORROWERS.

Each Borrower represents and warrants that:

**5.1**  **Corporate Status**.  Each Borrower (i) is a corporation, limited liability company or professional association duly organized, validly existing and in good standing under the laws of the state or jurisdiction of its organization, (ii) subject to the entry and the terms of the DIP Order, has all requisite power and authority to conduct its business and operations as now conducted and as presently contemplated and to make the borrowings hereunder, and to execute and deliver each Loan Document to which it is a party, and to consummate the transactions contemplated thereby, and (iii) is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except, in the case of clause (iii), where the failure to be so qualified or in good standing could not reasonably be expected to result in a Material Adverse Effect.  Each Medical Group Borrower is validly established as a professional entity in the state or jurisdiction of its formation or is otherwise permitted to provide medical services in each state or jurisdiction in which such Medical Group Borrower operates.

**5.2**  **Collateral.**  Each Borrower owns or has interests in the DIP Collateral, free and clear of all Liens, except for Permitted Liens.  Each Borrower has the power and authority to grant to the Agent the Liens in the DIP Collateral, as security for the Obligations.  All Liens of the Agent in the DIP Collateral are duly perfected Liens, subject to the Permitted Prior Liens as and to the extent expressly provided in the DIP Order.  Schedule 5.2 sets forth a description of the following DIP Collateral: (a) all real property; (b) all Deposit Accounts, Securities Accounts, Commodity Accounts and other investment accounts; and (c) all Commercial Tort Claims.

**5.3**  **Consents.**  Each Borrower's execution, delivery and performance of this Agreement and all other Loan Documents, (i) have been duly authorized by all necessary corporate or limited liability company action of such Borrower, (ii) will not result in the creation or imposition of any Lien upon the DIP Collateral, other than Permitted Liens and the Liens created by this Agreement and the other Loan Documents, (iii) do not violate any provisions of such Borrower's organizational documents or any material law, regulation, order, injunction, judgment, decree or writ to which such Borrower is subject, and (iv) do not, except for the entry of the DIP Order, require any authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or require the consent or approval of any other Person that has not been obtained.  The individual or individuals executing the Loan Documents are duly authorized to do so.

**5.4**  **Litigation**.  Except for pre-petition litigation that is stayed by 11 U.S.C. § 362, the Chapter 11 Cases or as otherwise set forth in Schedule 5.4, there is no pending or, to the best knowledge of each Borrower, threatened action, suit or proceeding affecting such Borrower or any of its properties before any court or other Governmental Authority or any arbitrator that (i) if adversely determined, could have a Material Adverse Effect or (ii) relates to this Agreement or any other Loan Document, the Prepetition Loan and Security Agreement or any other Prepetition Loan Document or any transaction contemplated hereby or thereby.

**5.5**    **Enforceability.**  Subject to entry of the DIP Order, this Agreement is, and each other Loan Document to which any Borrower is or will be a party when delivered hereunder, a legal, valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its terms.

**5.6**    **Use of Proceeds**.  The proceeds of the Loans shall be, or have been, used, subject to the other terms and conditions of this Agreement, to (a) pay fees and expenses related to the Loan Documents and the Chapter 11 Cases and (b) fund working capital of the Borrowers and other general corporate purposes, in each case, as set forth in each Notice of Borrowing and consistent with the Approved Budget that arise in the ordinary course of the applicable Borrower's business. None of the proceeds of the Loans, portion of the Carve-Out, cash collateral or other DIP Collateral proceeds may be used for any purpose prohibited by the DIP Order, including to challenge, as opposed to investigate, the validity, perfection, priority, extent or enforceability of this Agreement and any other Loan Documents, the Prepetition Loan Documents, or the liens or security interests securing the obligations under this Agreement and any other Loan Documents, the Prepetition Loan and Security Agreement or any other Prepetition Loan Documents or to pursue any causes of action of any kind against the Agent, any Lender, the Prepetition Agent or any Prepetition Lender solely in their respective capacities as agent or lenders under this Agreement and any other Loan Documents or the Prepetition Loan and Security Agreement and any other Prepetition Loan Documents, as applicable, or to object to or to oppose any action authorized hereunder or under the DIP Order, and the Borrowers waive their right to challenge and investigate each of the foregoing.  No more than $50,000 of any proceeds hereunder, any DIP Collateral (including cash collateral) or the Carve-Out may be used by the Committee, if any, to investigate (but not to prosecute) the validity, perfection, priority, extent or enforceability of the Prepetition Loan Documents or the liens or security interests securing the obligations under the Prepetition Loan Documents; provided that any party in interest with standing and requisite authority shall have the right to commence any action against the Prepetition Agent and/or the Prepetition Lenders within sixty (60) days from the date of formation of the Committee, as may be extended, in writing, by the Prepetition Agent in its sole discretion.

**5.7**    **Laws**.

(a)    <u>Generally</u>.  No Borrower is in violation of any law, rule or regulation, or in default with respect to any judgment, writ, injunction or decree of any governmental authority, where such violation or default is reasonably expected to result in a Material Adverse Effect. No Borrower is in default under (i) any provision of any agreement or instrument evidencing material Indebtedness in any material respect, or (ii) any other agreement to which it is a party or by which it is bound that is reasonably expected to result in a Material Adverse Effect.  No Borrower is an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act of 1940, as amended.  No Borrower is engaged in one of its important activities in extending credit for margin stock (under Regulations X, T and U of the Federal Reserve Board of Governors).  Each Borrower has complied in all material respects with the Federal Fair Labor Standards Act. No Borrower is a "holding company" or an "affiliate" of a "holding company" or a "subsidiary company" of a "holding company" as each term is defined and used in the Public Utility Holding Company Act of 2005.

(b) <u>Environmental</u>.  None of any Borrower's properties or assets have been used by such Borrower, or to its knowledge, by previous Persons, in disposing, producing, storing, treating, or transporting any hazardous substance other than in material compliance with applicable laws.  Each Borrower has obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all governmental authorities that are necessary to continue their respective businesses as currently conducted.

(c) <u>Anti-Terrorism, etc</u>.  No Borrower, or to the knowledge of any Borrower, any of such Borrower's agents, acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement, is (i) in violation of any Anti-Terrorism Law, (ii) engaging in or conspiring to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law, or (iii) is a Blocked Person.  No Borrower or to the knowledge of any Borrower, any of its agents, acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement, (x) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (y) deals in, or otherwise engages in any transaction relating to, any property or interest in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law. None of the funds to be provided under this Agreement shall be used, directly or indirectly, (A) for any activities in violation of any applicable anti-money laundering, economic sanctions and anti-bribery laws and regulations laws and regulations or (B) for any payment to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**5.8**    **Information Correct and Current**.  No financial statement, exhibit or schedule furnished, by or on behalf of any Borrower to the Agent or any Lender in connection with any Loan Document contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were or are made, not misleading in any material respect at the time such statement was made or deemed made.  Additionally, any and all financial or business projections provided by any Borrower to the Agent and each Lender shall be at the time delivered provided in good faith and based on the most current data and information available to such Borrower, it being recognized by the Agent and each Lender that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount.

**5.9**    **Tax Matters.**  Except as described on Schedule 5.9, (a) each Borrower has filed all federal and material state and local tax returns that it is required to file (or extensions thereof) within the time and manner required by applicable law, (b) each Borrower has duly paid or fully reserved for all material taxes or installments thereof (including any interest or penalties) as and when due, which have or may become due pursuant to such returns, and (c) each Borrower has paid or fully

reserved for any material tax assessment received by such Borrower (including any taxes being contested in good faith and by appropriate proceedings).

**5.10**   **Intellectual Property Claims**.   Except for Permitted Liens, each Borrower is the sole owner of, or otherwise has the right to use, the Intellectual Property material to its business.   As of the Interim Facility Effective Date, except as described on Schedule 5.10, to each Borrower's knowledge, (i) each of the material Copyrights, Trademarks and Patents of such Borrower is valid and enforceable, (ii) no material Intellectual Property of such Borrower has been judged invalid or unenforceable, in whole or in part, by a final, non-appealable decision of a court of competent jurisdiction, and (iii) no claim has been made in writing to such Borrower that any material Intellectual Property of such Borrower violates the rights of any third party, which claim such Borrower believes to be valid and could reasonably be expected to result in a Material Adverse Effect.   No Borrower is in material breach of, nor has any Borrower failed to perform any material obligations under, any of the foregoing contracts, licenses or agreements and, to each Borrower's knowledge, no third party to any such contract, license or agreement is in material breach thereof or has failed to perform any material obligations thereunder, in each case, where such breach or failure would reasonably be expected to result in a Material Adverse Effect.

**5.11**   **Intellectual Property Rights**.   Except as described on Schedule 5.11, each Borrower has all material rights with respect to Intellectual Property necessary in the operation or conduct of such Borrower's business as currently conducted.   Except as would not reasonably be expected to result in a Material Adverse Effect, to Carbon Health's knowledge, Carbon Health owns or has the right to use, pursuant to valid licenses, all software development tools, library functions, compilers and all other third-party software and other items that are used in the design, development, promotion, sale, license, manufacture, import, export, use or distribution of Carbon Health Products.

**5.12**   **Intellectual Property Actions**.   Except as described on Schedule 5.12, no Intellectual Property owned by any Borrower and no Carbon Health Product has been or is subject to any actual or, to the knowledge of any Borrower, threatened (in writing) action, litigation, proceeding (including any proceeding in the United States Patent and Trademark Office or any corresponding foreign office or agency) or outstanding decree, order, judgment, settlement agreement or stipulation that restricts in any manner any Borrower's use, transfer or licensing thereof or that affects the validity, use or enforceability thereof, except in each case, as would not reasonably be expected to have a Material Adverse Effect.   There is no decree, order, judgment, agreement, stipulation, arbitral award or other provision entered into in connection with any action, litigation or proceeding against any Borrower that obligates any Borrower to grant licenses or ownership interests in any future Intellectual Property related to the operation or conduct of the business of any Borrower or in the Carbon Health Products, except in each case, as would not reasonably be expected to have a Material Adverse Effect.   No Borrower has received any written notice or claim challenging or questioning such Borrower's ownership or other rights in any Intellectual Property (or written notice of any claim challenging or questioning the ownership or rights in any licensed Intellectual Property of the owner thereof) or suggesting that any third party has any claim of legal or beneficial ownership with respect thereto, except in each case, as would not reasonably be expected to have a Material Adverse Effect.   To each Borrower's knowledge, neither the use of its Intellectual Property nor the production and sale of any of the Carbon Health Products infringes

the intellectual property or other rights of others, except in each case, as would not reasonably be expected to have a Material Adverse Effect.

**5.13** **Capitalization and Subsidiaries**. Each Borrower's capitalization is set forth on Schedule 5.13 annexed hereto. No Borrower owns any Equity Interests or other securities of any other Person, except as set forth on Schedule 5.13.

**5.14** **Compliance with Healthcare Regulations**. Except as disclosed on Schedule 5.14:

(a)     Each Borrower, each Medical Group and their respective Subsidiaries have timely filed or caused to be timely filed, all material reports required by a Third Party Payor, to have been filed or made. There are no claims, actions or appeals pending (and no Borrower or Medical Group has filed any claims or reports which should result in any such claims, actions or appeals) before any Governmental Authority, including, without limitation, any intermediary or carrier, the Provider Reimbursement Review Board or the Administrator of CMS, with respect to any state or federal Medicare or Medicaid cost reports or claims filed by any Borrower, any Medical Group or any of their respective Subsidiaries, or any disallowance by any Governmental Authority in connection with any audit of such cost reports. Each Borrower meets, in all material respects, the applicable and binding requirements for participation and enrollment in, and receipt of payment for claims submitted to, all Third Paty Payors in which such Person participates or is enrolled. No Borrower has (i) has failed to repay any overpayments received from, or has failed to refund any amount due to, any Third Party Payor in violation of any Healthcare Law, nor (ii) received written notice of, or has any knowledge of, any overpayment or refunds due to any Third Party Payor, other than notices received in the ordinary course of business.

(b)     No Borrower, no Medical Group nor any of their respective Subsidiaries is currently or has in the lesser of (x) the past six (6) years or (y) the time since the formation of such Borrower, Medical Group or Subsidiary been subject to: (1) any state or local governmental investigation, inspection outside of routine surveys and audits related to any license or licensure standards applicable to such Borrower, Medical Group or Subsidiary; (2) any federal, state, local governmental or private payor civil or criminal investigations, audits involving and/or related to any federal, state or private payor healthcare fraud and abuse provisions or contractual prohibition of healthcare fraud and abuse; or (3) any federal, state or private payor investigation, inspection or audit regarding such Borrower, Medical Group or Subsidiary or their activities, including, without limitation, any federal, state or private payor investigation of any Person having "ownership or control interest" in any Borrower, Medical Group or Subsidiary (as that term is defined in 42 C.F.R. § 420.201 et seq.) involving and/or related to healthcare fraud and abuse, false claims under 31 U.S.C. §§ 3729– 3731 or any similar contractual prohibition, or any qui tam action brought pursuant to 31 U.S.C. § 3729 et seq.

