**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| In re: | Chapter 11 |
| Carbon Health Technologies, Inc.,[1] | Case No. 26-90306 (CML) |
| Debtors. | Related Dkt. Nos. 13 & 49 |

**OBJECTION OF THE OFFICIAL COMMITTEE**
**OF UNSECURED CREDITORS TO THE DEBTORS'**
**EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION SECURED**
**FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE;**
**(II) AUTHORIZING THE DEBTORS TO USE CERTAIN CASH COLLATERAL;**
**(III) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE**
**EXPENSE CLAIMS; (IV) GRANTING ADEQUATE PROTECTION TO THE**
**PREPETITION SECURED PARTIES; (V) MODIFYING THE AUTOMATIC STAY;**
**(VI) SCHEDULING A FINAL HEARING; AND (VII) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "UCC"), hereby objects to the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Secured Financing Pursuant to Section 364 of the Bankruptcy Code; (II) Authorizing the Debtors to Use Certain Cash Collateral; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Granting Adequate Protection to the Prepetition Secured Parties; (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* (Dkt. No. 13) (the "DIP Motion").[2]  In support of this Objection, the UCC respectfully states as follows.

---

[1]  A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/CarbonHealth.  The location of Carbon Health Technologies, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 500 East Remington Drive, Suite 20, Sunnyvale, CA 94087.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the DIP Motion.

## PRELIMINARY STATEMENT

1.        Section 364 of the Bankruptcy Code governs the inducements that a debtor may offer a lender to obtain a post-petition loan or extension of credit.  It does not authorize a debtor to secure or enhance pre-petition debt.  *Matter of Saybrook Mfg. Co.*, 963 F.2d 1490, 1495 (11th Cir. 1992).  If a debtor wants to confer benefits on holders of pre-petition debt, in their capacity as such, it must look to a different Code section and satisfy its burden of proof by offering evidence sufficient to justify the relief requested.  The Debtors have not met their burden of proof.

2.        The Debtors' first-day filings show that in November 2025—less than three months before the Petition Date—the Debtors undertook a significant recapitalization/refinancing process with Future Solution Investments LLC ("Future Solution").  *See* Dkt. No. 16 at ¶ 23.

3.        This financing purportedly included (a) $16 million of aggregate *new* money advanced in November 2025 and January 2026, and (b) additional funds advanced in November 2025 to purchase or "take out" the prior secured facility held by Fearless Capital Management, LLC.  *Id.* at ¶¶ 22-24.  This makes Future Solution a voluntary creditor in these cases—*i.e.*, an investor that bargained for a credit position in a financially distressed company.

4.        The Debtors' disclosures concerning this voluntary financing are conspicuously sparse.  *See id.*  The Debtors have not advanced any purported justification for the $16 million of new liquidity.  Nor has there been even basic disclosure concerning the terms of the takeout debt.

5.        Notwithstanding, the Debtors seek authority to stipulate that the principal amount of the *pre*-petition debt owed to Future Solution is not less than $77 million and that this *pre*-petition debt is secured by a valid security interest in the Debtors' assets.  *See* Dkt. No. 13-1 (the "DIP Order") at ¶¶ D(i)—D(v) & § 11.2.  The Debtors do so without requiring the basic disclosures that a secured creditor must make in order to file a valid proof of claim.

2

6. The DIP Order includes aggressive milestones, including a March 6th bid deadline and March 25th sale consummation. *See* DIP Order at § 4.2; DIP Motion at Ex. A (DIP Financing Agreement at pp. 14-15). Failure to achieve these milestones constitutes an event of default that could be used to cut off funding and permit the DIP Lenders to foreclose on the assets.

7. The DIP Order further contemplates a full credit bid by the DIP Lenders, including both the ***post***-petition DIP Loan and purported ***pre***-petition debt. *See* DIP Order at § 4.3.

8. And, while the pre-petition financing may be susceptible to avoidance or recharacterization, the DIP Order seeks to immunize Future Solution (in its capacity as a holder of ***pre***-petition debt) by giving Future Solution (in its capacity as a DIP Lender) a lien on Avoidance Action proceeds. *Id.* at § 2.1.

9. Future Solution's intent to execute a loan-to-own transaction is clear. *See* Dkt. No. 16 at ¶¶ 55-58. The UCC does not object in theory to an investor who purchases debt with an ownership strategy in mind. The question for today is what relief should be granted by this Court under section 364 of the Bankruptcy Code given the record that is before the Court.

10. The UCC asserts, as a threshold matter, that relief that is beyond the scope of section 364 of the Bankruptcy Code—namely, recognizing the validity and security of the pre-petition debt—should not be granted *at this time*.

