**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Carbon Health Technologies, Inc.,[1] | Case No. 26-90306 (CML) |
| Debtors. | (Jointly Administered) |

**MOTION OF THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS FOR ENTRY OF AN
ORDER PURSUANT TO SECTIONS 1103(c) AND 1109(b) OF THE
BANKRUPTCY CODE GRANTING EXCLUSIVE LEAVE, STANDING, AND
AUTHORITY TO COMMENCE, PROSECUTE AND, IF APPROPRIATE, SETTLE
CERTAIN CAUSES OF ACTION ON BEHALF OF THE DEBTORS' ESTATES**

> **THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.  UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY**

The Official Committee of Unsecured Creditors (the "Committee"), by and through its counsel, respectfully submits this motion (the "Motion") seeking entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to sections 1103(c) and 1109(b) of the

---

[1]   A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/CarbonHealth.  The location of Carbon Health Technologies, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 500 East Remington Drive, Suite 20, Sunnyvale, CA 94087.

Bankruptcy Code, granting the Committee exclusive leave, standing, and authority to commence, prosecute and, if appropriate, settle certain causes of action (the "Causes of Action") against defendant Future Solution Investments, LLC ("FSI" or the "Defendant"),[2] as more fully described herein and in the draft adversary complaint (the "Draft Complaint") attached hereto as **Exhibit B**.[3] In support of the Motion, the Committee respectfully states as follows.

## INTRODUCTION

1.      The question before the Court is *who* should have the right to pursue, and if appropriate, settle the causes of action addressed in the Draft Complaint.

2.      In the Fifth Circuit, a committee may obtain standing to pursue an estate cause of action where (a) a colorable claim exists, (b) the debtor unjustifiably refuses to pursue the claim, and (c) the Court grants permission to initiate the action on behalf of the debtor's estate.  *See In re Louisiana World Exposition, Inc.,* 832 F.2d 1391, 1397 (5th Cir. 1987).

3.      The Committee satisfies this standard and is the *only* estate fiduciary that will assert claims against FSI on behalf of the estates of Carbon Health Technologies, Inc. ("CHTI") and its affiliated debtors-in-possession (the "Debtors," or the "Company").

4.      FSI's debt is subject to challenge.  The Debtors' obligation to pay approximately $17 million in prepetition debt based on a late stage "multiple on invested capital" or "MOIC" provision should be avoided as a fraudulent transfer or, alternatively, this debt should be recharacterized as equity.  In addition, because FSI used its inflated debt position to chill bidding during the Debtors' sale process to guarantee a restructuring transaction that would allow insiders to retain control of the Company, such debt should be equitably subordinated under section 510(c).

---

[2]   The Committee reserves the right to add other entities and/or individuals as defendants as the Committee's investigation continues.

[3]   Capitalized terms used but not otherwise defined herein have the meanings given to them in the Draft Complaint.

5.      The MOIC provision, which was added to FSI's loan agreement less than 90 days prior to the Debtors' bankruptcy filing, *on its face*, gives FSI the same returns that can be realized from an equity investment in the Debtors while also giving FSI the safety of a fully secured claim.

6.      But FSI did **not** add the MOIC provision merely to obtain an inflated return.  It was a means to an end: FSI and the Debtors added this provision to inflate FSI's secured debt so that they could suppress bidding on the Debtors' assets, lock in FSI's desired chapter 11 plan, and create the *illusion* that the sale process shows that unsecured creditors are out of the money.

7.      FSI and the Debtors added the MOIC provision at a time when the Company had no other financing options and FSI and the Debtors knew that the Debtors would soon commence a bankruptcy proceeding that would result in the cancellation of existing equity interests.  In fact, based on certain provisions of the credit agreement, bankruptcy was guaranteed.

8.      When the Debtors incurred this obligation, they were insolvent (or became insolvent) and did not receive reasonably equivalent value in return.  In fact, the Debtors received **no value** in return.  Further, the natural and intended consequence of the Debtors' decision to acquiesce to the MOIC provision on the eve of bankruptcy was to afford FSI enhanced control of the sale process, which enabled it to block competitive bids on the Debtors' operating assets.

9.      FSI is a strategic buyer that entered the picture in the Fall of 2025.  At this time, as explained below, Hercules Capital, Inc. ("Hercules") was the lender under the Debtors' existing secured credit facility which provided a $60 million term loan.  On or about October 6, 2025, after Hercules and the Debtors had entered into a series of forbearance agreements, Hercules exited the stage and assigned its rights, title, and interest in the term loan to Fearless Capital Management, LLC ("Fearless").  Upon information and belief, Fearless purchased this debt at a discount.  By the end of October 2025, the Debtors' total secured debt was just under $60 million.

10. Fearless held the debt for a short period of time. Upon information and belief, the Debtors' insiders reached an agreement with FSI whereby FSI would acquire the Company through a bankruptcy transaction that preserved the Company's massive net operating losses ("NOLs"), gave FSI access to the Company's intellectual property, and maintained and rewarded the Debtors' insiders. If successful, FSI would realize a massive return on its investment and general unsecured creditors, including victims of sexual abuse, would be zeroed out.

11. At this time, FSI and the Company knew that parties were interested in purchasing the Debtors' clinics in California and possibly New Jersey. But, for FSI to take advantage of the "bankruptcy exception" that allows companies to preserve and utilize NOLs after a change of ownership, the Company must carry on more than an insignificant amount of an active trade or business or risk jeopardizing the NOLs by creating a presumption of tax avoidance.[4]

12. To achieve its ultimate objective, FSI needed to control the inevitable sale process that would occur in a bankruptcy proceeding. FSI did so, in part, by artificially augmenting its secured debt position through the MOIC provision and by securing the Debtors' insiders' agreement with FSI's desired plan. This created a high hurdle that potential bids could not clear. And, by suppressing bids, the Debtors and FSI could then contend that the sale process proves that unsecured creditors are entitled to receive no recovery.

13. On or about November 14, 2025, FSI and the Debtors entered into an agreement under which FSI provided (i) $10 million of an initial term loan to the Debtors and (ii) a $27.5 million uncommitted *delayed* draw term loan (the "FSI Loan"). The Debtors' first draw on

---

[4]  *See* Treas. Reg. § 1.269-3(d) ("Absent strong evidence to the contrary, a requisite acquisition of control or property in connection with an ownership change to which section 382(l)(5) applies is considered to be made for the principal purpose of evasion or avoidance of Federal income tax unless the corporation carries on more than an insignificant amount of an active trade or business during and subsequent to the title 11 or similar case (as defined in section 382(l)(5)(G)).").

the FSI Loan was for $10 million, which the Debtors used for working capital and general corporate purposes. Ten days after this draw, on November 24, 2025, FSI and the Debtors amended the loan agreement.

14. Through this amendment, FSI added a MOIC provision (the "MOIC Provision") that required the Debtors to pay FSI a *25% premium* on the principal of the advances made under the FSI Loan *on or after* the date of the amendment. This amendment converted FSI's delayed draw term loan facility from an uncommitted $27.5 million to a fully committed $62.25 million. This enabled the Debtors to make a second draw for the full amount available, all of which was subject to the MOIC Provision. The Debtors used the second draw to retire the Fearless debt.

15. FSI and the Debtors entered into an additional amendment to the loan agreement on January 20, 2026, just 13 days before the Petition Date. This amendment enabled the Debtors to make a third draw for $6 million, which was also subject to the MOIC Provision.

16. ***In total, the MOIC Provision added approximately $17 million to FSI's debt position without providing the Debtors with any additional liquidity***.

17. The MOIC was a new creature in the Debtors' capital structure. Hercules and Fearless, the Debtors' prior secured lenders, never included a MOIC provision in their loan agreements despite multiple amendments and five forbearance agreements over an eight-month period of deepening financial distress. FSI itself did not include the MOIC Provision in its own initial loan agreement with the Debtors, which was the result of negotiations between the parties on a plan to pay off the Debtors' then-existing debt to Fearless and then petition for bankruptcy.

18. As structured, the MOIC Provision yielded equity-like returns on a senior secured position—the effective annualized rate of return on the MOIC would have been a massive *253%* if paid by the original year-end maturity date. The annualized return under the delayed draw

facility under the First FSI Amendment is roughly 60%, and the return on the delayed draw facility under the Third FSI Amendment is 81% when assuming an effective date of May 27, 2026.

19. The Debtors' estate holds colorable claims against FSI that can and should be brought for the benefit of unsecured creditors. The analysis necessary to reach this conclusion is straightforward. Each allegation in the Draft Complaint is well supported.

20. Granting the Committee standing here is critical. There is zero chance that the Debtors will assert the Causes of Action against FSI, let alone pursue them vigorously. The Debtors' insiders want FSI to succeed here because they will be rewarded if FSI becomes the new owner of the Company. If FSI's desired chapter 11 plan is confirmed, the Debtors' unsecured creditors will be harmed, including tort claimants who may never obtain any justice for the horrendous physical and emotional injuries they have suffered.

21. The Committee will not settle any estate claims absent certainty that the claims against FSI have been fully investigated and are being settled on proper terms with full disclosure to the claimants regarding the possible impact of any potential settlement on their ability to pursue their claims against non-debtor third parties. By its Motion, the Committee seeks permission from this Court to file each of the Causes of Action set forth in the Draft Complaint.

## FACTUAL BACKGROUND

22. As noted in the Declaration of Karem Ozkay, the Debtors and FSI planned this bankruptcy for months—including while running up legal expenses in connection with certain lawsuits commenced on behalf of sexual assault victims—without providing any suggestion to their unsecured creditors that this plan relied upon pulling the rug out from under those creditors.

23. While the Debtors originally proposed a plan that contemplates a sale, that was never FSI's intention. The allegedly "extensive prepetition marketing process for the sale of some

or all of their assets," identified a problem that required a solution.  FSI had to ensure that the sale efforts largely failed to obtain a handsome guaranteed return on its investment, including obtaining access to the Debtors' extensive and valuable NOLs, as FSI has done in other bankruptcy cases.

24.     The Debtors have alleged that Mr. Robert Warshauer, the sole independent director and sole member of the strategic transactions committee, was charged with soliciting, evaluating, negotiating, and making recommendations regarding strategic transactions involving the Debtors. While the Debtors may have described those duties when Mr. Warshauer was appointed shortly before these cases were commenced, FSI had already made the strategic decisions.

**I.     The Hercules Debt**

25.     On March 17, 2021, the Debtors entered into a secured credit facility with Hercules (the "Original Hercules Loan Agreement").  This agreement provided for term loans in the aggregate principal amount of $60 million at an interest rate of prime plus 3.1% subject to a floor of 8.1%.  The loans were secured by first priority liens on the Debtors' assets.  This agreement also contained an end of term charge but did not include any MOIC provision, equity participation, or similar creditor upside mechanism beyond contractual interest and fees.

