**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>CARBON HEALTH TECHNOLOGIES, INC., *et al.*,<br><br>Debtors. [1] | Chapter 11<br><br>Case No. 26-90306 (CML)<br><br>(Jointly Administered) |

**DECLARATION OF ROBERT WARSHAUER IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. §§ 362 AND 363 APPROVING SETTLEMENT WITH THE STATE OF CALIFORNIA AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

I, Robert Warshauer, pursuant to section 1726 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am a member of the board of directors of Debtor Carbon Health Technologies, Inc. ("CHTI"). I was appointed to this position on January 10, 2026. I have no prior affiliation with any of the above-captioned debtors and debtors in possession (collectively, the "Debtors").

2.      I have 35 years of operational, financial and investment banking expertise with both public and private companies in a wide range of industries. I have worked with boards of directors, management teams and creditors on all aspects of capital markets transactions, including restructurings, refinancings, mergers and acquisitions. I currently serve as independent director on various boards and have served on over two dozen boards of directors and served as CEO, president or chairman of several publicly and privately traded companies. I was previously with Imperial Capital for fourteen years where I served as head of investment banking in New York

---

[1]     A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/CarbonHealth.The location of Carbon Health Technologies, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 500 East Remington Drive, Suite 20, Sunnyvale, CA 94087.

and national co-head of the restructuring practice. Prior to that, I was with Ernst & Young and its affiliated entities for nineteen years and served as partner in the national corporate finance practice and a member of its board of managers. I began my career with Price Waterhouse where I earned my certified public accountant accreditation and later worked for WR Grace in their corporate finance group focusing on mergers and acquisitions.

3. I graduated from Bucknell University with a Bachelor of Science in Business Administration and earned a Masters of Business Administration in Finance from New York University

4. I make this Declaration in support of the *Debtors' Motion for Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. §§ 362 and 363 Approving Settlement with the State of California and Authorizing Actions Consistent Therewith* (the "Motion"), filed concurrently herewith.[2]

5. On February 3, 2026 (the "Petition Date"), the Debtors commenced voluntary bankruptcy cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"). The Debtors continue to manage their assets and affairs as debtors in possession.

6. The Debtors are in the process of completing a balance sheet restructuring of, and obtaining a substantial capital investment in, their business through these chapter 11 cases. To that end, the Debtors have proposed a Plan of Reorganization (the "Plan"), confirmation of which will be considered by this Court on May 27-29, 2026. *See* [Docket Nos. 431, 440, and 468]. A critical step in that process is the resolution of a pre-bankruptcy investigation of the Carbon Health

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

Entities' business practices and the threatened enforcement action by the AG concerning alleged violations of California state law (the "Investigation").

7.      Prior to the Petition Date, on January 29, 2024, the AG served an investigative subpoena for the production of documents and interrogatories on CHTI, seeking documents and information related to CHTI's corporate structure and business, advertisements, billing and insurance, and consumer complaint processes, to which the Debtors began responding on March 4, 2024.  The AG reviewed the Debtors' interrogatory responses and their production of over 5,500 documents.

8.      On February 18, 2026, the AG presented to the Debtors its position that CHTI is in current non-compliance with various California state laws, including prohibitions on the corporate practice of medicine, arising from California's Unfair Competition Law ("UCL"), Cal. Business & Professionals Code ("B&P Code") § 17200, and False Advertising Law ("FAL"), B&P Code § 17500.  The AG also alleged certain historical concerns, including:

- From 2021-2023, the Debtors advertised that it accepted "all major insurance," which the AG contends was false because it states multiple major health plans were not covered.

- Prior to the Petition Date, the Debtors engaged in allegedly improper billing in connection with contract negotiations with a payor.

- The Debtors' credit card authorization was on the second page of the Debtors' intake form, and the Debtors did not obtain patients' express consent prior to charging them in accordance with the credit card authorization.

- The Debtors, in certain instances, billed patients prior to billing their insurance.

9.      The Debtors disagree with the historical concerns raised by the AG and indicated as much when the Debtors subsequently responded in a March 13, 2026, presentation. Specifically, the Debtors noted that:

- The advertising and marketing materials did appear to be accurate, particularly related to COVID messaging, and were not misleading to a reasonable consumer.

