**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| CARBON HEALTH TECHNOLOGIES, INC., et al., | Case No. 26-90305 (CML) |
| Debtors. [1] | (Jointly Administered) |
|  | **Related to Docket No. 452** |

**DEBTORS' OBJECTION TO MOTION OF THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER PURSUANT TO
SECTIONS 1103(c) AND 1109(b) OF THE BANKRUPTCY CODE GRANTING
EXCLUSIVE LEAVE, STANDING, AND AUTHORITY TO COMMENCE,
PROSECUTE AND, IF APPROPRIATE, SETTLE CERTAIN CAUSES OF
ACTION ON BEHALF OF THE DEBTORS' ESTATES**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby file this objection (the "Objection") to the *Motion of the Official Committee of Unsecured*

*Creditors for Entry of an Order Pursuant to Sections 1103(c) and 1109(b) of the Bankruptcy Code*

*Granting Exclusive Leave, Standing, and Authority to Commence, Prosecute and, if Appropriate,*

*Settle Certain Causes of Action on Behalf of the Debtors' Estate* [Docket No. 452] (the "Standing

Motion")[2] filed by the Official Committee of Unsecured Creditors (the "Committee"). In support

of the Objection, the Debtors represent as follows:

**Preliminary Statement**

1. The Committee seeks standing to commence an adversary proceeding against

Future Solution Investments, LLC ("FSI"), in its capacity as the Debtors' prepetition lender, to

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/CarbonHealth. The location of Carbon Health Technologies, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 500 East Remington Drive, Suite 20, Sunnyvale, CA 94087.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Standing Motion.

challenge the MOIC or "multiple on invested capital" in the amount of approximately $17 million (1.25x) charged by FSI against the Debtors' estates pursuant to the prepetition loan documents. The Debtors object to the Standing Motion because the proposed claims that the Committee seeks to pursue are not colorable and would not create value beneficial for these estates.

2.    First, the MOIC is part and parcel of the economic deal struck by the Debtors and FSI prepetition in order to obtain nearly $78 million in new money financing, a portion of which totaling nearly $62 million was used to repay pre-existing secured debt and the remaining $16 million was made available to the Debtors for working capital purposes. There is no basis to single out the MOIC as part of a challenge, which is a standard and market-oriented price that lenders frequently charge. Perhaps most importantly, FSI stands to receive no other closing or exit fees associated with FSI's prepetition secured debt, and the interest rate, which equals the prime rate (*i.e.*, ~7%) plus 3% per annum, is significantly below market. Taken in context, the MOIC of 25% on nearly $68 million of prepetition advances (excluding the $10 million initial draw not subject to the MOIC) is extremely reasonable.

3.    Second, all of the economic terms of the prepetition loan facility between the Debtors and FSI were negotiated at arms' length and in good faith. There was no hidden insider deal or benefit, as the Committee seems to suggest. Prior to FSI's involvement, the Debtors were in default under their pre-existing secured debt. They needed immediate financing and FSI offered the best terms that could be negotiated under the circumstances. With the benefit of hindsight, the Committee now argues that there was a constructive fraudulent transfer and lack of reasonably equivalent value associated solely with the MOIC, while apparently ignoring all the other benefits to the Debtors provided through the prepetition loan documents. The record establishes complete transparency and good faith in the context of FSI's prepetition loan and the Committee's proposed

complaint contains no basis for recharacterization or equitable subordination of the portion of the loan relating to the MOIC.  The Committee further alleges, without any factual basis, that FSI and the Debtors' insiders conspired to include the MOIC to chill bidding on the Debtors' assets.  Not true.  The MOIC simply represents another economic component of the consideration charged by FSI for this relatively risky prepetition loan, which otherwise had no closing or exit fees and a very modest rate of interest.

4.      Third, the Committee fails to weigh the costs of any potential challenge to the MOIC against the potential benefits to the estates.  Even if the MOIC were avoided, recharacterized, or subordinated, what would be the point of litigating the issue?  Under the Debtors' proposed chapter 11 plan, the MOIC and the remainder of the Debtors' obligations to FSI (prepetition and postpetition) are equitized.  Neither the MOIC, nor any other FSI claims, are diluting the Debtors' estates or unsecured creditor recoveries.  Alternatively, if there is no plan confirmed for any reason, the Debtors have sought approval of an alternative credit bid sale to FSI in the amount of $100 million that also does not include the MOIC.  Such purchase price is materially more than the aggregate of all bids received for the Debtors' assets following a robust marketing process.  As a practical matter, a challenge to the MOIC will only serve to waste estate resources and incur potentially substantial litigation fees and expenses without any prospect of tangible benefit.