(c)     Within the past six (6) years, no director, officer, shareholder, employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. § 420.201) in any Borrower, Medical Group or Subsidiary: (1) has had a civil monetary penalty assessed against him or her pursuant to 42 U.S.C. § 1320a-7a; (2) has been excluded from participation in a Federal Health Care Program (as that term is defined in 42 U.S.C. § 1320a-7b); (3) has been convicted (as that term is defined in 42 C.F.R. § 1001.2) of any of those offenses described in 42 U.S.C. § 1320a-7b or 18 U.S.C. §§ 669, 1035, 1347 or 1518, including without limitation any of the following

categories of offenses: (A) criminal offenses relating to the delivery of an item or service under any Federal Health Care Program (as that term is defined in 42 U.S.C. § 1320a- 7b) or healthcare benefit program (as that term is defined in 18 U.S.C. § 24b); (B) criminal offenses under federal or state law relating to patient neglect or abuse in connection with the delivery of a healthcare item or service; (C) criminal offenses under federal or state law relating to fraud and abuse, theft, embezzlement, false statements to third parties, money laundering, kickbacks, breach of fiduciary responsibility or other financial misconduct in connection with the delivery of a healthcare item or service or with respect to any act or omission in a program operated by or financed in whole or in part by any federal, state or local governmental agency; (D) federal or state laws relating to the interference with or obstruction of any investigations into any criminal offenses described in (1) through (3) above; or (E) criminal offenses under federal or state law relating to the unlawful manufacturing, distribution, prescription or dispensing of a controlled substance; or (4) has been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§ 3729–3731 or qui tam action brought pursuant to 31 U.S.C. § 3729 et seq.  All current arrangements between any Borrower or other Medical Group and any physicians, other healthcare providers or and referral sources comply with all Healthcare Laws.

(d)     Each Borrower and Medical Group and their respective Subsidiaries and their respective employees and contractors, in the exercise of their duties, are and shall continue to be in compliance with all laws, rules, regulations, orders, and decrees of any Governmental Authority (including, without limitation, the Social Security Act, as amended, the rules and regulations promulgated by CMS), and any state laws applicable to the collections on Accounts, any contracts relating thereto or any other DIP Collateral, or otherwise applicable to its business and properties, a violation of which could materially adversely affect its ability to collect on its Accounts or repay the Secured Obligations.

(e)     All Persons providing professional healthcare services for or on behalf of any Borrower, any Medical Group or their respective Subsidiaries (either as an employee or independent contractor) are (i) appropriately licensed in every jurisdiction in which they provide such professional health care services to patients, as applicable and (ii) otherwise in compliance in all material respects with applicable Healthcare Laws in connection with the services provided by such individual on behalf of such Medical Group.

(f)     The terms of each Medical Group Document are in compliance with all applicable Healthcare Laws, and the parties to such Medical Group Documents have performed their respective obligations under such Medical Group Documents in compliance with all applicable Healthcare Laws.

(g)     Within the lesser of (x) the past six (6) years or (y) the time since the formation of any Borrower, any Medical Group or any of their respective Subsidiaries, no state and local licenses, permits, registrations, certifications and other approvals relating to providing healthcare services and other services provided by such Borrower, such Medical Group or such Subsidiary have been suspended, revoked, limited or denied renewal at any time.

**5.15    Healthcare Permits**.  Each Borrower is in compliance with all applicable Healthcare Laws.  Each Borrower and Medical Group and their respective Subsidiaries have (a) each Healthcare Permit and other rights from, and have made all declarations and filings with, all

applicable governmental authorities necessary to engage in the ownership, management and operation of the assets of such Borrower, such Medical Group or such Subsidiary, as applicable, and (b) no knowledge that any Governmental Authority is considering limiting, suspending or revoking any Healthcare Permit. All such Healthcare Permits are valid and in full force and effect and each Borrower and Medical Group and their respective Subsidiaries are in material compliance with the terms and conditions of all such Healthcare Permits, except where failure to be in such compliance or for a Healthcare Permit to be valid and in full force and effect would not have a material adverse effect.

**5.16**   **HIPAA Compliance**. To the extent that and for so long as any Borrower, any Medical Group or any of their respective Subsidiaries is a "covered entity" or "business associate" as either such term is defined under the requirements and implementing regulations at 45 Code of Federal Regulations ("C.F.R.") Parts 160–64 for the Administrative Simplification provisions of Title II, Subtitle F of HIPAA, each Borrower, each Medical Group and their respective Subsidiaries and (a) has undertaken or will promptly undertake all necessary surveys, audits, inventories, reviews, analyses and/or assessments (including any necessary risk assessments) of all areas of its business and operations required by HIPAA; (b) has developed a detailed plan and time line for becoming HIPAA Compliant (a "**HIPAA Compliance Plan**"); and (c) has implemented those provisions of such HIPAA Compliance Plan in all material respects necessary to ensure that such Borrower, such Medical Group or such Subsidiary, as applicable, becomes HIPAA Compliant.

**5.17**   **Billing**. Each Borrower, each Medical Group and their respective Subsidiaries, and, to the knowledge of each Borrower, their respective contractors, have appropriately and legally billed all Third Party Payors and have maintained their records to reflect such billing practices. No funds relating to any Borrower, any Medical Group or any Subsidiaries are now, or, to the knowledge of Borrower will be, withheld by any Third Party Payor. All Medicare, Medicaid, and private insurance cost reports and financial reports submitted by any Borrower, any Medical Group or any Subsidiary are and will be materially accurate and complete and have not been and will not be misleading in any material respects.

## SECTION 6.  INSURANCE; INDEMNIFICATION.

**6.1**   **Coverage**.  Carbon Health shall cause to be carried and maintained commercial general liability insurance, on an occurrence form, against risks customarily insured against in Carbon Health's line of business. Such risks shall include the risks of bodily injury, including death, property damage, personal injury, advertising injury, and contractual liability per the terms of the indemnification agreement found in Section 6.3.  Carbon Health must maintain a minimum of $2,000,000 of commercial general liability insurance for each occurrence.  Carbon Health has and agrees to maintain a minimum of $1,000,000 of directors' and officers' insurance for each occurrence.  So long as there are any Obligations outstanding, Carbon Health shall also cause to be carried and maintained insurance upon the DIP Collateral, insuring against all risks of physical loss or damage howsoever caused, in an amount not less than the full replacement cost of the DIP Collateral, provided that such insurance may be subject to standard exceptions and deductibles.  If Carbon Health fails to obtain the insurance called for by this Section 6.1 or fails to pay any premium thereon or fails to pay any other amount which Carbon Health is obligated to pay under this Agreement or any other Loan Document or which may be required to preserve the DIP Collateral, Agent may obtain such insurance or make such payment, and all amounts so paid by

Agent are immediately due and payable, bearing interest at the then highest rate applicable to the Obligations, and secured by the DIP Collateral. Agent will make reasonable efforts to provide Carbon Health with notice of Agent obtaining such insurance at the time it is obtained or within a reasonable time thereafter. No payments by Agent are deemed an agreement to make similar payments in the future or Agent's waiver of any Event of Default.

**6.2** **Insurance Certificates.** Carbon Health shall deliver to the Agent and Lenders certificates of insurance that evidence Carbon Health's compliance with its insurance obligations in <u>Section 6.1</u> and the obligations contained in this <u>Section 6.2</u>. Carbon Health's insurance certificate shall state the Agent is an additional insured for commercial general liability and a loss payee for property insurance with respect to the DIP Collateral. Attached to the certificates of insurance will be additional insured endorsements for liability and lender's loss payable endorsements for property damage insurance with respect to the DIP Collateral, or other endorsements reasonably acceptable to the Agent. All certificates of insurance with respect to the DIP Collateral will provide for (a) subject to subclause (b) in this <u>Section 6.2</u>, a minimum of thirty (30) days advance written notice to the Agent of cancellation, (b) a minimum of ten (10) days' advance written notice to the Agent for cancellation due to non-nonpayment, or (c) other evidence of notice of cancellation reasonably acceptable to the Agent. Any failure of the Agent or any Lender to scrutinize such insurance certificates for compliance is not a waiver of the Agent's or any Lender's rights, all of which are reserved.

**6.3** **Indemnity.** Carbon Health agrees to indemnify and hold the Agent and each Lender and its officers, directors, employees, agents, attorneys, accountants, appraisers, auditors, business valuation experts, environmental engineers or consultants, financial advisors, turnaround consultants, other professionals and experts, representatives and equity holders harmless (each, an "**Indemnitee**"), on an after tax basis, from and against any and all claims, costs, expenses, damages and liabilities (including such claims, costs, expenses, damages and liabilities based on liability in tort, including strict liability in tort), including reasonable attorneys' fees and disbursements and other costs of investigation or defense (including those incurred upon any appeal), that may be instituted or asserted against or incurred by any Indemnitee as the result of credit having been extended, suspended or terminated under this Agreement and the other Loan Documents or the administration of such credit, or in connection with or arising out of the transactions contemplated hereunder and thereunder, or any actions or failures to act in connection therewith, or arising out of the disposition or utilization of the DIP Collateral, excluding in all cases claims of any Indemnitee resulting from such Indemnitee's bad faith, breach of contract, gross negligence or willful misconduct as determined by a final, non-appealable decision of a court of competent jurisdiction (collectively, the "**Indemnified Claims**"). This <u>Section 6.3</u> shall not apply with respect to Taxes other than any Taxes that represent costs, expenses, losses, claims, damages or liabilities arising from any non-Tax claim.

## SECTION 7. COVENANTS OF THE BORROWERS.

So long as any principal of or interest on any Loan or any other Obligation of the Borrowers (whether or not due) shall remain unpaid or any Lender shall have any Term Loan Commitment to the Borrowers hereunder, each Borrower, as applicable, agrees as follows:

**7.1**    **Reports**.  Carbon Health shall furnish to the Agent and the Lenders the following financial statements and reports:

(a)    as soon as practicable (and in any event within thirty (30) days) after the end of each calendar month, unaudited interim and year-to-date financial statements as of the end of such month (prepared on a consolidated basis), including balance sheet and related statements of income and cash flows, all certified by Carbon Health's Authorized Officer to the effect that they have been prepared in accordance with GAAP, except (i) for the absence of footnotes, (ii) that they are subject to normal year-end adjustments, and (iii) they do not contain certain non-cash items that are customarily included in quarterly and annual financial statements;

(b)    on the Interim Facility Effective Date and every two (2) weeks thereafter an updated 13-week cash flow forecast to extend out through the succeeding 13-week period, in substantially the same form as the Approved Budget then in effect, and such cash flow forecast shall constitute the "Approved Budget" once approved by the Agent in writing (provided, that, until the Agent approves any such updated cash flow forecast, the Approved Budget then in effect shall continue to be the "Approved Budget" and any amounts to be funded that are not in the "Approved Budget" shall be solely in the discretion of the Agent);

(c)    on Wednesday of every second week, commencing with the first Wednesday after the First Measurement Period, a variance and compliance report (a "**Variance Report**") (A) showing the comparison of, and the variances between, actual performance to projections for each line item of the Approved Budget and reconciling operating cash receipts,  and operating disbursements of cash, for the Measurement Period most recently ended, and (B) a certificate from a senior officer or financial advisor of Carbon Health, commencing with the Variance Report for the First Measurement Period, (1) certifying the calculation and compliance of the Permitted Variances under Section 7.23 for the Measurement Period most recently ended and (2) including explanations for all unfavorable variances in excess of the Permitted Variances set forth in Section 7.23.  For purposes hereof, "**Measurement Period**" means the trailing two-week period ending on every second Friday; provided that, and notwithstanding the foregoing, the first Measurement Period shall be the first full two-week period ending on the Friday after the Closing Date (the "**First Measurement Period**"), and each Measurement Period thereafter shall be a two-week period ending on Friday of every second week thereafter;

(d)    promptly after the sending or filing thereof, as the case may be, copies of any proxy statements, financial statements or reports that any Borrower has made available to holders of its Equity Interests and copies of any regular, periodic and special reports or registration statements that any Borrower files with the SEC or any Governmental Authority that may be substituted therefor, or any national securities exchange;

(e)    as soon as possible, and in any event within two (2) Business Days after the occurrence of a Default or an Event of Default or the occurrence of any event or development that could reasonably be expected to result in a Default or Event of Default or to have, either individually or in the aggregate, a Material Adverse Effect, the written statement of an

Authorized Officer of Carbon Health setting forth the details of such Default or Event of Default or other event or development having a Material Adverse Effect and the action which the Borrowers propose to take with respect thereto;

(f)   promptly after the commencement thereof but in any event not later than three (3) days after service of process with respect thereto on, or the obtaining of knowledge thereof by, any Borrower, notice of each action, suit or proceeding before any court or other Governmental Authority or other regulatory body or any arbitrator, which, if adversely determined, could have a Material Adverse Effect;

(g)   prompt (but in any event no more than three (3) Business Days) notice if any Borrower has knowledge that such Borrower is listed on the OFAC Lists or (i) is convicted on, (ii) pleads nolo contendere to, (iii) is indicted on, or (iv) is arraigned and held over on charges involving money laundering or predicate crimes to money laundering;

(h)   as soon as possible and in any event within three (3) Business Days after execution, receipt or delivery thereof, copies of any material notices that any Borrower executes or receives in connection with a Carbon Health Sale, a Carbon Health Plan, or any other sale or disposition of any of its property or assets;

(i)   promptly and in any event within three (3) Business Days after the filing thereof and to the extent the same is not publicly available on the Bankruptcy Court's electronic docket, copies of all pleadings, motions, applications, financial information and other papers and documents filed by any Borrower in the Chapter 11 Cases, which papers and documents shall also be given or served on the Agent's counsel and drafts of which shall be provided to Agent's counsel two (2) Business Days in advance of filing thereof to the extent reasonably practicable;

(j)   promptly and in any event within three (3) Business Days after the sending thereof, copies of all written reports (excluding information concerning the identification of bidders and the amount of bids submitted pursuant to the Bid Procedures Order) given by any Borrower to any official or unofficial creditors' committee in the Chapter 11 Cases;

(k)   promptly after the furnishing thereof, copies of any financial information, report or other notice delivered to the Prepetition Agent or any Prepetition Lender.