11. Assuming, *arguendo*, that such a recognition is appropriate, subject to the UCC's right to seek derivative standing to challenge this debt, Future Solution should not be permitted to credit bid debt that is the subject of a challenge until that challenge is resolved. In addition, the proposed liens on Avoidance Action proceeds are not necessary and should not be approved.

12. The DIP contains other improprieties for which the Debtors have failed to meet their burden under section 364(d), including section 552 and section 506(c) waivers.

13.     Finally, the Budget should be modified to provide for payment of February "stub rent" for the period from the Petition Date through February 28, 2026 (the "Stub Rent").  The risk of administrative insolvency should not be placed on the landlords.

14.     The UCC was formed on February 16, 2026, retained counsel on February 18, 2026, and was required to file this Objection by February 23, 2026.  The UCC will attempt to resolve these issues with the Debtors' counsel prior to the hearing scheduled for February 27, 2026.  To preserve the objections set forth herein, the UCC states as follows.

**BACKGROUND**

15.     The Debtors contend that, as of the Petition Date, they were indebted and liable to the Prepetition Secured Parties for an aggregate principal amount of not less than $77 million.  *See* Dkt. No. 16 at ¶ 25.  The Debtors represent that $16 million of the purported $77+ million owed on a pre-petition basis is attributable to two separate advances made in November 2025 and January 2026.  *Id.* at ¶¶ 22-24.

16.     The remaining portion appears to be the result of a November 24, 2025, takeout financing.  *Id.* at ¶ 23.  It is unclear the quantum of financing that the Lenders advanced in this respect.  As to the entirety of the purported pre-petition debt, the Debtors have not offered any explanation, justification, or context with which to evaluate the propriety of the financing.

17.     The same lender group that facilitated this transaction now controls the DIP financing in these cases and is seeking to impose tight case milestones with the apparent goal of converting their debt to equity, whether through a credit bid or a chapter 11 plan.

18.     The UCC must, consistent with its fiduciary obligations, conduct an independent investigation and ensure that these cases are used to maximize value for creditors.  In addition to the November 2025 transaction, the UCC has concerns regarding what will happen to potential

claims against the Debtors' insiders who have long exercised significant control over the Debtors and may face both direct and derivative claims.

19. Given the proposed case milestone, the UCC is moving quickly. As to the DIP Motion that is before this Court, the UCC generally does not object to traditional section 364 relief—namely, liens and priorities to induce the post-petition extension of credit to the Debtors. The DIP Motion, however, seeks relief that is beyond the scope of section 364.

20. Consistent with the unity of interests that appears to exist in these cases among various parties, the DIP Motion seeks to provide material benefits and advantages to the Prepetition Lenders in their capacity as such. This is improper. On February 3, 2026, the Court entered an order (the "Interim DIP Order") approving the DIP Motion on an interim basis and scheduling a hearing for February 27, 2026, at 1:00 p.m. (CT) to consider entry of a final order granting the DIP Motion (the "Final DIP Order").[3] The Debtors extended the UCC's deadline to object to the DIP Motion until February 23, 2026 at 5:00 p.m. (CT).

### ARGUMENT

21. By this Objection, the UCC is targeting several problematic features of the DIP Motion—securing unsecured prepetition debt, illusory challenge rights, liens on Avoidance Proceeds, the failure to properly budget for administrative expenses, including Stub Rent, and section 552 and section 506(c) waivers.

---

[3] The Interim DIP Order approved, on an interim basis, the Debtors' Initial DIP Budget, which was attached as Annex 1 to the Interim DIP Order. While the Initial DIP Budget provides for rent payments in March and April, it does not provide for any rent payments in February and accordingly does not appear to provide for the payment of Stub Rent. Instead, the Debtors presumably intend to pay Stub Rent as post-petition administrative claims when the Debtors hopefully emerge from chapter 11.

I.   **Section 364 of the Bankruptcy Code Does Not Allow the Debtors to Convert Unsecured Prepetition Debt into Secured Debt**

22.    The facts and circumstances surrounding the purported Prepetition Secured Obligations raise concerns that warrant investigation.  The DIP Order, however, attempts to shield those financings from inquiry and artificially harden the liens to the amount stipulated by the Debtors, without the benefit of due investigation.  If the pre-petition debt is subject to challenge, then the relief sought by the Debtors could effectively convert unsecured *pre*-petition debt into secured debt.  Such relief is not appropriate under section 364 of the Bankruptcy Code.

23.    Section 364 governs how a debtor in bankruptcy can obtain financing after the case has been filed.  Section 364 governs the inducements a debtor may offer a lender to obtain a loan or credit, as well as when court approval is required.