26.     The Debtors then approached Hercules to refinance their existing debt.  On or about February 14, 2025, the Hercules facility was amended and restated (the "Amended and Restated Hercules Loan Agreement").  This refinancing triggered the end of term charge under the Original Hercules Loan Agreement.  The Debtors paid Hercules an end of term charge of $3,520,000 in accordance with the Original Hercules Loan Agreement, representing an early termination fee of just under 6.5% of the outstanding principal balance of $54,796,460.  This agreement also required the Debtors to, among other things, maintain an unrestricted cash balance of at least $2.5 million.

27.     While there were clear signs that the Debtors were experiencing operating and financial stress, the Amended and Restated Hercules Loan Agreement did not contain a MOIC provision or similar return enhancement.

## II.     The Debtors' Continuing Financial Decline

28.     By early 2025, the Debtors were experiencing significant financial distress driven by operational challenges, increased competition, and their inability to achieve projected milestones.

29.     The Debtors attempted to raise equity capital from new and existing investors but were unable to secure the funding required under the covenants in the Amended Hercules Loan Agreement.  The Debtors' liquidity constraints were severe, and their management projected that, without additional capital or a strategic transaction, the Debtors would be unable to meet their obligations as they came due.

30.     As of May 22, 2025, the Debtors were unable to maintain the required minimum cash balance of $2.5 million under the Amended Hercules Loan Agreement, which constituted a Default Event.  Rather than immediately accelerating the debt and foreclosing on the collateral, Hercules entered into a forbearance agreement and amendment dated June 3, 2025 (the "First Forbearance Agreement"), pursuant to which Hercules agreed to forbear from exercising its contractually granted remedies through July 31, 2025.

31.     The First Forbearance Agreement was conditioned upon the Debtors' continued efforts to raise $10–15 million in equity capital.  Although the Debtors were in default and had severely limited negotiating leverage, Hercules did not add a MOIC provision to the First Forbearance Agreement.  Instead, Hercules gave the Debtors additional time to address their capital needs while preserving Hercules' rights under the original agreement.

8

32.     The Debtors' financial situation continued to deteriorate through the summer of 2025.  The Debtors were unable to raise the required equity capital within the forbearance period and violated other covenants, including failing to maintain minimum cash levels, achieve operational milestones, and complete contemplated strategic transactions.

33.     On or about July 15, 2025, Hercules and the Debtors entered into a second forbearance agreement and amendment (the "Second Forbearance Agreement") extending the forbearance period through August 22, 2025.  At this time, the outstanding principal balance was $52,671,460.   Once again, despite the Debtors' mounting defaults and weakened solvency, Hercules did not add a MOIC provision or demand equity-like returns to the Second Forbearance Agreement.  Hercules continued to rely on its senior secured position, contractual interest rate, and end-of-term charge as adequate compensation for the risk it was taking.

34.     By September 2025, the Debtors missed an interest payment due under the Second Forbearance Agreement, failed to maintain adequate minimum cash, and continued to breach multiple covenants.  On or about September 25, 2025, Hercules and the Debtors entered into a third forbearance agreement and amendment (the "Third Forbearance Agreement"), extending the forbearance period through October 31, 2025.   The outstanding principal balance remained $52,671,460 at that time.

35.     Signaling that Hercules was no longer willing to risk an investment in the Debtors, the Third Forbearance Agreement refers to discussions regarding a potential transaction with Fearless, pursuant to which Fearless would refinance or acquire the Hercules debt.

36.     Even in this third forbearance in less than four months, executed when the Debtors were in multiple continuing defaults, and Hercules was discussing a debt sale to a third party, Hercules did not believe it necessary to impose a MOIC provision.

37.     The progression of these three forbearance agreements highlights several critical facts.  **First**, Hercules, a sophisticated institutional lender with experience in distressed debt scenarios, never deemed it necessary or appropriate to add a MOIC provision despite multiple opportunities to do so when the Debtors were in default and had severely limited alternatives.

38.     **Second**, the Debtors' financial distress was not a temporary liquidity issue.  It was severe and prolonged, as evidenced by the Debtors' repeated defaults and inability to cure covenant breaches.  **Third**, by the fall of 2025, the Debtors had exhausted traditional financing alternatives and were dependent on forbearance and potential debt restructuring to avoid collapse.

### III.     The Transfer of the Hercules Debt to Fearless Capital

39.     The Hercules debt was purportedly transferred from Hercules to Fearless pursuant to a *Non-Recourse Loan Document Sale and Assignment Agreement* dated as of October 6, 2025, though that transaction remains largely undocumented in the materials produced to the Committee.

40.     The Committee's only evidence of the transfer is in a recital in a Forbearance Agreement and Fourth Amendment to Amended and Restated Loan And Security Agreement (the "Fourth Forbearance Agreement") that states "Borrower has been advised that [Hercules] assigned all of their right, title and interest in the Loan Agreement, the other Loan Documents and the Collateral to [Fearless] pursuant to that certain Non-Recourse Loan Document Sale And Assignment Agreement dated as of October 6, 2025 by and among [Hercules] and [Fearless]."

41.     As noted above, the Third Forbearance Agreement references a letter of intent from Fearless to refinance or acquire the debt, but neither the letter of intent nor any assignment agreement, purchase agreement, or amendment to the credit facility reflecting Fearless as lender, or other documentation of this critical transaction has been made available to the Committee.

10

42.     Documentation of this transfer is important for the Committee to understand the terms of the debt transfer between Hercules and Fearless.  Based on information and belief, Fearless acquired the debt from Hercules at a significant discount.

43.     FSI's failure to produce documentation of the Hercules-Fearless transaction prevents the Committee from understanding the true value of the Fearless loan that was subsequently paid off using funds from FSI.  Fearless subsequently entered into a fifth forbearance agreement and amendment, effective as of November 13, 2025 (the "Fifth Forbearance Agreement").  Despite the ever-increasing risk of investing in the Debtor, none of the six amendments to the Original Hercules Loan Agreement contained a MOIC provision.

## IV.     FSI's Initial Loan Agreement

44.     On or about November 14, 2025, FSI and the Debtors entered into a Loan and Security Agreement (the "Initial FSI Loan Agreement") pursuant to which FSI provided an initial term loan of $10 million and an uncommitted delayed draw term loan facility of up to $27.5 million.  The date of maturity was December 31, 2025.  The stated use of proceeds of the Initial FSI Loan Agreement was to refinance the pre-existing debt held by Fearless, which is believed to have totaled approximately $61.9 million at the time of refinancing.

45.     The Initial FSI Loan Agreement bore interest at a rate equal to the J.P. Morgan Chase Bank Prime Rate (~7%) plus 3%, contained an Exit Fee equal to 10% of the aggregate amount of all advances, and was secured by liens on the Debtors' assets.

46.     In other words, the Initial FSI Loan Agreement was structured as a traditional secured term loan facility with market-rate interest, fees typical of distressed financing, and an exit fee to compensate FSI for the risk of lending to a borrower in financial distress.  Critically, the Initial FSI Loan Agreement did not contain a MOIC provision.

47. The structure and content of the Initial FSI Loan Agreement suggests that the MOIC Provision was not contemplated at the time of the original financing, even though the Debtors had been through two lenders in the previous year. The agreement contained a 13-week cash flow budget as well as references to a Restructuring Support Agreement ("FSI RSA"), both of which reflect a pre-planned and coordinated restructuring process.

48. Notably, the budget projected a $40 million inflow from an anticipated sale during the week ending December 19, 2025 (the "California Sale"), alongside the $27.5 million delayed draw term loan advance from FSI—funds that were explicitly earmarked for the refinancing.

49. The inclusion of these projections in the original loan documentation demonstrates that the refinancing of the Hercules/Fearless debt was not initially an opportunistic transaction, but rather a carefully orchestrated component of a broader restructuring strategy.

50. The plan sought under this FSI Loan Agreement RSA allowed for the possibility that the Debtors would hand over equity to FSI. This suggests that the initial reason for FSI's arrangement with the Debtors to take out the Fearless loan facility was to take over the Company.

51. FSI did not require or negotiate for a MOIC provision as a condition of its original financing. FSI added the MOIC provision just ten days later, on November 24, 2025, after the Debtors had become dependent on FSI for liquidity.

## V.    The Addition of the MOIC Provision

52. On November 24, 2025, just ten days after executing the Initial FSI Loan Agreement, FSI and the Debtors entered into the First Amendment to the Loan and Security Agreement (the "First FSI Amendment"). The First FSI Amendment retained the stated maturity date of December 31, 2025, but made several changes to the Initial FSI Loan Agreement.

12

53.     The changes included converting the uncommitted delayed draw into a committed facility and increasing the aggregate delayed drawn term loan commitment from $27.5 million to $62.25 million.  The most significant was the addition of the MOIC provision, which had been entirely absent from the Initial FSI Loan Agreement executed just ten days earlier.

54.     The amount due under the MOIC Provision (the "<u>MOIC Premium</u>") was defined in the First FSI Amendment as the additional payment required such that the aggregate amount of all payments to FSI on account of the Delayed Draw Term Loan Commitment would equal 1.25x (125%) of the principal amount of the Delayed Draw Term Loan Commitment from the effective date of the First FSI Amendment.  In other words, FSI would receive a 25% premium return on the principal with respect to delayed draw advances made on or after November 24, 2025.

55.     The First FSI Amendment specified that the MOIC Premium would become fully due and payable upon the occurrence of a "MOIC Event," defined to include payment in full of the Delayed Draw Term Loan Advance, acceleration of the Secured Obligations (including acceleration upon bankruptcy filing, liquidation, or insolvency proceedings), or the Term Loan Maturity Date.  The First FSI Amendment included extensive provisions ***purporting*** to establish the enforceability of the MOIC Premium in bankruptcy and to waive defenses.

56.     The First FSI Amendment provided that the Debtors specifically waived any statutory prohibitions on collection of the MOIC Premium upon acceleration of the debt, acknowledged that the MOIC Premium was deemed to be "reasonable," represented that the MOIC Provision was "the product of arm's-length negotiation" and constituted "material inducement for Lenders" to provide the financing, and expressly stated that the MOIC Premium and Exit Fee would remain enforceable obligations notwithstanding any bankruptcy filing.

13

57.    The inclusion of such extensive self-insulating language is itself evidence that FSI understood the provision to be vulnerable to attack as an unenforceable penalty or unconscionable term.   The timing and circumstances of the added MOIC Provision are highly suspicious and undermine any claim that the provision was the product of an arm's-length negotiation.   FSI had already committed to provide financing to the Debtors pursuant to the Initial FSI Loan Agreement executed November 14, 2025.   The Debtors had no alternative sources of financing, were in continuing default under their prior debt, and required the FSI facility to avoid collapse.