- There was nothing improper or improper related to the payor negotiations and, in fact, Carbon is now in network with that payor.

- The Debtors' credit card authorization and billings appear to have been done in accordance with state law and, in any event, the Debtors were already updating their authorizations.

Nonetheless, the Debtors noted the historical concerns and sought to resolve the matter expeditiously.

10.     According to the AG, the Debtors' conduct exposes it to civil penalties, including up to $2500 per UCL and FAL violation (with an additional $2500 per violation for elderly, disabled or veteran victims under the UCL), calculable per incident, per facility, per day, and/or per patient.

11.     The Debtors have shared information regarding the AG's investigation on a confidential basis with the Committee.

12.     Both prior to and after commencement of the Chapter 11 Cases, CHTI cooperated with the AG and responded to the subpoena and interrogatories and the related Investigation regarding the AG's allegations of non-compliance with various California state laws. CHTI has expended, and, in the absence of the Settlement, would have been obligated to continue to expend financial and managerial resources in connection with responding to the subpoena and interrogatories and any related Investigation or any other future requests for information.

13.     After good faith and arm's-length negotiations, the AG and the Defendants entered into the Settlement to fully and finally resolve the AG's claims against the Defendants. The principal terms of the Settlement are as follows:[3]

---

[3] In the event of any inconsistency between this Motion and the Stipulation or Injunction, the terms of the Stipulation or Injunction, as applicable, shall control.

(a) *Permanent Injunction.* The Injunction permanently enjoins the Defendants from: (i) engaging in the corporate practice of medicine as prohibited by B&P Code sections 2052(a) and 146(a); (ii) using unfair consumer contracts as prohibited by California Civil Code section 1770(a)(19) and in breach of the covenant of good faith and fair dealing; (iii) improperly billing patients and insurance companies in violation of applicable California and federal laws; and (iv) making or causing to be made false or misleading statements or any other false advertising as prohibited by B&P Code section 17500.

(b)   *Civil Penalty.* A civil penalty shall be imposed in the aggregate amount of $4,500,000.00, divided as follows: (i) an allowed general unsecured claim of $4,025,000.00 (the "General Unsecured Claim"); (ii) an administrative expense of $375,000.00, allowed pursuant to section 503(b) of the Bankruptcy Code (the "Administrative Claim"), to be paid by the Debtors within three (3) business days upon entry of the Bankruptcy Court's order approving the Settlement and approval of the Stipulation and Injunction by the state court; and (iii) the amount of $100,000.00 against Bali.

(c) *Release.*  The Settlement shall have a *res judicata* effect and shall constitute a full, final, and binding settlement and release, to the fullest extent permitted by law, of any claims that (i) the AG has or could have brought against the Defendants arising out of or in connection with the factual allegations set forth in the letter from the AG dated, February 10, 2026; or (ii) are addressed by the terms of the Stipulation.

(d) *Reservation of Medicaid Claims*.  The Settlement does not resolve, estop, adjudicate, preclude, or bar any claims for civil, criminal, or administrative liability to the State's Medicaid Program.

(e) *State Court Action.*  To facilitate implementation of the Settlement, the AG will file a complaint in the Superior Court for the State of California, that outlines various causes of action against the Defendants under B&P Code sections 17200, *et seq.*, and 17500, *et seq.*, which alleges, among other things, that the Carbon Health Entities are: (i) engaging in the corporate practice of medicine in violation of B&P Code sections 2052 and 146; (ii) using unfair consumer contracts in violation of Civil Code section 1770(a)(19) and in breach of the covenant of good faith and fair dealing; (iii) improperly billing patients and insurance companies in violation of California and federal laws; and (iv) making false or misleading statements and engaging in false advertising in violation of B&P Code section 17500.  The Stipulation will be filed contemporaneously with the complaint.

14.     The Settlement will become effective and enforceable upon, among other things,

(a) entry of an order of the Bankruptcy Court granting this Motion and approving the Settlement,

(b) entry of an order approving the Stipulation and of the Injunction by the State Court, and (c) the effective date of a Plan in these Chapter 11 Cases.