5.      In sum, the Debtors have not unjustifiably refused to bring the claims that are the subject of the Standing Motion because there are no viable claims against FSI with respect to the MOIC and, even if there were any such claims, there would be no material benefit to these estates from pursuing such claims.

**Relevant Background**

A.      **Case Background**

6.      On February 2, 2026 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code before this Court.

7.      On the Petition Date, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Secured Financing Pursuant to Section 364 of the Bankruptcy Code; (II) Authorizing the Debtors to Use Certain Cash Collateral; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Granting Adequate Protection to the Prepetition Secured Parties; (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* [Docket No. 13] (the "DIP Motion").

8.      On February 16, 2026, the Office of the United States Trustee appointed the Committee.

9.      On February 27, 2026, the Court entered its final order approving the DIP Motion [Docket No. 194], which imposed a Challenge Deadline (as defined therein) for the Committee and any other parties in interest to assert a Challenge (as defined therein) against FSI as to the Prepetition Lien and Claim Matters (as defined therein).

10.      On April 13, 2026, the Committee filed the Standing Motion.

B.      **The Debtors' Relationship with FSI**

11.      The Debtors and FSI had no relationship until Fall 2025.

12.      On or about November 14, 2025, FSI and certain of the Debtors entered into the Initial FSI Loan Agreement, pursuant to which FSI provided an initial term loan of $10 million and an uncommitted delayed draw term loan facility of up to $27.5 million. The date of maturity

was December 31, 2025.  The stated use of proceeds of the Initial FSI Loan Agreement was to provide $10 million of working capital and an additional $27.5 million uncommitted loan potentially to partially repay (along with projected proceeds from a clinic sale totaling $40 million) the pre-existing debt held by another secured lender, Fearless Capital Management, LLC ("Fearless"), which totaled approximately $61.9 million at the time.  Notably, Fearless had purchased its debt position from a prior secured lender, Hercules Capital, Inc., only a couple months earlier.

13.     The Initial FSI Loan Agreement: (a) bore interest at a rate equal to the J.P. Morgan Chase Bank Prime Rate (~7%) plus 3% (a very low rate under the circumstances), (b) contained an Exit Fee equal to 10% of the aggregate amount of the initial advance of $10 million, and (c) was secured by liens on the applicable Debtors' assets (junior to Fearless' existing liens).  Pursuant to the terms of the Initial FSI Loan Agreement, the Exit Fee was waived in the context of a chapter 11 bankruptcy filing by the Debtor obligors supported by FSI.  There were no other lender fees thereunder.

14.     At the time of the Initial FSI Loan Agreement and thereafter, the applicable Debtors were facing intense pressure from Fearless to repay its debt or face the consequences, which could include the foreclosure of assets, the sweeping of bank accounts, or the charging of usurious or unreasonable rates of interest or fees.

15.     On November 24, 2025, FSI and the Debtor obligors entered into the First Amendment, which retained the stated maturity date of December 31, 2025, but made several important changes to the Initial FSI Loan Agreement.  These changes included converting the uncommitted delayed draw into a committed facility and increasing the aggregate delayed draw term loan commitment from $27.5 million to $62.25 million (which allowed the full repayment of

Fearless' debt), plus the addition of the MOIC equal to 1.25x of the new money to be advanced. In other words, FSI would receive a 25% premium return on the principal with respect to delayed draw advances made on or after November 24, 2025. However, there was no Exit Fee on such new advances, and no other commitment, closing, or other lender fees of any type, and the interest rate remained unchanged, notwithstanding the substantial increase in the loan commitment (from $10 million to $72.25 million in the aggregate). As a result of the payoff of the Fearless debt, FSI became the senior lienholder with respect to the applicable Debtors' assets to the same extent as Fearless' prior position.

16. Following the First FSI Amendment, FSI and certain of the Debtors entered into two additional amendments. On January 13, 2026, effective as of December 31, 2025, FSI and the applicable Debtors entered into the Second FSI Amendment, which extended the maturity date of the facility from December 31, 2025 to February 2, 2026.

17. On January 20, 2026, FSI and the applicable Debtors entered into the Third FSI Amendment, which provided for an additional $6 million committed delayed draw term loan to provide the Debtors with yet more liquidity. The Third FSI Amendment extended the MOIC to cover this additional $6 million of new money financing. Again, aside from the MOIC and the same low interest rate as before, there were no fees charged by FSI under the Third FSI Amendment.