(l)   promptly and in any event within two (2) Business Days after request thereof, such other information concerning the condition or operations, financial or otherwise, of any Borrower as the Agent may from time to time may reasonably request.

**7.2   Taxes.** Each Borrower shall pay when due all material postpetition Taxes (unless being contested in good faith and by appropriate proceedings) fees or other charges of any nature whatsoever (together with any related interest or penalties) now or hereafter imposed or assessed against such Borrower or the DIP Collateral or upon such Borrower's ownership, possession, use, operation or disposition thereof or upon such Borrower's rents, receipts or earnings arising therefrom, subject to and only as permitted by the Bankruptcy Code. Each Borrower shall file on

or before the due date therefor all material personal property tax returns (or extensions) in respect of the DIP Collateral.

**7.3    Compliance with Laws; Environmental; Regulatory**.

(a)    <u>Generally</u>.  Each Borrower shall maintain compliance in all material respects with all applicable laws, rules or regulations, and shall obtain and maintain all required Registrations reasonably necessary in connection with the conduct of such Borrower's business, including:

(i)    Such Borrower shall not become an "investment company" or a company controlled by an "investment company," under the Investment Company Act of 1940, as amended, or undertake as one of its important activities extending credit to purchase or carry margin stock (as defined in Regulation X, T and U of the Federal Reserve Board of Governors).

(ii)    Such Borrower shall not directly or indirectly, knowingly enter into any documents, instruments, agreements or contracts with any Person listed on the OFAC Lists. Such Borrower shall not directly or indirectly, (A) conduct any business or engage in any transaction or dealing with any Blocked Person, including, without limitation, the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person, (B) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 or any similar executive order or other Anti-Terrorism Law, or (C) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224 or other Anti-Terrorism Law.

(iii)    Such Borrower has implemented and shall maintain in effect policies and procedures designed to reasonably ensure compliance by such Borrower and its directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and such Borrower its officers and employees and to the knowledge such Borrower, its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects

(iv)    None of such Borrower or any of its directors, officers or employees, or to the knowledge of such Borrower, any agent that shall act in any capacity in connection with or benefit from the credit facility established hereby for the Borrowers is a Sanctioned Person.  No Loan, use of proceeds or other transaction contemplated by this Agreement shall violate Anti- Corruption Laws or applicable Sanctions.

(b)    <u>Environmental</u>.  Each Borrower shall comply with all material environmental laws and provide to the Agent any documentation of such compliance which the Agent may reasonably request.  Each Borrower shall promptly provide to the Agent notice of any violation, citation or other administrative order which could have a Material Adverse Effect.

(c) <u>Regulatory and Product Notices</u>. Each Borrower shall promptly (but in any event within five (5) Business Days) after the receipt or occurrence thereof notify Agent of:

(i) any written notice received by such Borrower from a governmental authority alleging potential or actual violations of any Healthcare Laws, FDA Laws or Federal Health Care Program Laws by such Borrower;

(ii) any written notice that the FDA (or international equivalent) is limiting, suspending or revoking any Registrations (including, but not limited to, the issuance of a clinical hold);

(iii) any written notice that such Borrower has become subject to any Regulatory Action;

(iv) the exclusion or debarment from any governmental healthcare program or debarment or disqualification by FDA (or international equivalent) of such Borrower;

(v) any written notice that any Carbon Health Product has been seized, withdrawn, recalled, detained, or subject to a suspension of manufacturing, or the commencement of any proceedings in the United States or any other jurisdiction seeking the withdrawal, recall, suspension, import detention, or seizure of any Carbon Health Product are pending or threatened in writing against such Borrower; or

(vi) narrowing or otherwise limiting the scope of marketing authorization or the labeling of the Carbon Health Products under any such Registration;

except, in each case of subclauses (i) through (vi) above, where such action would not reasonably be expected to have, either individually or in the aggregate, any Material Regulatory Liabilities.

**7.4** **Status Calls; Financial Advisors**. Each Borrower and its professional and financial advisors shall participate in weekly conference calls with the Agent, the Lenders and/or Agent Professionals to review and discuss the Carbon Health Sale and Carbon Health Plan process and the Milestones, the Project Medical Group Clinic Closures, variances from the Approved Budget, operational issues and financial information. In addition, the advisors of the Agent and the Lenders shall have reasonable access to each Borrower and its professional and financial advisors.

**7.5** **Inspection Rights**. Each Borrower shall permit the Agent and any representative of the Agent, including its attorneys and accountants, to examine and make copies of and abstracts from its records and books of account, to visit and inspect its properties, to verify materials, leases, notes, accounts receivable, deposit accounts and its other assets, to conduct audits, physical counts, valuations, appraisals, or examinations and to discuss its affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants, auditors, financial advisors or any of its other representatives, in each case at reasonable times and upon reasonable notice during normal business hours and excluding attorney client privileged items. During the course

any inspections, audits and other visits and discussions permitted under this Section 7.5 or elsewhere under the Loan Documents, representatives of the Agent or any Lender may encounter individually identifiable healthcare information as defined under HIPAA, or other confidential information relating to healthcare patients (collectively, the "**Confidential Healthcare Information**"). The Person (including any Borrower or other Medical Group) maintaining such Confidential Healthcare Information shall, consistent with HIPAA's "minimum necessary" provisions, permit such disclosure for their "healthcare operations" purpose. Unless otherwise required by any applicable laws, the Agent or any Lender and its representatives shall not require or perform any act that would cause any Person (including Borrowers or any other Medical Group) to violate any Healthcare Laws, including HIPAA. In the event that the Agent or any Lender proposes to undertake activities that any Borrower reasonably believes would constitute services of a "business associate" under HIPAA, the parties hereto agree to review the matter and, where appropriate, the Agent or such Lender may take action to comply with HIPAA, including, without limitation, executing a business associate agreement with the applicable Person.

**7.6** **Medical Group Documents**. Each Borrower shall comply with all material terms of the respective Medical Group Documents and any related agreements entered into in connection therewith related to the management, funding or equity ownership of a Medical Group. No Borrower shall amend or modify any of the Medical Group Documents or such related agreements in such a way that would have an adverse effect on (a) the DIP Collateral, (b) the ability of Agent to dispose of DIP Collateral, or (c) the perfection or priority of Agent's Lien in the DIP Collateral. Each Borrower shall obtain Agent's written consent prior to entering into or amending any Medical Group Document or such related agreements. Each Borrower shall take such steps as Agent requests to obtain the consent of, or waiver by, any person whose consent or waiver is necessary for (i) any Management Services Agreement and Securities Transfer Restriction Agreement to be deemed "DIP Collateral" and for Agent to have a security interest in such Management Services Agreement and Securities Transfer Restriction Agreement, and (ii) Agent to have the ability in the event of a liquidation of any collateral to dispose of such DIP Collateral in accordance with Agent's rights and remedies under this Agreement and the other Loan Documents.

**7.7** **Use of Proceeds; Budget Compliance**. The proceeds of the Loans shall be used, subject to the other terms and conditions of this Agreement, to fund operating expenditures and disbursements of the Borrowers (including fees and expenses related to this Agreement and the Chapter 11 Cases), in each case, as set forth in each Notice of Borrowing and consistent with the Approved Budget that arise in the ordinary course of the applicable Borrower's business. No Borrower shall make any payment or incur any obligation that is not provided for in the Approved Budget (within the variances from budgeted amounts permitted by Section 7.23), other than with the prior written consent of the Agent. The proceeds of the Loans shall not be used in violation of Anti-Corruption Laws or applicable Sanctions.

**7.8** **Register**. The Agent shall maintain at its offices a register for the recordation of the names and addresses of the Lenders and the amount of principal and interest due and payable or to become due and payable from the Borrowers to each Lender hereunder or any other Loan Documents (the "**Register**"). Any assignment or transfer of an interest in any Loan shall be effective only upon appropriate entries with respect thereto being made in the Register, which the Agent shall promptly record upon receiving notice of any such proposed assignment or transfer. The Register shall be

available for inspection by each party hereto, at any reasonable time and from time to time upon reasonable prior notice. Notwithstanding the generality of the foregoing, the Agent shall reflect ownership interests in the Loans in a book entry system in accordance with all applicable provisions of the Internal Revenue Code and Treasury Regulations, including for purposes of establishing that the Loans are in registered form under Sections 1.871-14(c)(1)(i) and 5f.103-1(c) of the Treasury Regulations.

**7.9** **Milestones**.  Each Borrower shall comply with and achieve the Milestones.

**7.10** **Further Assurances**.  Subject to the terms of the DIP Order, each Borrower shall from time to time execute, deliver and/or file, alone or with the Agent or any Lender, any financing statements, security agreements, mortgages, deeds of trust, collateral assignments, notices or other documents requested by the Agent with respect to the DIP Collateral.  Each Borrower shall from time to time procure any instruments or documents as may be requested by the Agent or any Lender with respect to the DIP Collateral.  In addition, and for such purposes only, each Borrower hereby authorizes the Agent to prepare and deliver on behalf of such Borrower and to file financing statements either in the Agent's name or in the name of the Agent as agent and attorney-in-fact for such Borrower.  Each Borrower shall protect and defend such Borrower's title to the DIP Collateral and the Agent's Liens thereon against all Persons claiming any interest adverse to such Borrower or the Agent or any Lender other than holders of Permitted Liens, in accordance with the priorities set forth in this Agreement.  For the avoidance of doubt, nothing herein shall require the Agent or any Lender to file any financing statements, mortgages, Certificates of Title, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect any Liens and security interests granted by or pursuant to this Agreement, the DIP Order, or any other Loan Document.

**7.11** **Indebtedness.**  The Borrowers shall not, nor shall they permit any of their Subsidiaries to, directly or indirectly, create, incur, assume, guarantee or be or remain liable with respect to any Indebtedness other than Permitted Indebtedness.

**7.12** **Liens; Collateral.**  The Borrowers shall not enter into any agreement with any Person, or suffer any agreement to exist (in each case, other than the Agent and Lenders and any other holder of a Permitted Lien), granting a Lien on the DIP Collateral, subject to the priorities set forth in this Agreement.  Each Borrower shall at all times keep the DIP Collateral and all other property and assets used in such Borrower's operations or in which such Borrower now or hereafter holds any interest free and clear from any Liens whatsoever other than Permitted Liens, subject to the priorities set forth in this Agreement.  Each Borrower shall give the Agent and Lenders prompt written notice when such Borrower knows of any legal process affecting title to any of the DIP Collateral, or any pending or threatened (in writing) litigation, action or other proceeding against such Borrower that would reasonably be expected to have a Material Adverse Effect.

**7.13** **Investments.**  The Borrowers shall not, nor shall they permit any of their Subsidiaries to, directly or indirectly acquire or own, or make any Investment in or to any Person other than Permitted Investments.

**7.14** **Payments on Indebtedness.**  The Borrowers shall not make any payment or prepayment of interest on, principal of, premium, if any, fees, redemption, conversion, exchange, purchase,

retirement, defeasance, sinking fund or similar payment with respect to, any Indebtedness, except as permitted under this Agreement (including Section 9.2(b)). The Borrowers shall not make any payment or incur any obligation that is not provided for in the Approved Budget (within the variances from budgeted amounts permitted by Section 7.23), other than with the prior written consent of the Agent.

**7.15** **Dispositions**. Except for Permitted Dispositions, the Borrowers shall not voluntarily or involuntarily transfer, sell, lease, license, lend or in any other manner convey any equitable, beneficial or legal interest in any portion of its assets (any of the foregoing, a "**Transfer**").

**7.16** **Fundamental Changes**. No Borrower shall (a) merge or consolidate with or into any other organization, (b) acquire all or substantially all of the equity interests or property of another Person, or (c) liquidate, wind up its affairs or dissolve itself, whether in a single transaction or in a series of related transactions.