24.    **Ordinary Course**.  Section 364(a) provides that a debtor "may obtain unsecured credit" in "the ordinary course of business" without the need for court approval.  11 U.S.C. § 364(a).  Thus, a debtor can make inventory purchases on normal terms.  Trade creditors that extend credit are entitled to an "administrative expense" claim under "section 503(b)(1)."  *Id.*

25.    **Outside the Ordinary Course**.  Section 364(b) provides that a debtor may "obtain unsecured credit" *outside* the ordinary course of business "after notice and a hearing."  *Id.* at § 364(b). Thus, for example, a debtor can enter into unusual vendor arrangements after obtaining court approval.  The security provided under section 364(b) of the Bankruptcy Code is also an allowed "administrative expense" claim.  *Id.*

26.    **Enhanced Security (Super-Priority and Liens)**.  Section 364(c) enables a debtor to obtain credit and provide enhanced security to lenders.  *Id.* at § 364(c).

27.    If the debtor cannot obtain credit under subsection (a) or (b), then the court, after "notice and a hearing," may authorize one or more of the following forms of security:  (1) a super-

priority administrative expense; (2) a lien on unencumbered property; and (3) a junior lien on encumbered property. *Id.* The point of section 364(c) is exactly as its terms suggest: to provide security to induce the extension of credit to a debtor.

28. **Enhanced Security (Priming Lien)**. Section 364(d) is more aggressive and allows a debtor to provide a lender with a "senior" lien over existing liens, sometimes referred to as a "priming lien." *Id.* at § 364(d). If a debtor cannot obtain "credit otherwise," and the existing lienholders are "adequate[ly] protect[ed]," then the court may authorize the debtor to obtain credit and provide a priming lien. *Id.* at § 364(d)(1). The point of section 364(d) is also, as its terms suggest, to provide security to induce the extension of credit to a debtor.

29. **The DIP Loan**. Here, the Debtors sought authority under section 364(d). The Debtors are seeking authority to borrow $19.5 million and provide the DIP Lenders with the forms of security specifically authorized by sections 364(c)(2), 365(c)(3), and 364(d)(1)—*i.e.*, liens on unencumbered property, a senior priming lien, and super-priority administrative expense status. *See* DIP Motion at ¶¶ 1 & 38.

30. The DIP Loan will likely be repaid in full. The Debtors are in the process of marketing their operating assets through a section 363 sale, or alternatively, the Debtors propose to confirm a plan that converts debt to equity. A sale transaction will generate sufficient proceeds to repay the DIP Loan. Because the DIP Loan is entitled to priority status, it must be repaid in full as a condition to plan confirmation. Thus, the security offered by the Debtors is sufficient to induce and secure the repayment of the DIP Loan.

31. **The Prepetition Debt**. The issue here is that the relief the Debtors seek goes beyond the scope of section 364. Included within the Motion and the proposed DIP Order—

7

namely, Section D(i) to D(iv)—are stipulations regarding the validity of the Prepetition Secured Obligations.  DIP Order at ¶¶ D(i)—D(iv) & § 11.2.

32.     The Debtors seek a determination by this Court that the Prepetition Secured Liens are valid, binding, perfected, duly recorded, and enforceable, and that the Prepetition Secured Obligations constitute legal, valid, and binding obligations of the Debtors.  *See id.*  But some investigation must take place before the Court decides whether this is, in fact, true.

33.     Certain of the Prepetition Secured Obligations were incurred within 90 days prior to the Petition Date.  Other aspects of the November 2025 re-financing are currently unknown to the UCC and have not been disclosed to this Court.  It may be that, following an investigation, there is no basis to object to the proposed findings.  But, if such investigation reveals serious infirmities, the DIP Order will have improperly shifted the burden of proof on these matters from the Debtors and the DIP Lenders to the UCC.

34.     "By their express terms, sections 364(c) & (d) apply only to future—*i.e.*, post-petition—extensions of credit.  They do not authorize the granting of liens to secure pre-petition loans."  *Matter of Saybrook Mfg. Co.*, 963 F.2d 1490, 1495 (11th Cir. 1992); *see also In re Sun Runner Marine, Inc.*, 945 F.2d 1089, 1095 (9th Cir. 1991); *In re Main, Inc.*, 239 B.R. 59, 72 (E.D. Pa. 1999).  There is no difference between a debtor granting liens to secure pre-petition loans and stipulating to the validity of invalid liens that purport to secure pre-petition loans.  In either circumstance, the relief sought by the debtor is beyond the scope of section 364.