58.    Just ten days after the initial loan closing, when the Debtors had already utilized the initial $10 million draw under the Initial FSI Loan Agreement and were dependent on FSI for additional delayed draw advances to fund their operations, FSI presented the First FSI Amendment containing the MOIC Provision.   The Debtors' insiders eagerly agreed to add the MOIC Provision because it would provide FSI with the ability to block bids for the Debtors' assets.

VI.    **Expansion of the MOIC Provision**

59.    Following the addition of the MOIC Provision in the First FSI Amendment, FSI and the Debtors entered into two additional amendments that extended and expanded the MOIC's reach.   On January 13, 2026, effective as of December 31, 2025, FSI and the Debtors entered into a Second Amendment to the Loan and Security Agreement (the "Second FSI Amendment").

60.    The Second FSI Amendment extended the maturity date of the facility from December 31, 2025 to February 2, 2026 and made certain other modifications.   Importantly, the Second Amendment maintained the MOIC Provision without alteration.   The MOIC Premium remained payable upon any MOIC Event, including acceleration, and continued to be calculated based on all delayed draw advances made since the November 24, 2025, effective date of the First FSI Amendment.

14

61.     On January 20, 2026, just thirteen days before the Debtors filed for chapter 11, FSI and the Debtors entered into the Third Amendment to the Loan and Security Agreement (the "Third FSI Amendment").  The Third FSI Amendment provided for an additional $6 million committed delayed draw term loan facility to provide the Debtors with final liquidity in their attempt to execute asset sales and/or strategic transactions.  Critically, the Third FSI Amendment extended the MOIC Provision to cover this additional $6 million.

62.     This Third FSI Amendment, executed just thirteen days before the bankruptcy, ensured that FSI's MOIC Premium would apply to ~$68 million of the $78 million of financing FSI provided to the Debtors, increasing FSI's secured claim by approximately $17 million.  To be clear, this $17 million is not attributable to any funds advanced by FSI to the Debtors.  It was simply added to the debt by drafting and executing amendments to the loan agreement.

## VII.     The Perceived Benefit of Increasing FSI's Secured Debt

63.     The Debtors' willingness to inflate FSI's secured debt by approximately $17 million through the MOIC provision may seem counterintuitive, but it may have been a rational decision for the Debtors' insiders who wanted to retain their positions and realize significant returns post-confirmation.

64.     The Debtors' deferred tax assets, namely their $784 million in NOLs, are among the Debtors' most valuable assets.  The ability to utilize IRC Section 382(l)(5), the bankruptcy exception that allows companies to preserve and utilize NOLs after a change of ownership, may be jeopardized if a significant amount of an active trade or business is not carried on by the Company during and after the chapter 11 proceedings.  *See supra* fn. 4.

65.     However, as of November 2025, parties had expressed a serious interest in acquiring the Company's business, particularly the clinics in California.  One buyer signed an asset purchase agreement that included the business assets in California.  FSI knew that this buyer and

others would surface in the Debtors' bankruptcy cases.  FSI, however, did not want a section 363 sale transaction to occur.  Inflating FSI's debt would give FSI enhanced control of the sale process and enable FSI to block competitive bids on the Debtors' operating assets.

66.     The MOIC Premium, from FSI's and the insiders' perspective, was a win-win.  When facing potential bidders, FSI and the Debtors could demand bids that, standing alone or on a combined basis, exceed the value of FSI's inflated debt.  When facing the unsecured creditors, FSI and the Debtors could contend that since the sale process did not result in any meaningful bids—as judged against FSI's credit bid based on the inflated debt—the unsecured creditors must accept a *de minimis* or zero recovery.

67.     If no such bids materialized, then FSI could flip into the desired plan under which the Debtors will own the clinics, the intellectual property, and tax assets free and clear of the Debtors' general unsecured debt, including the sex abuse claims.

68.     Management keeps their jobs and earns bonuses.  FSI realizes a return of *150%* or more on its total investment.  And the women who were abused will be told that there is no point in liquidating their claims because such claims are worthless.  These women deserve better than this, as do all general unsecured creditors in these cases.

## JURISDICTION AND VENUE

69.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 1103(c) and 1109(b) of the Bankruptcy Code.

**RELIEF REQUESTED**

70.     By this Motion, the Committee seeks an order, pursuant to sections 1103(c) and 1109(b) of the Bankruptcy Code, granting the Committee exclusive leave, standing, and authority to commence, prosecute and, if appropriate, settle the Causes of Action.

**ARGUMENT**

**I.     Applicable Legal Standard**

71.     It is well-settled within this Circuit that Courts may allow, under appropriate circumstances, a creditors' committee to pursue causes of action on behalf of the estate.[5] Although the Bankruptcy Code does not expressly authorize a creditors' committee the standing to initiate an adversary proceeding and/or to pursue other causes of action typically brought by the trustee or the debtor-in-possession, the Bankruptcy Code does establish creditors' committees for the express purpose of protecting the rights of their constituents and similarly situated creditors. *See* H.R. Rep. No. 95-595, at 91-92 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6053-54.

72.     To achieve this purpose, section 1103(c) of the Bankruptcy Code, which enumerates the statutory functions of a creditors' committee, authorizes creditors' committees to "perform such other services as are in the interest of those represented." 11 U.S.C. § 1103(c)(5). To that end, section 1109(b) of the Bankruptcy Code provides, in pertinent part, that:

---

[5]     *See, e.g.*, *Louisiana World Exposition v. Fed. Ins. Co.,* 858 F.2d 233, 247 (5th Cir. 1988) ("The law is well-settled that in some circumstances, a creditors' committee has standing under Title 11, United States Code, section 1103(c)(5) and/or section 1109(b) to file suit on behalf of a debtor-in-possession or a trustee."); *see also Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1363 (5th Cir. 1986) (suggesting that section 1109(b) provides a basis for the standing of a creditors' committee); *Fuel Oil Supply & Terminaling v. Gulf Oil Corp.*, 762 F.2d 1283, 1287 (5th Cir. 1985) (expressing approval of bankruptcy cases in which the court has concluded that a creditors' committee may sue in certain situations); *In re Cooper*, 405 B.R. 801, 809 (Bankr. N.D. Tex. 2009) ("[I]n Chapter 11, there is both a textual basis and, frequently, a non-textual, equitable rationale for granting a creditors committee (and perhaps an individual creditor) derivative standing to pursue avoidance actions or other causes of action belonging to the estate.").

> A party in interest, including the debtor, the trustee, *a creditors' committee*, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

11 U.S.C. § 1109(b) (emphasis added).

73.     Indeed, this general right to be heard would ring hollow unless creditors' committees are also given the right to act on behalf of the estate if a debtor-in-possession or a trustee that is explicitly granted the right to act for the estate unjustifiably fails to act.[6]  Courts have granted creditors' committees standing in connection with claims similar to the Causes of Action asserted here by operation of their equitable powers.[7]  Moreover, the practice of conferring standing upon creditors' committees to pursue actions on behalf of a bankruptcy estate is widely followed and accepted in other jurisdictions as well.[8]

---

[6]     *See, e.g.*, *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568-69 (3d Cir. 2003) (holding that sections 1103(c)(5) and 1109(b) of the Bankruptcy Code implicitly authorize a court to grant a creditors' committee derivative standing to prosecute an avoidance action when the trustee or debtor-in-possession cannot or will not do so, or when the debtor-in-possession is unlikely to act); *In re Cooper*, 405 B.R. 801, 810 (Bankr. N.D. Tex. 2009) ("Most of the circuit courts have gone the same direction as the Fifth Circuit, in permitting creditors committees, or even creditors, to pursue estate causes of action when a debtor unjustifiably refuses"); *In re Joyanna Holitogs, Inc.*, 21 B.R. 323, 326 (Bankr. S.D.N.Y. 1982) (holding that the general right to be heard would be empty unless those who have such a right are also given the right to act when the debtors refuse to do so); *see also In re iPCS, Inc.,* 297 B.R. 283, 290 (Bankr. N.D. Ga. 2003) ("[I]f a debtor has a cognizable claim, but refuses to pursue that claim, an important objective of the Code [the recovery and collection of estate property] would be impeded if the bankruptcy court has no power to authorize another party to proceed on behalf of the estate in the debtor's stead.").

[7]     *See Official Comm. of Unsecured Creditors v. Credit Suisse First Bos. (In re Exide Techs., Inc.),* 299 B.R. 732, 739 (Bankr. D. Del. 2003) ("[A] bankruptcy court may utilize its equitable powers to grant a creditors' committee derivative standing to pursue avoidance actions.").

[8]     *See, e.g., Cybergenics,* 330 F.3d at 568 (holding that "the ability to confer derivative standing upon creditors' committees is a straightforward application of bankruptcy courts' equitable powers."); *Contractor Creditor's Comm. v. Fed. Ins. Co. (In re La. World Exposition, Inc.)*, 832 F.2d 1391, 1397 (5th Cir. 1987) (discussing how "[a] number of bankruptcy courts have held that in some circumstances, a creditors' committee has standing under 11 U.S.C. § 1103(c)(5) and/or § 1109(b) to file suit on behalf of debtors-in-possession…or the trustee."); *Unsecured Creditors Comm. v. Noyes (In re STN Enters.),* 779 F.2d 901, 904 (2d Cir. 1985) (concurring with those bankruptcy courts that have held that sections 1103(c)(5) and 1109(b) of the Bankruptcy Code imply a qualified right for creditors' committees to initiate litigation with the approval of the bankruptcy court).

18

**II.     The Committee Satisfies the Requirements for Obtaining Derivative Standing**

74.     In the Fifth Circuit, where an official committee seeks to pursue an action without the consent of the debtor, the committee may obtain derivative standing by establishing the existence of a colorable claim and an unjustifiable refusal by the trustee or debtor in possession to prosecute the claim.  In addition, the committee must obtain leave of the Bankruptcy Court to sue on behalf of the estate.[9]  The Committee satisfies each of the elements of this test and should be granted derivative standing to pursue the Causes of Action.

**A.     The Causes of Action Asserted in the Draft Complaint Are Colorable**

75.     Asserting a "colorable claim" is a relatively low threshold to satisfy, requiring only that the claim "must have a possibility of success."[10]

76.     In determining if a claim is "colorable," this Court need not conduct a mini-trial. Rather, "the Court may weigh the 'probability of success and financial recovery,' as well as the anticipated costs of litigation as part of a cost/benefit analysis conducted to determine whether the pursuit of the colorable claims are likely to benefit the estate."[11]  The Committee need only establish the existence of a plausible claim and that the Causes of Action have value to the Debtors' estates and their creditors.  The Committee has done so here.