15. The AG has asserted that the Defendants violated various California state laws, including the prohibition on the corporate practice of medicine under B&P Code sections 2052 and 146, unfair consumer contracting practices under Civil Code section 1770(a)(19), and improper billing and false advertising under the B&P Code.  Although the Defendants deny any wrongdoing or liability, litigating the AG's claims would be very costly, time-consuming, and value-destructive to these estates and creditor recoveries, and there is no guarantee that the Defendants would prevail in any such litigation in a timely fashion.  In particular, the AG has broad investigative and enforcement authority under the California Unfair Competition Law, and any litigation would likely involve complex factual and legal questions requiring extensive discovery and expert analysis.

16. I believe that economic terms of the Settlement reflect the litigation risks and uncertainties facing the Defendants. The total civil penalty of $4,500,000.00, the majority of which is bifurcated as to the Debtors between an allowed General Unsecured Claim ($4,025,000.00) and the Administrative Claim ($375,000.00), represents a reasonable and negotiated resolution of the AG's claims.  Absent the Settlement, the AG could impose substantial civil penalties, including up to $2500 per UCL and FAL violation (with an additional $2500 per violation for elderly, disabled or veteran victims under the UCL), calculable per incident, per facility, per day, and/or per patient. Given the breadth of the AG's allegations and the potential for significant civil penalties under the B&P Code, the Settlement provides a fixed, certain, and final resolution of these claims.

17.     I believe that the substantial expense, inconvenience, time, and delay that would ensue if the Court rejects the Settlement is a significant factor supporting approval. The AG's Investigation has been ongoing since January 2024 and involves complex regulatory and legal issues spanning the corporate practice of medicine, consumer protection, billing practices, and false advertising. Any litigation among the Parties would be time-consuming, expensive, and disruptive, with the AG potentially asserting the full range of claims identified by the AG and seeking significant civil penalties and injunctive relief in State Court while these bankruptcy proceedings are also pending. Plus, section 1129(a)(3) of the Bankruptcy Code requires the Debtors to demonstrate that the Plan is not by any means forbidden by law. Thus,  any litigation would unduly burden the Debtors' administration of these Chapter 11 Cases and potentially delay their proposed conclusion through the Plan, confirmation of which is to be considered by the Court in a little over one month's time.

18.     Approval of the Settlement is further justified by the paramount interest of the Debtors' creditors. By resolving the AG's claims through a fixed civil penalty of $4,500,000.00 (of which $4,025,000.00 constitutes the General Unsecured Claim, $375,000.00 constitutes the Administrative Claim and $100,000.00 is to be paid by Bali), the Settlement provides certainty with respect to the AG's claims against the Debtors' estates, avoids additional administrative costs and the distraction of protracted litigation with a state enforcement authority, and permits the Debtors to focus on maximizing value for all stakeholders.

19.     Based on all the foregoing, the Settlement also reflects an exercise of the Debtors' sound business judgment.  The Settlement minimizes and fixes the AG's claims against the Debtors' estates and avoids potentially significant litigation costs, delays, and uncertainties. The thoroughness and sophistication of the arm's-length negotiations between the AG and the

4916-0969-9490.5 12854.00002

Defendants represents a careful consideration of the terms of the Settlement.   The Settlement provides an expedient, cost-effective, certain, and final resolution of the Parties' disputes, in order to maximize the value of the Debtors' assets for all stakeholders.

20.     I believe that without the ability to implement the Settlement by filing the Complaint, Stipulation and Injunction in state court, the AG would not have agreed to the terms of the Settlement.

21.     Approval of the Settlement is necessary to further the Debtors' impending reorganization, assure the Debtors' compliance with various legal requirements governing their business structure and operations, and maximize the value of the estates for all of the Debtors' stakeholders.

22.     Given the Debtors' goal to maximize the value of the Estates' assets in an efficient, effective manner for the benefit of all stakeholders, I believe it is in the best interests of the Debtors and their estates that the Settlement be approved and implemented.  The failure to obtain the relief requested in the Motion could result in significant harm to the Debtors and their estates, including the resumption or escalation of the AG's enforcement activities, substantial litigation costs, and disruption to the administration of the Chapter 11 Cases.

Executed this 25th day of April, 2026.

*/s/ Robert Warshauer*
Robert Warshauer