**C.     The Debtors' Prepetition Lending Relationship with FSI was Conducted at Arms' Length and in Good Faith and Characterized By Fair Dealing**

18. At all relevant times, the Debtor obligors and FSI were represented by separate counsel in the negotiation of the Initial FSI Loan Agreement and the amendments thereto. All discussions between the parties were conducted at arms' length and in good faith. There was no agreement among the Debtors and FSI prior to the Petition Date as to the terms of a chapter 11

plan or management compensation in the context of a plan.   The parties' relationship was characterized throughout the prepetition period and beyond by fair dealing.

19.      There is no basis for the Committee's allegation that the Debtors' insiders agreed to the MOIC in order to chill bidding on the Debtors' assets or benefit themselves in anticipation of an unspecified restructuring supported by FSI.   Rather, even the Committee's own proposed complaint points to the Debtors' need for immediate financing and FSI's provision of such financing.   FSI loaned funds to the applicable Debtors on attractive economic terms as a bridge to additional funding provided by FSI to the Debtors on a postpetition basis, all with the Debtors' goal of maximizing the value of their estates for the benefit of stakeholders.

20.      Subsequent to the Petition Date, the Debtors continued to market their assets with the assistance of experienced investment bankers at Stifel, Nicolaus, & Co., Inc.   The Debtors did not receive any bids that individually or in the aggregate approached $100 million, which is the purchase price that FSI has offered for the Debtors' assets under section 363 of the Bankruptcy Code if the pending chapter 11 plan is not confirmed or withdrawn.   Such purchase price is in the form of a credit bid that notably does not included the MOIC.

### Objection

**A.      The Committee Has Not Met Its Burden of Demonstrating that Granting Derivative Standing is Necessary**

21.      A basic premise of chapter 11 is that the debtor should manage its own restructuring.   *See* 11 U.S.C. § 1107(a) ("[A] debtor in possession shall have all the rights . . . and powers, and shall perform all the functions and duties . . . of a trustee serving in a case under this chapter."); *In re Adelphia Commc'ns Corp.*, 544 F.3d 420, 424 (2d Cir. 2008) (stating that the derivative standing doctrine does not "undermine either the debtor's central role in handling the estate's legal affairs or the court's responsibility to monitor for abuses by the parties").

22.     The reason is that a single steward is best able to integrate the various pieces of the chapter 11 puzzle into a coherent whole that maximizes value.  Debtors must consider all stakeholders while a creditors' committee must only consider unsecured creditors.  *See In re Smart World Techs., LLC*, 423 F.3d 166, 175 n.12 (2d Cir. 2005) ("A creditors' committee owes a fiduciary duty to the class it represents, but not to the debtor, other classes of creditors, or the estate."); *see also Westmoreland Human Opportunities, Inc. v. Walsh*, 246 F.3d 233, 256 (3d Cir. 2001) ("We have construed § 1103(c) as implying a fiduciary duty on the part of members of a creditor's committee . . . toward their constituent members."); *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1315 (1st Cir. 1993) (rejecting the "erroneous assumption that the [creditors' committee] is a fiduciary for the estate as a whole" and explaining that "the committee is a fiduciary for those whom it represents, not for the debtor or the estate generally").

23.     Accordingly, parties other than the debtor are generally not well-situated to manage the estate's legal claims.  *In re Smart World Techs.*, 423 F.3d at 180 ("As a general matter, other parties to a bankruptcy proceeding have interests that differ from those of the estate and thus are not suited to act as the estate's legal representative."). Derivative standing, therefore, is rare, and is the "exception to the 'general rule'" that the trustee or debtor in possession maintains "'the privilege of prosecuting'" various actions on behalf of the estate." *In re Balt. Emergency Servs. II, Corp.*, 432 F.3d 557, 560 (4th Cir. 2005); *see also In re Adelphia*, 544 F.3d at 423 ("The Bankruptcy Code does not expressly authorize committees or individual creditors--in contrast to trustees and debtors-in-possession--to sue on behalf of an estate.").  "Even if permitted under the Bankruptcy Code, derivative standing is the exception rather than the rule . . . [as] the interests of a creditor or creditors' committee may not always align with those of the estate." *In re Balt. Emergency Servs.*, 432 F.3d at 562.