**7.17** **Transactions with Affiliates.** The Borrowers shall not, directly or indirectly, enter into or permit to exist any material transaction with any Affiliate, other than the transactions or agreements set for on Schedule 7.17.

**7.18** **Deposit Accounts, Securities Accounts and Investment Accounts.**

(a) Schedule 5.2 lists all of the Deposit Accounts, Securities Accounts, Commodity Accounts and other investment accounts owned or maintained by the Borrowers (including all such accounts subject to an Existing Account Control Agreement as so indicated). No Borrower shall maintain any Deposit Accounts, Securities Accounts, Commodity Accounts and other investment accounts, other than Excluded Accounts, except with respect to which Agent has an Account Control Agreement or Existing Account Control Agreement (subject to Section 4.5). No additional Deposit Accounts, Securities Accounts, Commodity Accounts or other investment accounts shall be opened and maintained by any Borrower without the prior written consent of the Agent and unless such Borrower causes to be executed and delivered, substantially concurrently with such opening, an Account Control Agreement in favor of the Agent for each such Deposit Account, Securities Account, Commodity Account and/or investment account opened and maintained by such Borrower.

(b) Each Borrower (on behalf of itself and each Medical Group and each Subsidiary of a Medical Group (in each case, other than a Project Medical Group while the applicable Project Medical Group Debt Facility remains outstanding)) shall direct Account Debtors to deliver or transmit all proceeds of Accounts of Medical Groups and each Subsidiary of a Medical Group (in each case, other than a Project Medical Group while the applicable Project Medical Group Debt Facility remains outstanding) which consist of Medicare and Medicaid payments into a Deposit Account that is designated as a dedicated Medicare / Medicaid collections account and identified to Agent as such, that is used exclusively for purposes of collection of Medicare and Medicaid payments (the "**Governmental Payor Collections Account**"), without remitting such excess within five (5) Business Days to a Deposit Account subject to an Account Control Agreement or an Existing Account Control Agreement in favor of Agent. E a c h  Borrower shall at all times

immediately deliver (i) all payments on and proceeds of Accounts of Medical Groups and each Subsidiary of a Medical Group (in each case, other than a Project Medical Group while the applicable Project Medical Group Debt Facility remains outstanding) which consist of Medicare and Medicaid payments into a Governmental Payor Collections Account, and (ii) which do not consist of Medicare and Medicaid payments, into a dedicated collections account identified to Agent as such that is used exclusively for collection of payments due to Medical Groups  (other than a Project Medical Group while the applicable Project Medical Group Debt Facility remains outstanding) other than Medicare and Medicaid payments (the "**Non-Governmental Payor Collections Account**" and together with the Governmental Payor Collections Account, collectively, the "**Collections Accounts**"). The Borrowers shall cause balances in the Collections Accounts to be remitted to a Deposit Account that is subject to an Account Control Agreement or an Existing Account Control Agreement in favor of Agent within two (2) Business Days.

## 7.19 <u>Subsidiaries and Medical Groups</u>.

(a)  No Borrower shall form or acquire any Subsidiary or any Medical Group subsequent to the Facility Effective Date except, for new Medical Groups, to the extent that Carbon Health or its Subsidiaries enters into a complete set of Medical Group Documents, in a form approved by the Agent with such new Medical Group and its equityholders.

(b)  No Borrower shall permit (a) (i) the aggregate fair market value of the assets of the Turkish Subsidiary to exceed Two Million Dollars ($2,000,000) at any time or (ii) the aggregate cash of the Turkish Subsidiary to exceed Two Hundred Fifty Thousand Dollars ($250,000) at any time, (b) (i) the aggregate fair market value of the assets of the Colombian Subsidiary to exceed Two Million Dollars ($2,000,000) at any time or (ii) the aggregate cash of the Colombian Subsidiary to exceed Two Hundred Fifty Thousand Dollars ($250,000) at any time, or (c) any Immaterial Subsidiary to conduct any operations, incur any liabilities (other than ordinary course liabilities and those incidental to its continued existence, dissolution and winding up) or hold any assets.

(c)   No Borrower shall form or acquire any Subsidiary (including any Medical Group or Subsidiary of a Medical Group) subsequent to the date hereof.

## 7.20 <u>Amendments</u>.  Without the Agent's prior consent, no Borrower shall, directly or indirectly, amend, modify, or change any of the terms or provisions of any agreement, instrument, document, indenture, or other writing evidencing or concerning Permitted Indebtedness.

## 7.21 <u>Hazardous Materials</u>.  No Borrower shall permit the use, handling, generation, storage, treatment, release or disposal of any hazardous materials at any property owned or leased by it, except in compliance with all environmental laws.

## 7.22 <u>DIP Order; Administrative Priority; Lien Priority; Payment of Claims</u>.

No Borrower shall:

(a)     at any time, seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacatur of the DIP Order, except for modifications and amendments agreed to by the Agent;

(b)     at any time, suffer to exist a priority for any administrative expense or unsecured claim against such Borrower (now existing or hereafter arising of any kind or nature whatsoever), including any administrative expense of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code equal or superior to the priority of the Agent's and the Lenders' claims with respect to the Obligations, except as referred to in Section 3.2 and except for payments permitted to be made under this Agreement consistent with the Approved Budget;

(c)     at any time, suffer to exist any Lien having a priority equal or superior to the DIP Liens in favor of the Agent for its benefit and the benefit of the Lenders in respect of the DIP Collateral, except for the Permitted Prior Liens as and to the extent expressly provided in the DIP Order;

(d)     at any time, seek to reject or terminate, or permit the rejection or termination of, any license agreement, real property lease, or other material contract without the consent of the Agent; or

(e)     prior to the date on which all the Obligations have been paid in full in cash, pay any administrative expense claims except (i) the Carve-Out, (ii) the Obligations due and payable hereunder, (iii) [reserved], (iv) other administrative expense and professional claims approved by order of the Bankruptcy Court, but only to the extent consistent with the Approved Budget and (v) to fund working capital and other general corporate purposes of the Borrowers, in case in the ordinary course of business and only to the extent consistent with the Approved Budget.

**7.23    Budget Variances**.  No Borrower shall (unless the Agent shall otherwise consent in writing), permit, for any Measurement Period, (i) actual total cash receipts during such Measurement Period to be less than 85% of the projected total operating cash receipts in the Approved Budget, (iii) actual total disbursements (other than those disbursements provided in clause (iv) below) for such Measurement Period to be greater than 115% of the total projected disbursements (other than those disbursements provided in clause (iv) below) in the Approved Budget, and (iv) actual non-operating line item disbursements for Professionals and Committee Professionals of the Borrowers for such Measurement Period to be greater than 100% of the projected non-operating line item disbursements for Professionals and Committee Professionals of the Borrowers in the Approved Budget (the variances in clauses (i) through (iv) hereof, as applicable, "**Permitted Variances**"); provided that, (a) the unused amounts for any line item may not be carried forward and applied to any other line items or to the fees and expenses of the Borrower Professionals or the Committee Professionals other than any unused amounts for such same line item or such specific Professional's line item; (b) that no unused amounts for the fees and expenses of such Professionals shall be carried forward to be applied to such fees and expenses incurred after the occurrence of the Carve-Out Trigger Date; and (c) disbursements to the Agent Professionals and Lender Professionals shall not be subject to any variance reporting.

**7.24** __Critical Vendors and Other Payments__.  No Borrower shall make (a) any pre-petition "critical vendor" payments or other payments on account of any creditor's pre-petition unsecured claims and (b) payments to any vendors who may be entitled to assert various Lien claims against such Borrower, its property or other assets, on account of any such vendor's pre-petition claims, if such Borrower failed to pay for pre-petition goods and services, except, in each case, (i) in amounts and on terms and conditions that are approved by order of the Bankruptcy Court and (ii) are permitted by the Approved Budget.

**7.25** __No Further Negative Pledges; Burdensome Agreements__.  No Borrower will, or will permit any Subsidiary to, directly or indirectly enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any material condition upon (a) the ability of such Borrower to create, incur or permit to exist any Lien upon any of its property or assets or (b) the ability of any Subsidiary thereof to pay dividends or other distributions with respect to any of its Equity Interests to such Borrower or to make or repay loans or advances to a Borrower or any other Subsidiary of a Borrower or to guarantee Indebtedness of the Borrowers or any other Subsidiary of the Borrowers, provided that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document or any Prepetition Loan Document, (ii) the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (iii) the foregoing shall not apply to customary provisions restricting assignments, subletting or other transfers (including the granting of any lien) contained in leases, subleases, licenses, sublicenses or other agreements and/or the property or assets secured by such Liens or the property or assets subject to such leases, subleases, licenses, sublicenses or other agreements, as the case may be, (iv) the foregoing shall not apply to licenses or contracts which by the terms of such licenses and contracts prohibit the granting of Liens on the rights contained therein, (vi) the foregoing shall not apply to any restriction in existence on the Petition Date, so long as such restriction was permitted under the Prepetition Loan Documents, (vii) the foregoing shall not apply to specific property to be sold pursuant to any Disposition permitted by Section 7.15, (viii) the foregoing shall not apply to restrictions contained in the documentation governing Indebtedness permitted by Section 7.11, and (ix) the foregoing shall not apply to Permitted Liens and restrictions in the agreements relating thereto that limit the right of the Borrowers and/or any Subsidiary to dispose of, or encumber the assets subject to such Liens.

<h3 style="text-align:center">SECTION 8.  MULTIPLE BORROWER TERMS.</h3>

**8.1** __Borrowers' Agent__.  Each of the Borrowers hereby irrevocably appoints Carbon Health Technologies, Inc. as its agent, attorney-in-fact and legal representative for all purposes, including requesting disbursement of the Loans and receiving account statements and other notices and communications to Borrowers (or any of them) from the Agent or any Lender.  The Agent may rely, and shall be fully protected in relying, on any Notice of Borrowing for a Term Loan, disbursement instruction, report, information or any other notice or communication made or given by Carbon Health Technologies, Inc., whether in its own name or on behalf of one or more of the other Borrowers, and the Agent shall not have any obligation to make any inquiry or request any confirmation from or on behalf of any other Borrower as to the binding effect on it of any such request, instruction, report, information, other notice or communication, nor shall the joint and several character of the Borrowers' obligations hereunder be affected thereby.

**8.2**   **Waivers**.  Each Borrower hereby waives:  (i) any right to require the Agent to institute suit against, or to exhaust its rights and remedies against, any other Borrower or any other person, or to proceed against any property of any kind which secures all or any part of the Obligations, or to exercise any right of offset or other right with respect to any reserves, credits or Deposit Accounts, Security accounts or Commodity Accounts held by or maintained with the Agent or any Indebtedness of the Agent or any Lender to any other Borrower, or to exercise any other right or power, or pursue any other remedy the Agent or any Lender may have; (ii) any defense arising by reason of any disability or other defense of any other Borrower or any guarantor or any endorser, co- maker or other person, or by reason of the cessation from any cause whatsoever of any liability of any other Borrower or any guarantor or any endorser, co-maker or other person, with respect to all or any part of the Obligations, or by reason of any act or omission of the Agent or others which directly or indirectly results in the discharge or release of any other Borrower or any guarantor or any other person or any Obligations or any security therefor, whether by operation of law or otherwise; (iii) any defense arising by reason of any failure of the Agent to obtain, perfect, maintain or keep in force any Lien on, any property of any Borrower or any other person; (iv) any defense based upon or arising out of any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, liquidation or dissolution proceeding commenced by or against any other Borrower or any guarantor or any endorser, co-maker or other person, including without limitation any discharge of, or bar against collecting, any of the Obligations, in or as a result of any such proceeding.  Until all of the Obligations have been paid, performed, and discharged in full, nothing shall discharge or satisfy the liability of any Borrower hereunder except the full performance and payment of all of the Obligations.  If any claim is ever made upon the Agent for repayment or recovery of any amount or amounts received by the Agent in payment of or on account of any of the Obligations, because of any claim that any such payment constituted a preferential transfer or fraudulent conveyance, or for any other reason whatsoever, and the Agent repays all or part of said amount by reason of any judgment, decree or order of any court or administrative body having jurisdiction over the Agent or any of its property, or by reason of any settlement or compromise of any such claim effected by the Agent with any such claimant (including without limitation any other Borrower), then and in any such event, each Borrower agrees that any such judgment, decree, order, settlement and compromise shall be binding upon such Borrower, notwithstanding any revocation or release of this Agreement or the cancellation of any note or other instrument evidencing any of the Obligations, or any release of any of the Obligations, and each Borrower shall be and remain liable to the Agent and the Lenders under this Agreement for the amount so repaid or recovered, to the same extent as if such amount had never originally been received by the Agent or any Lender, and the provisions of this sentence shall survive, and continue in effect, notwithstanding any revocation or release of this Agreement. Each Borrower hereby expressly and unconditionally waives all rights of subrogation, reimbursement and indemnity of every kind against any other Borrower, and all rights of recourse to any assets or property of any other Borrower, and all rights to any collateral or security held for the payment and performance of any Obligations, including (but not limited to) any of the foregoing rights which Borrower may have under any present or future document or agreement with any other Borrower or other person, and including (but not limited to) any of the foregoing rights which any Borrower may have under any equitable doctrine of subrogation, implied contract, or unjust enrichment, or any other equitable or legal doctrine.