35.     Section 501(a) of the Bankruptcy Code provides that a "creditor" may "file a proof of claim."  11 U.S.C § 501(a).  Section 502(a) of the Bankruptcy Code provides that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest … objects."  11 U.S.C § 502(a).  Section 9 of Official Form 410 requests that claimants

that assert secured claims identify whether the claim is secured by a lien on property, the basis for perfection, the value of the property, and the amount necessary to cure any default as of the petition date. Thus, the Bankruptcy Code and Official Form 410 place the burden on the secured creditor to provide this information. The Debtors, however, ask this Court to relieve Future Solution of these obligations, making the Prepetition Secured Obligations deemed valid based on the Debtors' acknowledgments and not based on any actual evidence. *See* DIP Order at ¶ 4(v).

36.     The Debtors' request that this Court recognize the validity of the Prepetition Secured Obligations is not section 364 relief. Such a transaction, if permitted notwithstanding the requirements of sections 501(a) and 502(a) of the Bankruptcy Code, should be evaluated under section 363(b) of the Bankruptcy Code or Rule 9019, which means that the Debtors bear the burden of proof. *See generally In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) (debtor must satisfy the business judgment standard for using, selling, or leasing property outside of the ordinary course of business); *Matter of AWECO, Inc.*, 725 F.2d 293, 300 (5th Cir. 1984) (bankruptcy courts are required to consider "sufficient factual information" before approving settlements).

37.     Further, the Committee has concerns that the DIP Lenders may be affiliated with certain insiders of the Debtors. If insiders have an interest in the DIP Loan, heightened scrutiny is required. *See Matter of Foster Mortg. Corp.*, 68 F.3d 914, 919 (5th Cir. 1995) ("[t]he court's scrutiny must be great when the settlement is between insiders"); *Fabricators Inc. v. Tech. Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991) (dealings between a debtor and an insider are to be "rigorously scrutinized by the courts.").

38.     The evidentiary record before the Court is not sufficient to satisfy the Fifth Circuit's standard for approving a settlement recognizing the validity of the pre-petition debt. Discovery may show that insiders have an interest in the DIP Loan. This highlights the reason why

authorizing the Debtors to stipulate to the validity of prepetition debt today would be improper. The Debtors offer no explanation as to why the Prepetition Secured Parties cannot file a proof of claim and provide the required disclosures.

39. **Challenge Rights**. The Debtors are likely to rely on the provision in the DIP Order that permits the UCC to "Challenge" their "fall down" on the prepetition debt by seeking standing to assert estate claims on behalf of the Debtors' estate. *See* DIP Order at § 11.1.

40. Bankruptcy jurisprudence permits a committee to seek standing to assert causes of action against non-debtors that belong to the debtors' estates. *See La. World Exposition, Inc. v. Fed. Ins. Co. (In re La. World Exposition, Inc.)*, 858 F.2d 233, 247 (5th Cir. 1988). The two examples of this are (1) derivative lawsuits involving harm caused to a corporate entity by a breach of fiduciary duty and (2) fraudulent transfer actions that seek to avoid insider transactions. *See, e.g., La. World*, 858 F.2d at 247; *In re Enron Corp.*, 319 B.R. 128, 131-132 (Bankr. S.D. Tex. 2004) (official committee may be authorized by the court to bring avoidance-power actions).

41. Critically, to obtain such standing in bankruptcy, a committee (or the claimants) bears the burden of proof. *See La. World*, 858 F.2d at 247. The party seeking standing must show that "the claim" that the debtor can assert on its own behalf is "colorable" and that "the debtor-in-possession" has "refused unjustifiably to pursue the claim." *Id.* And the party seeking standing to assert claims on behalf of the debtor must "receive leave to sue from the bankruptcy court." *Id.*

42. Offering the UCC the right to challenge by seeking standing to assert estate claims on behalf of the Debtors' estates is not a fair substitute for compliance with sections 501(a) and 502(a) of the Bankruptcy Code and the Fifth Circuit's standards governing relief sought under Bankruptcy Rule 363(b) or Rule 9019.

43.     It would be convenient for the Prepetition Secured Parties and the Debtors if their obligations to satisfy their respective burdens of proof could be negated and replaced with the standard governing derivative standing under which the UCC bears the burden of proof.  But that is not the law.  If the Debtors want this Court to find that the Prepetition Secured Obligations are valid and secured, then the Debtors and the Prepetition Secured Parties should be held to their burden of proof.

44.     **Consent Cannot Reasonably be with Withheld**.  The Debtors may also rely on their need to secure the Prepetition Secured Parties' consent to priming liens under section 364(d).  But this argument, if made by the Debtor, would fail for at least two reasons.