---

[9]     *In re Enron Corp.*, 319 B.R. 128, 131 (Bankr. S.D. Tex. 2004) (citing *Louisiana World,* 832 F.2d 1391, 1397 (5th Cir. 1987)).

[10]    *In re Clear the Air, LLC*, 631 B.R. 286, 295 (Bankr. S.D. Tex. 2021) (citing *In re McConnell*, 122 B.R. 41, 44 (Bankr. S.D. Tex. 1989)); *see In re Chesapeake*, Case No. 20-33233, (Bankr. S.D. Tex.) Jan. 13, 2021 Hr'g Tr. at 325:5-11 ("Colorability is a really low standard.  It doesn't take a lot to get over the colorability standard.  And I do find that the claims asserted by the Committee meet that….[T]here are plenty of lawyers who would put their name pursuant to Rule 11 on a complaint that sets forth those claims, and if that's not exactly the colorability argument or standard, it's awfully close.").

[11]    *In re Atl. Nat. Foods, LLC*, No. 25-10676, 2025 WL 1747930, at *2 (Bankr. E.D. La. June 24, 2025) (citing *In re iPCS, Inc.*, 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003)).

### 1.    Fraudulent Transfer Claim

77.    The fraudulent transfer claim regarding the Debtors' obligation under the MOIC Provision is colorable.  *See* Draft Complaint at Count I.  Count I sets forth a fraudulent transfer claim pursuant to 11 U.S.C. § 548(a) and the Uniform Fraudulent Transfer Act (UFTA) and/or the Uniform Voidable Transactions Act laws made applicable through 11 U.S.C. § 544(b)(1).  The Debtors' obligation to pay the MOIC Premium can be avoided as a constructive fraud.

78.    A constructive fraud claim requires a movant to show that the debtor received less than reasonably equivalent value in exchange for the transfer or obligation incurred, and that the transfer or obligation caused the debtor to become insolvent or to be engaged, or about to be engaged, in a business or transaction for which any property remaining with the debtor was an unreasonably small capital, or that the debtor intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.  11 U.S.C. § 548(a)(1)(B).

79.    There are three financial conditions that trigger section 548(a)(1)(B)(ii)—*i.e.*, balance sheet insolvency, cash flow insolvency, and inadequate capital.  Inadequate capital turns on the nature of the debtor's business and whether it is reasonably foreseeable that the debtor will be able to generate sufficient profits to sustain operations.[12]

---

[12]    *See ASARCO LLC v. Am. Mining Corp.*, 396 B.R. 278, 397 (Bankr. S.D. Tex. 2008) ("The test for unreasonably small assets is 'reasonable foreseeability.'"); *Pioneer Home Builders, Inc. v. Int'l Bank of Commerce (In re Pioneer Home Builders, Inc.)*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992) (unreasonably small capital signifies an inability to generate enough cash flow from operations and the sale of assets to remain financially stable); *accord In re North Am. Clearing, Inc.*, No. 6:08-ap-00145, 2014 WL 4956848, at *8 (Bankr. M.D. Fla. Sept. 29, 2014) ("Although not defined in the Bankruptcy Code, the most common view is that 'unreasonably small capital denotes a financial condition short of equitable insolvency.'") (quoting *Moody v. Sec. Pac. Bus. Credit*, 971 F.2d 1056, 1070 (3d Cir. 1992)); *Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 321 (Bankr. S.D.N.Y. 2013) ("[T]he cases recognize that the unreasonably small capital test may be easier for a plaintiff to satisfy than insolvency because 'unreasonably small capital' means 'difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some time in the future.'") (quoting *In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 137 (Bankr. D. Mass. 1989)).

80.     Here, the Debtors did not receive *anything* in exchange for incurring the obligation to pay the MOIC Premium.  As was clear from the numerous refinancings, loan amendments and forbearance agreements necessary for the Debtors to continue operating in the year prior to the Petition Date, the Debtors clearly suffered from inadequate capital.  Thus, the fraudulent transfer cause of action to avoid the Debtors' obligations under the MOIC Provision is colorable.

### 2.     Recharacterization of the MOIC Provision

81.     The cause of action against FSI to recharacterize the MOIC Provision is colorable. *See* Draft Complaint at Count II.  When a creditor files a timely claim, the Code states that "the court, after notice and a hearing, shall determine the amount of such claim ... and shall allow such claim in such amount, except to the extent that—(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law...."  11 U.S.C. § 502(b).

82.     The Supreme Court has held that the "applicable law" is state law:  "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Butner v. United States*, 440 U.S. 48, 54 (1979).  "Taken together, *Butner* and section 502(b) support the bankruptcy courts' authority to recharacterize claims." *In re Lothian Oil, Inc.*, 650 F.3d 539, 543 (5th Cir. 2011).  "If a claim asserts a debt that is contrary to state law, the bankruptcy court may not allow the claim." *Id.*

83.     To distinguish between debt and equity, Courts consider various factors, including:

> (1) the intent of the parties; (2) the identity between creditors and shareholders; (3) the extent of participation in management by the holder of the instrument; (4) the ability of the corporation to obtain funds from outside sources; (5) the 'thinness' of the capital structure in relation to debt; (6) the risk involved; (7) the formal indicia of the arrangement; (8) the relative position of the obligees as to other creditors regarding the payment of interest and principal; (9) the voting power of the holder of the instrument; (10) the provision of a fixed rate of interest; (11) a contingency on the obligation to repay; (12) the source of the interest payments; (13) the presence or absence of a fixed maturity date; (14) a provision for

21

redemption by the corporation; (15) a provision for redemption at the option of the holder; and (16) the timing of the advance with reference to the organization of the corporation.[13]

84.     Here, the MOIC Provision, by its terms, is an equity-like provision.  FSI and the Debtors amended the Initial FSI Loan Agreement to include a MOIC provision that guaranteed FSI a 25% return on any draws on the delayed loan facility taken on or after the date of the First FSI Amendment.  While styled as a loan facility and an obligation to make additional payments sufficient to achieve a 1.25 multiple of the amount of the loan amounts taken by the Debtors, FSI did not in fact intend to act as lenders to the Debtors.  The economic reality was that FSI acted as equity investors in the Debtors and did not expect the Debtors to repay the loan facility.  Each of the three MOIC Events, as defined in the First FSI Amendment, that would trigger the MOIC Provision was tied to the Debtors' anticipated bankruptcy and expected petition date.

85.     The MOIC Provision was negotiated between FSI and the Debtors' insiders.  At the time the Debtors entered into the First FSI Amendment, the Debtors were undercapitalized and required additional liquidity to fund operations until they could petition for bankruptcy protection.  As FSI was well-aware, the Debtors were also unable to obtain other outside financing.  The Debtors' only viable option was the financing offered by FSI.

86.     The MOIC Provision was atypical.  The Hercules loan agreements did not include a MOIC provision.  Fearless did not demand a MOIC provision during its short stint as a debt holder.  The Initial FSI Loan Agreement did not contain a MOIC provision, any guaranteed rate of return, or any guaranteed interest on the transaction.  The MOIC provision was structured in

---

[13]  *See In re Mangia Plaza Investments, LP*, 480 B.R. 669, 707 (Bankr. W.D. Tex. 2012); *see also In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 750 (6th Cir. 2001) (identifying factors used to recharacterize a claim from debt to equity); *In re Mallett, Inc.*, No. 21-11619 (JLG), 2024 WL 150628, at *14 (Bankr. S.D.N.Y. Jan. 12, 2024) (applying *AutoStyle* factors); *In re TransCare Corp.*, 602 B.R. 234, 243-44 (Bankr. S.D.N.Y. 2019) (same).  As the Fifth Circuit noted in *Lothian*, state courts have imported these factors "from federal tax law."  650 F.3d at 544.

such a way as to give FSI the unlimited upside of an equity investment but paired with the downside protection of a fully collateralized secured creditor.

87.     A declaratory judgment that all debt attributable to the MOIC provision shall be treated as equity investment is appropriate here.  Such a judgment will resolve whether FSI can collect the MOIC Premium at the expense of other creditors and be convenient to the relevant parties.  Therefore, the recharacterization cause of action against FSI involving the FSI's ability to collect the MOIC Premium is colorable.

### 3.     Equitable Subordination

88.     There is a colorable claim to equitably subordinate the portion of FSI's prepetition debt attributable to the MOIC Premium under section 510(c) of the Bankruptcy Code.  This claim is set forth in Count III of the Draft Complaint.

89.     Equitable subordination under Fifth Circuit law has three elements:  "(1) the claimant engaged in inequitable conduct; (2) the conduct resulted in harm to the creditors or conferred an unfair advantage upon the claimant; and (3) equitable subordination is not inconsistent with the Bankruptcy Code."[14]  "As a practical matter," equitable subordination is typically found:  "(1) when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors."  *Id.*

90.     "[T]he claims arising from the dealings between the debtor and its fiduciaries must be subjected to rigorous scrutiny, and, if sufficiently challenged, the burden shifts to the fiduciary to prove both the good faith of the transaction and its inherent fairness."[15]  While "the mere fact

---

[14]     *Matter of Cajun Elec. Power Co-op., Inc.*, 119 F.3d 349, 357 (5th Cir. 1997); *see Matter of Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977).

[15]     *Matter of Herby's Foods, Inc.*, 2 F.3d 128, 131 (5th Cir. 1993).

of an insider relationship is insufficient to warrant subordination," subordination can be appropriate when an insider uses "its power to control to its own advantage or to the other creditors' detriment."[16]  Equitable subordination may also be proper when a third party exerts control over the debtor through "atypical" loan documents entered into when the debtor is "insolvent" and such control is used to disadvantage other creditors.[17]

91.     Here, prior to the Petition Date, the Debtors' insiders exercised control over the Debtors' operations, including financial transactions.  In this capacity, the Debtors' insiders negotiated an agreement with FSI whereby FSI would acquire the Company through a bankruptcy transaction that preserved the Company's massive NOLs, gave FSI access to the Company's intellectual property, and maintained and rewarded the Debtors' insiders.

92.     If successful, FSI would realize a massive return on its investment, the Debtors' insiders would retain their management positions and enjoy significant returns, and general unsecured creditors, including victims of sexual abuse, would be zeroed out.

93.     To achieve their ultimate objective, FSI and the Debtors' insiders needed to control the inevitable sale process that would occur in a bankruptcy proceeding.  FSI and the Debtors' insiders did so, in part, by artificially augmenting FSI's secured debt position through the MOIC Provision, an *atypical* loan provision added when the Debtors were *insolvent* and after the inception of the loan relationship, which added at least $17 million to FSI's debt for *no consideration* whatsoever.