8

24.    Based on the foregoing, the standard for granting derivative standing is substantial. As determined by the Fifth Circuit, a creditor may be granted standing to pursue estate causes of action only if (a) the claims are colorable; (b) the debtor has unjustifiably refused to pursue them; and (c) the creditor obtains approval from the bankruptcy court to pursue the causes of action. *See In re SI Restructuring Inc.*, 714 F.3d 860, 863–64 (5th Cir. 2013) (citing *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988)); *see also In re Packer*, 816 F.3d 87, 92 (5th Cir. 2016) (citing the same standard for derivative standing).

25.    For the reasons set forth below, the Committee has failed to meet this standard in these cases.

**B.    <u>The Committee Has Failed to Allege Any Colorable Claims Challenging the MOIC</u>**

26.    The first step—whether a party has asserted a colorable claim— requires "the court [to] undertake the same analysis as when a defendant moves to dismiss a complaint for failure to state a claim." *In re Centaur, LLC*, No. 10-10799 (KJC), 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010); see also *In re Pursuit Capital Mgmt., LLC*, 595 B.R. 631, 665 (Bankr. D. Del. 2018) ("A claim is colorable if it would survive a motion to dismiss."). Accordingly, courts in the Fifth Circuit equate the term "colorable" with a claim's ability to survive a motion to dismiss. *See, e.g.*, *City Bank v. Compass Bank*, No. EP-09-CV-96-KC, 2010 WL 1424275, at *5 (W.D. Tex. Apr. 6, 2010) (emphasis added) ("That there are at least *colorable* fraudulent transfer claims at issue in this case is beyond dispute—[plaintiff] initially made such claims, and there was not even an attempt to *dismiss them under Rule 12(b)(6)* for failure to state a claim."); *In re On-Site Fuel Serv., Inc.*, No. 18-04196-NPO, 2020 WL 3703004, at *12 (Bankr. S.D. Miss. May 8, 2020) ("A creditor or a creditors' committee seeking derivative standing must assert a 'colorable' claim, defined as a claim that would survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules

of Civil Procedure."). Here, the Committee has failed to state a colorable claim challenging the MOIC.

27. The MOIC was simply one economic component of the nearly $68 million in new money loans made to the Debtors by FSI (an additional $10 million of advances is not subject to the MOIC and is no longer subject to an Exit Fee either). FSI is essentially charging the Debtors' estates only 10% per annum in interest for nearly $78 million in total prepetition borrowings. There are no closing, commitment, exit, unused line, or other lender-type fees that are commonly charged in distressed (and even non-distressed) situations. FSI acted in a commercially reasonable manner when it insisted on a return on capital charge of 25% reflected through the MOIC and the Debtor obligors were equally well justified to agree to it. The MOIC is a standard fee charged in many lending relationships, whether in or outside of bankruptcy.

28. Further, notwithstanding the Committee's unsupported insinuations in the Standing Motion, there has been no impropriety with regard to the prepetition loan facility or, specifically, the MOIC. All of the economic terms of the prepetition loan facility between the Debtors and FSI were negotiated at arms' length and in good faith. The record establishes that there are no hidden side deals or benefits and no effort to chill the bidding on the Debtors' assets. The Debtors simply needed liquidity and FSI provided the best available economic terms for prepetition financing.

29. Prior to the Petition Date, the Debtors had defaulted on their secured debt to Fearless and were in dire financial straits. FSI stepped up to the plate to provide the needed financing under terms that were even better than market. FSI ultimately loaned almost $78 million to the Debtors under the prepetition facility (repaying Fearless' debt in full), while charging interest at approximately 10% per year with no lender fees of any kind, aside from the 1.25x MOIC as to $68 million of loans, which itself is a standard charge in facilities of this type.

30.     The Committee alleges that the MOIC can be avoided as a constructive fraudulent transfer or equitably subordinated on the basis of a lack of consideration or otherwise recharacterized as equity.  There was no lack of consideration and no basis to recharacterize this standard MOIC.  The Debtors received nearly $78 million of loan advances from FSI on a prepetition basis, with more funding to come postpetition.  All of the documents reflect a debtor-creditor relationship between the Debtors and FSI.  The Committee cannot divorce the benefits that the Debtors clearly realized under the prepetition loan facility from the MOIC, as if the MOIC stands on its own in a vacuum.  The MOIC is part and parcel of the economic package of benefits and burdens that the Debtors agreed to as part of the prepetition financing deal with FSI, and there is no colorable basis to challenge the MOIC as one economic aspect of that deal.