**8.3** **Consents**. Each Borrower hereby consents and agrees that, without notice to or by Borrower and without affecting or impairing in any way the obligations or liability of Borrower hereunder, the Agent may, from time to time before or after revocation of this Agreement, do any one or more of the following in its sole and absolute discretion: (i) accept partial payments of, compromise or settle, renew, extend the time for the payment, discharge, or performance of, refuse to enforce, and release all or any parties to, any or all of the Obligations; (ii) grant any other indulgence to any Borrower or any other Person in respect of any or all of the Obligations or any other matter; (iii) accept, release, waive, surrender, enforce, exchange, modify, impair, or extend the time for the performance, discharge, or payment of, any and all property of any kind securing any or all of the Obligations or any guaranty of any or all of the Obligations, or on which the Agent at any time may have a Lien, or refuse to enforce its rights or make any compromise or settlement or agreement therefor in respect of any or all of such property; (iv) substitute or add, or take any action or omit to take any action which results in the release of, any one or more other Borrowers or any endorsers or guarantors of all or any part of the Obligations, including, without limitation one or more parties to this Agreement, regardless of any destruction or impairment of any right of contribution or other right of Borrower; and (v) apply any sums received from any other Borrower, any guarantor, endorser, or co-signer, or from the disposition of any DIP Collateral or security, to any Indebtedness whatsoever owing from such Person or secured by such DIP Collateral or security, in such manner and order as the Agent determines in its sole discretion, and regardless of whether such Indebtedness is part of the Obligations, is secured, or is due and payable. Each Borrower consents and agrees that the Agent shall be under no obligation to marshal any assets in favor of Borrower, or against or in payment of any or all of the Obligations. Each Borrower further consents and agrees that the Agent shall have no duties or responsibilities whatsoever with respect to any property securing any or all of the Obligations. Without limiting the generality of the foregoing, the Agent shall have no obligation to monitor, verify, audit, examine, or obtain or maintain any insurance with respect to, any property securing any or all of the Obligations.

**8.4** **Independent Liability**. Each Borrower hereby agrees that one or more successive or concurrent actions may be brought hereon against such Borrower, in the same action in which any other Borrower may be sued or in separate actions, as often as deemed advisable by Agent. Each Borrower is fully aware of the financial condition of each other Borrower and is executing and delivering this Agreement based solely upon its own independent investigation of all matters pertinent hereto, and such Borrower is not relying in any manner upon any representation or statement of the Agent or any Lender with respect thereto. Each Borrower represents and warrants that it is in a position to obtain, and each Borrower hereby assumes full responsibility for obtaining, any additional information concerning any other Borrower's financial condition and any other matter pertinent hereto as such Borrower may desire, and such Borrower is not relying upon or expecting the Agent to furnish to it any information now or hereafter in the Agent's possession concerning the same or any other matter.

**8.5** **Subordination**. Subject to the terms of the DIP Order, all Indebtedness of a Borrower now or hereafter arising held by another Borrower is subordinated to the Obligations and the Borrower holding the Indebtedness shall take all actions reasonably requested by Agent to effect, to enforce and to give notice of such subordination.

## SECTION 9.  EVENTS OF DEFAULT

**9.1**    **Events of Default**.  The occurrence of any one or more of the following events shall be an immediate "**Event of Default**":

(a)    <u>Payments</u>.  Any Borrower fails to pay any Loan or other amount due under this Agreement or any of the other Loan Documents on the due date thereof; or

(b)    <u>Covenants; Provisions; Loan Documents</u>.  Any Borrower breaches or defaults in the performance of (i) any covenant under Section 7 or (ii) any other covenants (other than those listed in Section 9.1(b)(i)), any other provision or Obligation under this Agreement or under any of the other Loan Documents and such breach or default under this clause (ii) is not cured within three (3) Business Days after the occurrence of such breach or default; or

(c)    <u>Representations</u>.  Any representation or warranty made by any Borrower in any Loan Document shall have been false or misleading in any material respect when made; or

(d)    <u>Loan Documents</u>.  Any provision of any Loan Document or any Lien granted thereunder shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against any Borrower, or the validity, perfection, priority or enforceability thereof shall be contested by any Person (other than the Agent or any Lender thereto), or a proceeding shall be commenced by any Person or any Governmental Authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Borrower shall deny in writing that it has any liability or obligation purported to be created under any Loan Document; or

(e)    <u>Prepetition Loan Documents</u>.  Any provision of any Prepetition Loan Document or any Lien granted thereunder shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Borrower or any Guarantor (each as defined in the Prepetition Loan and Security Agreement), or the validity, perfection, priority or enforceability thereof shall be contested by any Borrower, any Guarantor, or any other Person with standing on behalf of the Estates (as defined in the Interim DIP Order), including any Challenge (as defined in the Interim DIP Order), or a proceeding shall be commenced by any Person or any Governmental Authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or the Borrower or any Guarantor (each as defined in the Prepetition Loan and Security Agreement) shall deny in writing that it has any liability or obligation purported to be created under any Prepetition Loan Document; or

(f)    <u>Attachments; Judgments</u>.  Any material portion of any Borrower's assets is attached or seized, or a levy is filed against any such assets, or a judgment or judgments is/are entered for the payment of money, individually or in the aggregate, of at least $250,000; or

(g)    <u>DIP Collateral</u>.  Any material damage to, or loss, theft or destruction of, any material portion of the DIP Collateral, whether or not insured; or

(h)  Criminal Proceedings. The institution by any Governmental Authority of any criminal proceedings against any Borrower, any Subsidiary of a Borrower or any Medical Group.

(i)  Medical Group Documents. If (a) any Borrower delivers or receives any notice of termination in regard to any Medical Group Document, (b) any Medical Group Document is terminated for any reason or (c) a default occurs under any Medical Group Document which is not cured within any applicable cure or grace period, (d) any Borrower falls under investigation by any Governmental Authority for a violation of any Healthcare Law, and in the case of clauses (a) through (d), which could reasonably be expected to have a Material Adverse Effect.

(j)  Termination of Account Control Agreements.  The termination of any Account Control Agreement or any agreement to sweep funds from any Governmental Payor Collections Account for any reason by any Borrower.

(k)  Sales.  Without the prior written consent of the Agent, any Borrower, any Subsidiary or any Medical Group enters into (a) any definitive agreement to sell, transfer, or otherwise dispose of, or (b) any commitment, option, or agreement that contains binding obligations (including any exclusivity, "no-shop" or good-faith negotiation covenant) with respect to the sale, transfer or other disposition of any clinic which is operated by any Borrower, any Subsidiary or Medical Group.

(l)  Priority Matters.  Any Borrower or any of its Subsidiaries fails to comply with the terms of any subordination, lien priority or intercreditor agreement or any subordination or lien priority provisions of any note or other document running to the benefit of the Agent or any Lender or the Prepetition Agent or any Prepetition Lender, or if any such document becomes null and void or any Borrower denies in writing further liability under any such document or provides notice to that effect.

(m)  Claims Against Secured Parties.  Any Borrower asserts or prosecutes any claim or cause of action against the Agent, any Lender, the Prepetition Agent or any  Prepetition Lender.

(n)  Change in Control.  A Change in Control shall have occurred;

(o)  Chapter 11 Cases.  The occurrence of any of the following in the Chapter 11 Cases:

(i)  the Interim DIP Order shall not have been entered by the Bankruptcy Court within three (3) Business Days after the Petition Date;

(ii)  the Final DIP Order shall not have been entered by the Bankruptcy Court within thirty-five (35) days after the Petition Date;

(iii)  the DIP Order shall have been revoked, reversed, vacated, stayed, modified, extended, supplemented or amended without the express prior written consent of the Agent and the Required Lenders;

(iv)  an order with respect to the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing (A) a trustee under Section 1104 of the Bankruptcy Code or (B)

a responsible officer or an examiner with enlarged powers relating to any Borrower's operations (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106 of the Bankruptcy Code;

(v)     an order with respect to the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Agent, (A) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any Borrower *pari passu* or superior to the priority of (1) the Agent and the Lenders in respect of the Obligations, or (2) the Prepetition Agent and the Prepetition Lenders in respect of the Prepetition Secured Obligations or (B) to grant or permit the grant of a Lien on the DIP Collateral other than a Permitted Lien, subject to the priority provisions set forth in this Agreement;

(vi)    an order with respect to the Chapter 11 Cases shall be entered by the Bankruptcy Court converting the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code;

(vii)   an order shall be entered by the Bankruptcy Court dismissing the Chapter 11 Cases which does not contain a provision for termination of the Total Term Loan Commitments and payment in full in cash of all Obligations hereunder and under the other Loan Documents on dismissal;

(viii)  any Borrower shall take any action, including the filing of an application, motion or other pleading, directly or indirectly, supporting or advancing any of the events or actions set forth under clauses (i) through (vii) above;

(ix)    an order shall be entered by the Bankruptcy Court granting relief from the automatic stay to any creditor of any Borrower with respect to any claim (other than any claim for personal injury that is covered by liability insurance) against such Borrower in an amount equal to or exceeding $250,000 in the aggregate;

(x)     if any material property or assets of any Borrower is sold without the express written consent of the Agent;

(xi)    without the prior written consent of the Agent and the Required Lenders, any Borrower shall take any action, including the filing of an application, motion or other pleading, requesting or seeking authority for such Borrower (A) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Liens (subject to the priority provisions set forth in this Agreement) upon or affecting any DIP Collateral; (C) to sue or grant any Lien on (other than Permitted Liens, subject to the priority provisions set forth in this Agreement) the cash collateral of the Agent and the Lenders under Section 363(c) of the Bankruptcy Code; (D) to take any other action or actions materially adverse to the Agent and/or any Lender or the Prepetition Secured Parties or their rights and remedies

hereunder; or (E) the entry of any order by the Bankruptcy Court in the Chapter 11 Cases granting relief as described in subclauses (A) through (D) of this clause;

(xii)    (A) any Borrower, or any authorized representative of any Borrower, shall attempt to (1) invalidate, reduce or otherwise impair the Liens or security interests of the Agent and/or any Lender's claims or rights against such Borrower or (2) subject any DIP Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (B) any DIP Collateral becoming subject to surcharge or to marshaling, other than as expressly provided in the DIP Order, (C) any DIP Lien created by this Agreement, the DIP Order or any other Loan Document shall, for any reason, cease to be a valid DIP Lien with the priorities set forth in this Agreement, subject only to Permitted Prior Liens as and to the extent expressly provided in the DIP Order, or (D) any action is commenced by any Person (with the support of any Borrower, or where the applicable Borrower does not object to such action) which contests the validity, perfection, enforceability or priority of any of the DIP Liens of the Agent and/or the Lenders created by this Agreement, the DIP Order or any other Loan Document;

(xiii)   if any Borrower, or any authorized representative of any Borrower, commences, or seeks leave to commence, any action against any of the Prepetition Agent, Prepetition Lenders or their respective agents, advisors or employees, challenging the validity, perfection, priority, extent or enforceability of any Prepetition Loan Document or claims that arose in connection with the Prepetition Loan Documents, or seeking to avoid, modify, dispute, challenge or subordinate any Lien or claim thereunder;

(xiv)    the determination of any Borrower, whether by vote of the Board of Directors or otherwise, to liquidate all or substantially all of such Borrower's assets, or employ an agent or other third party to conduct any sales of all or substantially all of such Borrower's assets, or the filing of a motion or other application in the Chapter 11 Cases, seeking authority to do any of the foregoing, in each case without the prior written consent of the Agent;

(xv)     the failure to comply with or achieve any Milestone;

(xvi)    immediately upon the consummation of one or more Carbon Health Sales, the Net Cash Proceeds therefrom are not applied to the repayment in full of the Obligations subject to the DIP Order and the priorities set forth in this Agreement;

(xvii)   any Borrower makes any disbursement or payment not in accordance with, or set forth in, the Approved Budget, subject to the permitted variances set forth in Section 7.23;

(xviii)  an order shall be entered by the Bankruptcy Court amending, supplementing or otherwise modifying, or the filing by any Borrower of an application, motion, pleading or notice seeking the amendment, supplement or other modification of or appeal against, in each case, the DIP Order or any of the "first day" orders in respect

of cash management or critical vendors or suppliers, in each instance, without the consent of the Agent;

(xix)    except with respect to payments as permitted by any order of the Bankruptcy Court entered into prior to the date of this Agreement, an order shall be entered by the Bankruptcy Court permitting the payment of, or granting adequate protection with respect to, prepetition Indebtedness or other obligations, whether secured or not (other than any adequate protection granted in respect of the Prepetition Secured Obligations in effect as of the entry of the Interim DIP Order) or the filing of any motion seeking the same by any Borrower, in each case, without the consent of the Agent;

(xx)    this Agreement, the DIP Order or any other Loan Document, shall for any reason fail or cease to create valid DIP Liens, with the priorities set forth in this Agreement, in favor of the Agent for the benefit of the Agent and Lenders on any DIP Collateral purported to be covered thereby; or

(xxi)    any adequate protection liens granted to the Prepetition Secured Parties under the DIP Order shall, for any reason, fail or cease to be valid, perfected, and enforceable liens with the priorities set forth in the DIP Order, subject only to the Carve-Out and Permitted Prior Liens, or any order is entered reversing, modifying, or vacating such adequate protection liens without the prior written consent of the Agent and the Required Lenders; or

(xxii)    any breach of any covenant or obligation in any of the DIP Order by any Person other than the Agent or any Lender;

then, and in any such event, the Agent may, and shall at the request of the Required Lenders, (i) immediately cease making any Term Loans hereunder, (ii) subject to the terms and conditions in the DIP Order, terminate, reduce or restrict the Total Term Loan Commitments, whereupon the Total Term Loan Commitments shall immediately be so terminated, reduced or restricted, and/or (iii) absent the granting of relief in favor of the Borrowers as set forth in the DIP Order, (A) declare all or any portion of the Loans then outstanding to be due and payable, whereupon all or such portion of the aggregate principal of all Loans, all accrued and unpaid interest thereon, all fees and all other amounts payable under this Agreement and the other Loan Documents shall become due and payable immediately, without presentment, demand, protest or further notice or formalities, of any kind, all of which are hereby expressly waived by each Borrower, (B) terminate this Agreement and any other Loan Document as to any future liability or obligation of the Agent or any Lender, but without affecting any of the Obligations or the Liens securing the Obligations and (C) exercise any and all of its other rights and remedies under applicable law, hereunder and under the other Loan Documents (including under the Bankruptcy Code and the UCC).