45.     First, the Prepetition Loan Parties and the DIP Lenders are essentially the *same parties*.  *See* Dkt. No. 16, Decl. of Kerem Ozkay at *3, n.3 ("Future Solution Investments LLC . . . as agent for . . . the 'Prepetition Lenders' . . . [and] . . . the 'DIP Lenders'").  For the DIP Lenders to ask the "pre-petition secured lenders" to consent is a question they can essentially ask *themselves*.  The Debtors offer no explanation as to why Future Solution (in its capacity as a holder of *pre*-petition debt) would refuse to consent to a priming lien granted in favor of Future Solution (in its capacity as a DIP Lender) because there is none.

46.     Second, even if the Prepetition Loan Parties and the DIP Lenders were not the same parties, the Debtors' first day pleadings reveal that the Prepetition Loan Parties are engaged in a loan-to-own transaction that requires a chapter 11 proceeding.

47.     For the Debtors to consummate a "free and clear" sale transaction under section 363 (where the Prepetition Secured Parties buy the Debtors' assets through a credit bid) or the consummation of a plan that converts debt to equity, there must be a bankruptcy proceeding.

48.     For there to be a bankruptcy proceeding, the Debtors must have funding to cover administrative expenses.  The Prepetition Loan Parties cannot credibly hold themselves hostage. If the DIP Lenders truly require a priming lien, then the Prepetition Secured Parties must consent regardless of whether the Debtors stipulate to the validity of Prepetition Secured Liens at this time.

49.     The status of the Prepetition Loans need not be determined at this time.  This Court's evaluation of any proposed section 363(b) sale transaction will depend, *inter alia*, on the vigor of the marketing process and whether the Debtors can show that they have obtained the highest and best price of the assets being sold.  The validity of the Prepetition Secured Obligations may become an issue at plan confirmation, in addition to whether the treatment offered under a proposed chapter 11 plan is consistent with sections 1123 and 1129 of the Bankruptcy Code.

50.     But this highlights the fact that such issues can and should be addressed at that time and not today.  This Court's evaluation of the DIP Motion, the proposed DIP Loan, and the proposed security for the DIP Loan under section 364, does not require the Court to determine the validity of any ***prepetition*** debt, including the Prepetition Secured Obligations.

II.     **The Prepetition Loan Parties Should Not be
Allowed to Credit Bid Debt that Is the Subject of a Challenge**

51.     Assuming, *arguendo*, that the Debtors are permitted to stipulate to the validity of prepetition debt and liens through the DIP Motion, the Prepetition Loan Parties should not be permitted to credit bid debt that is the subject of a challenge.

52.     **Section 11.1** of the proposed DIP Order purports to provide the UCC with the ability to challenge the Debtors' admissions and stipulations by filing pleadings with this Court no later than 60 days following the UCC's formation, as noted above.  DIP Order at § 11.1.

53.     **Section 4.3** of the proposed DIP Order, however, provides that "the Prepetition Agent shall have the right to credit bid with respect to the … Prepetition Collateral, … any portion

or all of the Debtors' outstanding obligations under the … Prepetition Loan Documents, … pursuant to Bankruptcy Code section 363(k), and any bid submitted by the … Prepetition Agent shall be deemed a 'qualified bid' under any order of the Court approving bidding procedures in connection with such Sale."  DIP Order at § 4.3.

54.     Section 4.3 of the DIP Order, to the extent that it permits the Prepetition Agent to credit bid prepetition debt that is the subject of a timely filed challenge, renders Section 11.1 illusory.  The combined impact of stipulating to the validity and security of $77 million in pre-petition debt and authorizing the Prepetition Agent to credit bid such debt irrespective of a challenge is no different than a roll-up.

55.     Roll-up financings "shift the dynamics of a chapter 11 reorganization dramatically," by, among other things, creating structural impediments to plan alternatives.[4] Accordingly, for good reason, courts evaluate roll-up financing structures with extreme skepticism.[5] Even though the Debtors are not proposing to convert $77 million in pre-petition debt into post-petition debt, the combined impact of the various provisions in the DIP Order allow Future Solution to achieve essentially the same result.  If prepetition debt is subject to a challenge and the challenge is successful, then the holders of such debt should **not** be able to credit bid it as if it were valid.

---

[4]  *See* 3 COLLIER ON BANKRUPTCY 364.06[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("The[] protections [available to postpetition lenders] can sometimes shift the dynamics of a chapter 11 reorganization dramatically, because of the increased rights that the holder of an administrative claim may have as compared to the holder of a prepetition secured claim.  For example, the holder of a prepetition claim risks cram-down treatment under a chapter 11 plan. . . . By contrast, administrative claims must be paid in cash in full upon confirmation, giving the postpetition lender greater leverage and control over the case").