94.     The natural and intended consequence of the insiders' decision to acquiesce to the MOIC Provision was to afford FSI enhanced control of the sale process and enable FSI to block

---

[16]   *Matter of Fabricators, Inc.*, 926 F.2d 1458, 1467 (5th Cir. 1991).

[17]   *See Matter of Clark Pipe & Supply Co., Inc.*, 893 F.2d 693, 700 (5th Cir. 1990); *see also In re T. E. Mercer Trucking Co.*, 16 B.R. 176, 189-190 (Bankr. N.D. Tex. 1981).

competitive bids on the Debtors' operating assets.  This was done to suppress the perceived value of the Debtors' operating assets and pave the way for the confirmation of FSI's desired plan.

95.     FSI and the Debtors' insiders effectively controlled the Debtors with respect to the plan that inflated FSI's secured debt position.  As a direct and proximate result of FSI's misconduct, FSI obtained an unfair advantage in the Debtors' sale process and the ability to block bids for the Debtors' operating assets that, on a combined basis, may have exceeded the value of FSI's prepetition debt (determined without the MOIC Provision).

96.     FSI's conduct harmed the Debtors' estate and the Debtors' unsecured creditors. The subordination of FSI's debt attributable to the MOIC Provision is necessary to offset the harm caused by conduct of FSI and the Debtors' insiders and ensure an equitable distribution among creditors in these cases.  Thus, the equitable subordination claim against FSI is also colorable.

**B.     The Debtors Will Not Assert the Causes of Action**

97.     The second element of the derivative standing test is whether the trustee or the debtor has unjustifiably refused to initiate suit.  *See Louisiana World,* 832 F.2d at 1397.

98.     Here, the Debtors will not prosecute the Causes of Action.  The Debtors stipulated to FSI's prepetition debt.  *See* Dkt. No. 194 at ¶ D.  The Debtors have not even contemplated any wrongdoing on FSI's part—these cases were conceived and planned jointly by the Debtors and FSI and the Debtors have made it clear that they intend to follow that plan.  *See* Dkt. No. 431.  The Debtors are intertwined with, and beholden to, the very target of the Causes of Action.

**C.     The Committee Should be Granted the Right to Pursue
and Settle, Subject to Court Approval, the Causes of Action**

99.     The third element of the derivative standing test is whether the Bankruptcy Court has granted leave to sue.  *See Louisiana World,* 832 F.2d at 1397.  The Committee should be granted the exclusive right to pursue and settle the Causes of Action, if deemed appropriate by the

25

Court pursuant to Bankruptcy Rule 9019.  The Debtors would not ever contemplate the Causes of Action because they were part of the plan that subjected them to the MOIC Provision obligation.

100.    Rather than maximizing the value of the estate, the Debtors' plan—devised in concert with FSI—not only ignores the value of the Causes of Action but actually grants FSI further value in the form of the NOLs FSI will be able to access.  The Debtors are actively involved in maximizing the value of FSI's claims, to the detriment of all of their other creditors.

## RESERVATION OF RIGHTS

101.    The Committee reserves its rights to (a) supplement this Motion and the Draft Complaint (including by adding additional counts to the Draft Complaint) at any time prior to the hearing on the same, and (b) seek authority to commence, prosecute, and settle other claims and/or causes of action on behalf of the Debtors' estates against FSI or any other party.

## NOTICE

102.    Notice of this Motion has been served on: (a) the U.S. Trustee; (b) counsel to the Debtors; and (c) all persons who have formally appeared in these chapter 11 cases and requested service pursuant to Bankruptcy Rule 2002.  Considering the nature of the relief requested herein, the Committee respectfully submits that no other or further notice need be provided.

## NO PRIOR REQUEST

103.    No prior request for the relief sought in this Motion has been made to this or any other court in connection with these chapter 11 cases.

## CONCLUSION

104.     **WHEREFORE**, based on the foregoing, the Committee requests that the Court

grant the Motion and such other and further relief as the Court deems necessary and appropriate.

Dated:  April 13, 2026

**BROWN RUDNICK LLP**

/s/ *Eric R. Goodman*

David J. Molton (admitted *pro hac vice***)**
Eric R. Goodman (admitted *pro hac vice*)
D. Cameron Moxley (admitted *pro hac vice*)
Gerard T. Cicero (admitted *pro hac vice*)
Susan Sieger-Grimm (admitted *pro hac vice*)
7 Times Square
New York, NY 10036
Telephone:   (212) 209-4800
Facsimile:    (212) 209-4801
DMolton@BrownRudnick.com
EGoodman@BrownRudnick.com
DMoxley@BrownRudnick.com
GCicero@BrownRudnick.com
SSieger-Grimm@BrownRudnick.com

*Proposed Counsel for the Official Committee of Unsecured Creditors*

**EXHIBIT A**

PROPOSED ORDER

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Carbon Health Technologies, Inc.,[1] | Case No. 26-90306 (CML) |
| Debtors. | (Jointly Administered) |

**ORDER PURSUANT TO SECTIONS 1103(c) AND 1109(b) OF THE
BANKRUPTCY CODE GRANTING THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS EXCLUSIVE LEAVE, STANDING, AND
AUTHORITY TO COMMENCE, PROSECUTE AND, IF APPROPRIATE, SETTLE
CERTAIN CAUSES OF ACTION ON BEHALF OF THE DEBTORS' ESTATES**

Upon the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Pursuant to Sections 1103(c) and 1109(b) of the Bankruptcy Code Granting Exclusive Leave, Standing, and Authority to Commence, Prosecute and, if Appropriate, Settle Certain Causes of Action on Behalf of the Debtors' Estates* (the "Motion")[2] filed by the Official Committee of Unsecured Creditors (the "Committee"), for entry of an order pursuant to sections 1103(c) and 1109(b) of the Bankruptcy Code granting the Committee exclusive leave, standing, authority to commence, prosecute, and, if appropriate, settle certain causes of action on behalf of the Debtors' estates; and it appearing that (i) this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; (ii) venue of these chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); (iv) this Court having determined that the relief requested in the Motion is in

---

[1]   A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/CarbonHealth.  The location of Carbon Health Technologies, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 500 East Remington Drive, Suite 20, Sunnyvale, CA 94087.

[2]   All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

the best interests of the Debtors, their estates, their creditors and other parties in interest; and (v) proper and adequate notice of the Motion has been given and that no other or further notice is necessary; after due deliberation thereon; and good and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      All objections, if any, to the Motion or the relief requested therein, that have not been withdrawn, waived, or settled, are overruled.

3.      The Committee shall be, and hereby is, granted, on behalf of the Debtors' estates, exclusive leave, standing, and authority to commence and prosecute the Causes of Action set forth in the Motion and the Draft Complaint.

4.      The Committee is authorized, and shall have the exclusive right and authority, to negotiate and settle the Causes of Action on behalf of the Debtors' estates, subject to further order of this Court approving such settlements.

5.      The Committee may amend or modify the Draft Complaint attached to the Motion prior to its filing.

6.      The Committee is authorized and empowered to take all actions necessary to implement the relief granted in this Order.

7.      Nothing in this Order shall affect in any way the Committee's rights to seek standing to bring additional causes of actions against the Defendant or any other party.

Signed: _____, 2026

_____
Christopher M. López
United States Bankruptcy Judge

2

**EXHIBIT B**

DRAFT COMPLAINT

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Carbon Health Technologies, Inc., *et al*., | Case No. 26-90306 (CML) |
| Debtors.[1] | (Jointly Administered) |
| Official Committee of Unsecured Creditors of Carbon Health Technologies, Inc., | Adversary No. 26-_____ (CML) |
| Plaintiff, | **Jury Trial Demanded** |
| v. | |
| Future Solution Investments, LLC, | |
| Defendant. | |

**COMPLAINT**

1.    Plaintiff, the Official Committee of Unsecured Creditors (the "Committee" or "Plaintiff"), appointed in the above-captioned chapter 11 cases (the "Chapter 11 Cases") of Carbon Health Technologies, Inc. ("CHTI") and its affiliated debtors-in-possession (the "Debtors," or the "Company"), submits this complaint (the "Complaint") and brings this action on behalf of the Debtors' estate against Defendant Future Solution Investments, LLC ("FSI" or "Defendant").[2]

---

[1]    A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/CarbonHealth.  The location of Carbon Health Technologies, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 500 East Remington Drive, Suite 20, Sunnyvale, CA 94087.

[2]    The Committee reserves the right to add other parties as defendants as the Committee's investigation continues.

**NATURE OF THE ACTION**

2.      FSI's debt is subject to challenge.  The Debtors' obligation to pay approximately $17 million in prepetition debt based on a late stage "multiple on invested capital" or "MOIC" provision should be avoided as a fraudulent transfer or, alternatively, this debt should be recharacterized as equity.  In addition, because FSI used its inflated debt position to chill bidding during the Debtors' sale process (both pre-petition and post-petition) to guarantee a restructuring transaction that would allow insiders to retain control of the Company, such debt should be equitably subordinated under section 510(c) of the Bankruptcy Code.

3.      The MOIC provision, which was added to FSI's loan agreement less than 90 days prior to the Debtors' bankruptcy filing, *on its face*, gives FSI the same returns that can be realized from an equity investment in the Debtors while also giving FSI the safety of a fully secured claim. But all indications are that FSI and the Debtors added this provision to inflate FSI's secured debt so that they could chill bidding on the Debtors' assets, lock in FSI's desired chapter 11 plan, and create the *illusion* that the sale process shows that unsecured creditors are out of the money.

4.      FSI and the Debtors added the MOIC provision at a time when the Company had no other financing options and FSI and the Debtors knew that the Debtors would soon commence a bankruptcy proceeding that would result in the cancellation of existing equity interests.  In fact, based on certain provisions of the credit agreement, bankruptcy was guaranteed.

5.      When the Debtors incurred this obligation, they were insolvent (or became insolvent) and did not receive reasonably equivalent value in return.  In fact, the Debtors received *no value* in return.  Further, the natural and intended consequence of the Debtors' decision to acquiesce to the MOIC provision on the eve of bankruptcy was to afford FSI enhanced control of the sale process, which enabled it to block competitive bids on the Debtors' operating assets.

2

6. FSI is a strategic buyer that entered the picture in the Fall of 2025. At this time, as explained below, Hercules Capital, Inc. ("Hercules") was the lender under the Debtors' existing secured credit facility which provided a $60 million term loan. On or about October 6, 2025, after Hercules and the Debtors had entered into a series of forbearance agreements, Hercules exited the stage and assigned its rights, title, and interest in the term loan to Fearless Capital Management, LLC ("Fearless"). Upon information and belief, Fearless purchased this debt at a discount. By the end of October 2025, the Debtors' total secured debt was just under $60 million.