## C.     The Debtors Did Not Unjustifiably Refuse to Pursue a Challenge to the MOIC Because There is No Benefit to the Estates From Pursuing Such Claims.

31.     For the second prong of the standard applicable for the grant of derivative standing, to determine whether a debtor refused unjustifiably to pursue claims, the court "must look to whether the interests of creditors were left unprotected as a result" of its refusal.  *Louisiana World*, 858 F.2d at 253 n.20.  Typically, the unjustified refusal calculus entails a cost-benefit analysis. *See In re Clear the Air, LLC*, 631 B.R. 286, 295 (Bankr. S.D. Tex. 2021) (quoting *In re Cooper*, 405 B.R. 801, 810 (Bankr. N.D. Tex. 2009)) ("As the interests of creditors are imperiled where valid and profitable state law causes of action are neglected by the debtor-in-possession, the unjustified refusal calculus will generally amount to little more than a cost-benefit analysis."); *In re Enron Corp.*, 319 B.R. 128, 131 (Bankr. S.D. Tex. 2004) ("In its discretion, the court considers the benefit to the estate.").

32.     Although the Fifth Circuit has not fully elaborated on the cost-benefit analysis required under the second element of the test for derivative standing, the Fifth Circuit has agreed

with the Second Circuit's approach where the court assesses the probability of success, the amount of potential recovery, and the costs of litigation. *See Louisiana World Exposition v. Fed. Ins. Co.*, 864 F.2d 1147, 1153 (5th Cir. 1989) (noting the Fifth Circuit's "complete agreement with the cost-benefit analysis mandated by the Second Circuit in *In re STN*, 779 F.2d 901, 905 (2d Cir. 1985)"); *In re STN Enters.*, 779 F.2d 901, 905 (2d Cir. 1985) (noting that a cost-benefit analysis includes "a determination of probabilities of legal success and financial recovery in event of success"); *see also In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 516 (Bankr. S.D.N.Y. 2016) (internal quotation marks omitted) ("The court should weigh the probability of success and financial recovery, as well as the anticipated costs of litigation, as part of a cost/benefit analysis to determine whether the prosecution of claims is likely to benefit the debtor's estate.").

33.     In the instant cases, the Committee simply assumes that the MOIC is worth challenging—this is a false premise. The Committee fails to properly weigh the costs and benefits of such action from the perspective of the Debtors' estates. In fact, if the estates were to incur the cost and delay associated with seeking to avoid, recharacterize, or subordinate the MOIC, there would be no material benefit to the estates.

34.     The Debtors are currently soliciting a chapter 11 plan through which the MOIC and the remainder of the Debtors' obligations to FSI (prepetition and postpetition) are equitized. If confirmed, the plan will have the effect of eliminating the MOIC and all other FSI claims against the Debtors' estates. Hence, proceeding with the Committee's challenges against the MOIC would be a complete waste of time and resources.

35.     Alternatively, if the plan is not confirmed for whatever reason, the Debtors have sought approval of an alternative credit bid sale to FSI in the amount of $100 million that also does not include the MOIC. This purchase price is materially more than the aggregate of all bids

received for the Debtors' assets following a robust marketing process.  Hence, a challenge to the MOIC will only waste estate resources and incur litigation costs without any prospect of tangible benefit.

### CONCLUSION

Based on the foregoing, the Debtors respectfully request that the Court enter an order: (a) denying the Standing Motion and (b) granting such other and further relief as the Court deems just and appropriate under the circumstances.

Dated: May 4, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Maxim B. Litvak*

Maxim B. Litvak (SBT 24002482)
Theodore S. Heckel (SBT 24133488)
700 Louisiana Street, Suite 4500
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile:  (713) 691-9407
mlitvak@pszjlaw.com
theckel@pszjlaw.com

-and-

Debra I. Grassgreen (admitted *pro hac vice*)
John W. Lucas (admitted *pro hac vice*)
One Sansome Street, 34th Floor, Suite 3430
San Francisco, CA 94104
Telephone: (415) 263-7000
Facsimile:  (415) 263-7010
dgrassgreen@pszjlaw.com
jlucas@pszjlaw.com

*Counsel to the Debtors and Debtors in Possession*

13

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 4, 2026, a true and correct copy of the foregoing document was caused to be served via the CM/ECF System for the United States Bankruptcy Court for the Southern District of Texas on parties registered to receive electronic service in the above cases.

*/s/ Maxim B. Litvak*
Maxim B. Litvak