## 9.2    <u>Allocation.</u>

(a)    Subject to the DIP Order, the Carve-Out, Permitted Prior Liens and the priorities set forth in this Agreement, the repayment of any of the Obligations or the proceeds, as provided

under the terms of this Agreement, of any sale, disposition (other than a disposition described under clauses (ii) and (iii) of the definition of Permitted Dispositions but including a Carbon Health Sale and a Carbon Health Plan) or other realization upon all or any part of the DIP Collateral shall be applied by the Agent and the Lenders in the following order of priorities:

> First, to the Agent in an amount sufficient to pay in full the Agent's costs and professionals' and advisors' fees and expenses relating to the Obligations as described in Section 10.11;

> Second, to the Lenders in an amount sufficient to pay in full the Lenders' costs and professionals' and advisors' fees and expenses relating to the Obligations as described in Section 10.11;

> Third, to the Lenders (on a Pro Rata basis) in an amount equal to the then unpaid amount of the Obligations constituting interest on the Term Loans;

> Fourth, to the Lenders (on a Pro Rata basis) in an amount equal to the then unpaid amount of the Obligations constituting principal on the Term Loans;

> Fifth, to the Lenders in an amount equal to any other unpaid Obligations; and

> Finally, after the full and final payment in cash of all of the Obligations, as the Bankruptcy Court or as a court of competent jurisdiction may direct;

provided, however, that notwithstanding the foregoing, the Agent in its sole and absolute discretion may cause any mandatory prepayments made pursuant to Section 2.4(b)(i) to instead be applied to prepayment of the Prepetition Secured Obligations in such order and manner as the Agent may determine in its sole discretion.

(b) The Agent and each Lender shall be deemed to have acted reasonably in the custody, preservation and disposition of any of the DIP Collateral if it complies with the obligations of a secured party under the UCC.

## SECTION 10. MISCELLANEOUS.

**10.1 Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent and duration of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**10.2 Notice.** Except as otherwise provided herein, any notice, demand, request, consent, approval, declaration, service of process or other communication (including the delivery of financial statements) that is required, contemplated, or permitted under the Loan Documents or with respect to the subject matter hereof shall be in writing, and shall be deemed to have been validly served, given, delivered, and received upon the earlier of: (i) the day of transmission by electronic mail or hand delivery or delivery by an overnight express service or overnight mail

delivery service; or (ii) the third calendar day after deposit in the United States of America mails, with proper first class postage prepaid, in each case addressed to the party to be notified as follows (or to such other address as each party may designate for itself by like notice):

>   If to the Borrowers:
>
>   c/o Carbon Health Technologies, Inc.
>   2100 Franklin Street, Suite 355
>   Oakland, California 94104
>   Attn: Kerem Ozkay and Eric Slusser
>   Email: kozkay@carbonhealth.com, eric.slusser@carbonhealth.com, fpa@carbonhealth.com and legal@carbonhealth.com
>
>   with a copy to:
>
>   PACHULSKI STANG ZIEHL & JONES LLP
>   919 North Market Street, 17th Floor
>   Wilmington, DE 19801
>   Attn: Debra I. Grassgreen
>        Maxim B. Litvak
>   Email: dgrassgreen@pszjlaw.com
>        mlitvak@pszjlaw.com
>   Phone: 302-652-3100
>
>
>   If to the Agent and the Lenders:
>
>   FUTURE SOLUTION INVESTMENTS LLC
>   970 W. Broadway, Suite E #464
>   Jackson, WY 83001
>   Attn: Michael F. Solomon
>   E-Mail: michael@futuresolutioninvestments.com
>
>   with a copy to:
>
>   KTBS Law LLP
>   1801 Century Park East, 26th Floor
>   Los Angeles, CA 90067
>   Attn: Nir Maoz
>        Tanner Frei
>   Email: nmaoz@ktbslaw.com
>        tfrei@ktbslaw.com
>   Phone: 310-407-4010

Nothing in this Agreement or in any other Loan Document shall be construed to limit or affect the obligation of any Borrower or any other Person to serve upon the Agent and the Lenders in the

4935-7871-9363.8                                       61

manner prescribed by the Bankruptcy Code any pleading or notice required to be given to the Agent and the Lenders pursuant to the Bankruptcy Code.

**10.3** **Entire Agreement; Amendments**.  This Agreement and the other Loan Documents constitute the entire agreement and understanding of the parties hereto in respect of the subject matter hereof and thereof, and supersede and replace in their entirety any prior proposals, term sheets, letters, negotiations or other documents or agreements, whether written or oral, with respect to the subject matter hereof or thereof.  Subject to any notice and consent provisions in the DIP Order, with respect to any amendments to this Agreement, no amendment, waiver or other modification of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Borrower therefrom, shall be effective unless the same shall be in writing and signed by the Required Lenders (or by the Agent at the written request of the Required Lenders) and the Borrowers that are party thereto and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given; provided, however, that no such waiver, amendment, modification, or consent shall, unless in writing and signed by all of the Lenders directly affected thereby and the Borrowers, do any of the following: (a) increase the amount of any Term Loan Commitment or extend the Maturity Date, (b) postpone or delay any date fixed by this Agreement or any other Loan Document for any payment of principal, interest, fees, or other amounts due hereunder or under any other Loan Document, (c) reduce the principal of, or the rate of interest on, any loan or other extension of credit hereunder, or reduce any fees or other amounts payable hereunder or under any other Loan Document (except in connection with the waiver of applicability of Section 2.3 (which waiver shall be effective with the written consent of the Required Lenders)), (d) amend, modify, or eliminate this Section or any provision of this Agreement providing for consent or other action by all Lenders, (e) amend, modify, or eliminate the definition of "Required Lenders" or "Pro Rata", (f) contractually subordinate any of the Agent's Liens, (g) other than in connection with a merger, liquidation, dissolution, release or sale of such Person expressly permitted by the terms hereof or the other Loan Documents, release any Borrower from any obligation for the payment of money hereunder or consent to the assignment or transfer by any Borrower of any of its rights or duties under this Agreement or the other Loan Documents, (h) amend, modify, or eliminate any of the provisions of Section 2.7 or Section 9.2, or (i) amend, modify, or eliminate any of the provisions of Section 3 (except to add DIP Collateral).  In addition to the foregoing, no amendment, waiver, modification, elimination, or consent shall amend, modify, or waive any provision of any Loan Document that relates to the rights, duties or discretion of the Agent, without the written consent of the Agent, the Borrowers, and the Required Lenders.

**10.4** **No Strict Construction**.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

**10.5** **No Waiver**.  The powers conferred upon the Agent and each Lender by this Agreement are solely to protect their respective rights hereunder and under the other Loan Documents and their interests in the DIP Collateral and shall not impose any duty upon the Agent or any Lender to exercise any such powers.  No omission or delay by the Agent or any Lender at any time to

enforce any right or remedy reserved to it, or to require performance of any of the terms, covenants or provisions hereof by any Borrower at any time designated, shall be a waiver of any such right or remedy to which the Agent or any Lender is entitled, nor shall it in any way affect the right of the Agent or any Lender to enforce such provisions thereafter.

**10.6    Survival.**  All agreements, representations and warranties contained in this Agreement and the other Loan Documents or in any document delivered pursuant hereto or thereto shall be for the benefit of the Agent and each Lender.  Section 6.3, Section 10.11, Section 10.14, Section 11.10 and any provisions that by their express terms are to survive the execution and delivery of this Agreement and the expiration or other termination of this Agreement shall survive such termination or expiration.

**10.7    Successors and Assigns**.  The provisions of this Agreement and the other Loan Documents shall inure to the benefit of and be binding on each Borrower and its respective permitted assigns (if any).  No Borrower shall assign its obligations under this Agreement or any of the other Loan Documents without the Agent's and Lenders' express prior written consent, and any such attempted assignment shall be void and of no effect.  Any Lender may assign, transfer, or endorse its rights hereunder and under the other Loan Documents in accordance with Section 10.13 hereof.

**10.8    Governing Law.**  This Agreement and the other Loan Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, applicable to contracts made and to be performed in the State of New York, except as governed by the Bankruptcy Code.

**10.9    Consent to Jurisdiction, Service of Process and Venue.**  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MUST BE BROUGHT IN THE BANKRUPTCY COURT AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, ANY STATE OR FEDERAL COURT LOCATED STATE OF NEW YORK IN THE COUNTY OF NEW YORK OR OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT EACH BORROWER HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT AND THE POWER OF THE BANKRUPTCY JUDGE TO ENTER ORDERS AND JUDGMENTS.    EACH BORROWER HEREBY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH BORROWER AT ITS ADDRESS FOR NOTICES AS SET FORTH IN SECTION 10.2. EACH BORROWER HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**10.10  Mutual Waiver of Jury Trial.**  EACH BORROWER, THE AGENT AND THE LENDERS EACH HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION,

PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM OR RELATING TO ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH BORROWER CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF ANY AGENT OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT ANY AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS. EACH BORROWER PARTY HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE AGENT AND THE LENDERS ENTERING INTO THIS AGREEMENT.

**10.11** **Professional Fees.** The Borrowers jointly and severally promise to pay upon demand the Agent's and the Lenders' reasonable fees and expenses necessary to finalize the loan documentation, each of the Interim DIP Order and the Final DIP Order and in connection with any consummation of a Carbon Health Sale and/or a Carbon Health Plan, including but not limited to reasonable attorneys' and other professionals' fees and expenses (including all Agent Professionals), UCC searches, filing costs, and other reasonable miscellaneous expenses. In addition, to the extent there has been no objection by the Borrowers, the U.S. Trustee or the Committee within ten (10) days after the submission thereto of a monthly summary invoice (which may be redacted to protect privilege), the Borrowers jointly and severally promise to pay promptly, and in any event, within ten (10) days after the end of such objection period, any and all attorneys' and other professionals' fees and expenses (including Lender Expenses) incurred by the Agent and each Lender after the date of this Agreement in connection with or related to: (a) the Loans; (b) the administration, collection, or enforcement of the Loans; (c) the amendment or modification of the Loan Documents; (d) any waiver, consent, release, or termination under the Loan Documents; (e) the protection, preservation, sale, lease, liquidation, or disposition of any DIP Collateral or the exercise of remedies with respect to any DIP Collateral; (f) any legal, litigation, administrative, arbitration, or out of court proceeding in connection with or related to any Borrower or any DIP Collateral, and any appeal or review thereof; and (g) the Chapter 11 Cases or any other action related to any Borrower, any DIP Collateral, the Loan Documents, a Carbon Health Plan, including representation of the Agent or any Lender in any adversary proceeding or contested matter in connection therewith, commenced or continued by or on behalf of any Borrower or its estate, and any appeal or review thereof.

**10.12** **Public Disclosure**. Each Borrower agrees that neither it nor any of its Affiliates will now or in the future issue any press release or other public disclosure, excluding filings with the Bankruptcy Court, using the name of the Agent, any Lender or any of their respective Affiliates or referring to this Agreement or any other Loan Document without the prior written consent of the Agent or such Lender, except to the extent that such Borrower or such Affiliate is required to do so under applicable law (in which event, such Borrower or such Affiliate will consult with the Agent or such Lender before issuing such press release or other public disclosure). Each Borrower hereby authorizes the Agent and each Lender, after consultation with such Borrower, to advertise

the closing of the transactions contemplated by this Agreement, and to make appropriate announcements of the financial arrangements entered into among the parties hereto, as the Agent or such Lender shall deem appropriate.