[5]  *See, e.g., Saybrook*, 963 F.2d at 1494–96 (cross-collateralization is inconsistent with bankruptcy law because it (a) is not authorized as a means of post-petition financing pursuant to Section 364 and (b) is directly contrary to the fundamental priority scheme of the Bankruptcy Code); *In re Monach Circuit Indus., Inc.*, 41 B.R. 859, 862 (Bankr. E.D. Pa. 1984) (cross-collateralization constitutes an unauthorized preference); *In re Vanguard Diversified, Inc.*, 31 B.R. 364, 366 (Bankr. E.D.N.Y. 1983) (cross-collateralization is "a disfavored means of financing").

13

### III.   Liens on Avoidance Action Proceeds Are Improper

56.    The UCC also objects to the proposed liens on Avoidance Action proceeds.  The UCC acknowledges that the proposed DIP Collateral excludes the "Avoidance Actions themselves" and is limited to "Avoidance Proceeds."  DIP Order at § 2.1.

57.    Avoidance actions are rights created by the Bankruptcy Code to ensure fair distribution among a debtor's unsecured creditors and reserved for the benefit of the estate and unsecured creditors.  *See Bear v. Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 194 (S.D.N.Y. 2002) (citing *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 597 (9th Cir. 1991) ("the purpose of § 547 is to ensure fair distribution between creditors, while the purpose of § 548 is to protect the estate itself for the benefit of all creditors.").

58.    Courts in this District have noted that debtors must show "extraordinary circumstances" to grant liens on avoidance actions, and that DIP financings that "convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lenders" are prohibited.  *See In re Laffite's Harbor Dev. I, LP*, No. 17–36191–H5–11, 2018 WL 272781, at *3 (Bankr. S.D. Tex. Jan. 2, 2018).  The Debtors have failed to show "extraordinary circumstances" exist to grant liens on Avoidance Proceeds.

59.    **First**, the DIP Loan is already secured by liens on unencumbered property, a senior priming lien, and super-priority administrative expense status.  Adding Avoidance Proceeds to the collateral package here is not necessary to secure the repayment of the DIP Loan.  If Avoidance Proceeds could be included here, the legal standard would be transformed from "extraordinary circumstances" to "ordinary circumstances."

60.    **Second**, granting the DIP Lenders a lien on Avoidance Proceeds would mean that any challenge to the Prepetition Secured Obligations based on the November 2024 or January 2026 financings (or re-financings) as being avoidable as either fraudulent or preferential transfers could

14

result in a round-trip to Future Solution. The practical effect of the DIP Order should not be a shield of circular analysis that insulates the prepetition debt from scrutiny and strips from unsecured creditors a potential avenue of recovery.

## IV.      **Landlords are Entitled to Adequate Protection**

61.      The DIP Order also fails to address landlords' entitlement to adequate protection. Section 363(e) of the Bankruptcy Code guarantees adequate protection to any party with an interest in property used by a debtor during the debtor's bankruptcy proceedings who makes a request for adequate protection. *See* 11 U.S.C. § 363(e). Section 363(e) is not limited to secured creditors.

62.      A landlord holds an interest in the property that it owns and leases to a debtor, as well as an interest in the lease itself, the rents due under that lease, and the proceeds of the lease.[6] A landlord's interests in its lease and the premises it leases to a debtor are further evidenced by the allowance of landlords' stub rent claims in other cases pursuant to section 503(b) of the Bankruptcy Code. *See, e.g., In re Goody's Family Clothing Inc.*, 401 B.R. 656, 665 (D. Del. 2009) (affirming the allowance of stub rent claims under section 503(b)(1) of the Bankruptcy Code).

63.      Section 361 states that adequate protection may take one of three forms: a debtor may (i) tender an upfront cash payment or periodic cash payments, (ii) grant replacement liens, or (iii) grant other related relief (other than an administrative claim under section 503(b)(1) of the

---

[6]      *See In re P.J. Clarke's Rest. Corp.*, 265 B.R. 392, 404 (Bankr. S.D.N.Y. 2001) (citing several cases holding that a landlord has the right to adequate protection of its right to timely payment of post-petition rent); *see also In re Ernst Home Center, Inc.*, 209 B.R. 955, 965-66 (Bankr. W.D. Wash. 1997) (held that real property lessors may request adequate protection under § 363(e) and noted that the right to payment under § 365(d)(3) would be hollow without a remedy); *In re Mr. Gatti's, Inc.*, 164 B.R. 929, 946 (Bankr. W.D. Tex. 1994) (the enactment of § 365(d)(3) abrogated any argument against the entitlement of a landlord to adequate protection); *In re MS Freight Distribution, Inc.*, 172 B.R. 976, 980 (Bankr. W.D. Wash. 1994) (landlord's right to be kept current on post-petition obligations is entitled to adequate protection); *In re Ames Dep't Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) ("Section 363(e) of the Bankruptcy Code reserves for bankruptcy courts the discretion to condition the time, place and manner of [store closing] sales, thereby providing adequate safeguards to protect shopping center landlords and their other tenants, while allowing the Trustee to fulfill its fiduciary obligations.").