7. Fearless held the debt for a short period of time. Upon information and belief, the Debtors' insiders reached an agreement with FSI whereby FSI would acquire the Company through a bankruptcy transaction that preserved the Company's massive net operating losses ("NOLs"), gave FSI access to the Company's intellectual property, and maintained and rewarded the Debtors' insiders. If successful, FSI would realize a massive return on its investment and general unsecured creditors, including victims of sexual abuse, would be zeroed out.

8. At this time, FSI and the Company knew that parties were interested in purchasing the Debtors' clinics in California and possibly New Jersey. But, for FSI to take advantage of the "bankruptcy exception" that allows companies to preserve and utilize NOLs after a change of ownership, the new loss company must carry on more than an insignificant amount of an active trade or business or risk jeopardizing the NOLs by creating a presumption of tax avoidance.

9. To achieve its ultimate objective, FSI needed to control the inevitable sale process that would occur in a bankruptcy proceeding. FSI did so, in part, by artificially augmenting its secured debt position through the MOIC provision and by securing the Debtors' insiders' agreement with FSI's desired plan. This created a high hurdle that potential bids could not clear.

3

And, by suppressing bids, the Debtors and FSI could then contend that the sale process proves that unsecured creditors are entitled to receive no recovery.

10. On or about November 14, 2025, FSI and the Debtors entered into a *delayed* draw term loan (the "FSI Loan"). The Debtors' first draw on the FSI Loan was for $10 million, which the Debtors used for working capital and general corporate purposes. Ten days after this draw, on November 24, 2025, FSI and the Debtors amended the loan agreement.

11. Through this amendment, FSI added a MOIC provision (the "MOIC Provision"), which required the Debtors to pay FSI a *25% premium* on the principal of the advances made under the FSI Loan *on or after* the date of the amendment. This amendment increased the cap of the FSI Loan and enabled the Debtors to make a second draw for approximately $62 million, which was subject to the MOIC Provision. The Debtors used the second draw to retire the Fearless debt.

12. FSI and the Debtors entered into an additional amendment to the loan agreement on January 20, 2026, just 13 days before the Petition Date. This amendment enabled the Debtors to make a third draw for $6 million, which was also subject to the MOIC Provision.

13. ***In total, the MOIC Provision added approximately $17 million to FSI's debt position without providing the Debtors with any additional liquidity***.

14. The MOIC was a new creature in the Debtors' capital structure. Hercules and Fearless, the Debtors' prior secured lenders, never included a MOIC provision in their loan agreements despite multiple amendments and four forbearance agreements over an eight-month period of deepening financial distress. FSI itself did not include the MOIC Provision in its own initial loan agreement with the Debtors, which was the result of negotiations between the parties on a plan to pay off the Debtors' then-existing debt to Fearless and then petition for bankruptcy.

15.     As structured, the MOIC Provision yielded equity-like returns on a senior secured position—the effective annualized rate of return on the MOIC would have been a massive *253%* if paid by the original year-end maturity date.  The annualized return under the delayed draw facility under the First FSI Amendment is roughly 60%, and the return on the delayed draw facility under the Third Amendment is 81% when assuming an effective date of May 27, 2026.

16.     The chart below summarizes FSI's debt position, along with the DIP Loan:

| | | |
|---|---|---|
| Initial Draw | $ | 10.0 |
| First Delayed Draw Advance | | 61.9 |
| Final Delayed Draw Advance | | 6.0 |
| **FSI Prepetition Loan Amount (Principal)** | $ | 77.9 |
| Prepetition Term Loan - MOIC | | 17.0 |
| **FSI Prepetition Loan Amount** | $ | 94.9 |
| DIP Principal | | 19.5 |
| Est. Accrued Interest (DIP) | | 0.4 |
| Est. Accrued Interest (Initial Draw) | | 0.4 |
| **Total FSI Debt** | $ | 115.2 |
| Additional Commitment Amount | | 12.0 |
| **Total Potential FSI Debt** | $ | 127.2 |

17.     The Committee seeks to avoid the Debtors' obligations under the MOIC Provision as a fraudulent transfer.  The 25% premium on delayed-draw advances represents a windfall for FSI rather than conferring reasonably equivalent value to the Debtors.  In the alternative, the Committee seeks to recharacterize the MOIC-related debt as equity.  Further, given how FSI utilized its inflated debt position during the Debtors' sale process to thwart competitive bidding, the Committee also seeks to subordinate FSI's debt attributable to the MOIC Provision under section 510(c) of the Bankruptcy Code.

**JURISDICTION AND VENUE**

18.      This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. § 1334 because this is a civil proceeding arising in or related to the Debtors' Chapter 11 Cases (under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")).  The matters set forth herein are core proceedings pursuant to 28 U.S.C. § 157(b)(2).

19.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

20.      Pursuant to Local Bankruptcy Rule 7008-1, the Committee consents to the entry of final orders or a judgment by the Bankruptcy Court in this adversary proceeding.

**PROCEDURAL BACKGROUND**

21.      On February 2, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Court").

22.      Since the Petition Date, the Debtors have continued to operate their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

23.      The Chapter 11 Cases are being jointly administered for procedural purposes pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1 upon the *Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 17].

24.      On February 16, 2026, the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") appointed the Committee in these Chapter 11 cases. *See* Docket No. 313.  On February 18, 2026, the Committee selected Brown Rudnick to serve as its counsel in the Chapter 11 Cases.

6

**PARTIES**

25.     The Committee is the Plaintiff in this adversary proceeding.  The U.S. Trustee appointed the Committee on February 16, 2026.  The Plaintiff Committee represents the interests of all the Debtors' unsecured creditors.

26.     Defendant Future Solution Investments, LLC is a Wyoming limited liability company with its principal place of business at 970 West Broadway, Suite E #464, Jackson, Wyoming 83001.  FSI is the administrative agent and collateral agent under the Loan and Security Agreement, dated November 14, 2025, entered into by and among the Debtors, Lenders, and FSI (the "Initial FSI Loan Agreement").

**FACTUAL BACKGROUND**

27.     Except where stated to be made on actual knowledge, allegations herein are made upon information and belief based on the discovery record developed to date, the investigation of counsel, matters of public record, and inferences drawn from such sources.  The Committee's investigation is ongoing, and the Committee reserves all rights to amend this Complaint to allege additional facts and causes of action.

**I.      Overview of the Debtors' Business and the Hercules Loan Agreement**

28.     Carbon Health Technologies, Inc. is a health technology and management services organization founded in 2015.  CHTI and its affiliates provide non-clinical, administrative, and operational support to urgent care and primary care medical service providers at approximately 93 locations across eight states.  The Debtors also support other clients through their strategic partnerships and operating system.

29.     During the 2020 and 2021 period, with the rise of Covid and increased demand for accessible healthcare services in the communities that the Debtors served, the Debtors expanded their operations by investing in technology, opening additional clinics, and increasing the number

of personnel.  At the time, the Debtors' services included, among other things, Covid-related testing and vaccinations.

30.     To fund the expansion, the Debtors entered into a secured credit facility with Hercules Capital, Inc. ("Hercules").  On or about March 17, 2021, Hercules and the Debtors entered into a Loan and Security Agreement (the "Original Hercules Loan Agreement").

31.     The Original Hercules Loan Agreement provided for term loans in the aggregate principal amount of $60 million at an interest rate equal to the prime rate plus 3.1% (in all circumstances, a minimum of 8.1%).  The term loans taken from this credit facility were secured by first-priority liens on substantially all the Debtors' assets.

32.     As the Covid pandemic began to subside in 2022, demand for the Debtors' services declined.  The Debtors experienced a material decline in access to external financing.  Despite implementing various cost-reduction initiatives, the Debtors continued to face liquidity constraints as the scale of the business no longer aligned with available capital.

**II.     The Debtors' Defaults and Forbearances Under the Hercules Loan Agreements**

33.     By early 2025, the Debtors were experiencing significant financial distress and liquidity constraints driven by operational challenges and increased competition.  The Debtors' liquidity constraints were so severe that management projected the Debtors would be unable to meet their obligations without additional capital or a strategic transaction.

34.     The Debtors then approached Hercules to refinance their existing debt.  On or about February 14, 2025, the Debtors entered into an Amended and Restated Loan and Security Agreement with Hercules Capital (the "Amended and Restated Hercules Loan Agreement").

35.     This refinancing triggered the end of term charge under the Original Hercules Loan Agreement. The Debtors paid Hercules an end of term charge of $3,520,000 in accordance with the Original Hercules Loan Agreement, representing an early termination fee of just under 6.5%

8

of the outstanding principal balance of $54,796,460.  This Amended and Restated Hercules Loan Agreement also required the Debtors to, among other things, maintain an unrestricted cash balance of at least $2.5 million.

36.     The Amended and Restated Hercules Loan Agreement again included end of term charges that would be triggered in the event of an early termination of the loan agreement.  Neither the Original Hercules Loan Agreement nor the Amended and Restated Hercules Loan Agreement contained a MOIC provision or similar return enhancement.

37.     The Debtors were experiencing financial difficulties and were unable to maintain the $2.5 million minimum cash requirement under the Amended and Restated Hercules Loan Agreement.  As a result, the Debtors defaulted under the agreement on or about May 22, 2025.

38.     Hercules could have accelerated the debt and foreclosed on the secured collateral.  But it did not.  Instead, Hercules entered into three separate forbearance agreements with the Debtors, giving the Debtors multiple opportunities to address their capital structure challenges while preserving Hercules' rights under the original agreements.

39.     On or about June 3, 2025, Hercules and the Debtors entered into a Forbearance Agreement and First Amendment to Amended and Restated Loan and Security Agreement ("First Forbearance Agreement").  Under the First Forbearance Agreement, Hercules agreed to forbear from exercising its contractually granted remedies for approximately two months, through July 31, 2025.  In exchange, the Debtors agreed to raise additional capital in the amounts of at least $10 million and at least $15 million—through the sale of Capital Stock or issuance of Subordinated Indebtedness—through June 27 and July 31, 2025, respectively.  The Debtors also agreed to make progress towards a "Change in Control" or other strategic transaction.

40.     Hercules did not attempt to incorporate a MOIC provision or similar enhancement, instead relying on its senior secured position, contractual interest rate, and end-of-term charge as adequate compensation for the risk taken.

41.     The Debtors' financial condition, however, continued to spiral.  The Debtors were unable to maintain the required $2.5 million minimum cash balance, to raise the additional required capital, or to make meaningful progress towards a strategic transaction.