**10.13    Assignment of Rights**.  Each Borrower acknowledges and understands that each Lender may, with the consent of the Agent, sell, transfer or assign all or part of its interest hereunder, under any Loan, under any Term Loan Commitment of such Lender and under the other Loan Documents, to any person or entity (an "**Assignee**").  After such assignment the term "Lenders" as used in the Loan Documents shall mean and include such Assignee, and such Assignee shall be vested with all rights, powers and remedies of a Lender hereunder with respect to the interest so assigned; but with respect to any such interest not so transferred, the assigning Lender shall retain all rights, powers and remedies hereby given.  No such assignment by a Lender shall relieve any Borrower of any of its obligations hereunder.  Each Assignee shall, to the extent it is entitled to an exemption from or reduction of withholding Tax with respect to payments made under the Loans or the Loan Documents, deliver to the Borrowers, at the time or times reasonably requested by the Borrowers, such properly completed and executed documentation reasonably requested by the Borrowers as will permit such payments to be made without withholding or at a reduced rate of withholding.

**10.14    Reinstatement; Certain Payments.**  If any claim is ever made upon the Agent or any Lender for repayment or recovery of any amount or amounts received by the Agent or such Lender in payment or on account of any of the Obligations, the Agent or such Lender shall give prompt notice of such claim to each other Lender, the Agent, if applicable, and the Borrowers, and if the Agent or such Lender repays all or part of such amount by reason of (a) any judgment, decree or order of any court or administrative body having jurisdiction over the Agent or such Lender or any of its property, or (b) any good faith settlement or compromise of any such claim effected by the Agent or such Lender with any such claimant, then and in such event each Borrower agrees that (i) any such judgment, decree, order, settlement or compromise shall be binding upon it notwithstanding the cancellation of any Indebtedness hereunder or under the other Loan Documents or the termination of this Agreement or the other Loan Documents, and (ii) it shall be and remain liable to the Agent or such Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by the Agent or such Lender. The provisions of this Section shall survive the repayment of the Obligations and release of the Liens granted under the Loan Documents.

**10.15    Counterparts.**  This Agreement and any amendments, waivers, consents or supplements hereto may be executed in any number of counterparts, and by different parties hereto in separate counterparts, each of which when so delivered shall be deemed an original, but all of which counterparts shall constitute but one and the same instrument.

**10.16    No Third Party Beneficiaries**.  No provisions of the Loan Documents are intended, nor will be interpreted, to provide or create any third-party beneficiary rights or any other rights of any kind in any person (including non-Borrower Medical Groups) other than the Agent, the Lenders and the Borrowers unless specifically provided otherwise herein, and, except as otherwise so provided, all provisions of the Loan Documents will be personal and solely between the Agent, the Lenders and the Borrowers.

4935-7871-9363.8

10.17 **No Assumption of Liability**. The Liens on the DIP Collateral granted hereunder are given as security only and shall not subject the Agent or any Lender to, or in any way modify, any obligation or liability of any Borrower relating to any DIP Collateral, as applicable.

10.18 **Relationship with Lenders**. The obligations of each Lender hereunder are several, and no Lender shall be responsible for the obligations of any other Lender. Amounts payable hereunder to each Lender shall be a separate and independent debt. It shall not be necessary for the Agent or any other Lender to be joined as an additional party in any proceeding for such purposes. Nothing in this Agreement and no action of the Agent or Lenders pursuant to the Loan Documents or otherwise shall be deemed to constitute the Agent and any Lender to be a partnership, association, joint venture or any other kind of entity, nor to constitute control of any Borrower or any Medical Group.

10.19 **Parties Including Trustee; Bankruptcy Court Proceedings**. Subject to the DIP Order, this Agreement, the other Loan Documents, and all Liens created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Borrower and any trustee or other successor in interest of any Borrower in the Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code or any other bankruptcy or insolvency laws, and shall not be subject to Section 365 of the Bankruptcy Code. Subject to the DIP Order, this Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Agent and Lenders and their respective assigns, transferees and endorsees. Subject to the DIP Order, the Liens created by this Agreement, the DIP Order and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Cases or any other bankruptcy case of any Borrower to a case under Chapter 7 of the Bankruptcy Code, or in the event of dismissal of the Chapter 11 Cases or the release of any DIP Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent or the Lenders file financing statements or otherwise perfect their security interests or Liens under applicable law.

## SECTION 11. THE AGENT.

11.1 **Appointment and Authority**. Each Lender appoints and designates Future Solution Investments LLC as the Agent under all Loan Documents. The Agent may, and each Lender authorizes the Agent to, enter into all Loan Documents to which the Agent is intended to be a party. Each Lender agrees that any action taken by the Agent or Required Lenders in accordance with the provisions of the Loan Documents, and the exercise by the Agent or Required Lenders of any rights or remedies set forth therein, together with all other powers reasonably incidental thereto, shall be authorized by and binding upon all Lenders. Without limiting the generality of the foregoing, and notwithstanding anything to the contrary in this Agreement or the other Loan Documents, the Agent shall have the sole and exclusive authority to (a) execute and deliver as the Agent each Loan Document and accept delivery of each Loan Document from each Borrower or any other Person; (b) act as collateral agent for Lenders for purposes of perfecting and administering Liens under the Loan Documents, and for all other purposes stated therein; (c) deal with the DIP Collateral; (d) exercise such other powers delegated to the Agent by the terms hereof or the other Loan Documents (including the power to give or to refuse to give notices, waivers, consents, approvals and instructions and the power to make or to refuse to make determinations and calculations, in each case, in the Agent's sole and absolute discretion) together with such

powers as are reasonably incidental thereto to carry out the purposes hereof and thereof and (e) take any Enforcement Action or otherwise exercise any rights or remedies with respect to any DIP Collateral under the Loan Documents, applicable law or otherwise. The duties of the Agent shall be ministerial and administrative in nature, and the Agent shall not have a fiduciary relationship with any Lender or other Person by reason of any Loan Document or any transaction relating thereto.

**11.2** **Duties**. The Agent shall not have any duties except those expressly set forth in the Loan Documents. The conferral upon the Agent of any right shall not imply a duty to exercise such right, unless instructed to do so by Lenders in accordance with this Agreement.

**11.3** **Agent Professionals**. The Agent may perform its duties through agents and employees. The Agent may consult with and employ the Agent Professionals, and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by an Agent Professional. The Agent shall not be responsible for the negligence or misconduct of any agents, employees or the Agent Professionals selected by it with reasonable care.

**11.4** **Instructions of Required Lenders**. The rights and remedies conferred upon the Agent under the Loan Documents may be exercised without the necessity of joinder of any other party, unless required by applicable law. The Agent may request instructions from Required Lenders or other Lenders with respect to any act (including the failure to act) in connection with any Loan Documents, and may seek assurances to its satisfaction from Lenders of their indemnification obligations against all Indemnified Claims that could be incurred by the Agent in connection with any act. The Agent shall be entitled to refrain from any act until it has received such instructions or assurances, and the Agent shall not incur liability to any Person by reason of so refraining. Instructions of Required Lenders shall be binding upon the Agent and all Lenders, and no Lender shall have any right of action whatsoever against the Agent as a result of the Agent acting or refraining from acting in accordance with the instructions of Required Lenders. Notwithstanding the foregoing, instructions by and consent of specific parties shall be required to the extent provided in Section 10.3. In no event shall the Agent be required to take any action that, in its opinion, is contrary to applicable law or any Loan Documents or could subject any Agent Indemnitee to personal liability.

**11.5** **Lien Releases; Care of DIP Collateral**.

(a)     The Lenders authorize the Agent to release any Lien with respect to any DIP Collateral (i) upon full and final cash payment of all Obligations with respect to the DIP Collateral; (ii) that is the subject of an asset disposition to a Person other than any Borrower which the Borrowers certify in writing to the Agent is a Permitted Disposition; (iii) that does not constitute a material part of the DIP Collateral; or (iv) with the written consent of all Lenders. The Agent and the Lenders agree that the Agent shall execute and deliver all documents reasonably requested by the Borrowers to effect or otherwise evidence such release described in clauses (i), (ii) or (iv) above (and, if requested by the Agent in connection with such execution and delivery, the Borrowers shall certify to the Agent that any applicable sale or disposition is being made in compliance with the terms of this Agreement (and the Agent may rely conclusively on any such certificate, without further inquiry)). Any such release shall not in any manner discharge, affect or impair the Obligations or any Liens (other than those expressly being released) upon (or

obligations of any Borrower in respect of) all interests retained by any Borrower, including the proceeds of any sale, all of which shall continue to constitute part of the DIP Collateral, as applicable.

(b)    The Agent shall have no obligation to assure that any DIP Collateral exists or is owned by the Borrowers, or is cared for, protected or insured, nor to assure that the Agent's Liens have been properly created, perfected or enforced, or are entitled to any particular priority, nor to exercise any duty of care with respect to any DIP Collateral.

**11.6    Possession of DIP Collateral.**  The Agent and Lenders appoint each other Lender as agent (for the benefit of the Lenders) for the purpose of perfecting Liens in any DIP Collateral held or controlled by such Lender, to the extent such Liens are perfected by possession or control.  If any Lender obtains possession or control of any DIP Collateral, it shall notify the Agent thereof and, promptly upon the Agent's request, deliver such DIP Collateral to the Agent or otherwise deal with it in accordance with the Agent's instructions.

**11.7    Reliance By the Agent**.  The Agent shall be entitled to rely, and shall be fully protected in relying, upon any certification, notice or other communication (including those by telephone, telex, telegram, telecopy or e-mail) believed by it to be genuine and correct and to have been signed, sent or made by the proper Person, and upon the advice and statements of the Agent Professionals.  The Agent shall have a reasonable and practicable amount of time to act upon any instruction, notice or other communication under any Loan Document, and shall not be liable for any delay in acting.

**11.8    Action Upon Default.**  The Agent shall not be deemed to have knowledge of any Event of Default unless it has received written notice from the Borrowers or Required Lenders specifying the occurrence and nature thereof.  Each Lender agrees that, except with the written consent of the Agent and Required Lenders, it will not take any Enforcement Action, or exercise any right that it might otherwise have under applicable law to credit bid at foreclosure sales or other similar dispositions of the DIP Collateral or to assert any rights relating to any DIP Collateral.

**11.9    Ratable Sharing**.  If any Lender shall obtain any payment or reduction of any Obligation, whether through set-off or otherwise, in excess of its share of such Obligation, determined on a Pro Rata basis or in accordance with Section 9.2, as applicable, such Lender shall forthwith purchase from the Agent and the other Lenders such participations in the affected Obligation as are necessary to cause the purchasing Lender to share the excess payment or reduction on a Pro Rata basis or in accordance with Section 9.2, as applicable.  If any of such payment or reduction is thereafter recovered from the purchasing Lender, the purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.  Notwithstanding the foregoing, any payment of Indemnified Taxes pursuant to Section 2.6 shall not be considered an excess payment under this Section 11.9 and does not have to be shared Pro Rata.

**11.10    Indemnification.  EACH LENDER SHALL INDEMNIFY AND HOLD HARMLESS AGENT INDEMNITEES, TO THE EXTENT NOT REIMBURSED BY THE BORROWERS, ON A PRO RATA BASIS, AGAINST ALL INDEMNIFIED CLAIMS THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY SUCH AGENT INDEMNITEE, PROVIDED THAT ANY INDEMNIFIED CLAIM AGAINST AN AGENT INDEMNITEE RELATES TO OR ARISES FROM ITS ACTING AS OR FOR AGENT (IN**

**THE CAPACITY OF AGENT).**  In the Agent's discretion, it may reserve for any Indemnified Claims made against an Agent Indemnitee, and may satisfy any judgment, order or settlement relating thereto, from proceeds of the DIP Collateral prior to making any distribution of the DIP Collateral proceeds to Lenders.  If the Agent is sued by any receiver, bankruptcy trustee, debtor-in-possession or other Person for any alleged preference or fraudulent transfer, then any monies paid by the Agent in settlement or satisfaction of such proceeding, together with all interest, costs and expenses (including attorneys' fees) incurred in the defense of same, shall be promptly reimbursed to the Agent by each Lender to the extent of its Pro Rata share.

**11.11   Limitation on Responsibilities of the Agent**.  The Agent shall not be liable to any Lender for any action taken or omitted to be taken under the Loan Documents, except for losses directly and solely caused by the Agent's gross negligence or willful misconduct as determined by a final, non-appealable decision of a court of competent jurisdiction.  The Agent does not assume any responsibility for any failure or delay in performance or any breach by any Borrower or any Lender of any obligations under the Loan Documents.  The Agent does not make any express or implied representation, warranty or guarantee to the Lenders with respect to any Obligations, DIP Collateral, Loan Documents or any Borrower.  No Agent Indemnitee shall be responsible to the Lenders for any recitals, statements, information, representations or warranties contained in any Loan Documents; the execution, validity, genuineness, effectiveness or enforceability of any Loan Documents; the genuineness, enforceability, collectability, value, sufficiency, location or existence of any DIP Collateral, or the validity, extent, perfection or priority of any Lien therein; the validity, enforceability or collectability of any Obligations; or the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any Borrower.  No Agent Indemnitee shall have any obligation to any Lender to ascertain or inquire into the existence of any Event of Default, the observance by any Borrower of any terms of the Loan Documents, or the satisfaction of any conditions precedent contained in any Loan Documents.