Bankruptcy Code) amounting to the indubitable equivalent of the protected party's interest in the property. Adequate protection may not take the form of a deferred administrative claim. Under section 361 of the Bankruptcy Code, only a contemporaneous transfer of value satisfies the requirements of adequate protection.

64.     Here, the Debtors are using certain leased premises to store, safeguard, and/or liquidate the DIP Lenders' collateral, while the landlords are bearing the full risk that the Debtors' estates may be administratively insolvent. Thus, landlords are essentially funding the Debtors' restructuring efforts on an involuntary and interest-free basis through the use and occupancy of the leased premises. No other administrative creditor is placed in such a situation. The Initial DIP Budget's omission of any payments for Stub Rent is particularly troubling given that the Debtors are seeking to pay approximately $2.8 million under their proposed KEIP and KERP programs.[7] Why should these payments be made over payments to the landlords housing the DIP Lenders' collateral?

65.     The solution is for the Debtors to pay all rent obligations, including Stub Rent, during their cases. If the Debtors, or the DIP Lenders who control the purse strings, insist on delaying payment of the Stub Rent in the short term, the Debtors should be required to hold funds in escrow as adequate protection for the payment of Stub Rent, so the landlords are not forced to bear the risk that they may never be paid if a plan is not confirmed or these cases are or become administratively insolvent, and the Debtors should be authorized and directed to pay those funds to landlords at an agreed-upon time.

---

[7]     *See Debtors' Motion for Entry of an Order (I) Authorizing and Approving (A) Key Employee Incentive Plan, and (B) Key Employee Retention Plan; and (II) Granting Related Relief* (Dkt. No. 121) at ¶¶ 11, 18.

66.     This Court granted similar relief in *In re CEC Entertainment, Inc. et al.*, No. 20-33163 (MI) (Bankr. S.D. Tex. 2020) [Docket No. 1118] at 39.  In that case, the Court directed the debtors to place funds in a segregated account to cover certain unpaid rent due to landlords.  Similar relief is appropriate here to guard against potential administrative insolvency.

**V.     Additional Concerns Regarding the Proposed DIP Facility**

67.     The DIP Facility includes several other improper provisions.

68.     **First**, estate waivers are not fair or reasonable under the circumstances.  The Debtors propose to waive their ability to surcharge collateral pursuant to section 506(c), and rights under the "equities of the case" exception set forth in section 552(b).  Waiver of these rights is inappropriate and unsupported under the facts of these cases.

69.     Section 506(c) allows a debtor to surcharge a lender's collateral for the cost of preserving or disposing of that collateral.  11 U.S.C. § 506(c).  This provision ensures that the cost of liquidating a secured lender's collateral is not paid from unsecured creditor recoveries.  *See In re Skuna River Lumber, LLC*, 564 F.3d 353, 355 (5th Cir. 2009) (the Bankruptcy Code "allows administrative expenses to be surcharged against a creditor's collateral").[8]

70.     The "equities of the case" exception in section 552(b) of the Bankruptcy Code allows a debtor, committee, or other party-in-interest to exclude post-petition proceeds from pre-petition collateral on equitable grounds, including to avoid having unencumbered assets fund the cost of a secured lender's foreclosure.  11 U.S.C. § 552(b).

---

[8]   *See also In re Visual Indus., Inc.*, 57 F.3d 321, 325 (3d Cir. 1995) ("[section] 506(c) is designed to prevent a windfall to the secured creditor at the expense of the claimant"); *Kivitz v. CIT Group/Sales Fin., Inc.*, 272 B.R. 332, 334 (D. Md. 2000) ("The reason for [section 506(c)] is that unsecured creditors should not be required to bear the cost of protecting property that is not theirs and to require the secured party to bear the cost of preserving or disposing of its own collateral."); *In re Codesco Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").

71.     The preemptive waivers of sections 506(c) and 552(b) could affect the recoveries of unsecured creditors where there may be insufficient liquidity to fund administrative claims. The DIP Lenders will substantially benefit from the Debtors' continued use and occupancy of leased premises. The DIP Lenders should be required to fund the expenses of those benefits, rather than escape any responsibility through waivers of the estate's rights under sections 506(c) and 552.[9]

72.     **Second**, if liens are granted on estate claims and causes of action (which they should not be), including avoidance actions, then there must be last-out marshalling for assets of that kind upon a DIP default. Unliquidated causes of action will receive little to no value if disposed of in a fire sale.