42.     On or about July 15, 2025, Hercules and the Debtors entered into a Forbearance Agreement and Second Amendment to the Amended and Restated Loan and Security Agreement ("Second Forbearance Agreement").   The Second Forbearance Agreement extended the forbearance period another month through August 22, 2025, or an additional event of default/breach.

43.     The Debtors agreed to raise $6.5 million in equity or subordinated debt capital, engage a financial advisor that reported directly to Hercules, and continue to work toward completing a "Change in Control" or other strategic transaction.

44.     At this time, a transaction with Exer Holding Company, LLC ("Exer"), a third-party bidder, came into the fold via a letter of intent dated June 27, 2025.  In negotiating the Second Forbearance Agreement, Hercules did not attempt to incorporate a MOIC provision or similar enhancement, instead relying on its senior secured position, contractual interest rate, and end-of-term charge as adequate compensation for the risk taken.

45.     Unable to raise the $6.5 million in capital required under the Second Forbearance Agreement, the Debtors again defaulted.  A transaction with Exer would also fail to occur.

46.     On or about August 13, 2025, Hercules and the Debtors entered into a Forbearance Agreement and Third Amendment to the Amended and Restated Loan and Security Agreement.

10

This agreement, however, never became effective because the Debtors could not even raise the required cash proceeds to satisfy the conditions of the agreement's effectiveness.

47.     One month later, on or about September 25, 2025, Hercules and the Debtors again entered into a Forbearance Agreement and Third Amendment to the Amended and Restated Loan and Security Agreement ("Third Forbearance Agreement").  The Third Forbearance Agreement extended the forbearance period through October 31, 2025.  Hercules did not attempt to incorporate a MOIC provision or similar enhancement, instead relying on its senior secured position, contractual interest rate, and end-of-term charge as adequate compensation for the risk taken.

48.     Notably, the Third Forbearance Agreement contemplated a potential sale transaction to Fearless Capital Management, LLC ("Fearless") that was to be completed by the end of the forbearance period.  Upon information and belief, between September 25 and November 14, 2025, the Debtors entered into an asset purchase agreement with Fearless pursuant to a Letter of Intent entered into between the Debtors and Fearless, dated August 5, 2025.

49.     On or before October 6, 2025, Fearless would decide not to purchase the Debtors but instead enter into the certain Non-Recourse Loan Document Sale and Assignment agreement that assigned all of Hercules' right, title, and interest in the loan to Fearless.

50.     The Debtors would again default on the loan, requiring a fourth forbearance at or around November 3, 2025 (the "Fourth Forbearance Agreement").

51.     While Fearless increased the default interest rate from three percent (3%) to ten percent (10%) as part of this amendment, Fearless did not attempt to incorporate a MOIC provision or similar enhancement, instead relying on its senior secured position and contractual interest rate as adequate compensation for the risk taken.

11

52.     The Debtors would yet again default on the loan.  Pursuant to another forbearance agreement entered into on November 13, 2025 (the "Fifth Forbearance Agreement"), Fearless now demanded full repayment of the outstanding debt, which totaled at least $62.25 million, by January 2, 2026.

**III.     Future Solution Investments, LLC, Refinance and the Initial Loan Agreement**

53.     Shortly after Fearless acquired the Debtors' outstanding debt, the Debtors worked with FSI to come up with a solution to the Debtors' liquidity concerns.  The plan was to reorganize the Company through a chapter 11 bankruptcy that would preserve the Debtors' valuable NOLs and take steps to ensure FSI would be able to acquire the Debtors' valuable assets in bankruptcy.

54.     The Debtors would first pay off a portion of their existing secured debt obligation to Fearless (as successor to Hercules) using the proceeds of the planned sale of certain of the Debtors' California assets seeking to be purchased by Exer.  The balance of the Debtors' secured debt obligation would be "refinanced" using proceeds from a $27.5 million delayed draw term loan facility provided by FSI.

55.     On or about November 14, 2025, FSI and the Debtors entered into the Initial FSI Loan Agreement.  Under the Initial FSI Loan Agreement, FSI agreed to provide the Debtors with a $10 million initial draw for use as working capital and for general corporate purposes.

56.     FSI also agreed to provide the Debtors an uncommitted delayed draw term loan facility to "refinance the Senior Credit Facility" (*i.e.*, the pre-existing debt held by Fearless), allowing FSI to take Fearless's position as the senior secured creditor.

57.     The Initial FSI Loan Agreement was part of a carefully pre-planned and coordinated restructuring process.  The agreement included a "13 Week Cash Flow Forecast" that projected both pre-petition and post-petition expenses.

58.     This forecast also anticipated a $40 million inflow of cash from the anticipated sale of California assets to Exer Holding Company, LLC (the "California Asset Sale"), which when combined with a $27.5 million delayed draw term loan facility, was intended to pay off the Debtors' secured debt obligations to Fearless.  FSI also required the Debtors to deliver a "fully-executed copy of the Restructuring Support Agreement" within 15 calendar days of closing.

59.     Under the Initial FSI Loan Agreement, secured term loan facilities charged an interest rate equal to the prime rate plus 3% (similar to the interest rate charged by Hercules), and an exit fee equal to 10% of the aggregate amount of all advances.  The exit fee was designed to compensate FSI for the risk of lending to a borrower in financial distress; however, this exit fee would be waived and no longer payable after bankruptcy filing by the borrower.  The stated maturity date of the loan was December 31, 2025, the eve of the projected bankruptcy—again, showing that before the MOIC was added, even FSI had not implemented or planned to implement an artificial enhancement leading into the bankruptcy.

**IV.     FSI Incorporates the MOIC Provision into Subsequent Amendments of the Loan Agreement**

60.     After the Initial FSI Loan Agreement closed, the Debtors utilized the initial $10 million initial draw and were dependent on FSI for additional delayed draw advances to fund their operations going forward.  The anticipated California Asset Sale, however, did not close.

61.     FSI recognized the proposed California Asset Sale could put the Company's NOLs—a prized asset—at risk.  Under a specialized bankruptcy exception in the tax code, an acquiring company can preserve and utilize a debtor's NOLs following a change in ownership if (i) certain types of creditors and/or historic equity holders end up owning at least fifty percent (50%) of the reorganized debtor and (ii) the debtor carries on "more than an insignificant amount" of an active trade or business during and subsequent to the bankruptcy proceedings.  Accordingly,

if the Debtors did not proceed with the sale of the California clinics, the position that the NOLs would remain available for FSI's benefit should FSI ultimately acquire the Debtors' assets through the bankruptcy process would be bolstered due to the significant trade or business carried on by the Debtors during and after the Chapter 11 proceedings.

62.     To protect its own interests, FSI orchestrated a new deal with the Debtors.  FSI proposed that it would advance to the Debtors the amount needed to pay off the Debtors' obligations to Fearless; the Debtors would decline to proceed with the California Asset Sale to Exer; and following the Debtors' inevitable default on its loan agreement with FSI, the Debtors would file for Chapter 11 bankruptcy.

63.     FSI presented the Debtors with the First Amendment to the Loan and Security Agreement ("First FSI Amendment"), which was entered into by the parties on November 24, 2025.  In many respects, the First FSI Amendment mirrored the Initial FSI Loan Agreement.  The First FSI Amendment kept the same stated maturity date of December 31, 2025.  But the First FSI Amendment made several significant changes to the Initial FSI Loan Agreement.

64.     First, the First FSI Amendment converted the uncommitted delayed draw term loan facility of $27.5 million into a committed delayed drawn term loan facility with an aggregate principal amount of $62.25 million—enough for the Debtors to pay off their outstanding obligations to Fearless.

65.     Second, and most significantly, the First FSI Amendment added the MOIC Provision, which would be triggered upon any MOIC Event.[3]  The MOIC Provision required that

---

[3]   As defined in the First Amendment, "MOIC Event" means the occurrence of any of the following: (a) any payment resulting in the payment in full of the Delayed Draw Term Loan Advance, (b) any acceleration of the Secured Obligations for any reason, including, without limitation, acceleration in accordance with Section 10.1, including as a result of the commencement of any proceeding commenced by or against Borrower or any Guarantor under the United States Bankruptcy Code and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or

14

for any draws on the delayed draw term loan facility as of the date of the First FSI Amendment, the Debtors must repay FSI an aggregate amount equal to 1.25 multiple, or 125%, of the principal amounts drawn ("MOIC Premium"). Thus, FSI would be guaranteed a 25% premium return on the principal with respect to delayed draw advances made on or after November 24, 2025.

66.     By the First FSI Amendment's own terms, the purpose of the MOIC Provision is not to reimburse or compensate FSI for any losses but rather to guarantee desired gains. Had the MOIC Premium been paid at the original maturity date, the effective annualized return on MOIC Provision would have been 253%.

67.     An annualized return of this magnitude, by any standard, would be exceptional. Recognizing the controversial nature of the MOIC Provision, and the possibility that the MOIC Provision would be construed as an unenforceable penalty or unconscionable term, FSI included in the First FSI Amendment extensive provisions purporting to establish the enforceability of the MOIC Premium in bankruptcy and to waive defenses.

68.     The First FSI Amendment provided that the Debtors waived any statutory prohibitions on collection of the MOIC Premium upon acceleration of the debt. The First FSI Amendment further purported to acknowledge that the MOIC Provision was "reasonable" (even though it was not) and to represent that the MOIC Provision was "the product of arm's length negotiation" (even though it was not). The First FSI Amendment stated that the MOIC Premium would remain enforceable obligations notwithstanding any bankruptcy filing.

69.     The above underscores the duplicitous nature of the MOIC Premium. Extracted from the Debtors for no consideration, the MOIC Premium was intended to give FSI control over

---

similar debtor relief law of the United States or other applicable jurisdiction from time to time in effect, or (c) the Term Loan Maturity Date.

any sale process in the bankruptcy proceedings and enable FSI to steer the case toward its desired Chapter 11 Plan.

70.     Far from being "the product of an arm's length negotiation," the Debtors agreed to the terms of the First FSI Amendment because they supported FSI becoming the new owner of the Company.   FSI and the Debtors subsequently entered into two additional amendments that extended and expanded the MOIC provision's reach.

71.     On January 13, 2026, FSI and the Debtors entered into the Second Amendment to the Loan and Security Agreement ("Second FSI Amendment") that extended the maturity date of the facility from December 31, 2025 (the eve of the original projected petition date) to February 2, 2026 (the actual Petition Date).   The Second FSI Amendment made no changes to, and essentially reaffirmed, the MOIC Provision.

72.     On January 20, 2026—thirteen days before the Debtors filed for bankruptcy—FSI and the Debtors entered into the Third Amendment to the Loan and Security Agreement ("Third FSI Amendment").   Again, the Third FSI Amendment made no changes to, and essentially reaffirmed, the MOIC provision.  The Third FSI Amendment provided for an additional $6 million committed delayed draw term loan facility, providing the Debtors with adequate liquidity to carry the Debtors through to the Petition Date.  Critically, this additional $6 million was also subject to the MOIC Provision's 125% return requirement.