**11.12   Resignation; Successor Agent**.  Subject to the appointment and acceptance of a successor Agent as provided below, the Agent may resign at any time by giving at least 10 days written notice thereof to the Lenders and the Borrowers.  Upon receipt of such notice, Required Lenders shall have the right to appoint a successor Agent which shall be a Lender or an affiliate of a Lender.  If no successor Agent is appointed prior to the effective date of the resignation of the Agent, then the Agent may appoint a successor Agent from among the Lenders or, if no Lender accepts such role, the Agent may appoint Required Lenders as successor Agent.  Upon acceptance by a successor Agent of an appointment to serve as the Agent hereunder, or upon appointment of Required Lenders as successor Agent, such successor Agent shall thereupon succeed to and become vested with all the powers and duties of the retiring Agent without further act, and the retiring Agent shall be discharged from its duties and obligations hereunder but shall continue to have the benefits of the indemnification set forth in Section 6.3 and Section 11.10.  Notwithstanding the Agent's resignation, the provisions of this Section 11 shall continue in effect for its benefit with respect to any actions taken or omitted to be taken by it while the Agent.  Any successor to Future Solution Investments LLC shall continue to be the Agent hereunder without further act on the part of the parties hereto, unless such successor resigns as provided above.

**11.13   Separate Collateral Agent**.  If the Agent believes that it may be limited in the exercise of any rights or remedies under the Loan Documents due to any applicable law, the Agent may

appoint an additional Person who is not so limited, as a separate collateral agent or co-collateral agent. If the Agent so appoints a collateral agent or co-collateral agent, each right and remedy intended to be available to the Agent under the Loan Documents shall also be vested in such separate agent. The Lenders shall execute and deliver such documents as the Agent deems appropriate to vest any rights or remedies in such agent. If any collateral agent or co-collateral agent shall die or dissolve, become incapable of acting, resign or be removed, then all the rights and remedies of such agent, to the extent permitted by applicable law, shall vest in and be exercised by the Agent until appointment of a new agent.

**11.14** **Due Diligence and Non-Reliance**. Each Lender acknowledges and agrees that it has, independently and without reliance upon the Agent or any other Lender, and based upon such documents, information and analyses as it has deemed appropriate, made its own credit analysis of each Borrower and its own decision to enter into this Agreement and to fund Term Loans hereunder. Each Lender has made such inquiries as it feels necessary concerning the Loan Documents, the DIP Collateral and each Borrower. Each Lender acknowledges and agrees that the other Lenders have made no representations or warranties concerning any Borrower, any DIP Collateral or the legality, validity, sufficiency or enforceability of any Loan Documents or Obligations. Each Lender will, independently and without reliance upon any other Lender, and based upon such financial statements, documents and information as it deems appropriate at the time, continue to make and rely upon its own credit decisions in making the Term Loans, and in taking or refraining from any action under any Loan Documents. Except for notices, reports and other information expressly requested by a Lender, the Agent shall have no duty or responsibility to provide any Lender with any notices, reports or certificates furnished to the Agent by any Borrower or any credit or other information concerning the affairs, financial condition, business or properties of any Borrower (or any of its affiliates) which may come into possession of the Agent or its affiliates.

**11.15** **Recovery of Payments.** If the Agent pays any amount to a Lender in the expectation that a related payment will be received by the Agent from any Borrower and such related payment is not received, then the Agent may recover such amount from each Lender that received it. If the Agent determines at any time that an amount received under any Loan Document must be returned to any Borrower or paid to any other Person pursuant to applicable law or otherwise, then, notwithstanding any other term of any Loan Document, the Agent shall not be required to distribute such amount to any Lender. If any amounts received and applied by the Agent to any Obligations are later required to be returned by the Agent pursuant to applicable law, each Lender shall pay to the Agent, on demand, such Lender's Pro Rata share of the amounts required to be returned. The preceding sentence shall not apply to any payment of Indemnified Taxes pursuant to Section 2.6 or any other amount that is specific to a particular Lender; any such amount, which the Agent is required to return, shall be repaid to the Agent solely by the Lender that received the payment.

**11.16** **Agent in its Individual Capacity**. As a Lender, Future Solution Investments LLC (and any successor Agent that is a Lender) shall have the same rights and remedies under the other Loan Documents as any other Lender, and the terms "Lenders," "Required Lenders" or any similar term shall include Future Solution Investments LLC (and any such successor Agent that is a Lender) in its capacity as a Lender. In their individual capacities, the Agent and its Affiliates may receive information regarding any Borrower and its Affiliates (including information subject to

70

confidentiality obligations), and each Lender agrees that Future Solution Investments LLC and its Affiliates shall be under no obligation to provide such information to any Lender, if acquired in such individual capacity.

**11.17  <u>No Third Party Beneficiaries</u>**.  This Section 11 is an agreement solely among Lenders and the Agent, and shall survive full and final payment in cash of the Obligations.  This Section 11 (other than Section 11.4(a)) does not confer any rights or benefits upon any Borrower or any other Person.  As between each Borrower and the Agent, any action that the Agent may take under any Loan Documents or with respect to any Obligations shall be conclusively presumed to have been authorized and directed by the Lenders.

**11.18  <u>Electronic Execution of Certain Other Documents</u>**.  The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation assignments, assumptions, amendments, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(SIGNATURES TO FOLLOW)

    **IN WITNESS WHEREOF**, the Borrowers, the Agent and the Lenders have duly executed and delivered this Senior Secured and Superpriority Financing Agreement as of the day and year first above written.

               **CARBON HEALTH TECHNOLOGIES, INC.**

               By: _____
               Name:
               Title:

               **CARBON HEALTH MEDICAL GROUP OF CALIFORNIA, P.C.**

               By: _____
               Name:
               Title:

               **CARBON HEALTH PRIMARY CARE OF CALIFORNIA, P.C.**

               By: _____
               Name:
               Title:

               **CARBON HEALTH MEDICAL GROUP OF FLORIDA, P.A.**

               By: _____
               Name:
               Title:

               **CARBON HEALTH PRIMARY CARE OF FLORIDA, P.A.**

               By: _____
               Name:
               Title:

[SIGNATURE PAGE TO SENIOR SECURED AND SUPERPRIORITY FINANCING AGREEMENT]

**CARBON HEALTH MEDICAL GROUP OF NEW JERSEY, P.A.**

By: _____
Name:
Title:

**CARBON HEALTH PRIMARY CARE OF NEW JERSEY, P.A.**

By: _____
Name:
Title:

**CENTRAL JERSEY URGENT CARE LIMITED LIABILITY COMPANY**

By: _____
Name:
Title:

**DJAVAHERIAN MEDICAL PRACTICE, PLLC**

By: _____
Name:
Title:

**CARBON HEALTH MEDICAL GROUP OF MASSACHUSETTS, P.C.**

By: _____
Name:
Title:

**CARBON HEALTH MEDICAL GROUP OF KANSAS, P.A.**

By: _____
Name:
Title:

[SIGNATURE PAGE TO SENIOR SECURED AND SUPERPRIORITY FINANCING AGREEMENT]

**CARBON HEALTH PRIMARY CARE OF KANSAS, P.A.**


By: _____
Name:
Title:

**CARBON HEALTH MEDICAL GROUP OF SUNNYVALE, INC.**


By: _____
Name:
Title:

**CARBON HEALTH MEDICAL GROUP OF TEXAS, PLLC**


By: _____
Name:
Title:

**HILLCREST URGENT CARE OF ALABAMA PC**


By: _____
Name:
Title:

**RITECARE MEDICAL CENTER, LLC**


By: _____
Name:
Title:

**TREAT MEDICAL, INC.**


By: _____
Name:
Title:

**CARBON HEALTH SOUTH BAY MEDICAL GROUP, P.C.**


By:    _____
Name:
Title:

**CARBON HEALTH SOUTH BAY PRIMARY CARE, P.C.**


By:    _____
Name:
Title:


**CARBON HEALTH MEDICAL GROUP OF WISCONSIN, S.C.**


By:    _____
Name:
Title:

**CARBON HEALTH PRIMARY CARE OF WISCONSIN, S.C.**


By:    _____
Name:
Title:

**CARBON HEALTH ALPHA MEDICAL GROUP OF CALIFORNIA, P.C.**


By:    _____
Name:
Title:

**CARBON HEALTH ALPHA MEDICAL GROUP OF FLORIDA, P.A.**


By:    _____
Name:
Title:

[SIGNATURE PAGE TO SENIOR SECURED AND SUPERPRIORITY FINANCING AGREEMENT]

**CARBON HEALTH ALPHA MEDICAL GROUP OF KANSAS, P.A.**


By: _____
Name:
Title:

**CARBON HEALTH ALPHA PRIMARY CARE OF CALIFORNIA, P.C.**


By: _____
Name:
Title:

**CARBON HEALTH ALPHA PRIMARY CARE OF FLORIDA, P.A.**


By: _____
Name:
Title:

**CARBON HEALTH ALPHA PRIMARY CARE OF KANSAS, P.A.**


By: _____
Name:
Title:

**CARBON HEALTH EAST BAY MEDICAL GROUP, P.C.**


By: _____
Name:
Title:

**CARBON HEALTH EAST BAY PRIMARY CARE, P.C.**


By: _____
Name:
Title:

**AGENT:**

**FUTURE SOLUTION INVESTMENTS LLC**

By:  _____
Name:  Michael F. Solomon
Title:   Managing Director

**LENDERS:**

**FUTURE SOLUTION INVESTMENTS LLC**


By: _____
Name: Michael F. Solomon
Title:   Managing Director

# TABLE OF SCHEDULES AND EXHIBITS

| | |
|---|---|
| Schedule 1.1(A) | Total Term Loan Commitments |
| Schedule 5.2 | Real Property; Deposit Accounts, Securities Accounts, Commodity Accounts and Investment Accounts; Commercial Tort Claims |
| Schedule 5.3 | Consents, Etc. |
| Schedule 5.4 | Litigation |
| Schedule 5.9 | Tax Matters |
| Schedule 5.10 | Intellectual Property Claims |
| Schedule 5.11 | Intellectual Property |
| Schedule 5.12 | Intellectual Property Actions |
| Schedule 5.13 | Capitalization |
| Schedule 5.14 | Compliance with Healthcare Regulations |
| Schedule 7.11 | Existing Permitted Indebtedness |
| Schedule 7.12 | Existing Permitted Liens |
| Schedule 7.13 | Existing Permitted Investments |
| Schedule 7.17 | Transactions with Affiliates |

| | |
|---|---|
| Exhibit A: | Form of Interim DIP Order |
| Exhibit B: | Form of Notice of Borrowing |

**SCHEDULE 1.1(A)**

**TOTAL TERM LOAN COMMITMENTS**

**Total Term Loan Commitments on Facility Effective Date**

| Lender | Term Loan Commitment |
|---|---|
| Future Solution Investments LLC | $19,500,000 |
| **Total** | $19,500,000 |

**SCHEDULE 5.2**

**REAL PROPERTY; DEPOSIT ACCOUNTS, SECURITIES ACCOUNTS, COMMODITY ACCOUNTS AND INVESTMENT ACCOUNTS; COMMERCIAL TORT CLAIMS**

**[TO BE INSERTED]**

1

**SCHEDULE 5.3**

**CONSENTS, ETC.**

**[TO BE INSERTED]**

**SCHEDULE 5.4**

**LITIGATION**

**[TO BE INSERTED]**

**SCHEDULE 5.9**

**TAX MATTERS**


**[TO BE INSERTED]**

**SCHEDULE 5.10**

**INTELLECTUAL PROPERTY CLAIMS**


**[TO BE INSERTED]**

**SCHEDULE 5.11**

**INTELLECTUAL PROPERTY**


**[TO BE INSERTED]**

**SCHEDULE 5.12**

**INTELLECTUAL PROPERTY ACTIONS**


**[TO BE INSERTED]**

**SCHEDULE 5.13**

**CAPITALIZATION**


**[TO BE INSERTED]**

**SCHEDULE 5.14**

**HEALTHCARE MATTERS**

**[TO BE INSERTED]**

**SCHEDULE 7.11**

**EXISTING PERMITTED INDEBTEDNESS**


**[TO BE INSERTED]**

**SCHEDULE 7.12**

**EXISTING PERMITTED LIENS**

**[TO BE INSERTED]**

**SCHEDULE 7.13**

**EXISTING PERMITTED INVESTMENTS**


**[TO BE INSERTED]**

**SCHEDULE 7.17**

**TRANSACTIONS WITH AFFILIATES**

**[TO BE INSERTED]**

1

1

**EXHIBIT A**

**FORM OF INTERIM DIP ORDER**

**[SEE ATTACHED]**

**EXHIBIT B**

**FORM OF NOTICE OF BORROWING**

**[TO BE INSERTED]**