73.     **Third**, any liens on leasehold interests must comply with the terms of such leases. Section 365 of the Bankruptcy Code mandates that the Debtors must "timely perform all of the obligations" under their leases until such time that the Debtors assume or reject the leases. 11 U.S.C. § 365(d)(3). The Debtors have neither assumed nor rejected any leases; therefore, the Debtors must comply with those leases, including provisions prohibiting liens on such leases.

74.     In addition, the imposition of liens on leases would run counter to provisions in the leases that subordinate the leases and any related liens to any existing or potential liens granted by landlords against leased premises. A debtor "takes the contracts of the debtor subject to their terms and conditions." *Thompson v. Texas Mexican Ry. Co.*, 328 U.S. 134, 141 (1946).

75.     Thus, to the extent that leases contain subordination clauses, any new liens granted by the Court should be subordinated to any existing or potential liens against the affected leased

---

[9]     *See In re Domistyle, Inc.*, 811 F.3d 691, 696 (5th Cir. 2015) ("a secured creditor should not reap the benefit of actions taken to preserve the secured creditor's collateral without shouldering the cost") (citation omitted); *see also In re Isaac Cohen Clothing Corp.*, 39 B.R. 199, 201 (Bankr. S.D.N.Y. 1984) (granting surcharge because lender "clearly benefited from the property being stored on the [landlord's] premises").

premises.  Any DIP Liens, therefore, should attach only to the proceeds of the sale, assignment, or other disposition of the leases.  This provides the DIP Lenders with a lien on what they desire— the economic value of the leases—and does not otherwise prejudice the Debtors or landlords.[10]

76.     **Fourth**, the DIP Milestones, when combined with the credit-bid and challenge period dynamics, demonstrate that the sale process is designed for the benefit of the prepetition lender, and must be extended by two weeks (with the entry of any order approving a sale involving a credit bid occurring after the Challenge Deadline):[11]

| Current Date | Milestone | Proposed New Date |
|---|---|---|
| March 6, 2026 | Bid Deadline | March 20, 2026 |
| March 9, 2026 | Entry of Final DIP Order | March 23, 2026 |
| March 11, 2026 | Auction, if any | March 25, 2026 |
| March 19, 2026 | Entry of Disclosure Statement | April 2, 2026 |
| March 25, 2026 | Entry of Sale Order | May 15, 2026 |
| April 17, 2026 | Challenge Deadline | May 1, 2026 |
| April 22, 2026 | Plan Voting Deadline | May 6, 2026 |
| May 1, 2026 | Entry of Confirmation Order | May 15, 2026 |
| May 8, 2026 | Plan Effective Date | May 22, 2026 |

## CONCLUSION

Based on the foregoing, unless the concerns raised herein are resolved, the UCC respectfully requests that the Court deny the DIP Motion.

---

[10]   A lien on the potential proceeds of the disposition of the Debtors' leases more than adequately protects the DIP Lenders' interests.  The "bonus value" of the leases has been recognized as property of the bankruptcy estate, *see, e.g., In re Ernst Home Center, Inc.*, 221 B.R. 243, 249 (B.A.P. 9th Cir. 1998) (Russel, J., concurring), and a security interest in that bonus value, in the form of a lien on the proceeds of the disposition of leases, strikes a balance between the DIP Lenders' economic interests, the Debtors' need for financing, and landlords' rights under leases and the Bankruptcy Code.

[11]   *See* DIP Order at § 11.1; DIP Motion at Ex. A (DIP Financing Agreement at pp. 14-15).

Dated: February 23, 2026
New York, New York

**BROWN RUDNICK LLP**

By: */s/ Eric R. Goodman*
David J. Molton (*pro hac vice* pending)
Eric R. Goodman (*pro hac vice* pending)
D. Cameron Moxley (*pro hac vice* pending)
Gerard T. Cicero (*pro hac vice* pending)
Susan E. Sieger-Grimm (*pro hac vice* pending)
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email: dmolton@brownrudnick.com
Email: egoodman@brownrudnick.com
Email: cmoxley@brownrudnick.com
Email: gcicero@brownrudnick.com
Email: ssieger-grimm@brownrudnick.com

-and-

Adam Schiffer (Texas Bar ID 17745763)
609 Main Street, Suite 3550
Houston, TX  77002
Telephone: (281) 815-0511
Email: aschiffer@brownrudnick.com

-and-

Michael W. Reining (*pro hac vice* pending)
One Financial Center
Boston, MA  02111
Telephone: (617) 856-8200
Email: mreining@brownrudnick.com

*Proposed Counsel to the Official Committee of Unsecured Creditors*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by electronic means via ECF transmission to all Pacer System participants in these bankruptcy cases on February 23, 2026.

*/s/ Eric R. Goodman*
Eric R. Goodman