73.     The Debtors agreed to the terms of FSI's proposed amendment and demand to extend the MOIC to the additional $6 million.  By the Petition Date, the MOIC Provision applied to approximately $68 million of the $78 million of financing that FSI provided to the Debtors, maximizing FSI's claimed return at the expense of other creditors.

16

## V.      The Perceived Benefit of Increasing FSI's Secured Debt

74.      Upon information and belief, the Debtors' insiders were willing to inflate FSI's secured debt by approximately $17 million through the MOIC Provision because doing so offered a path for them to retain their positions and realize significant returns post-confirmation.

75.      The Debtors' deferred tax assets, namely their $784 million in NOLs, are among the Debtors' most valuable assets.  IRC Section 382(l)(5), the bankruptcy exception that allows companies to preserve and utilize NOLs after a change of ownership, may be jeopardized if a significant amount of an active trade or business is not carried on during and subsequent to the chapter 11 proceedings.

76.      However, as of November 2025, third-parties had expressed a serious interest in acquiring the Company's business, particularly the clinics in California.  One buyer signed an asset purchase agreement that included the business assets in California.

77.      FSI knew that this buyer and others would surface in the Debtors' bankruptcy cases. FSI, however, did not want a section 363 sale transaction to occur.  Inflating FSI's debt would give FSI enhanced control of the sale process and enable FSI to block competitive bids on the Debtors' operating assets.

78.      The MOIC Premium offered FSI leverage over the sale process and plan process. When facing potential bidders, FSI and the Debtors could demand bids that, standing alone or on a combined basis, exceed the value of FSI's inflated debt.  When facing the unsecured creditors, FSI and the Debtors could contend that since the sale process did not result in any meaningful bids—as judged against FSI's credit bid based on the inflated debt—the unsecured creditors must accept a de minimis or zero recovery.

79.     As a direct result of FSI's conduct, the Debtors cancelled the auction and are now following FSI's desired path to a plan transaction under which the reorganized Company will own the clinics, the intellectual property, and tax assets free and clear of the Debtors' general unsecured debt, including the sexual abuse claims.

80.     If FSI's bankruptcy strategy is successful, management keeps their jobs and earns bonuses, FSI will realize a return of 150% or more on its total investment, and the unsecured creditors, including abuse victims, will receive little to no recovery on account of their claims.

## COUNTS

### COUNT I
### Constructive Fraudulent Transfer
### (Pursuant to 11 U.S.C. §§ 544(b)(1), 548(a)(1)(B), 550
### and Applicable State Fraudulent Transfer Law)

81.     The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

82.     FSI and the Debtors entered into the First FSI Amendment, under which the Debtors first incurred the obligation to pay the MOIC Premium.

83.     Under the MOIC Provision, the Debtors incurred the obligation to pay FSI an additional payment in an amount to be determined that is sufficient for FSI to achieve a 1.25 multiple of the aggregate amounts drawn by the Debtors under the delayed draw term loan facility as of and subsequent to the date of the First FSI Amendment.

84.     At the time the Debtors incurred the obligation to pay the MOIC Premium, the Debtors: (i) were insolvent or became insolvent as a result thereof; and/or (ii) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; and/or (iii) intended to

18

incur, or believed or reasonably should have believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

85.     The Debtors received less than the reasonably equivalent value in exchange for incurring the obligation to pay the MOIC Premium.

86.     FSI was not a good faith transferee and therefore not entitled to offset rights under section 548(c) of the Bankruptcy Code or any applicable non-bankruptcy law.

87.     As of the Petition Date, there were actual creditors of the Debtors holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b) who could avoid a transfer of the Debtors' property under Del. Code § 1304(a)(2) or other applicable state fraudulent transfer law.

88.     The Debtors' payment obligations to FSI pursuant to the Loan Agreement Amendments should be avoided pursuant to 11 U.S.C. § 544 and Del. Code § 1307(a)(1) or other applicable state fraudulent transfer law and should be recovered for the benefit of the Debtors' estate pursuant to 11 U.S.C. § 550.

## COUNT II
### Declaratory Judgment for Recharacterization of Debt as Equity
### (Pursuant to 11 U.S.C. § 502(b)(1))

89.     The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

90.     FSI agreed to provide the Debtors with access to a delayed draw term loan facility that would allow the Debtors to pay off their then-existing debt obligations to Fearless, as successor to Hercules, and provide the Debtors with adequate financing to continue operations through the Debtors' planned chapter 11 restructuring.  The Initial FSI Loan Agreement did not contain a MOIC provision, any guaranteed rate of return, or any guaranteed interest on the transaction.

19

91. Ten days later, FSI amended the Initial FSI Loan Agreement to include a MOIC provision that guaranteed FSI a 25% return on any draws on the delayed loan facility taken on or after the date of the First FSI Amendment.

92. Viewed as a whole, FSI intended the delayed draw term loan facility, including the addition of the MOIC provision, to be an equity investment in the Debtors.

93. While styled as a loan facility and an obligation to make additional payments sufficient to achieve a 1.25 multiple of the amount of the loan amounts taken by the Debtors, FSI did not in fact intend to act as lenders to the Debtors.

94. The economic reality was that FSI acted as equity investors in the Debtors and did not expect the Debtors to repay the loan facility.

95. Each of the three MOIC Events, as defined in the First FSI Amendment, that would trigger the MOIC Provision was tied to the Debtors' anticipated bankruptcy and expected petition date.

96. At the time the Debtors entered into the First FSI Amendment, the Debtors were undercapitalized and required additional liquidity to fund operations until they could petition for bankruptcy protection.

97. The Debtors were also unable to obtain other outside financing. The Debtors' only viable option was the financing offered by FSI.

98. FSI and the Debtors did not operate at arm's length in connection with the addition of the MOIC provision.

99. The MOIC provision was structured in such a way as to give FSI the unlimited upside of an equity investment but paired with the downside protection of a fully collateralized secured creditor.

20

100.     Based on the facts alleged herein, the obligations the Debtors incurred under the MOIC Provision should be recharacterized as equity.

## COUNT III
### Declaratory Judgment for Equitable Subordination
### (Pursuant to 11 U.S.C. § 510(c))

101.     The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

102.     Prior to the Petition Date, the Debtors' insiders exercised control over the Debtors' operations, including financial transactions.  In this capacity, the Debtors' insiders negotiated an agreement with FSI whereby FSI would acquire the Company through a bankruptcy transaction that preserved the Company's massive net operating losses, gave FSI access to the Company's intellectual property, and maintained and rewarded the Debtors' insiders.

103.     If successful, FSI would realize a massive return on its investment, the Debtors' insiders would retain their management positions and enjoy significant returns, and general unsecured creditors, including victims of sexual abuse, would be zeroed out.

104.     To achieve their ultimate objective, FSI and the Debtors' insiders needed to control the inevitable sale process that would occur in a bankruptcy proceeding.  FSI and the Debtors' insiders did so, in part, by artificially augmenting FSI's secured debt position through the MOIC Provision, which added at least $17 million to FSI's debt.

105.     The natural and intended consequence of the Debtors' decision to acquiesce to the MOIC Provision was to afford FSI enhanced control of the sale process and enable FSI to block competitive bids on the Debtors' operating assets.  This was done to suppress the perceived value of the Debtors' assets and pave the way for the confirmation of FSI's desired Chapter 11 plan.

106.     A direct and proximate result of FSI's misconduct, FSI obtained an unfair advantage in the Debtors' sale process and the ability to block bids for the Debtors' operating

21

assets that, on a combined basis, may have exceeded the value of FSI's prepetition debt (determined without the MOIC Provision).  FSI's conduct also harmed the Debtors' estate and the Debtors' unsecured creditors.

107.   The subordination of FSI's prepetition debt attributable to the MOIC Premium is not inconsistent with the Bankruptcy Code.  Subordination of FSI's prepetition debt attributable to the MOIC Premium is necessary to offset the harm caused by conduct of FSI and the Debtors' insiders and ensure an equitable distribution among creditors in the Chapter 11 Cases.

## RESERVATION OF RIGHTS

108.   The Committee's investigation is ongoing, and to the extent the Committee's understanding of the facts alleged herein evolves between the submission of this draft Complaint and the time the Court permits the Committee to file this Complaint, the Committee reserves the right—consistent with any ruling the Court may issue—to bring additional claims, including, without limitation, additional claims that the Committee discerns from its ongoing investigation of Defendant's and other parties' related conduct.

109.   The Committee reserves the right to bring the claims asserted herein, and any additional claims in any appropriate forum, including, without limitation, any state or U.S. District Court, notwithstanding the caption for this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, the Committee requests that the Court grant the following relief:

On Count I:

(1)   entering judgment against FSI, finding that the Debtors' incurrence of the obligation to pay the MOIC Premium under the November 24, 2025 First Amendment to the Loan and Security Agreement and subsequent

amendments thereto constitutes a constructive fraudulent transfer pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550;

(2)     entering judgment against FSI, finding that the Debtors' incurrence of the obligation to pay the MOIC Premium under the November 24, 2025 First Amendment to the Loan and Security Agreement and subsequent amendments thereto constitutes a constructive fraudulent transfer pursuant to 11 U.S.C. § 544(b) and the applicable Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act; and

(3)     preserving the avoided obligation for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 551.

On Count II:

(1)     entering judgment against FSI, declaring that any debt incurred by the Debtors under the MOIC Provision shall be recharacterized as equity for all purposes in the Debtors' Chapter 11 Cases.

On Count III:

(1)     entering judgment against FSI, declaring that FSI's prepetition debt attributable to the MOIC Provision shall be equitably subordinated to the full and final payment of all allowed general unsecured claims asserted against the Debtors' estates in the Chapter 11 Cases.

Dated:  [------], 2026              **BROWN RUDNICK LLP**

David J. Molton (admitted *pro hac vice*)
Eric R. Goodman (admitted *pro hac vice*)
D. Cameron Moxley (admitted *pro hac vice*)
Gerard T. Cicero (admitted *pro hac vice*)
Susan Sieger-Grimm (admitted *pro hac vice*)
7 Times Square
New York, NY 10036
Telephone:     (212) 209-4800
Facsimile:      (212) 209-4801
DMolton@BrownRudnick.com
EGoodman@BrownRudnick.com
DMoxley@BrownRudnick.com
GCicero@BrownRudnick.com
SSieger-Grimm@BrownRudnick.com

*Proposed Counsel for the Official Committee of Unsecured Creditors*

23