**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re | Chapter 11 |
| CARBON HEALTH TECHNOLOGIES, INC., *et al.*, | Case No.: 26-90306 (CML) |
| Debtors.[1] | (Jointly Administered) |

**ORDER GRANTING FINAL APPROVAL OF COMBINED DISCLOSURE STATEMENT AND CONFIRMING THIRD AMENDED PLAN OF REORGANIZATION OF CARBON HEALTH TECHNOLOGIES, INC. AND ITS AFFILIATED DEBTORS**

(Related Docket No. 681)

The above-captioned debtors and debtors in possession (the "***Debtors***") or the Court, as applicable, having:

a) commenced on February 2, 2026 (the "***Petition Date***") their respective chapter 11 cases (the "***Chapter 11 Cases***") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***");

b) operated their businesses and managed their properties during the Chapter 11 Cases as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

c) entered, on February 27, 2026, *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form and Manner for Filing Proofs of Claim* [Docket No. 193] ("***Bar Date Order***");

d) filed, on March 3, 2026, *Notice of Deadlines for the Filing of (I) Proofs of Claim, Including Requests for Payment Pursuant to Section 503(b)(9) of the Bankruptcy Code* [Docket No. 266] ("***Notice of Claims Bar Date***");

e) filed, on March 4, 2026, the *Combined Disclosure Statement and Plan of Reorganization of Carbon Health Technologies, Inc. and Its Affiliated Debtors* [Docket No. 274];

[1] A complete list of each of the Debtors in these chapter 11 cases is annexed as ***Exhibit A*** to the Plan. The Debtors' address is 500 East Remington Drive, Suite 20, Sunnyvale, CA 9408.

f) filed, on March 4, 2026, the *Debtors' Emergency Motion for Entry of an Order (I) Granting Interim Approval of the Adequacy of Disclosures in the Combined Disclosure Statement and Plan; (II) Scheduling a Combined Confirmation Hearing and Setting Deadlines Related Thereto; (III) Approving Solicitation Packages and Procedures; (IV) Approving the Forms of Ballots; and (V) Granting Related Relief* [Docket No. 275];

g) filed, on March 5, 2026, the *Affidavit Re: of Alain B. Francoeur Regarding Carbon Health Technologies, Inc. and Debtor Affiliates Combined Disclosure Statement and Plan of Reorganization, Debtors Emergency Motion for Entry of an Order (I) Granting Interim Approval of the Adequacy of Disclosures in the Combined Disclosure Statement and Plan; (II) Scheduling a Combined Confirmation Hearing and Setting Deadlines Related Thereto; (III) Approving Solicitation Packages and Procedures; (IV) Approving the Forms of Ballots; and (V) Granting Related Relief* [Docket No. 281] ("***Disclosure Statement Hearing Affidavit***");

h) filed, on March 12, 2026, the *Affidavit Re: (Publication) of Gregory Winter Regarding Notice of Deadlines for the Filing of (I) Proofs of Claim, Including Requests for Payment Pursuant to Section 503(b)(9) of the Bankruptcy Code* [Docket No. 309] (the "***Affidavit of Service of Publication of Notice of Claims Bar Date***");

i) filed, on March 25, 2026, the *Affidavit Re: of Jessica G. Berman Regarding Bar Date Notice, Proof of Claim Form, and Abbreviated Bar Date Notice* [Docket No. 361] ("***Affidavit of Service of Notice of Claims Bar Date***");

j) filed, on April 7, 2026, the *Combined Disclosure Statement and Amended Plan of Reorganization of Carbon Health Technologies, Inc. and Its Affiliated Debtors* [Docket No. 431];

k) entered, on April 8, 2026, the *Order (I) Granting Interim Approval of the Adequacy of Disclosures in the Combined Disclosure Statement and Plan; (II) Scheduling a Combined Confirmation Hearing and Setting Deadlines Related Thereto; (III) Approving Solicitation Packages and Procedures; (IV) Approving the Forms of Ballots; and (V) Granting Related Relief* [Docket No. 440] (the "***Disclosure Statement Order***");

l) filed, on April 15, 2026, the *Notice of (I) Interim Approval of Disclosures; (II) Hearing to Consider Confirmation of the Plan; (III) Deadline for Filing Objections to Confirmation of the Plan and Final Approval of the Disclosures; (IV) Deadline for Voting on the Plan; and (V) Bar Date for Filing Administrative Claims Established by the Plan* [Docket No. 468] (the "***Combined Hearing Notice***"), which contained notice of the date and time set for the Confirmation Hearing to consider confirmation of the Plan and final approval of the Disclosure Statement (the "***Combined Hearing***") and the deadline for filing objections to Confirmation or final approval of Disclosure Statement;

m) filed, on April 22, 2026, the *Affidavit Re: Certificate of Publication of Justin Lewenson Regarding Notice of (I) Interim Approval of Disclosures; (II) Hearing to Consider Confirmation of the Plan; (III) Deadline for Filing Objections to Confirmation of the Plan and Final Approval of the Disclosures; (IV) Deadline for Voting on the Plan; and (V) Bar Date for Filing Administrative Claims Established by the Plan* [Docket No. 498] ("***Publication of Combined Hearing Notice***");

n) filed, on May 6, 2026, the *Notice of Filing Plan Supplement for the Combined Disclosure Statement and Amended Plan of Reorganization of Carbon Health Technologies, Inc. and Its Affiliated Debtors* [Docket No. 587] (the "***Initial Plan Supplement***");

o) filed, on May 7, 2026, the *Affidavit Re: of Stanislav Kesler Regarding Solicitation Materials* [Docket No. 601] (the "***Affidavit Re Solicitation***" and together with the Disclosure Statement Hearing Affidavit, the "***Affidavits of Service***");

p) filed, on May 15, 2026, the *Combined Disclosure Statement and Second Amended Plan of Reorganization of Carbon Health Technologies, Inc. and Its Affiliated Debtors* [Docket No. 635];

q) filed, on May 22, 2026, the *Notice of Filing of Amended Notice of Filing Plan Supplement for the Combined Disclosure Statement and Amended Plan of Reorganization of Carbon Health Technologies, Inc. and Its Affiliated Debtors* [Docket No. 666] (the "***Amended Plan Supplement***");

r) filed, on May 27, 2026, the *Notice of Filing of Second Amended Notice of Filing Plan Supplement for the Combined Disclosure Statement and Third Amended Plan of Reorganization of Carbon Health Technologies, Inc. and Its Affiliated Debtors* [Docket No. 682] (the "***Second Amended Plan Supplement"***);

s) filed, on May 27, 2026, the *Combined Disclosure Statement and Third Amended Plan of Reorganization of Carbon Health Technologies, Inc. and Its Affiliated Debtors* [Docket No. 681];

t) filed, on May 27, 2026, the *Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding the Solicitation and Tabulation of Ballots Cast on the Combined Disclosure Statement and Amended Plan of Reorganization of Carbon Health Technologies, Inc. and Its Affiliated Debtors* [Docket No. 683] (the "***Voting Declaration***");

u) filed, on May 27, 2026, the *Declaration of Kerem Ozkay in Support of Final Approval and Confirmation of Plan of Reorganization of Carbon Health Technologies, Inc., and Its Affiliated Debtors* [Docket No. 684] (the "***Ozkay Declaration***");

v) filed, on May 27, 2026, the *Declaration of Sujal Mandavia in Support of Final Approval and Confirmation of Plan of Reorganization of Carbon Health Technologies, Inc., and Its Affiliated Debtors* [Docket No. 685] (the "***Mandavia***

***Declaration***" and collectively with the Ozkay Declaration and the Voting Declaration, the "***Declarations***"); and

w) filed, on May 27, 2026, the *Memorandum of Law in Support of Final Approval of Disclosure Statement and Confirmation of Plan of Reorganization of Carbon Health Technologies, Inc. and Its Affiliated Debtors* [Docket No. 686] (the "***Confirmation Brief***");

x) filed, on May 29, 2026, the *Notice of Filing of Third Amended Notice of Filing Plan Supplement for the Combined Disclosure Statement and Third Amended Plan of Reorganization of Carbon Health Technologies, Inc. and Its Affiliated Debtors* [Docket No. 697] (the "***Third Amended Plan Supplement***" and, together with the Initial Plan Supplement, Amended Plan Supplement, Second Amended Plan Supplement, as applicable and as may have been superseded, the "***Plan Supplement***");

The Court having:

a) reviewed the Plan, the Disclosure Statement, the Plan Supplement, the Confirmation Brief, the Declarations, the Confirmation Hearing Notice, the Affidavits of Service, and all filed pleadings filed with respect to final approval of the Disclosure Statement and Confirmation of the Plan, including all objections, statements, and reservations of rights with respect thereto, if any, filed on the docket in these Chapter 11 Cases or voiced at the Combined Hearing;

b) held the Combined Hearing on May 29, 2026, at 9:00 a.m. Central Time;

c) considered the statements and arguments made by counsel in respect of Confirmation of the Plan and the objections thereto; and

d) considered all oral representations, Affidavits of Services, testimony, documents, filing, and other evidence regarding Confirmation of the Plan and the objections thereto.

**NOW, THEREFORE**, it appearing to the Court that notice of the Combined Hearing and the opportunity for any party in interest to object to the final approval of the Disclosure Statement and Confirmation of the Plan have been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and the legal and factual bases set forth in the documents filed in support of Confirmation of the Plan and other evidence presented at the Combined Hearing establish just cause for the relief granted herein; and after due

deliberation thereon and good cause appearing therefor, it hereby is DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

A. Findings and Conclusions. The determinations, findings, judgments, decrees, and orders set forth and incorporated in this order (this "***Confirmation Order***") constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law. Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

B. Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b)(2) and 1334(a)). The Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. § 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The Court has jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed. Final approval of the Disclosure Statement and Confirmation of the Plan are core proceedings within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.

C. Chapter 11 Petitions. On the Petition Date, each Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have operated their businesses and managed their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases. On February 16, 2026, the Office of the United States Trustee for the Southern District of Texas (the "***U.S. Trustee***") appointed an Official Committee of Unsecured Creditors

(the "***Committee***") [Docket No. 115]. In accordance with the *Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 17], the Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

D. Judicial Notice. The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Court, including, without limitation, all pleadings and other documents filed and orders entered thereon. The Court also takes judicial notice of all evidence proffered or adduced and all arguments made at the hearings held before the Court during the pendency of the Chapter 11 Cases.

E. Eligibility for Relief. The Debtors are proper debtors under section 109 of the Bankruptcy Code and the Debtors are proper proponents of the Plan under section 1121(a) of the Bankruptcy Code.

F. Solicitation and Notice. On April 8, 2026, the Court entered the Disclosure Statement Order, which, among other things, established May 13, 2026,[2] as the deadline for voting to accept or reject the Plan (the "***Voting Deadline***"), and as the deadline for objecting to the Plan and final approval of the Disclosure Statement (the "***Objection Deadline***"). The solicitation of votes on the Plan complied with the solicitation procedures in the Solicitation Procedures Order and the direction of the Court at the April 7, 2026 hearing in these Chapter 11 Cases, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases and was in compliance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules. As evidenced by the Affidavits of Service, all parties required to be given notice of the Combined Hearing (including the deadline for filing and serving objections to final approval of the Disclosure

[2] The Voting Deadline was extended to May 23, 2026 as provided in [Docket No. 636] and also extended by Debtors' counsel with respect to a few ballots that were submitted during or shortly after the Memorial Day weekend.

Statement and Confirmation) have been provided due, proper, timely, and adequate notice and have had an opportunity to appear and be heard with respect thereto. No other or further notice is required.

G. Disclosure Statement. The Disclosure Statement provides Holders of Claims entitled to vote on the Plan with adequate information to make an informed decision as to whether to vote to accept or reject the Plan in accordance with section 1125 of the Bankruptcy Code. The Disclosure Statement also provides Holders of Claims and other entities with sufficient notice of the injunction, exculpation, and Debtor/Estate Release provisions contained in Section XVI of the Plan, in satisfaction of the requirements of Bankruptcy Rule 3016(c).

H. Solicitation. There are eleven classes of Claims or Interests under the Plan. Each Class is broken into separate sub-classes, as applicable, to represent the Class of Claims or Interests with respect to the applicable Debtor. Pursuant to Article X.D of the Plan, if any Class of Claims or Interest is entitled to vote but does not then such Classes of Claims or Interests, as the case may be, are presumed to accept the Plan. On May 27, 2026, the Debtors filed the Voting Declaration with the Court, certifying the method and results of the Ballots tabulated for Class 1(b) (John Muir Secured Claims), Class 1(c) (Prime Health Secured Claims), Class 1(d) (Stanford Health Secured Claims), Class 4 (Prepetition Secured Claims), Class 6 (Commercial GUC Claims), and Class 7 (Abuse Claims) (together, the "***Voting Classes***"). The procedures used to tabulate Ballots were fair and conducted in accordance with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Complex Case Procedures, and all other applicable rules, laws, and regulations. As set forth in the Combined Disclosure Statement and Plan, only Holders of Claims in the Voting Classes were eligible to vote on the Plan. Under section 1126(f) of the Bankruptcy Code, Holders of Claims in Class 1(a) (Other Secured Claims), Class 2 (Priority Non-

Tax Claims), and Class 3 (Priority Tax Claims) are unimpaired and are conclusively presumed to have accepted the Plan. Holders of Class 8 (Subordinated Claims), Class 9 (Equity Interests), Class 10 (Intercompany Claims), and Class 11 (Intercompany Interests) are Impaired and conclusively presumed to have rejected the Plan.

I. Voting. As evidenced by the Voting Declaration, (i) Classes 1(b)-1 and 2 (John Muir Secured Claims) (including the sub-classes that are presumed to accept the Plan for failure to vote), Class 1(c)-1-6 (Prime Health Secured Claims) (including the sub-classes that are presumed to accept the Plan for failure to vote), Class 1(d)-1 and 2 (Stanford Secured Claims) (including the sub-classes that are presumed to accept the Plan for failure to vote), Class 4 (Prepetition Secured Claims) (including the sub-classes that are presumed to accept the Plan for failure to vote), except as noted below, Class 6 (Commercial GUC Claims) (including the sub-classes that are presumed to accept the Plan for failure to vote), and Class 7 (Abuse Claims) (including the sub-classes that are presumed to accept the Plan for failure to vote) voted to accept the Plan (collectively, the "Accepting Classes") and (ii) Class 6(i) (Carbon Health Medical Group of California, P.C.), Class 6(j) (Carbon Health Medical Group of Florida, P.A.), Class 6(m) (Carbon Health Medical Group of New Jersey, P.A.), Class 6(r) (Carbon Health Primary Care of Florida, P.A.), and Class 6(y) (Central Jersey Urgent Care Limited Liability Company), each voted to reject the Plan (collectively, the "Rejecting Classes"), each voted to reject the Plan.

J. Plan Supplement Documents. The Plan Supplement (including as subsequently modified, supplemented, or otherwise amended pursuant to a filing with the Court), complies with the terms of the Plan, and the Debtors provided sufficient and proper notice of its filing in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Complex Case Procedures, the Disclosure Statement Order, and all other applicable laws, rules, and regulations.

All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan. Subject to the terms of the Plan, the Debtors are authorized to alter, amend, update, modify, or supplement the Plan Supplement on or before the Effective Date. The transmittal and notice of the Plan Supplement (and all documents identified therein) were appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases and were conducted in good faith. No other or further notice with respect to the Plan Supplement (and all documents identified therein) is necessary or shall be required.

K. Modifications to Plan. Pursuant to, and in compliance with, section 1127 of the Bankruptcy Code, the Debtors have proposed certain modifications to the Plan as reflected therein (the "***Plan Modifications***"). In accordance with Bankruptcy Rule 3019, the Plan Modifications do not (a) constitute material modifications of the Plan under section 1127 of the Bankruptcy Code, (b) cause the Plan to fail to meet the requirements of sections 1122 or 1123 of the Bankruptcy Code, (c) materially or adversely affect or change the treatment of any Claims or Interests, (d) require re-solicitation of any Holders of Claims, or (e) require that any such Holders be afforded an opportunity to change previously cast acceptances or rejections of the Plan. Under the circumstances, the form and manner of notice of the Plan Modifications were adequate, and no other or further notice of the Plan Modifications is necessary or required. In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims that voted to accept the Plan or that are conclusively presumed to have accepted the Plan, as applicable, are deemed to have accepted the Plan as modified by the Plan Modifications. No Holder of a Claim that has voted to accept the Plan shall be permitted to change its acceptance to a rejection as a consequence of the Plan Modifications.

L. Objections. To the extent that any objections (whether formal or informal), reservations of rights, statements, or joinders with respect to approval of the Disclosure Statement and Confirmation have not been resolved, withdrawn, waived, or settled prior to entry of this Confirmation Order or otherwise resolved herein, they are hereby overruled on the merits based on the record before the Court; *provided, however*, that any Cure Objections (as defined below) are preserved and shall be resolved as set forth in paragraph 14 below.

M. Burden of Proof. The Debtors, as proponents of the Plan, have met their burden of proving the applicable elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation of the Plan. In addition, and to the extent applicable, the Plan is confirmable under the clear and convincing evidentiary standard. Each witness who testified or submitted a declaration on behalf of the Debtors or any other party, in support of the Plan and Confirmation, in connection with the Combined Hearing was credible, reliable, and qualified to testify as to the topics addressed in their testimony.

N. Bankruptcy Rule 3016. The Plan is dated and identifies its proponents (*i.e.*, the Debtors) in accordance with Bankruptcy Rule 3016(a). The filing of the Disclosure Statement on the docket of the Chapter 11 Cases satisfied Bankruptcy Rule 3016(b).

**Compliance with Section 1129 of the Bankruptcy Code**

O. Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1)). The evidentiary record at the Combined Hearing, the Declarations, the contents of the Plan and the Disclosure Statement, the Affidavits of Service, the Confirmation Brief, and the Court's judicial notice of the complete record of the Chapter 11 Cases support the findings of fact and conclusions of law set forth herein.

P. Proper Classification (11 U.S.C. §§ 1122 and 1123(a)(1)). Article IX of the Plan designates Classes of Claims and Interests, other than Administrative Claims (including Professional Fee Claims) and Priority Tax Claims, which, pursuant to section 1123(a)(1) of the Bankruptcy Code, need not be designated. The Plan designates eleven Classes of Claims and Interests. As required by section 1122(a) of the Bankruptcy Code, each Class of Claims contains only Claims and Interests that are substantially similar to the other Claims and Interests within the applicable Class. Valid reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan. Such classifications were not implemented for improper purposes, and such Classes do not unfairly discriminate between or among Holders of Claims or Interests. The Plan, therefore, satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

Q. Specified Unimpaired and Impaired Classes (11 U.S.C. §§ 1123(a)(2) and 1123(a)(3)). Article IX of the Plan specifies that Claims in Class 1(a), Class 2, Class 3, and Class 5 are unimpaired. Article IX of the Plan also specifies the treatment of each Impaired Class under the Plan, which are Classes 1(b), 1(c), 1(d), 4, 6, 7, 8, 9, 10, and 11. The Plan, therefore, satisfies sections 1123(a)(2) and 1123(a)(3) of the Bankruptcy Code.

R. No Discrimination (11 U.S.C. § 1123(a)(4)). Article IX.D of the Plan provides the same treatment for each Claim or Interest within a particular Class unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment with respect to such Claim or Interest. The Plan, therefore, satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

S. Implementation of the Plan (11 U.S.C. § 1123(a)(5)). The Plan and the Trust Agreement set forth in the Plan Supplement provide adequate and proper means for the Plan's implementation, including, without limitation: (a) the good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan; (b) establishment of the Trust

and vesting of the Trust Assets for distribution to the Trust Beneficiaries in a manner as more fully set forth in the Plan; (c) appointment of the Trustee and the Trust Advisory Committee; and (d) collecting, holding, administering, distributing, and liquidating the Trust Assets for the Trust Beneficiaries. Article XII (Treatment of Executory Contracts and Unexpired Leases), Article XI (Means for Implementation of the Plan), Article XV (Conditions Precedent to Confirmation and Effective Date of the Plan), and Article XVI (Settlement, Discharge, Release, Exculpation, Injunctive, and Related Provisions), among other provisions of the Plan, set forth the means for its implementation. The Plan, therefore, satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

T. Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)). Effective upon the Effective Date, the Debtors' formation documents shall be deemed amended to prohibit the issuance by the Debtors of nonvoting securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.

U. Directors and Officers (11 U.S.C. § 1123(a)(7)). The Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code. Exhibit F of the Plan Supplement identifies the members of the boards of directors and officers of each of the Debtors. Article XI.E of the Plan describes the powers of the Trustee, which, as identified in Exhibit C of the Plan Supplement, shall initially be META Advisors LLC, as set forth and disclosed in the Plan Supplement. Article XI.E of the Plan and Exhibit H of the Plan Supplement describes the Trust, the appointment, rights and powers of the Trustee, the appointment, rights, and powers of the Trust Advisory Committee, who shall initially be Ernst Bell, Matthew Dundon, and Kevin O'Brien, and the transfer of Trust Interests in the Trust. The Trust Agreement included with the Plan Supplement also references the compensation of the Trustee. The foregoing appointment of the Trustee and the Trust Advisory

Committee is consistent with the interests of Holders of Claims and with public policy. The foregoing provisions regarding the Trustee and the Trust Advisory Committee satisfy section 1123(a)(7) of the Bankruptcy Code.

V. Impairment/Unimpairment of Any Class of Claims or Interest. The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code. Article IX of the Plan impairs or leaves unimpaired each Class of Claims and Interests.

W. Assumption and Rejection (11 U.S.C. § 1123(b)(2)). Consistent with section 1123(b)(2) of the Bankruptcy Code, Article XII of the Plan provides for the assumption or rejection, as applicable, of all of the executory contracts or unexpired leases of the Debtors that have not already been assumed or rejected in the Chapter 11 Cases; *provided however*, that nothing in the Plan shall cause the rejection, breach, or termination of any contract of insurance benefiting the Debtors and the Estates, the Debtors' officers, managers and directors, and/or the Trust. Nothing in the Plan shall be construed as an acknowledgement that a particular contract or agreement is executory or is properly characterized as a lease. The Debtors' determinations regarding the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases are based on and within the sound business judgment of the Debtors, are necessary to the implementation of the Plan, and are in the best interests of the Debtors, their Estates, and other parties in interest in these Chapter 11 Cases.

X. The Debtors' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2)). The Debtors have complied with the applicable provisions of the Bankruptcy Code. Specifically: (a) the Debtors are proper debtors under section 109 of the Bankruptcy Code; (b) the Debtors have complied with all applicable provisions of the Bankruptcy Code, including section 1125, except as otherwise provided or permitted by order of the Bankruptcy Court; and (c) the Debtors have

complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Solicitation Procedures Order in transmitting the Solicitation Materials and in tabulating the votes with respect to the Plan. In compliance with the Solicitation Procedures Order, the Debtors caused copies of the following materials to be transmitted to the known Holders of Claims in Classes that were entitled to vote to accept or reject the Plan (*i.e.*, Claims in Classes 1(b), 1(c), 1(d), 4, 6, and 7): (1) the Combined Disclosure Statement and Plan; (2) the Combined Hearing Notice; (3) the Solicitation Procedures Order; and (4) an appropriate form of ballot and a pre-addressed postage prepaid return envelope; (collectively, the "***Solicitation Materials***"). In further compliance with the Solicitation Procedures Order and as evidenced by the Affidavits of Service, the Debtors caused copies of the Combined Hearing Notice to be served on all parties in interest. In addition, copies of the Solicitation Procedures Order, the Plan, the Disclosure Statement, and the Combined Hearing Notice have been available free of charge, at https://restructuring.ra.kroll.com/carbonhealth/Home-Index, and the foregoing was set forth in the Combined Hearing Notice. The Combined Hearing Notice provided due and proper notice of the Hearing and all relevant dates, deadlines, procedures, and other information relating to the Plan and/or the solicitation of votes thereon, including, without limitation, the Voting Deadline and the Objection Deadline (as such terms are defined in the Combined Hearing Notice), the time, date, and place of the Combined Hearing and the provisions in the Plan concerning the Plan's exculpation, the Debtor/Estate Releases, and the Plan injunction provided for in the Plan. The Debtors also provided the Court-approved notices of non-voting status (the "***Notices of Non-Voting Status***") to the Holders of Claims and Interests not entitled to vote on the Plan, consistent with terms of the Solicitation Procedures Order. Based on the foregoing, all persons entitled to receive notice of the Disclosure Statement, the Plan, the Combined Hearing Notice, and Notices

of Non-Voting Status have received proper, timely, and adequate notice in accordance with the Solicitation Procedures Order, the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, and have had an opportunity to appear and be heard with respect thereto. As such, the Debtors are in compliance with section 1128 of the Bankruptcy Code and Bankruptcy Rules 2002(b) and 3017(d)-(f). No other or further notice is required.

Y. Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)). The Plan has been proposed by the Debtors in good faith and in the belief that the reorganization contemplated under the Plan and establishment of the Trust will maximize value for the Debtors' creditors. The Plan accomplishes the goals promoted by section 1129(a)(3) of the Bankruptcy Code by enabling the Trustee to make distributions to creditors on a fair and equitable basis, in accordance with the priorities established by the Bankruptcy Code, subject to the terms of the Plan. The Plan has been proposed with the legitimate purpose of maximizing the value of the Estates to achieve the best interests of the Debtors' creditors and not by any means forbidden by applicable law. The Debtors, the Released Parties, and the Exculpated Parties have acted diligently, in good faith, and in compliance with all applicable laws and duties in connection with the preparation, filing, and prosecution of these Chapter 11 Cases and actions taken in connection therewith, as is evident from the facts and record of the Chapter 11 Cases, the Disclosure Statement, the Plan, the Solicitation Materials, the hearing to conditionally approve the Disclosure Statement, the record of the Combined Hearing, the Declarations and testimony submitted to the Court, and other proceedings held in the Chapter 11 Cases. In so finding, the Court has considered the totality of the circumstances in the Chapter 11 Cases. The support for the Plan by Holders of Claims in the Accepting Classes who voted to accept the Plan further demonstrates that the Plan was proposed in good faith. Finally, as described in greater detail below, the Plan's indemnification, exculpation,

Debtor/Estate Release, and injunction provisions are warranted, necessary, and appropriate, and are supported by sufficient consent and consideration under the circumstances of the Chapter 11 Cases as a whole and are consistent with sections 105, 1123(b)(6), and 1129 of the Bankruptcy Code and applicable law in this Circuit, and the Debtors, the Released Parties, and the Exculpated Parties will be acting in good faith if they proceed to consummate the Plan and the agreements, settlements, transactions, distributions, and other transfers contemplated therein and in this Confirmation Order and take any actions authorized by the Plan and this Confirmation Order.

Z. Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)). No payment for services or costs and expenses in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be made by the Debtors other than payments that have been authorized by an order of the Court, including without limitation by the Confirmation of the Plan by this Confirmation Order. Pursuant to Section VIII.C of the Plan, such Professionals' applications for allowance of final compensation and reimbursement of expenses must be filed and served **no later than thirty (30) days after the Effective Date.** Such applications will be subject to review and approval by the Court.

AA. Proper Disclosure of Officers (11 U.S.C. § 1129(a)(5)). The Debtors have complied with section 1129(a)(5) by providing such disclosures in the Plan Supplement and the Plan. The Plan, in conjunction with the Plan Supplement, satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

BB. No Rate Changes (11 U.S.C. § 1129(a)(6)). The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and will not require governmental regulatory approval. Therefore, section 1129(a)(6) of the Bankruptcy Code does not apply to the Plan.

CC. "Best Interest Test" 11 U.S.C. § 1129(a)(7). Each holder of an Impaired Claim or Impaired Interest has either accepted the Plan or will receive or retain on account of such Claim or Interest, property of a value on the Effective Date of the Plan that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. The Plan satisfies section 1129(a)(7) of the Bankruptcy Code. The liquidation analysis attached as Exhibit C to the Plan and the other evidence related thereto in support of Confirmation that was presented, proffered, or adduced at or prior to the Combined Hearing: (a) are reasonable, persuasive, credible, and accurate as of the dates such analyses and evidence were prepared, presented, or proffered; (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that each Holder of an Impaired Claim or Interest has accepted the Plan and/or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date. The Plan, therefore, satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

DD. Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)). Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan. Classes 1(a), 2, 3, and 5 are unimpaired Classes of Claims, which are conclusively presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code. Classes 1(b), 1(c), 1(d), 4, 6 and 7 are the Impaired Classes entitled to vote on the Plan. Classes 1(b)-1 and 2 (John Muir Secured Claims) (including the sub-classes that are presumed to accept the Plan for failure to vote), Class 1(c)-1-6 (Prime Health Secured Claims) (including the sub-classes that are presumed to accept the Plan for failure to vote), Class 1(d)-1

and 2 (Stanford Secured Claims) (including the sub-classes that are presumed to accept the Plan for failure to vote), Class 4 (Prepetition Secured Claims) (including the sub-classes that are presumed to accept the Plan for failure to vote), except as noted below, Class 6 (Commercial GUC Claims) (including the sub-classes that are presumed to accept the Plan for failure to vote), and Class 7 (Abuse Claims) (including the sub-classes that are presumed to accept the Plan for failure to vote) voted to accept the Plan (i.e., the Accepting Classes). Class 6(i) (Carbon Health Medical Group of California, P.C.), Class 6(j) (Carbon Health Medical Group of Florida, P.A.), Class 6(m) (Carbon Health Medical Group of New Jersey, P.A.), Class 6(r) (Carbon Health Primary Care of Florida, P.A.), and Class 6(y) (Central Jersey Urgent Care Limited Liability Company), each voted to reject the Plan, and Class 8 (Subordinated Claims) and Class 9 (Equity Interests) are deemed to have rejected the Plan and not entitled to vote on the Plan, pursuant to section 1126(g) of the Bankruptcy Code (i.e., the Rejecting Classes) because no distribution is anticipated to the Holders of such Claims or Interests. Class 10 (Intercompany Claims) and Class 11 (Intercompany Interest) are Claims or Interests held by one Debtor against another Debtor. Each of the Debtors are parties to the Plan and support and consent to the proposed treatment under the Plan, which satisfies section 1129(a)(8) of the Bankruptcy Code and renders cram-down for such classes unnecessary. The Plan does not satisfy the requirements of section 1129(a)(8) of the Bankruptcy Code because at least one Impaired Class has voted against the Plan. Notwithstanding the foregoing, the Plan is confirmable because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.

EE. Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code (11 U.S.C. § 1129(a)(9)). The treatment of Administrative Claims and Priority Tax Claims as set forth in Article VIII of the Plan is in accordance with the requirements of

section 1129(a)(9) of the Bankruptcy Code. The Plan, therefore, satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

FF. Acceptance by at Least One Impaired Class of Claims (11 U.S.C. § 1129(a)(10)). Under Article IX.D.9 and 10 of the Plan, the distributions to the Holders of Allowed Class 6 (Commercial GUC Claims) and Allowed Class 7 (Abuse Claims) are being treated on a consolidated basis within their respective Classes, and each are projected to receive the approximately equal value for their respective claims. For purposes of tabulation of votes, courts have consolidated ballots among jointly administered debtors where distributions were consolidated, *see, e.g., In re SGPA, Inc.*, 2001 WL 34750646 (Bankr. M.D. Pa. Sept. 28, 2001) and also in cases where the debtors were substantively consolidated, *see, e.g., In re ADPT DFW Holdings, LLC*, 574 B.R. 87, 104-05 (Bankr. N.D. Tex. 2017). As set forth in the Voting Declaration, at least one impaired class voted to accept the Plan on a consolidated basis. Therefore, the requirement of section 1129(a)(10) is satisfied.

GG. Confirmation is Not Likely to Be Followed by Need for Further Reorganization (11 U.S.C. § 1129(a)(11)). The Plan provides for, among other things, the reorganization of the Debtors' businesses. The Disclosure Statement, the financial projections, the Ozkay Declaration, and other evidence proffered or adduced by the Debtors at the Confirmation Hearing with respect to the feasibility of the Plan (a) are reasonable, persuasive and credible, (b) have not been controverted by other evidence or credibly challenged in any objection, and (c) establish that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors. Accordingly, the Plan is feasible. The Plan, therefore, satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

HH. Payment of Bankruptcy Fees (11 U.S.C. § 1129(a)(12)). Section XIX.D of the Plan provides for the payment of all fees payable by the Debtors under 28 U.S.C. § 1930(a). The Plan, therefore, satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

II. Non-Applicability of Certain Sections (11 U.S.C. §§ 1129(a)(13), (14), (15), and (16)). The Debtors do not owe any retiree benefits or domestic support obligations, are not individuals, and are not nonprofit corporations. Therefore, sections 1129(a)(13), 1129(a)(14), 1129(a)(15), and 1129(a)(16) of the Bankruptcy Code do not apply to the Chapter 11 Cases.

JJ. "Cram Down" Requirements (11 U.S.C. § 1129(b)). The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code. The Plan does not unfairly discriminate against the Rejecting Classes because under Article IX.D.9 of the Plan, all Holders of Allowed Commercial GUC Claims in both Classes that accepted and rejected are being treated similarly and will receive their pro rata of the distribution of the Commercial GUC Fund. Consequently there is no discrimination against the Rejecting Classes. The Deemed Rejecting Class (*i.e.*, Class 9(x) (Interests in Carbon Health Technologies, Inc.) is the only class of equity securities in Carbon Health Technologies, Inc. As a deemed rejected class, the Holders in Class 9(x) are not receiving any distributions nor are there any other similar classes under the Plan that are receiving distributions on account of Interest being treated under the Plan. Consequently there is no discrimination against the Deemed Rejected Class. No class junior to the Rejecting Classes is entitled to any distributions under the Plan. Further, as noted above, there is no other class equally situated to the Rejecting Classes that will receive more favorable treatment under the Plan. In addition, the Classes of Claims senior to the Deemed Rejected Class 9(x) (Interests in Carbon Health Technologies, Inc.) will not be paid in full thereby prohibiting any distribution to the holders of Interests in Class 9(x). The foregoing treatment conforms to the absolute priority rule

and is therefore fair and equitable within the meaning of section 1129(b). Accordingly, the Plan satisfies the cramdown requirements of section 1129(b) of the Bankruptcy Code and may be confirmed notwithstanding the rejection of the Plan by the Rejecting Classes and Deemed Rejecting Class.

KK. Only One Plan (11 U.S.C. § 1129(c)). The Plan (including previous versions thereof), supersedes any other plan filed in the Chapter 11 Cases. The Debtors seek Confirmation of the Plan. No party other than the Debtors has proposed a plan. The Plan, therefore, satisfies the requirements of section 1129(c) of the Bankruptcy Code.

LL. Principal Purpose of the Plan (11 U.S.C. § 1129(d)). The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act, 15 U.S.C. § 77e. The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

MM. Good Faith Solicitation (11 U.S.C. § 1125(e)). The Debtors' good faith is evident from the facts and record of the Chapter 11 Cases, the Disclosure Statement, the Plan, the Solicitation Materials, the hearing to conditionally approve the Disclosure Statement, and the record of the Combined Hearing, the Declarations and testimony submitted to the Court, and other proceedings held in the Chapter 11 Cases. The Debtors and their advisors have proposed the Plan with the legitimate and honest purpose of maximizing the value of each of the Debtors' Estates for the benefit of their stakeholders. Accordingly, the Debtors and their advisors have been, are, and will continue to act in good faith if they proceed to: (a) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby; and (b) take the actions authorized and directed or contemplated by this Confirmation Order. Therefore, the Plan has been proposed in good faith to achieve a result consistent with the objectives and purposes of the Bankruptcy

Code and the aforementioned parties have acted in good faith within the meaning of sections 1125(e) and 1126(e) of the Bankruptcy Code.

NN. Implementation. The various means for implementation of the Plan, as set forth in Section XIV and other provisions of the Plan (collectively, the "***Implementation Activities***"), have been designed and proposed in good faith. The Implementation Activities are adequate and will promote the maximization of the value of the ultimate recoveries under the Plan in a fair and equitable manner in accordance with the priorities established by the Bankruptcy Code. The Implementation Activities are not intended to hinder, delay, or defraud any entity to which the Debtors is indebted on the Effective Date.

OO. Exculpation. The exculpation described in Section XVI.I of the Plan is essential to the Plan, proposed in good faith, was formulated following extensive, good faith, arm's-length negotiations with key constituents, is appropriately limited in scope to achieve the overall purpose of the Plan, and is consistent with applicable law. Each Exculpated Party made significant contributions to the Chapter 11 Cases, including with respect to the negotiation and implementation of the transactions embodied in the Plan. The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with all applicable laws and duties with regard to the negotiation of the Plan, solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable duty, law, rule, or regulation governing the negotiation of the Plan, solicitation of acceptances or rejections of the Plan, or distributions made pursuant to the Plan. The Plan's exculpation provisions do not relieve any party of liability for an act or omission to the extent such act or omission is determined by a final order of a court of competent jurisdiction to have constituted gross negligence, fraud, or

willful misconduct and are consistent with established practice in this jurisdiction and others. The record in the Chapter 11 Cases fully supports the exculpation provisions, which are appropriately tailored to protect the Exculpated Parties from inappropriate litigation arising from their participation in the Chapter 11 Cases and the Debtors' reorganization and are consistent with the Bankruptcy Code and applicable law.

PP. Injunction. The injunction provision provided in Section XVI.E of the Plan, as may be modified herein, is necessary to implement, preserve, and enforce the Plan.

QQ. Plan Releases. Entry of this Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor/Estate Release set forth in Section XVI.F of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor/Estate Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties who played an extensive and integral role in the Debtors' Chapter 11 Cases; (b) in the best interests of the Debtors and all Holders of Claims and Interests; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; (e) a necessary element to the Plan; (f) negotiated in good faith and critical to reaching consensus to support the Plan; and (g) a bar to any of the Debtor/Estate Releasors asserting any Claim or Cause of Action released pursuant to the Debtor/Estate Release. The Released Parties: (a) made substantial and valuable contributions to the Debtors' Chapter 11 Cases and the Estates, including through extensive negotiations with various stakeholders, ensuring the operation of the Debtors' business during the Chapter 11 Cases, and continuing to provide contributions to the Debtors and/or their Estates, including as set forth in Article XVI.F of the Plan, and (b) invested significant time and effort in the preparation of the Plan, all supporting analyses, and the numerous other pleadings filed in the Chapter 11 Cases,

thereby ensuring the smooth administration of the Chapter 11 Cases. Each of the Released Parties made significant concessions in, and good faith contributions to, these Chapter 11 Cases. The Released Parties share an identity of interest with the Debtors, supported the Plan and these Chapter 11 Cases, actively and diligently participated in meetings, hearings, and negotiations during these Chapter 11 Cases in good faith, and have provided other valuable consideration to the Debtors to facilitate the Debtors' liquidation pursuant to the Plan. The scope of the Debtor/Estate Release is appropriately tailored to the facts and circumstances of the Chapter 11 Cases. The Debtor/Estate Release is appropriate in light of, among other things, the value provided by the Released Parties to the Debtors' Estates and the critical importance of the Debtor/Estate Release to the Plan.

RR. Preservation of Causes of Action. Article XVII of the Plan appropriately provides that the Debtors, Reorganized Debtors, and the Trustee will retain, and may enforce, all rights to commence and pursue, as appropriate, any and all Causes of Action, except any Causes of Action that have been expressly waived, settled, excluded, or otherwise released as provided under the Plan (including, without limitation, the Debtor/Estate Release), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code. The provisions regarding the preservation of Causes of Action in the Plan are appropriate, fair, equitable, and reasonable, and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.

SS. Satisfaction of Confirmation Requirements. Based upon the foregoing, the Plan satisfies the requirements for Confirmation set forth in section 1129 of the Bankruptcy Code.

**BASED ON THE FOREGOING FINDINGS OF FACT, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

1. Confirmation. The Plan, attached hereto as **Exhibit A**, is **APPROVED** in its entirety and confirmed under section 1129 of the Bankruptcy Code. The Plan is **CONFIRMED** in its entirety pursuant to section 1129 of the Bankruptcy Code. The terms of the Plan, the Plan Supplement and each of the documents comprising the Plan Supplement, any amendments, modifications, or supplements thereto, and all documents and agreements thereto are incorporated by reference into and are an integral part of the Plan, and such terms and their implementation are hereby approved and authorized. The Debtors, the Reorganized Debtors, and/or the Trustee (as applicable) are authorized to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, and other agreements or documents created or contemplated in connection with the Plan.

2. Final Approval of Disclosure Statement. The Disclosure Statement is hereby **APPROVED**, on a final basis, pursuant to section 1125 of the Bankruptcy Code.

3. Objections. To the extent that any objections have not been withdrawn or resolved prior to the entry of this Confirmation Order, all objections are overruled in all respects for the reasons set forth in the record of the Combined Hearing, which record is incorporated herein, and all withdrawn informal comments, if any, are deemed withdrawn with prejudice; *provided, however*, that any Cure Objections are preserved and shall be resolved as set forth in paragraph 14, below.

4. Omission of Reference to Particular Plan Provisions. The failure to specifically describe or include any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Plan be approved and confirmed in its entirety.

5. Implementation. The Debtors and the Trustee are authorized to take all actions necessary, appropriate, or desirable to enter into, implement, and consummate the contracts, instruments, releases, leases, agreements, or other documents created, executed, or contemplated in connection with the Plan. Without further order or authorization of this Court, the Debtors and the Trustee, and their successors are authorized and empowered to make all modifications to all Plan documents that are consistent with the Plan. Execution versions of the Plan and all related documents, where applicable, shall constitute legal, valid, binding, and authorized obligations of the respective parties thereto, enforceable in accordance with their terms.

6. Classifications. The classification of Claims for purposes of distributions made under the Plan shall be governed solely by the terms of the Plan and the Solicitation Procedures Order.

7. Effective Date. The Effective Date of the Plan shall occur on the date determined by the Debtors when the conditions set forth in Article XV of the Plan have been satisfied or, if applicable, waived in accordance with the Plan.

8. Resolution of Claims. As discussed in detail in the Disclosure Statement and Plan, and as otherwise provided herein, in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise of all Claims and controversies resolved pursuant to the Plan. Subject to Articles XIII and XIV of the Plan, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final. The compromises or settlements of Claims, Equity Interests, and controversies contemplated by the Plan are approved in accordance with 11 U.S.C. §§ 105, 363, and 1123 and Bankruptcy Rule 9019.

9. Causes of Action. Unless any Causes of Action are expressly waived, relinquished, released, compromised, excluded, or settled in the Plan or any final order entered by this Court including, without limitation, this Confirmation Order (collectively, a "***Final Order***"), the Debtors, Reorganized Debtors, and the Trust expressly reserve all such Causes of Action for later adjudication. The reservation shall include, without limitation, a reservation by the Debtors, Reorganized Debtors, and the Trust of any Causes of Action not specifically identified in the Plan, Disclosure Statement, or Plan Supplement or of which the Debtors may presently be unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches will apply to such Causes of Action upon or after the Confirmation of the Plan based on the Disclosure Statement, the Plan, or this Confirmation Order, except where such claims and/or defenses have been expressly waived, relinquished, released, compromised, or settled in the Plan or by Final Order. Following the Effective Date, the Reorganized Debtors and the Trustee may assert, compromise or dispose of the Causes of Action, as they pertain to such respective parties, without further notice to Creditors or Interest Holders or authorization of the Bankruptcy Court, except as otherwise expressly provided herein or in the Plan, Plan Supplement, or Trust Agreement.

10. Trust and Trust Agreement. The Court hereby authorizes and approves, as of the Effective Date, (a) the establishment of the Trust in accordance with the Plan and the Trust Agreement; (b) the appointment of META Advisors LLC, as the initial Trustee as set forth and disclosed in the Plan Supplement; (c) the appointment of the Trust Advisory Committee, as set

forth and disclosed in the Plan Supplement; (d) the establishment of the Abuse Claims QSF; and (e) the appointment of the Abuse Claims Administrator. The Court further authorizes and approves the Trust Agreement and all transactions contemplated thereby or the Plan to be undertaken by the Trust. Without limitation of the generality of the foregoing, the Debtors and Trustee are hereby authorized, without further approval of this Court or any other party and in accordance with the Plan, to execute the Trust Agreement and deliver, file, and/or record any contracts, agreements, instruments, or other documents, including relating to the Trust Agreement, contemplated by the Plan or the Trust Agreement (or necessary or desirable to effectuate the transactions contemplated thereby) and to take all other steps necessary to establish the Trust and to perform its obligations pursuant to the Trust Agreement and consistent with the Plan. Once executed, the Trust Agreement shall constitute legal, valid, and binding obligations of the parties thereto and shall be enforceable according to its terms.

11. Trust Assets. On the Effective Date, other than as set forth in the Plan or this Confirmation Order and subject to applicable law, the Debtors are authorized and directed to, and shall be deemed to have irrevocably transferred, granted, assigned, conveyed, and delivered to the Trust, all of the Debtors' and their Estates' right, title, and interest in and to all of the Trust Assets free and clear of any and all Liens, Claims, encumbrances, and interests (legal, beneficial, or otherwise) of all other Persons and entities; *provided that*, the Debtors or their advisors may transfer Data Transfer Documents to the Trust irrespective of any applicable law or requirement to the contrary and the Trust shall have the same confidentiality obligations as the Debtors with respect thereto, unless otherwise provided by applicable law. The Debtors and the Trustee, and any party under the control of such parties are hereby authorized to execute any documents or other instruments and to take all other steps as necessary to cause title to the Trust Assets to be

transferred to the Trust. Subject to the terms of the Trust Agreement, the Trust shall be permitted to use the Trust Assets for the operation of the Trust for the payment of or distribution on account of all Allowed Claims in accordance with the terms of the Plan, the Trust Agreement and/or or this Confirmation Order. To enable the Trustee to fulfill its responsibilities under the Trust, subject to the terms of the Trust Agreement, the Trustee shall timely pay all trust expenses, including property insurance, professionals, and the Trustee's own compensation, from the Trust Assets and proceeds therefrom regardless of whether any or all secured, administrative, priority, or other claims have been paid or are otherwise outstanding. On and after the Effective Date, the Trustee shall carry out the Trust functions on behalf of the Trust as required by the Trust Agreement and the Plan.

12. Transfers by Debtor; Vesting and Revesting of Assets. All transfers of property of the Estates, including, without limitation, the vesting of assets in the Reorganized Debtors and the vesting of the Trust Assets in the Trust, (a) are legal, valid and effective transfers of property, and shall be effective as and to the extent provided in the Plan without need for further order of the Court or any act by the Debtors, Reorganized Debtors, the Trustee, or the Trust, except as otherwise provided in this Confirmation Order or in the Plan; (b) vest the transferees with good title to such property free and clear of all claims, liens, interests, charges or other encumbrances, except as expressly provided in the Plan or this Confirmation Order, (c) do not and will not constitute avoidable transfers under the Bankruptcy Code or other applicable law, and (d) are for good consideration and value.

13. Sources of Consideration for Plan Distributions. The distributions to be made under the Plan, including on account of certain Administrative Claims and Priority Tax Claims, as well as the Trust Funding Amount, shall be funded, as applicable, by the Debtors pursuant to the

Amended DIP Order; *provided, however*, the budgeted amounts for Administrative Claims pursuant to the Amended DIP Order shall not serve to cap Allowed Administrative Claims subject to satisfaction of the condition set forth in Article XV.B.(iii) of the Plan.

14. Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases and Cure Claims Relating Thereto. The executory contracts and unexpired leases set forth in Exhibit B of the Plan Supplement are assumed or assumed and assigned as set forth therein. All of the cure claims reflected in Exhibit B of the Plan Supplement reflect the prepetition arrearages arising prior to the Petition Date, including the rent arising under any unexpired nonresidential lease agreement for the period of February 2, 2026, through February 28, 2026 (the "***Prepetition & Stub Claims***"), which shall be paid no later than five (5) business days following the Effective Date. Subject to the reconciliation of the Postpetition Cures (as such term is defined below), this Confirmation Order constitutes a conclusive determination that the amount of any cure and compensation due under the applicable contracts and leases assumed hereunder is fixed in the applicable amount set forth in Exhibit B of the Plan Supplement, and no other or further amount is due and owing to the applicable counterparty on account of such contracts and leases for the period related to the Prepetition & Stub Claims. The Reorganized Debtor has demonstrated adequate assurance of future performance with respect to such contracts and leases, to the extent required, and otherwise satisfied the requirements of 11 U.S.C. § 365. All other amounts arising on or after the Petition Date (the "***Postpetition Cures***") shall be paid in the ordinary course of business pursuant to the terms of the applicable executory contract or unexpired lease, but to the extent due as of the Effective Date (which shall include any Postpetition Cure amount or compensation due that is reconciled and agreed as of the entry of this Confirmation Order), shall be paid in no event later than thirty (30) days from the Effective Date, unless such contract or lease

provides for a longer period and except where there is a dispute related to the Postpetition Cures, which dispute shall be resolved pursuant to the terms of this Confirmation Order. Further, the omission of Postpetition Cures from Exhibit B of the Plan Supplement shall not preclude the Reorganized Debtors or any counterparties from contesting or seeking the collection and enforcement, as applicable, of the Postpetition Cures or any nonmonetary defaults capable of cure under any executory contracts or unexpired leases notwithstanding any term or provision of the Plan or this Confirmation Order to the contrary. For the purposes of resolving any disputes relating to the Prepetition & Stub Claims or the Postpetition Cures ("***Cure Objections***"), as applicable, the Court hereby schedules a status conference to be held on July 20, 2026 at 2:00 p.m. (CT) (the "***Cure Objections Status Conference***") to determine any disputes regarding the payment of the Prepetition & Stub Claims or Postpetition Cures, as applicable, that have not been resolved by the parties before that time.

15. Assumed and Assumed and Assigned Executory Contracts and Unexpired Leases. Notwithstanding anything to the contrary in the Plan or this Confirmation Order, with respect to each executory contract or unexpired lease as set forth on Exhibit B of the Plan Supplement (collectively, the "***Assumed and Assumed and Assigned Contracts***") to be assumed or assumed and assigned under the Plan, upon the assumption or assumption and assignment of such Assumed and Assumed and Assigned Contracts pursuant to the Plan, the Reorganized Debtors, as applicable, shall be responsible for, and shall timely perform, all obligations under such Assumed and Assumed and Assigned Contracts, *cum onere*, including, without limitation, liabilities for any default under such Assumed and Assumed and Assigned Contracts, in each case arising or occurring after such assumption or assumption and assignment, as applicable, and for the payment or performance of any and all obligations under such Assumed and Assumed and Assigned

Contracts arising or occurring after such assumption, or assumption and assignment when due in accordance with the terms of such Assumed and Assumed and Assigned Contracts (irrespective of whether such obligations accrued before, on, or after assumption and assignment of the Assumed and Assumed and Assigned Contracts), including, but not limited to, with respect to (a) claims for indemnification, and (b) year-end adjustment and reconciliation amounts that become due or accrue after the entry of this Confirmation Order, including for royalties, rents, utilities, taxes, insurance, fees, common area or other maintenance charges, promotional funds, and percentage rent, in each case as applicable and subject to the terms and conditions of the Assumed and Assumed and Assigned Contracts, and subject to any defenses provided by such Assumed and Assumed and Assigned Contracts and applicable non-bankruptcy law and unless otherwise agreed with the counterparty to the Assumed and Assumed and Assigned Contracts. To the extent the applicable Reorganized Debtor relies on the Debtors' existing insurance coverage to satisfy any such assumed indemnification obligations under any Assumed and Assumed and Assigned Contracts, any deductibles or self-insured retention amount shall be the responsibility of the applicable Reorganized Debtor, except to the extent it has already been satisfied.

16. NHP/PMB Los Alamitos MOB, LP Ground Lease. Notwithstanding anything to the contrary in the Plan, this Confirmation Order, the Plan Supplement, or any other Plan-related document:

a. As to Carbon Health Medical Group of California, P.C.'s ("***CHMGCA***") lease with NHP/PMB Los Alamitos MOB, LP (the "***NHP/PMB Lease***"), nothing in the Plan, this Confirmation Order, the Plan Supplement or any other Plan-related document, changes, modifies or alters in any manner (i) the obligations (if any) of any tenant (including, for the removal of doubt, debtor CHMGCA and any assignee of CHMGCA) to

timely comply with the "MOB Ground Lease" identified on "Exhibit G (Use Restrictions)" to the NHP/PMB Lease (the "***MOB Ground Lease***"), or (ii) the MOB Ground Lease.

b. The NHP/PMB Lease is not, and shall not be, assumed pursuant to Bankruptcy Code section 365 until the earliest date all of the following has occurred: (i) NHP/PMB Los Alamitos MOB, LP ("***NHP/PMB***"), has received adequate assurance of future performance (as such term is utilized in Bankruptcy Code section 365) from CHMGCA's assignee; (ii) all amounts, whether such amounts arise pre-petition or post-petition, owed to NHP/PMB under the NHP/PMB Lease have been paid in full to NHP/PMB; and (iii) there are no uncured defaults under the NHP/PMB Lease (other than the defaults excepted from the Bankruptcy Code's cure requirements as set forth in Bankruptcy Code section 365(b)(1)(A)); *provided, however*, that if items (i) through (iii) hereinabove have not occurred or the parties have not resolved their disputes relating thereto prior to the Cure Objections Status Conference, such disputes shall be heard at the Cure Objections Status Conference and CHMGCA shall have the initial evidentiary burden of proof at such hearing.

17. Rejection of Executory Contracts and Unexpired Leases. Except with respect to: (a) Assumed and Assumed and Assigned Contracts set forth on Exhibit B of the Plan Supplement, (b) executory contracts or unexpired leases that were previously assumed or rejected by order of the Bankruptcy Court, (c) unexpired leases that were previously the subject of a stipulation filed with the Court; and (d) executory contracts or unexpired leases that are the subject of a pending motion to assume or reject pursuant to section 365 of the Bankruptcy Code pending as of the Confirmation Date, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall

be deemed rejected pursuant to section 365 of the Bankruptcy Code upon the entry of this Confirmation Order, subject to the occurrence of the Effective Date. To the extent there is a deemed rejection of any unexpired lease of nonresidential real property, the effective date of any such rejection shall be the later of the occurrence of the Effective Date and the date that the Debtors or Reorganized Debtors, as applicable, surrender possession of the premises to the applicable landlord counterparty by written notice and return of the keys and keys codes to such landlord counterparty, or if such keys or key codes are unavailable, written notice that the landlord may rekey and take control of the premises.

18. Claims Based on Rejection of Executory Contracts or Unexpired Leases. All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases pursuant to Confirmation of the Plan, if any, must be filed with the Claims Agent **within thirty (30) days after the last to occur of (x) the Effective Date, (y) the entry of an order of the Bankruptcy Court approving such rejection and (z) such other date as may be ordered by the Bankruptcy Court**. Any Claim arising from the rejection of an executory contract or unexpired lease pursuant to Confirmation of the Plan that is not filed within such time will be subject to objection. All such Claims for which Proofs of Claim are timely and properly filed and ultimately Allowed will be treated as Commercial GUC Claims (Class 6).

19. Distributions Under the Plan. On and after the Effective Date, the Distributions on account of Allowed Claims pursuant to Article XIII of the Plan and the resolution and treatment of Disputed Claims pursuant to Article XIV of the Plan are authorized to occur and, without limitation of the other provisions of the Plan and this Confirmation Order concerning the powers, duties, and authority of the Debtors, Reorganized Debtors, and Trustee, each, as applicable, shall be authorized to effectuate such Distributions, resolution, and treatment required by the Plan and

Trust Agreement; *provided, however*, notwithstanding any provision of the Plan to the contrary, no Claim shall be automatically deemed disallowed, expunged or marked as satisfied absent notice to the applicable Holder of such Claim (and its counsel, if known).

20. Exculpation. The exculpation provision contained in Article XVI.I of the Plan is approved and incorporated herein in all respects.

21. Plan Releases. The releases contained in Article XVI.D and F of the Plan are approved and incorporated herein in all respects.

22. Releases by Creditors. Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the release by holders of Claims under Article XVI.D of the Plan shall only apply to and bind creditors that affirmatively vote to accept the Plan and do not affirmatively opt out of the releases as set forth in the Ballot. For the avoidance of doubt, any other creditor shall not be subject to the release under Article XVI.D of the Plan.

23. Provisions Related to the United States. Notwithstanding anything to the contrary contained in the Plan and this Confirmation Order, nothing shall limit or be intended to or be construed as a release that would, in effect, act as a bar to the United States Government or any of its agencies, or any state and local authority, from pursuing any police or regulatory action or any criminal action.

24. Injunction and Discharge. The injunction contained in Article XVI.E of the Plan and the discharge of claims and termination of interests in Article XVI.D of the Plan are approved and incorporated herein in all respects. Without limiting the foregoing, this Confirmation Order permanently enjoins the commencement or prosecution by any Person or Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including the claims,

obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or this Confirmation Order. Also without limiting the foregoing, except as expressly provided herein or in the Plan, upon the Effective Date, all Holders of Claims and Equity Interests shall be forever precluded and enjoined, pursuant to sections 105, 524, 1141 of the Bankruptcy Code and Article X.D of the Plan, from prosecuting or asserting any such discharged Claim against or terminated Equity Interest in the Debtors or the Reorganized Debtors. The Debtors' discharge and release from all Claims as provided herein and in the Plan shall not diminish, impair, or otherwise affect the enforceability of any insurance policy that may provide coverage for claims against the Debtors, the Reorganized Debtors, their current and former directors and officers, or any other person or entity.

25. Notwithstanding the foregoing, and notwithstanding anything to the contrary herein, nothing in the Plan or this Confirmation Order shall modify the rights, if any, of any counterparty to an executory contract or unexpired lease to assert any right of setoff or recoupment that such party may have under applicable bankruptcy law or non-bankruptcy law, including, but not limited to, the (a) ability, if any, of such parties to setoff or recoup a security deposit held pursuant to the terms of their unexpired lease(s) with the Debtors, or Reorganized Debtors, as applicable, under the Plan, (b) assertion of rights of setoff or recoupment, if any, in connection with Claims reconciliation, or (c) assertion of setoff or recoupment as a defense, if any, to any Claim or action by the Debtors, the Reorganized Debtors, or any successors of the Debtors.

26. <u>Restructuring Transactions</u>. The Debtors or the Reorganized Debtors, as applicable, are hereby authorized, immediately upon entry of this Confirmation Order (but subject to the occurrence of the Effective Date), to enter into and take all steps desirable or necessary to effectuate the Restructuring Transactions, including the entry into and consummation of the

transactions contemplated by the Plan, the Plan Supplement, the New Organizational Documents, or the Exit Facility, as the same may be modified in accordance with the Plan, from time to time prior to the Effective Date (including, without limitation, any restructuring transaction steps set forth in the Restructuring Transactions Memorandum or other exhibits to or referred to in the Plan Supplement), and may take any actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Reorganized Debtors, as and to the extent provided in the Plan. Any transfers of assets, Claims, or equity interests effected or any obligations incurred through the Restructuring Transactions (including the deemed contributions of Claims or the transfers of assets of and/or Claims and Liens against a Debtor or a Reorganized Debtor or its property contemplated in the Restructuring Transactions Memorandum) are hereby approved and shall be deemed not to constitute a fraudulent conveyance, fraudulent transfer, or undervalue transaction or any similar avoidable or voidable transaction and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purposes whatsoever and shall not constitute an unfair preference or a preferential transfer, fraudulent conveyance, or any similar avoidable or voidable transaction under the Bankruptcy Code or any applicable Law, whether federal, state, or foreign Law. Except as otherwise provided in the Plan, including in the Restructuring Transactions Memorandum, each Reorganized Debtor, as applicable, shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, professional corporation, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, under the applicable Law in the jurisdiction in which such applicable Debtor is incorporated or formed. The Debtors or the Reorganized Debtors, as applicable, are hereby authorized, immediately upon entry of this

Confirmation Order, without the need to seek any third-party consents, corporate approvals, or further approvals of this Court, to take any and all actions necessary to implement the Restructuring Transactions contemplated by the Restructuring Transactions Memorandum, including the transfers of assets of and/or Claims and Liens against a Debtor or a Reorganized Debtor or its property.

27. Cancellation of Equity Interests. Pursuant to Article IX.D of the Plan. as of the Effective Date, any and all Equity Interests (Class 9) shall be deemed automatically cancelled, discharged, and surrendered and shall be of no further force, and the obligations of the Debtors thereunder or in any way related thereto, including any obligation of the Debtors to pay any franchise or similar type taxes on account of such Equity Interests, shall be discharged.

28. Specific Authorizations as to New Equity Interests; Exemption. Pursuant to Article XI.C of the Plan, from and after the Effective Date, the Reorganized Debtors are authorized to issue the New Equity Interests in accordance with the provisions of the Plan. Pending the occurrence of the Effective Date, the Debtors are authorized and directed to take all actions as may be necessary to facilitate the issuance of the New Equity Interests as of the Effective Date, including, without limitation, executing, delivering and performing under the various documents, paying any agreed fees and costs, and providing such other support, assurances and indemnifications as may be required, to facilitate or implement the Reorganized Debtors' governing documents, any other Plan related document, or the issuance and distribution of the New Equity Interests. Upon such issuance, the New Equity Interests shall be duly and validly authorized, issued, and outstanding, fully paid and nonassessable and not subject to pre-emptive or similar rights of third parties. The exemption from the requirements of section 5 of the Securities Act of 1933, and any state or local law requiring registration for the offer, sale, issuance,

exchange or transfer of the New Equity Interests provided for in the Plan is authorized by and ordered hereby pursuant to 11 U.S.C. § 1145.

29. Section 1146(a) Exemption. Pursuant to Section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of any security under the Plan, or the execution, delivery, or recording of any instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, the Plan Supplement, the Restructuring Transactions Memorandum, and the Exit Facility Documents, including, without limitation, any transfers to or by the Debtors, if on the Effective Date, and the Reorganized Debtors or Trustee, as applicable, if after the Effective Date, of the Debtors' property in implementation of or as contemplated by the Plan, the Plan Supplement, the Restructuring Transactions Memorandum, and the Exit Facility Documents (including, without limitation, any subsequent transfer of property by the Trust or the Abuse Claims QSF) shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

30. Release of Liens. Except as otherwise provided herein or in the Plan, the Trust Agreement, and/or relevant documents, agreements, and instruments contained in the Plan Supplement, on the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released,

without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Following the Effective Date, the Reorganized Debtors and the Trustee, as applicable, may transfer and dispose of any such property, free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Rules and without further approval of the Bankruptcy Court or notice to Creditors, except as may otherwise be required under the Plan or herein.

31. Administrative Expense Bar Date Provisions. Unless otherwise provided in the Bankruptcy Code or previously filed or as otherwise governed by a bar date order or in another order of the Court, requests for payment of Administrative Claims arising on or after the Petition Date, through and including the Effective Date, must be filed with the Court and served on counsel for the Debtors, and U.S. Trustee **on or before thirty (30) days after the Effective Date** (the "***Administrative Expense Bar Date***"); ***provided, however*****, for any counterparty to a non-residential real property lease that is assumed or assumed and assigned under the Plan with an unresolved Postpetition Cure claim following the Cure Objections Status Conference (the "*****Assumed Lease Administrative Claims*****"), the deadline to file such Assumed Lease Administrative Claims on account of unresolved Postpetition Cure claim shall be 30 days following the Cure Objections Status Conference; provided, further, notwithstanding anything to the contrary in this Order or the Plan, the Claims Objection Deadline for objecting to any Assumed Lease Administrative Claims shall be limited to thirty (30) days following the filing of such Assumed Lease Administrative Claims, which period may only be extended by consent of the applicable counterparty.** Holders of Administrative Claims that

are required to file and serve a request for payment of such Administrative Claims and that do not file and serve such a request by the Administrative Expense Bar Date shall be forever barred from asserting such Administrative Claims against the Debtors, the Estates, the Trust, or their respective property; *provided, however*, that a counterparty to an unexpired lease of non-residential real property shall not be required to File a request for payment of an Administrative Claim with the Bankruptcy Court; rather, they may submit their Claims directly to the Claims Agent by mail, by hand delivery, or through the Claims Agent's website, and must serve such request on the Debtors and their counsel.

32. Professional Fee Claims. Any Professional or other Entity asserting a Professional Fee Claim must file and serve on respective counsel for the Debtors or Reorganized Debtors, as applicable, and such other Entities who are designated by the Bankruptcy Rules or order of the Bankruptcy Court an application for final allowance of such Claim **no later than thirty (30) days after the Effective Date.** All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court.

33. Provisions Related to Texas State Taxing Authorities. Notwithstanding anything else to the contrary in the Plan or Confirmation Order, these provisions will govern the treatment of the claims of the Texas Comptroller of Public Accounts (the "***Comptroller***") and the Texas Workforce Commission (the "***TWC***", collectively with the Comptroller, the "***Texas State Taxing Authorities***"): (a) to the extent that interest is payable with respect to any administrative expense claim, unsecured priority claim, or secured tax claim of the Texas State Taxing Authorities, the interest rate shall be the applicable statutory interest rate; (b) nothing provided in the Plan or Confirmation Order shall affect or impair any statutory or common law setoff rights of the Texas

State Taxing Authorities in accordance with 11 U.S.C. § 553; (c) nothing provided in the Plan or Confirmation Order shall affect or impair any rights of the Texas State Taxing Authorities to pursue any non-debtor third parties for tax debts or claims, and the Texas State Taxing Authorities specifically opts out of any third party releases, if any; (d) The Texas State Taxing Authorities shall not be required to file any proof of claim, motion, or request for payment in order to be paid any Administrative Claims for taxes that arises or have arisen in the ordinary course of business, including all post-petition taxes incurred by the Debtor(s) after the Petition Date; and (e) Allowed Priority and Secured Tax Claims owed to the Texas State Taxing Authorities shall be paid, upon allowance, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code. For the avoidance of doubt, to the extent interest is payable with respect to any Allowed Priority and Secured Tax Claims, the Texas State Taxing Authorities will receive interest on their Allowed Priority Tax Claims after the Effective Date to the extent required by sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

34. Provisions Relating to UnitedHealthcare. Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or this Confirmation Order, all payor contracts or provider agreements (the "***Network Contracts***") by and between any of the Debtors, on the one hand, and UnitedHealthcare Insurance Company and its affiliates (collectively, "***United***"), on the other hand, shall be assumed, or as applicable, assumed and assigned, as of the Effective Date as set forth in the Plan Supplement. Any and all unpaid claims submitted by the Debtors and overpayment claims of United shall pass through and survive assumption and will be paid in the ordinary course of business in accordance with the terms of the Network Contracts, subject to all rights and defenses of United and the Reorganized Debtors regarding the validity and enforceability of such unpaid claims and overpayment claims. Nothing in the Plan, the Plan Supplement, this

Confirmation Order, or section 365 of the Bankruptcy Code shall affect the rights of recovery, setoff, or recoupment of United.

35. Provisions Related to Cigna. Notwithstanding anything to the contrary in the Plan, the Plan Supplement, any Notice related thereto, or this Order:

a. The active Third Party Payor contracts between Cigna (as such term is defined in the *Limited Objection of Cigna to (i) Final Disclosure Statement Approval, (ii) Confirmation of Amended Plan, (iii) Notice of Proposed Assumption and Assignment, and (iv) Supplemental Credit Bid Sale Motion* [Docket No. 623] (the "***Cigna Objection***")) and the Debtors (collectively, the "***Cigna Payor Contracts***") shall be assumed under the Plan and assigned to the applicable respective Reorganized Debtor as of the Effective Date and, in lieu of cure, all obligations due and unpaid under the Cigna Payor Contracts accruing prior to the Effective Date shall pass through to the applicable respective Reorganized Debtor and survive assumption and assignment, and nothing in this Order or section 365 of the Bankruptcy Code shall affect such obligations; *provided that*, in connection with such obligations, any defenses, claims, counterclaims, affirmative defenses, and other rights that exist under the Cigna Payor Contracts and applicable law are preserved and unimpaired.

b. The ASO Agreements (as defined in the Cigna Objection) shall be assumed under the Plan and assigned to the applicable respective Reorganized Debtor as of the Effective Date and, in lieu of cure, all obligations due and unpaid under the ASO Agreements accruing prior to the Effective Date shall pass through to the applicable respective Reorganized Debtor and survive assumption and assignment, and nothing in this Order or section 365 of the Bankruptcy Code shall affect such obligations; *provided that*,

in connection with such obligations, any defenses, claims, counterclaims, affirmative defenses, and other rights that exist under the ASO Agreements and applicable law are preserved and unimpaired; and upon the Effective Date, the Debtors shall transfer to the respective Reorganized Debtors, the Debtors' segregated Plan Bank Accounts (as defined in the Cigna Objection) through which eligible healthcare claims of the Debtors' employees and their dependents are funded under the ASO Agreements.

c. No later than the Effective Date, the Debtors shall provide written notice (email will suffice) to Cigna, through its counsel of record, of the respective Reorganized Debtor assignee for each Cigna Payor Contract and each ASO Agreement.

36. Authorization to Borrow. In order to provide the Debtors with sufficient financing to consummate the transactions required upon the Effective Date of the Plan, the Debtors are authorized to amend the DIP Financing Agreement, pursuant to the "Second Amendment," to increase the loan commitment thereunder from to $30.5 million to $63.04 million. The Second Amendment, in form and substance attached as **Exhibit B** is approved, and the Debtors are authorized and empowered to execute and consummate the Second Amendment.

37. Carbon Health Physicians, PA. Solely for purposes of Internal Revenue Code section 3121(a)(1) and Treas. Reg. 31.3121(a)(1) and consistent with the Restructuring Transaction Memorandum, Carbon Health Physicians, PA, will be the successor employer of Carbon Health Medical Group of Florida, PA, as described in Internal Revenue Code section 3121(a)(1) and Treas. Reg. 31.3121(a)(1).

38. Notices of Confirmation and Effective Date. The Debtors shall serve a combined notice of entry of this Confirmation Order and notice of the Effective Date in accordance with Bankruptcy Rules 2002 and 3020(c) on all creditors, equity holders, and parties having requested

notice in the Chapter 11 Cases. Notwithstanding the above, no notice of Confirmation or Effective Date or service of any kind shall be required to be mailed or made upon any party to whom the Debtors mailed notice of the Combined Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. The above-referenced notices are adequate under the particular circumstances of the Chapter 11 Cases and no other or further notice is necessary.

39. Payment of Statutory Fees. All fees payable under section 1930 of chapter 123 of title 28 of the United States Code shall be paid on the Effective Date, or when due. As of the Effective Date, the Reorganized Debtors may seek to close any of the Debtors' cases by filing a motion for entry of a final decree. The Voting Agent is authorized to destroy all paper/hardcopy records related to this matter two years after the Effective Date has occurred.

40. Successors and Assigns. The rights, duties and obligations of any Person named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person.

41. Plan Supplement. The documents contained in the Plan Supplement, and any amendments, modifications, and supplements thereto, and all documents and agreements introduced into evidence by the Debtors at the Combined Hearing (including all exhibits and attachments thereto and documents referred to therein), and the execution, delivery, and performance thereof by the Trust and/or the Reorganized Debtors, are authorized and approved when they are finalized, executed, and delivered. Without further order or authorization of this Court, the Debtors, the Reorganized Debtors, and their respective successors are authorized and empowered to make all modifications to all documents included as part of the Plan Supplement

that are consistent with the Plan. To the extent any document intended to be in the Plan Supplement is not attached to the Plan Supplement as of the entry of this Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, are authorized to enter into such document to the extent it is consistent with this Confirmation Order and the Plan (including any applicable consent rights and approval requirements set forth therein).

42. Exit Facility. On the Effective Date, the Reorganized Debtors shall enter into the Exit Facility on the terms set forth in the Exit Credit Agreement and the Loan Documents (as defined therein, the "***Exit Facility Documents***"), and are hereby authorized to enter into the Exit Facility. This Confirmation Order shall be deemed approval of the Exit Facility and the Exit Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provided for therein and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Exit Facility.

43. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents: (a) shall be deemed to be granted; (b) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents; (c) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Facility Documents; and (d) shall not be subject to avoidance, recharacterization, or equitable subordination for any

purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

44. The Reorganized Debtors granting such Liens and security interests are authorized to make all filings and recordings, and to obtain all government approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and this Confirmation Order (it being understood that perfection shall occur automatically by virtue of entry of this Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

45. Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Liens granted in connection with the Exit Facility shall not encumber leasehold interests of non-residential real property that prohibit or restrict the granting of such Liens in the applicable lease except as permitted pursuant to applicable non-bankruptcy law (but shall include the proceeds of the sale or disposition of such leases) and (b) any security deposits (in possession of the landlord) or the Reorganized Debtors' interests, if any, in pre-paid rent, unless Liens on such security deposits or pre-paid rent are expressly permitted pursuant to the underlying lease documents; provided, that the Liens and security interests granted pursuant to the Exit Facility shall extend to any such security deposits or pre-paid rent upon reversion thereof to the Reorganized Debtors, if at all.

46. <u>Binding Effect of the Plan</u>. The Plan shall bind the Debtors, Reorganized Debtor, the Trustee, any Entity receiving or acquiring property under the Plan, any Trust Beneficiaries,

and any Creditor or Interest Holder, whether or not such Creditor or Interest Holder has filed a Proof of Claim or Interest in the Chapter 11 Cases, whether or not the Claim of such Creditor or the Interest of such Interest Holder is Impaired under the Plan, and whether or not such Creditor or Interest Holder has accepted or rejected the Plan. All Claims and Debts shall be fixed and adjusted pursuant to the Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, or Governmental Unit or parish in which any instrument related to under the Plan or related to any transaction contemplated under the Plan is to be recorded with respect to any taxes of the kind specified in Bankruptcy Code section 1146(a).

47. Governmental Approvals Not Required. Except as otherwise specifically provided herein, this Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or other governmental authority with respect to the implementation or consummation of the Plan and Disclosure Statement, any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

48. Applicable Non-Bankruptcy Law. Pursuant to 11 U.S.C. §§ 1123(a), 1123(b) and 1142(a), the provisions of this Order, the Plan, or any other amendments or modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law. The consummation of the Plan, including the assumption or assumption and assignment of any executory contract or unexpired lease by the Reorganized Debtors, shall not constitute a change in ownership or change in control under any employee benefit plan or program, financial instrument, loan or financing agreement, executory contract or unexpired lease or contract, lease or agreement in existence on the Effective Date to which any Debtor is a party.

49. Effectiveness of All Actions. All actions authorized to be taken pursuant to the Plan shall be effective on, prior to, or after the Effective Date pursuant to this Confirmation Order, without further application to or order of the Bankruptcy Court or further action by the respective officers, directors, members, managers, or the Trust and with the effect that such actions had been taken by unanimous action of such officers, directors, members, managers, or employees.

50. Plan and Confirmation Order Mutually Dependent. This Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (c) nonseverable and mutually dependent.

51. Reversal. If any of the provisions of this Confirmation Order are hereafter reversed, modified, or vacated by a subsequent order of the Bankruptcy Court or any other court, such reversal, modification, or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under, or in connection with, the Plan prior to receipt of written notice of such order by the Debtors. Notwithstanding any such reversal, modification, or vacatur of this Confirmation Order, any such act or obligations incurred undertaken pursuant to, and in reliance on, this Confirmation Order prior to the effective date of such reversal, modification, or vacatur shall be governed in all respects by the provisions of this Confirmation Order, the Plan, all documents relating to the Plan, and any amendments or modifications to any of the foregoing.

52. No Stay. Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall not be stayed and shall be immediately effective and enforceable and deemed binding upon the Debtors, the Trust, and any and all Holders of Claims and Interests, all entities that are parties to or subject to the settlements, compromises, releases, and injunctions described in the Plan or in this Confirmation Order, all

state or local governments and governmental officials subject to the provisions of section 1146(a) of the Bankruptcy Code, and any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors.

53. Confirmation Order Supersedes. This Confirmation Order shall supersede any Bankruptcy Court orders issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order.

54. Substantial Consummation. On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

55. Recording. The Debtors, Reorganized Debtors, and the Trustee hereby are authorized to deliver a notice or short form of this Confirmation Order, with the Plan attached, to any state or local recording officer, and such officer must accept for filing such documents or instruments without charging any stamp tax, recording tax, personal property transfer tax, mortgage, or other similar tax. Such notice (a) shall have the effect of an order of this Court, (b) shall constitute sufficient notice of the entry of this Confirmation Order to such filing and recording officers, and (c) shall be a reasonable instrument notwithstanding any contrary provision of non-bankruptcy law. This Court specifically retains jurisdiction to enforce the foregoing direction, by contempt or otherwise.

56. Plan and Confirmation Order Govern. Without intending to modify any prior order of this Court (or any agreement, instrument, or document addressed by any prior order), in the event of an inconsistency between the Plan, on the one hand, and any other agreement, instrument, or document intended to implement the provisions of the Plan, on the other, the provisions of the Plan shall govern; *provided, further,* that, for the avoidance of doubt, in the event of any

inconsistency between the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order shall govern.

57. Final Order. This Confirmation Order is a final order, and the period in which an appeal must be filed shall commence immediately upon the entry hereof.

58. Governmental Units. Nothing in this Order, the Plan, or Plan Documents discharges, releases, precludes, exculpates, or enjoins any liability to a Governmental Unit of a non-debtor. Nothing in this Order, the Plan, or Plan Documents shall affect any setoff or recoupment rights of any Governmental Unit.

59. Retention of Jurisdiction. Notwithstanding the entry of this Confirmation Order of the occurrence of the Effective Date, this Court shall retain jurisdiction over the Chapter 11 Cases and any of the proceedings related to the Chapter 11 Cases pursuant to section 1142 of the Bankruptcy Code and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the purpose and intent of the Plan are carried out and as set forth in Article XVIII of the Plan.

Dated: May ___, 2026

____________________________________
CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

Plan

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re<br><br>CARBON HEALTH TECHNOLOGIES, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No.: 26-90306 (CML)<br><br>(Jointly Administered) |

**CARBON HEALTH TECHNOLOGIES, INC. AND DEBTOR AFFILIATES' COMBINED DISCLOSURE STATEMENT AND THIRD AMENDED PLAN OF REORGANIZATION**


PACHULSKI STANG ZIEHL & JONES LLP
Debra I. Grassgreen (admitted *pro hac vice*)
Maxim B. Litvak (SBT 24002482)
John W. Lucas (admitted *pro hac vice*)
Theodore S. Heckel (SBT 24133488)
700 Louisiana Street, Suite 4500
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile: (713) 691-9407
Email: dgrassgreen@pszjlaw.com
mlitvak@pszjlaw.com
jlucas@pszjlaw.com
theckel@pszjlaw.com

*Counsel to the Debtors and Debtors in Possession*

MORGAN, LEWIS & BOCKIUS LLP
Andrew J. Gallo
One Federal Street
Boston, MA 02110-1726
Telephone: (617) 341-7700
Email: andrew.gallo@morganlewis.com

-and-

Jason Alderson
101 Park Avenue
New York, NY 10178-0060
Telephone: (202) 309-6000
Email: jason.alderson@morganlewis.com

*Counsel to the Debtors and Debtors in Possession*


[1] A complete list of each of the Debtors in these chapter 11 cases is annexed hereto as **Exhibit A**. The Debtors' address is 500 East Remington Drive, Suite 20, Sunnyvale, CA 9408.

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| ARTICLE I. | INTRODUCTION | 4 |
| ARTICLE II. | DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW | 8 |
| ARTICLE III. | BACKGROUND | 29 |
| ARTICLE IV. | VOTING AND CONFIRMATION PROCEDURES | 40 |
| ARTICLE V. | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 49 |
| ARTICLE VI. | RISK FACTORS | 50 |
| ARTICLE VII. | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 54 |
| ARTICLE VIII. | TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS | 63 |
| ARTICLE IX. | CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS | 65 |
| ARTICLE X. | ACCEPTANCE OR REJECTION OF PLAN | 72 |
| ARTICLE XI. | PROVISIONS FOR IMPLEMENTATION OF PLAN | 74 |
| ARTICLE XII. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 87 |
| ARTICLE XIII. | PROVISIONS REGARDING DISTRIBUTIONS | 92 |
| ARTICLE XIV. | PROCEDURES FOR RESOLUTION OF DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS | 99 |
| ARTICLE XV. | CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE OF THE PLAN | 101 |
| ARTICLE XVI. | SETTLEMENT, DISCHARGE, RELEASE, EXCULPATION, INJUNCTIVE, AND RELATED PROVISIONS | 104 |
| ARTICLE XVII. | PRESERVATION OF CERTAIN CAUSES OF ACTION | 109 |
| ARTICLE XVIII. | RETENTION OF JURISDICTION | 111 |
| ARTICLE XIX. | MISCELLANEOUS PROVISIONS | 112 |

ARTICLE XX. RECOMMENDATION ....................................................................119

**EXHIBIT A** – LIST OF DEBTORS

**EXHIBIT B** – LIST OF PHYSICIAN OWNED DEBTORS

**EXHIBIT C** – LIQUIDATION ANALYSIS

**EXHIBIT D** – INSURANCE POLICIES

**EXHIBIT E** – PROJECTIONS

## DISCLAIMERS

**EACH HOLDER OF A CLAIM AGAINST THE DEBTORS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THE COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THE TERMS HEREOF AND SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE. IF YOU ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN. THE DEBTORS URGE YOU TO VOTE TO ACCEPT THE PLAN.**

**THE COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3016 AND 3017, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST OR INTERESTS IN THE DEBTORS SHOULD EVALUATE THE COMBINED DISCLOSURE STATEMENT AND PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THE COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE PLAN.**

**THE COMBINED DISCLOSURE STATEMENT AND PLAN CONTAINS SUMMARIES OF CERTAIN STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE COMBINED DISCLOSURE STATEMENT AND PLAN, EVENTS IN THE CHAPTER 11 CASES, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE STATEMENTS AND DESCRIPTIONS CONTAINED IN THE COMBINED DISCLOSURE STATEMENT AND PLAN ARE TRUE AND ACCURATE, THEY ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENTS RELATED TO THE COMBINED DISCLOSURE STATEMENT AND PLAN AND APPLICABLE STATUTORY PROVISIONS. THE TERMS OF THE DOCUMENTS RELATED TO THE COMBINED DISCLOSURE STATEMENT AND PLAN AND APPLICABLE STATUTES GOVERN IN THE EVENT OF ANY DISCREPANCY WITH THE COMBINED DISCLOSURE STATEMENT AND PLAN. CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ THE COMBINED DISCLOSURE STATEMENT AND PLAN, THE DOCUMENTS RELATED TO THE COMBINED DISCLOSURE STATEMENT AND PLAN, AND THE APPLICABLE STATUTES THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.**

**THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED IN**

**THE COMBINED DISCLOSURE STATEMENT AND PLAN ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED, AND THE DEBTORS DISCLAIM ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS AFTER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE COMBINED DISCLOSURE STATEMENT AND PLAN. THE DELIVERY OF THE COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.**

**THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES. ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTORS INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE DEBTORS' CONTROL. ACCORDINGLY, THE DEBTORS' FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS. SUCH FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THE COMBINED DISCLOSURE STATEMENT AND PLAN. THE DEBTORS DO NOT INTEND TO UPDATE OR REVISE THEIR FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED THEREIN WILL NOT BE REALIZED. ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THIS DISCLOSURE STATEMENT ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTORS AND THEIR ADVISORS. ALTHOUGH THE DEBTORS AND THEIR ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, THE DEBTORS AND THEIR ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THIS INFORMATION.**

**NOTHING CONTAINED IN THIS DOCUMENT SHALL CONSTITUTE AN OFFER, ACCEPTANCE, OR A LEGALLY BINDING OBLIGATION OF THE DEBTOR OR ANY OTHER PARTY IN INTEREST, SINCE THIS COMBINED DISCLOSURE STATEMENT AND PLAN REMAINS, *INTER ALIA*, SUBJECT TO FINAL APPROVAL BY THE BANKRUPTCY COURT. THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN CONDITIONALLY APPROVED BY THE COURT FOR PURPOSES OF SOLICITATION ONLY. THE INFORMATION CONTAINED HEREIN IS PRELIMINARY AND DEVELOPMENTS MAY OCCUR THAT REQUIRE MODIFICATIONS OR ADDITIONS TO, OR DELETIONS FROM, THIS COMBINED DISCLOSURE STATEMENT AND PLAN.**

**THIS COMBINED DISCLOSURE STATEMENT AND PLAN, THE DOCUMENTS RELATED TO THE COMBINED DISCLOSURE STATEMENT AND PLAN, AND THE APPLICABLE STATUTES ARE THE ONLY DOCUMENTS THAT CREDITORS AND OTHER PARTIES IN INTEREST SHOULD CONSIDER IN**

**CONNECTION WITH CONFIRMATION OF THE PLAN, INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN. NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND THE INFORMATION ACCOMPANYING THIS COMBINED DISCLOSURE STATEMENT AND PLAN. ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.**

**APPROVAL OF THE COMBINED DISCLOSURE STATEMENT AND PLAN BY THE BANKRUPTCY COURT, CONDITIONAL OR OTHERWISE, DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN, NOR DOES SUCH APPROVAL CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THE COMBINED DISCLOSURE STATEMENT AND PLAN.**

**THE COMBINED DISCLOSURE STATEMENT AND PLAN CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD READ THIS COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY. AFTER CAREFULLY REVIEWING THESE DOCUMENTS, IF YOU ARE A CLAIM HOLDER ENTITLED TO VOTE, PLEASE INDICATE YOUR VOTE WITH RESPECT TO THE PLAN ON THE BALLOT BY COMPLETING ALL BALLOT ITEMS PROPERLY AND LEGIBLY AND RETURNING IT AS PROVIDED THEREIN.**

# ARTICLE I.

# INTRODUCTION

The Debtors[2] in the above-captioned chapter 11 cases, hereby propose the following combined disclosure statement and plan of reorganization pursuant to sections 1121(a) and 1125(b) of title 11 of the United States Code (the "Combined Disclosure Statement and Plan" or the "Plan").[3]

A. *Overview of Restructuring*

On April 7, 2026, the Debtors filed the *Carbon Health Technologies, Inc. and Debtor Affiliates' Combined Disclosure Statement and Amended Plan of Reorganization* [Docket No. 431] (the "April 7 Plan"). In response to the Committee's opposition to the terms of the April 7 Plan, the Debtors, the DIP Lender, the Prepetition Lenders, and the Committee agreed to mediate the disputed issues pursuant to the *Agreed Mediation Order Appointing Judge Marvin Isgur as Mediator* [Docket No. 451]. Over the course of the past month, the foregoing parties, along with the mediator, Judge Isgur, met and conferred regarding the disputed terms of the April 7 Plan. On May 8, 2026, the parties reached an agreement in principle that was reflected in a term sheet [Docket No. 621] (the "Term Sheet"). In accordance with the Term Sheet, the Combined Disclosure Statement and Plan was amended to reflect the terms and conditions in the Term Sheet and the settlement among the Debtors, the DIP Lender, the Prepetition Lenders, and the Committee. **The Committee now supports the Plan and urges the Holders of Claims to vote in favor of the Plan.**

The Combined Disclosure Statement and Plan provides for a comprehensive restructuring of the Company's balance sheet and a significant investment of capital in the Debtors' business that provides significant value to the Holders of General Unsecured Claims while also providing the Debtors a discharge so that they can continue to operate their businesses and provide important healthcare services. As set forth in more detail herein, the Combined Disclosure Statement and Plan provides:

- The restructuring as set forth in the Combined Disclosure Statement and Plan implements a debt-for-equity exchange transaction (or similar transaction). Holders of DIP Claims and Allowed Prepetition Secured Claims will receive on the Effective Date, in full and final satisfaction of such Claims, their Pro Rata share of: (a) 100% of the New Equity Interests, subject to the dilution described herein, and (b) the Exit Facility. The corporate structure of the Reorganized Debtors is set forth in the Plan Supplement.

- A first lien term loan facility (the "Exit Facility"), which will be provided by the Holders of Prepetition Secured Claims in the event of a Reorganization Transaction, and which is

[2] Capitalized terms are defined in Article II.B of the Plan.
[3] The following bullets are intended for summary purposes only. A more detailed discussion of treatment under the Plan is contained herein at Article IX.

subject to increase as necessary to fund the liquidity requirements of the Reorganized Debtors.

- On the Effective Date of the Combined Disclosure Statement and Plan, a Trust will be formed for the benefit of the holders of an Allowed General Unsecured Claim (*i.e.*, the Trust Beneficiaries) who will each receive, in full and final satisfaction of such Allowed General Unsecured Claims a share of the Trust Assets. The Trust will be funded with the Data Transfer Documents, the Trust Causes of Action, the Trust Funding Amount ($12 million in cash), and the Abuse Insurance Rights. The "Avoidance Actions" assigned to the Trust shall not include the Excluded Avoidance Actions.

- Holders of Allowed Commercial GUC Claims (Class 6) will receive (i) $4.55 million of the Trust Funding Amount, (ii) the proceeds of the Avoidance Actions (other than the Excluded Avoidance Actions), and (iii) a Pro Rata share of the remaining Trust Assets that are not specifically allocated to the Holders of Allowed Abuse Claims, in each case after accounting for the administrative expenses of the Trust.

- Holders of Allowed Abuse Claims will receive (i) $7.45 million of the Trust Funding Amount, (ii) the net proceeds of the Abuse Insurance Policies and the Abuse Insurance Rights, and (iii) a Pro Rata share of the remaining Trust Assets that are not specifically allocated to the Holders of Allowed Commercial GUC Claims, in each case after accounting for the administrative expenses of the QSF.

- The Commercial GUC Claims shall be liquidated in accordance with the Combined Disclosure Statement and Plan, *provided that* the Trustee (but not the Debtors, the Reorganized Debtors or the Secured Parties) shall be responsible for objecting to the Commercial GUC Claims.

- Abuse Claims shall be liquidated in accordance with the Abuse Claims Protocol proposed by the Committee, which Abuse Claims Protocol shall be reasonably acceptable to the Debtors.

- The definition of "Released Parties" shall be expanded such that, *inter alia*, the Debtors' current or continuing control persons, officers, and directors are Released Parties.

- Subject to the Trust's receipt of the full amount of the $12 million Trust Funding Amount and the vesting of the Trust Causes of Action and the Abuse Insurance Rights Transfer in the Trust on the Effective Date, the Debtors and their current and continuing directors and officers will receive full releases from the Debtors and from any direct claims held by the Holders of Abuse Claims. The Debtors and the Secured Parties shall provide the form of release to be executed for Released Parties, by the Holders of Allowed Abuse Claims, which form of release shall be reasonably acceptable to the Committee.

The Combined Disclosure Statement and Plan is the result of extensive good faith negotiations among the Debtors, the Holders of Prepetition Secured Claims (including through the Prepetition Agent), the Holders of DIP Claims (including through the DIP Agent), and the Committee.

The chart below summarizes important, dates milestones to be used in connection with voting, contract assumption/assignment, and confirmation, which are also set forth in Article IV of the Combined Disclosure Statement and Plan below.

| Event | Date[4] |
|---|---|
| Voting Record Date | April 8, 2026 |
| Deadline to Solicit Votes | April 15, 2026 |
| Deadline to File and Serve Assumption Notice | April 22, 2026 |
| Deadline for Creditors to File Rule 3018 Motions | April 22, 2026, at 4:00 p.m. (CT) |
| Deadline to Respond to Rule 3018 Motions | April 29, 2026, at 4:00 p.m. (CT) |
| Contract and Cure Objection Deadline | May 13, 2026, at 4:00 p.m. (CT) |
| Combined Disclosure Statement and Plan Objection Deadline | May 13, 2026, at 4:00 p.m. (CT) |
| Deadline to file Amended Plan | May 15, 2026 |
| Deadline to Notify Voting Class of Amended Plan and Extended Voting Deadline | May 15, 2026 |
| Extended Voting Deadline | May 22, 2026, at 4:00 p.m. (CT) |
| Deadline to file Amended Plan Supplement | May 22, 2026 |
| Deadline to File Voting Tabulation Affidavit | May 27, 2026, at 4:00 p.m. (CT) |
| Deadline to File Confirmation Brief and Other Evidence Supporting the Combined Disclosure Statement and Plan | May 27, 2026, at 4:00 p.m. (CT) |
| Confirmation Hearing | May 29, 2026, at 9:00 a.m. (CT) |

The chart below summarizes the classification Claims and Equity Interests, their right to vote to accept or reject the Plan, and a projection of distributions to the Holders in each of the respective Classes.

| **Class** | **Claim** | **Status** | **Voting Right** | **Projected Distribution** |
|---|---|---|---|---|
| 1(a) | Other Secured Claims | Unimpaired | Deemed to Accept | 100% |
| 1(b) | John Muir Secured Claims | Impaired | Entitled to Vote | 24% |
| 1(c) | Prime Health Secured Claims | Impaired | Entitled to Vote | 4.5% |
| 1(d) | Stanford Health Secured Claims | Impaired | Entitled to Vote | 12% |

4 All times noted are in prevailing Central Time.

| **Class** | **Claim** | **Status** | **Voting Right** | **Projected Distribution** |
|---|---|---|---|---|
| 2 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept | 100% |
| 3 | Priority Tax Claims | Unimpaired | Deemed to Accept | 100% |
| 4 | DIP Claims and Prepetition Secured Claims[5] | Impaired | Entitled to Vote | TBD |
| 5 | Patient Claims | Unimpaired | Deemed to Accept | 100% |
| 6 | Commercial GUC Claims | Impaired | Entitled to Vote | 8%-10% |
| 7 | Abuse Claims | Impaired | Entitled to Vote | 9%-10% |
| 8 | Subordinated Claims | Impaired | Deemed to Reject | 0% |
| 9 | Equity Interests | Impaired | Deemed to Reject | 0% |
| 10 | Intercompany Claims | Unimpaired / Impaired | Deemed to Accept / Deemed to Reject | 0% or 100% |
| 11 | Intercompany Interests | Unimpaired / Impaired | Deemed to Accept / Deemed to Reject | 0% or 100% |

The Debtors submit that the Combined Disclosure Statement and Plan and/or notice thereof will be distributed to all holders of Claims and Interests in accordance with section 1125(b) of the Bankruptcy Code and Rules 2002, 3016, and 3017 of the Federal Rules of Bankruptcy Procedure. The Combined Disclosure Statement and Plan and the exhibits hereto include a discussion of: (i) the nature of the Debtors' business; (ii) events during the Chapter 11 Cases; (iii) the requirements for confirmation of the Plan and procedures for voting to accept or reject the Plan; (iv) additional factors and disclosures to be considered, including risk factors and certain U.S. federal income tax consequences of the Plan; and (v) the terms of the Plan, including the treatment of holders of Claims and Interests under the Plan. The Combined Disclosure Statement and Plan was prepared with the intent to provide "adequate information" (as defined in the Bankruptcy Code) to enable holders of Claims against and Interests in the Debtors to make informed judgments about the Plan.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XIX.E of the Combined Disclosure Statement and Plan, the Debtors expressly reserve the right to alter, amend, or modify the Combined Disclosure Statement and Plan, including the Plan Supplement, one or more times, before substantial consummation thereof.

[5] The DIP Claims have been placed in Class 4 for administrative convenience and for purposes of nomenclature within the Plan only and the Holders of the DIP Claims are not entitled to vote to accept or reject the Plan. The Prepetition Secured Claims shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan and receiving Plan Distributions.

***Please read the Combined Disclosure Statement and Plan, the exhibits, other supporting materials, and any appropriate Ballot carefully and follow the instructions set forth below and on the appropriate Ballot to vote on the Combined Disclosure Statement and Plan. The Debtors believe that the Plan provides the best method of maximizing the recoveries for the holders of Claims against the Debtors. Therefore, the Debtors recommend that all creditors who are entitled to vote should vote in favor of the Plan.***

All creditors entitled to vote to accept the Plan should return their Ballots (as defined herein), so as to be actually received by the Voting Agent no later than **May 22, 2026, at 4:00 p.m. prevailing Central Time**. Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing (as defined below).

## ARTICLE II.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A. *Rules of Interpretation, Computation of Time, and Governing Law*

For purposes herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (b) any reference herein to a contract, instrument, release, note, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or exhibit Filed, or to be Filed, shall mean such document or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to articles, exhibits, and schedules are references to the respective Articles, Exhibits or Schedules hereof or hereto; (e) the words "herein," "hereof" and "hereto" refer to the Combined Disclosure Statement and Plan in its entirety rather than to a particular portion of the Combined Disclosure Statement and Plan; (f) captions and headings of Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply except to the extent inconsistent with the Plan or Plan Supplement; (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (i) whenever the Plan or the Plan's Exhibits use the word "including," such reference shall be deemed to mean "including, without limitation,".

In computing any period of time prescribed or allowed hereby, the provisions of Bankruptcy Rule 9006(a) shall apply.

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the express provisions of the Restructuring Transactions Memorandum or any contract, instrument, release, note, or other agreement or document entered into in connection herewith,

the laws of the State of Texas, giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents and instruments executed in connection with the Plan, including any rule of law or procedure supplied by federal law as interpreted under decisions in the State of Texas (including the Bankruptcy Code and the Bankruptcy Rules).

B. *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

**1.** "*Abuse*" means any actual or alleged: (a) sexual conduct or misconduct, sexual abuse or molestation, indecent assault and/or battery, rape, pedophilia, hebephilia, ephebophilia, lascivious behavior, undue familiarity, or sexually-related physical psychological, or emotional harm, or contacts, or interactions of a sexual nature between a child and an adult, or a nonconsenting adult and another adult, sexual assault, sexual battery, sexual psychological or emotional abuse, sexual humiliation, or sexual intimidation, any other sexual misconduct, or any conduct constituting a sexual offense, incest, or use of a child in a sexual performance; or (b) non-sexual assault, battery, corporal punishment and other non-sexual acts of physical, psychological, mental or emotional abuse, humiliation or intimidation (including physical abuse or bullying without regard to whether such physical abuse or bullying is of a sexual nature).

**2.** "*Abuse Claims Protocol*" means the protocol for the resolution of Abuse Claims and distribution to Holders of Allowed Abuse Claims from the Abuse Claims QSF.

**3.** "*Abuse Claim*" means any General Unsecured Claim that has been or could be asserted against any Debtors that is attributable to, arises from, is based upon, or results from, in whole or in part, directly, indirectly, or derivatively, Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or any other relief under any theory of liability, law, or equity whatsoever, including contribution, indemnity, vicarious liability, *respondeat superior*, conspiracy, fraud (including fraud in the inducement), any negligence-based or employment-based theory (including negligent hiring, supervision, retention, or misrepresentation), any other theory based upon misrepresentation, concealment, or unfair practice, public or private nuisance, or any other theory (including any theory based upon public policy) or any act or failure to act by any Debtors or any other Entity for whose acts or failures to act any Debtors is or was alleged to be responsible. The term "Abuse Claim" shall not include any Cause of Action against any non-Debtors.

**4.** "*Abuse Claims Administrator*" means the Person, including the designee of such Person, who will assess Abuse Claims under the Abuse Claims Protocol.

**5.** "*Abuse Claims QSF*" or "*Abuse Claims Qualified Settlement Fund*" means a qualified settlement fund established pursuant to the Plan, solely for the benefit of Holders of Abuse Claims, which shall receive the Abuse Claims QSF Assets.

**6.** "*Abuse Claims QSF Assets*" means (a) $7.45 million of the Trust Funding Amount, the Abuse Insurance Policies, and the Abuse Insurance Rights and (b) a Pro Rata share

of the remaining distributable value of the Trust Assets, excluding the Avoidance Actions, after accounting for the administrative expenses of the Trust.

**7.** "*Abuse Claim Release*" means a release by each holder of an Abuse Claim of each of the Debtors, DIP Lenders, the DIP Agent, the Prepetition Lenders, Prepetition Agent, and the Debtors' current or continuing officers and directors (and each of their respective attorneys, consultants, financial advisors, investment bankers, accountants, and other retained professionals), in each case solely in their capacities as such, in a form to be provided by the Debtors and the Secured Parties, which form of release shall be reasonably acceptable to the Committee and which release shall be effective upon the payment in full of the Trust Funding Amount.

**8.** "*Abuse Insurance Coverage Defense*" means all defenses at law or in equity that any Insurance Company may have under applicable law to provide insurance coverage to or for an Abuse Claim, except for (a) any defense that the Abuse Insurance Rights Transfer is invalid or unenforceable or otherwise breaches the terms of such coverage and (b) any defense that the drafting, proposing, confirmation, or consummation of this Plan or the discharge or release of the Debtor or any other party from any Abuse Claims under this Plan operates to, or otherwise results in, the elimination of or the reduction in any obligation such Insurance Company may have under rights assigned to the Trust, including in providing coverage for liabilities assumed by the Trust that were or are liabilities of the Debtor.

**9.** "*Abuse Insurance Policies*" means any Insurance Policies that provides coverage for any Abuse Claim, but excluding any policy that was in force on and after the Petition Date.

**10.** "*Abuse Insurance Rights*" means any and all rights, titles, privileges, interests, claims, demands, or entitlements of the Debtors to any proceeds, payments, benefits, Causes of Action, choses in action, defense or indemnity arising under, or attributable to, any and all Abuse Insurance Policies on account of any and all Abuse Claims now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent, including any claim regarding (a) any Insurance Company's failure to provide coverage or otherwise pay under an Abuse Insurance Policy on account of an Abuse Claim, (b) the refusal of any Insurance Company to compromise and settle on account of any Abuse Claim or provide defense on account of any Abuse Claim under an Abuse Insurance Policy, (c) the interpretation or enforcement of the terms of any Abuse Insurance Policy with respect to any Abuse Claim, (d) any conduct by any Insurance Company involving any Abuse Claim constituting "bad faith" conduct or that could otherwise give rise to extra-contractual damages, or other wrongful conduct under applicable law on account of an Abuse Claim, or (e) any right to receive proceeds with respect to any Abuse Insurance Policy or a related coverage action on account of an Abuse Claim.

**11.** "*Abuse Insurance Rights Transfer*" means the assignment and transfer to the Abuse Claims QSF of (a) the Abuse Insurance Rights and (b) all other rights, claims, benefits, or Causes of Action of the Debtors under or with respect to the Abuse Insurance Policies (but not the policies themselves).

**12.** "*Acquired Assets*" means the assets of the Debtors acquired pursuant to a Third-Party Sale Transaction; *provided, however*, that notwithstanding anything to the contrary in the Third-Party Sale Transaction, the Trust Causes of Action shall not be Acquired Assets.

**13.** "*Acquisition Agreement*" means a purchase and sale agreement governing the purchase and sale of Acquired Assets with one or more Third-Party Successful Bidders, in form and substance acceptable to the Debtors, the Prepetition Agent, and the DIP Agent.

**14.** "*Administrative Expense Bar Date*" means (i) the date fixed by the Disclosure Statement Order by which any Person (including any Governmental Unit) asserting an Administrative Expense Claim against any Debtor (subject to the exceptions contained therein) must have filed a proof of Administrative Expense Claim with the Bankruptcy Court or application for allowance of such Administrative Expense Claim (as applicable) against any such Debtor or be forever barred from asserting such Administrative Expense Claim or (ii) for claims not subject to the foregoing, the first Business Day that is twenty-eight (28) days following the Effective Date. The Confirmation Order shall provide for the Administrative Expense Bar Date set forth herein to the extent not set by the Disclosure Statement Order.

**15.** "*Administrative Expense Claim*" means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases pursuant to sections 503(b) and 507(a)(2) or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the Debtors' business; (b) compensation for legal, financial advisory, accounting, and other professional services and reimbursement of expenses awarded or allowed pursuant to sections 327, 328, 330, 331, 503, or 1103 of the Bankruptcy Code; (c) any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their business after the Petition Date; and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

**16.** "*Administrative Expense Claims Objection Deadline*" means the deadline for objecting to an Administrative Expense Claim asserted against a Debtor, which shall be on the date that is the later of: (a) the first Business Day following 180 days after the Effective Date; and (b) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing upon a motion filed by the Reorganized Debtors either on or before the then existing Administrative Expense Claims Objection Deadline or thereafter for cause.

**17.** "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

**18.** "*Allowed*" means, with respect to any Claim against the Debtors, (a) a Claim listed in the Schedules, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009, as liquidated, non-contingent, and undisputed, and for which no contrary Proof of Claim or objection has been filed, (b) a Claim expressly allowed under this Plan, (c) a Claim to which the Debtors or the Trustee, as applicable, and the holder of such Claim agree to the amount and priority of the Claim, which agreement is approved by a Final Order, (d) a Claim that is compromised, settled, or otherwise resolved in a manner consistent with the Trust Documents and this Plan, or (e) a Claim that is compromised, settled, or otherwise resolved or Allowed pursuant to a Final Order (including any omnibus or procedural

Final Order relating to the compromise, settlement, resolution, or allowance of any Claims), provided, that notwithstanding the foregoing, unless expressly waived by this Plan, the Allowed amount of a Claim shall be subject to, and shall not exceed the limitations or maximum amounts permitted by, the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable. Notwithstanding anything to the contrary herein, any Claim of any Person from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall not be deemed Allowed unless and until such Person or transferee has paid the amount, or turned over any such property, for which such Person or transferee is liable under sections 522(i), 542, 543, 550, or 553 of the Bankruptcy Code, following an objection to a Claim filed on such grounds. "Allowance" and "Allowing" shall have correlative meanings.

**19.** "*Amended DIP Order*" means the *Order Granting Emergency Motion To Approve First Amendment To Senior Secured Superpriority Debtor-In-Possession Financing Agreement* [Docket No. 609].

**20.** "*Assumption Dispute*" means an unresolved objection regarding assumption, Cure Payment, "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or other issues relating to assumption or assumption and assignment of an executory contract or unexpired lease.

**21.** "*Assumption Notice*" means the schedule of executory contracts and unexpired leases potentially to be assumed, or assumed and assigned, as of the Effective Date, by the Debtor pursuant to this Plan. The Assumption Notice will be filed and served no later than April 22, 2026.

**22.** "*Assumption Notice Deadline*" means the twenty-first day after the filing of the Assumption Notice.

**23.** "*Assumption Schedule*" means the schedule of executory contracts and unexpired leases to be assumed, or assumed and assigned, as of the Effective Date, by the Debtor pursuant to this Plan. The initial Assumption Schedule will be filed as part of the initial Plan Supplement but remains subject to any modifications that may be made prior to the entry of the Confirmation Order in accordance with this Plan and the Restructuring Transactions Memorandum.

**24.** *"Avoidance Action"* means any and all actual or potential avoidance, recovery, subordination, or other Causes of Action or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Causes of Action or remedies under sections 502, 510, 542, 544, 545, 547-553, and 724(a) of the Bankruptcy Code, or under other similar or related local, state, federal, or foreign statutes or common law, including preference and fraudulent transfer and conveyance laws, in each case whether or not litigation to prosecute such Claim(s), Cause(s) of Action or remedy(ies) were commenced prior to the Effective Date.

**25.** "*Ballots*" mean the ballots upon which the Holders of Impaired Claims shall indicate their acceptance or rejection of the Plan in accordance with the Plan and the Solicitation Package.

**26.** "*Bankruptcy Clerk*" means the clerk of the United States Bankruptcy Court for the Southern District of Texas, Bob Casey United States Courthouse, 515 Rusk Avenue, Houston, TX 77002.

**27.** "*Bankruptcy Code*" means title 11 of the United States Code, as amended from time to time, as in effect on the Confirmation Date, as applicable to the Chapter 11 Cases.

**28.** "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, or any other court having jurisdiction over the Chapter 11 Cases or over any proceedings arising in or related to the Chapter 11 Cases.

**29.** "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, promulgated pursuant to 28 U.S.C. § 2075, and the general, local, and chambers rules of the Bankruptcy Court.

**30.** "*Bar Date*" means, as applicable, the (a) Claims Bar Date, (b) Governmental Unit Bar Date, or (c) Administrative Expense Bar Date.

**31.** "*Bar Date Order*" means Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Notice of Bar Dates [Docket No. 193].

**32.** "*Bidding Procedures Motion*" means Emergency Motion Debtors' Emergency Motion for Entry of Order (I) (A) Approving Bid Procedures for Sale of Debtors Assets, (B) Scheduling Sale Process Deadlines, Auction, Objection Deadlines, and Sale Hearing, (C) Establishing Assumption and Assignment Procedures, (D) Approving the Form and Manner of Notice of Sale, Auction, Sale Hearing, and Assumption and Assignment Procedures, and (E) Granting Related Relief; and (II) (A) Approving Sale of Debtors Assets, (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief Filed by Debtor Carbon Health Technologies, Inc. [Docket No. 38].

**33.** "*Bidding Procedures Order*" means Order (A) Approving Bid Procedures For Sale of Debtors' Assets, (B) Scheduling Sale Process Deadlines, Auction, Objection Deadlines, and Sale Hearing, (C) Establishing Assumption and Assignment Procedures, (D) Approving the Form and Manner of Notice of Sale, Auction, Sale Hearing, and Assumption and Assignment Procedures, and (E) Granting Related Relief [Docket No. 100].

**34.** "*Business Day*" means any day, other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or any other day on which commercial banks in New York are required or are authorized to close by law or executive order.

**35.** "*CAG*" means the Attorney General of the State of California.

**36.** "*Carbon Defendants*" has the meaning set out in Article III.E of this Combined Disclosure Statement and Plan.

**37.** "*Carbon East Bay Medical*" means Carbon Health East Bay Medical Group, P.C., a Debtor, Case No.: 26-90316 (CML).

**38.** "*Carbon East Bay Primary*" means Carbon Health East Bay Primary Care, P.C., a Debtor, Case No.: 26-90319 (CML).

**39.** "*Cash*" means lawful currency of the United States of America.

**40.** "*Category 1 Documents*" shall mean Data Transfer Documents that relate solely to the Trust Assets (including the Trust Causes of Action) and the General Unsecured Claims and not to Reorganized CHTI's business operations.

**41.** "*Category 2 Documents*" shall mean Data Transfer Documents that relate to both the Trust Assets (including the Trust Causes of Action) and the General Unsecured Claims and to Reorganized CHTI's business operations.

**42.** "*Category 3 Documents*" shall mean Data Transfer Documents that relate solely to Reorganized CHTI's business operations and not to the Trust Assets (including the Trust Causes of Action) and the General Unsecured Claims.

**43.** "*Causes of Action*" means any action, class action, claim, cause of action, controversy, demand, right, action, lien, indemnity, subrogation, contribution, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. "Cause of Action" also includes: (a) any right of setoff, counterclaim, reimbursement, or recoupment and any claim for breaches of duties imposed by law, in contract, by tort, or in equity, (b) the right to object to Claims or Equity Interests, (c) any claim or cause of action pursuant to section 362 of the Bankruptcy Code or chapter 5 of the Bankruptcy Code or similar state law, (d) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any claims under any state or foreign law, including any fraudulent transfer or similar claims.

**44.** "*Chapter 11 Cases*" means the chapter 11 cases jointly administered under the chapter 11 case styled *In re Carbon Health Technologies, Inc.*, Case No.: 26-90306 (CML), pending in the Bankruptcy Court.

**45.** "*CHMG Florida*" means Carbon Health Medical Group of Florida, P.A.

**46.** "*CHTI*" means Carbon Health Technologies, Inc., a Delaware corporation.

**47.** "*Claim*" means a claim, as defined by section 101(5) of the Bankruptcy Code, against the Debtors, or any of them, or against property of the Debtors.

**48.** "*Claims Bar Date*" means April 2, 2026, which is the date established by the Bankruptcy Court in the Bar Date Order, by which Holders of Claims other than Governmental Unit Claims and Administrative Expense Claims are required to File Proofs of Claim on account of such Claims.

**49.** "*Claims Objection Deadline*" means the deadline for objecting to a Claim asserted against a Debtor, which shall be on the date that is the later of: (a) the first Business Day following 180 days after the Effective Date; and (b) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing upon a motion filed by the Trustee, Debtors, or Reorganized Debtors either on or before the then existing Claims Objection Deadline or thereafter for cause.

**50.** "*Class*" means a category of Holders of Claims or Equity Interests as set forth in Article IX herein.

**51.** "*Clinic Secured Claims*" means those secured claims comprised of the John Muir Secured Claims, Prime Health Secured Claims, and Stanford Health Secured Claims.

**52.** "*COD*" has the meaning set forth in Article VII.B of this Combined Disclosure Statement and Plan.

**53.** "*Collateral*" means any property or interest in property of the Estates that is subject to an unavoidable Lien to secure the payment or performance of a Claim.

**54.** "*Common-Interest Communications*" means documents, information, or communications (whether written or oral) that are subject to the attorney-client privilege, attorney-work product doctrine, joint defense, or other privilege or protection from disclosure, and were shared between or among (a) the Debtors, on the one hand, and (b) any third-party Entity or its representatives, including representatives of an Insurance Company or their counsel, that share a common legal interest with the Debtors, on the other hand, including documents that reflect litigation defense or strategy, case evaluations, discussions of settlements or resolutions, and communications regarding underlying litigation.

**55.** "*Combined Disclosure Statement and Plan*" has the meaning set forth in Article I of this Combined Disclosure Statement and Plan.

**56.** "*Commercial GUC Claim*" means any General Unsecured Claim against a Debtor that is not an Abuse Claim.

**57.** "*Commercial GUC Fund*" means a fund established pursuant to the Plan solely for the benefit of Commercial GUC Claims, which shall receive (a) $4.55 million of the Trust Funding Amount and the Avoidance Actions (other than the Excluded Avoidance Actions) and (b) a Pro Rata share of the remaining distributable value of the Trust Assets, excluding the Abuse Insurance Policies and the Abuse Insurance Rights, after accounting for the administrative expenses of the Trust.

**58.** "*Committee*" means any Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases [Docket No. 115].

**59.** "*Committee Fee Cap Amount*" has the definition ascribed to it in Article VIII.C.2.

**60.** "*Committee Professionals*" means Brown Rudnick LLP, Province, LLC, and Gilbert LLP."

**61.** "*Confirmation*" means the entry on the docket by the Bankruptcy Clerk of the Confirmation Order, subject to all conditions specified in Article XV.A herein having been satisfied or waived pursuant to Article XV.C herein.

**62.** "*Confirmation Date*" means the date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

**63.** "*Confirmation Hearing*" means the hearing or hearings at which the Bankruptcy Court considers entry of the Confirmation Order.

**64.** "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

**65.** "*Creditor*" means any Holder of a Claim.

**66.** "*Data Room*" has the meaning set forth in Article III.D.3 of this Combined Disclosure Statement and Plan.

**67.** "*Data Transfer*" means the transfer to the Trust of the files, documents, and communications that are included within the definition of Data Transfer Documents to enable the Trust to have full access to and utilization of such documents to the extent set forth in this Plan.

**68.** "*Data Transfer Documents*" means (a) all of the Debtors' document productions to the Committee during the Chapter 11 Cases, (b) the Debtors' document production to the Committee resulting from the application of any reasonable search parameters provided by the Committee to the Debtors prior to the Confirmation Date, and (c) all reasonably identifiable documents, communications, and Privileged Information in the Debtors' possession, custody, or control that contain information relevant to the liquidation of General Unsecured Claims and the Trust Causes of Action.

**69.** "*D&O Claims*" means any Causes of Action the Debtors may have against their current and former officers and directors; provided, however, the foregoing shall not include claims against current or continuing directors and officers.

**70.** "*D&O Insurance Coverage*" means coverage available for insureds under any applicable D&O Policies.

**71.** "*D&O Policies*" means all Insurance Policies (including policies providing D&O Insurance Coverage, D&O Tail Coverage, and any excess or umbrella policy) and related agreements or instruments thereto of indemnity for directors', members', trustees' and officers' liability issued or providing coverage at any time to or for the benefit of any Debtor or individual insureds and all agreements, documents or instruments relating thereto, for any policy period whatsoever.

**72.** "*D&O Tail Coverage*" means the extension of the D&O Insurance Coverage for any period beyond the end of the applicable policy period, including but not limited to any extension after the Effective Date for claims based on conduct occurring prior to the Effective Date.

**73.** "*Debtors*" mean the entities listed on **Exhibit A** annexed hereto.

**74.** "*Debtors Professionals*" means Pachulski Stang Ziehl & Jones LLP, Alvarez & Marsal North America, LLC, Stifel, Nicolaus & Co., Inc., and Foley & Lardner LLP.

**75.** "*DIP Agent*" means Future Solution Investments LLC, in its capacity as administrative and collateral agent for itself and the DIP Lenders under the DIP Financing Agreement.

**76.** "*DIP Claims*" means all Claims held by the DIP Agent and the DIP Lenders pursuant to the DIP Financing Agreement and the Final DIP Order.

**77.** "*DIP Financing Agreement*" means that certain Senior Secured Superpriority Debtor-In-Possession Financing Agreement, dated as of February 2, 2026 (as amended in accordance with the terms thereof and the terms of the Final DIP Order), by and among the Debtors, as borrowers, the DIP Agent, and the DIP Lenders, as approved by the Bankruptcy Court pursuant to the Final DIP Order.

**78.** "*DIP Lenders*" means the lenders under the DIP Financing Agreement.

**79.** "*DIP Motion*" means the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Postpetition Financing and Use Certain Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 13].

**80.** *"Disclosure Statement Order"* means the *Order (I) Granting Interim Approval of the Adequacy of Disclosures in the Combined Disclosure Statement and Plan; (II) Scheduling a Combined Confirmation Hearing and Setting Deadlines Related Thereto; (III) Approving Solicitation Packages and Procedures; (IV) Approving the Forms of Ballots; and (V) Granting Related Relief* [Docket No. 440].

**81.** "*Disputed*" means, with respect to any Claim or Equity Interest, as of the date of determination, any Claim or Equity Interest: (a) listed on the Schedules as unliquidated, disputed or contingent, unless and until it is Allowed pursuant to a Final Order; (b) as to which

the Debtors or any other party in interest has Filed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, which objection or request for estimation has not been withdrawn with prejudice or determined by a Final Order; or (c) that is otherwise disputed by the Trustee, Debtors, Reorganized Debtors, or any other party in interest, or is subject to any right of setoff or recoupment, or the Holder thereof is subject to any Claim or Causes of Action, in accordance with applicable law, which dispute, right of setoff or recoupment, Claim, or Causes of Action, has not been withdrawn or determined in favor of such Holder by a Final Order. For the avoidance of doubt, none of the Prepetition Secured Claims or DIP Claims are Disputed Claims.

**82.** "*Distribution Record Date*" means the close of business on the Business Day immediately preceding the Effective Date. For the avoidance of doubt, the Distribution Record Date does not apply to holders of public securities.

**83.** "*DTC*" means the Depository Trust Company.

**84.** "*Effective Date*" means the date which is the first Business Day after (a) the Confirmation Order becomes a Final Order and (b) all conditions specified in Article XV.B herein have been (x) satisfied or (y) waived pursuant to Article XV.C herein.

**85.** "*Employment Arrangements*" means all employment and severance arrangements, programs, and policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, consultants, contractors, and non-employee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans (including equity and equity-based plans), welfare benefits plans, and life and accidental death and dismemberment insurance plans.

**86.** "*Enjoined Matters*" has the meaning set forth in Article XVI.E of this Combined Disclosure Statement and Plan.

**87.** "*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

**88.** "*Equity Interest*" means any equity interest in the Debtors, including any issued, unissued, authorized, or outstanding shares of stock together with any warrants, options, or contract rights to purchase or acquire such interests at any time, or any Claim or interest that is subject to the subordination to the level of any equity interest pursuant to Bankruptcy Code section 510(b).

**89.** "*Estate Causes of Action*" means Causes of Action owned, held, or capable of being asserted by, under, through or on behalf of the Debtors or their Estates, whether known or unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction, including actions that arise out of or are based on breach of warranty, breach of contract, fraudulent conveyances and transfers, breach of fiduciary duty, breach of duty of loyalty or obedience, aiding and abetting breach of fiduciary duty, legal malpractice, recovery of attorneys' fees, turnover of property and avoidance or recovery actions of the Debtors or their Estates, and all other actions that constitute property of the Estates under section 541 of the Bankruptcy Code that are or may be pursued by a representative of the Estates, including

pursuant to section 323 of the Bankruptcy Code, and actions, including Avoidance Actions under chapter 5 of the Bankruptcy Code, seeking relief in the form of damages (actual and punitive), imposition of a constructive trust, turnover of property, restitution, and declaratory relief with respect thereto or otherwise.

**90.** "*Estates*" means the estates of the Debtors created pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

**91.** "*Excluded Avoidance Actions*" means those Avoidance Actions set forth on Exhibit G of the Plan Supplement.

**92.** "*Exculpated Parties*" means the Debtors, the Committee, and the members of the Committee.

**93.** "*Exit Credit Agreement*" has the meaning set forth in Article XI.C.1 of this Combined Disclosure Statement and Plan.

**94.** "*Exit Facility*" has the meaning set forth in Article I.A of this Combined Disclosure Statement and Plan.

**95.** "*Federal Health Care Program*" is defined as such term is defined in 42. U.S.C. §1320a-7b(f) and including Medicare, state Medicaid programs, state CHIP programs, TRICARE and similar or successor programs with or for the benefit of any Governmental Unit.

**96.** "*File*" or "*Filed*" means file or filed with the Bankruptcy Court in the Chapter 11 Cases.

**97.** "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

**98.** "*Final DIP Order*" means the Order (I) Authorizing the Debtors to Obtain Postpetition Secured Financing Pursuant to Section 364 of the Bankruptcy Code; (II) Authorizing the Debtors to Use Certain Cash Collateral; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Granting Adequate Protection to the Prepetition Secured Parties; (V) Modifying the Automatic Stay; and (VI) Granting Related Relief, entered by the Bankruptcy Court on February 27, 2026 [Docket No. 194], as such order may be supplemented or extended.

**99.** "*Final Order*" means an order of the Bankruptcy Court: (a) as to which the time to appeal, petition for certiorari, or move for reargument, reconsideration, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for reargument, reconsideration, or rehearing is pending; or (b) if an appeal, writ of certiorari, reargument, or rehearing thereof has been sought, such order has been affirmed by the highest court to which such order was appealed or from which certiorari was sought, reargument, reconsideration, or rehearing has been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for reargument, reconsideration, or rehearing has expired; *provided*, *however*, that the possibility of a motion pursuant to Rule 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule or rule governing appellate

practice being Filed with respect to such order shall not cause such order to be deemed a non-Final Order.

**100.** "*Financial Projections*" has the meaning set forth in Article VI.D.1 of this Combined Disclosure Statement and Plan.

**101.** "*General Unsecured Claim*" means any Claim that is not an Administrative Expense Claim, DIP Claim, Prepetition Secured Claim, Other Secured Claim, John Muir Secured Claim, Prime Health Secured Claim, Stanford Secured Claim, Priority Tax Claim, Priority Non-Tax Claim, Subordinated Claim, or Intercompany Claim. The General Unsecured Claims include Abuse Claims and Commercial GUC Claims.

**102.** "*Go-Forward Fees*" means Professional Fee Claims of the Debtors Professionals and Committee Professionals incurred from May 9, 2026 through the Effective Date, and with respect to the Committee Professionals, subject to the Committee Fee Cap Amount.

**103.** "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

**104.** "*Governmental Unit Bar Date*" means August 1, 2026, which is the date established by the Bankruptcy Court in the Bar Date Order by which Holders of Governmental Unit Claims are required to File Proofs of Claim on account of such Governmental Unit Claims in accordance with the Bar Date Order.

**105.** "*Governmental Unit Claim*" means any Claim of which the Holder is a Governmental Unit.

**106.** "*Holder*" means the Person or Entity holding the beneficial interest in a Claim, Equity Interest, or Trust Interest.

**107.** "*Incurred Fees*" means Professional Fees Claims by the Debtors Professionals and the Committee Professionals incurred from the Petition Date through May 8, 2026, and with respect to the Committee Professionals, subject to the Committee Fee Cap Amount.

**108.** "*Impaired*" means, with respect to any Class of Claims or Equity Interests, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

**109.** "*Impaired Claim*" or "*Impaired Equity Interest*" means a Claim or Equity Interest, as the case may be, classified in an Impaired Class.

**110.** "*Independent Director*" means Robert Warshauer.

**111.** "*Insider*" means an "insider" as defined in section 101(31) of the Bankruptcy Code.

**112.** "*Insider Claim*" means any Causes of Action of the Debtors or their Estates against any of the Debtors' current or former Insiders or Affiliates based on any theory of

liability, including under the doctrines of alter ego and veil piercing; provided, however, the foregoing shall not include claims against any current or continuing directors and officers.

**113.** "*Insurance Coverage*" means coverage for insureds under any applicable Insurance Policies.

**114.** "*Insurance Company*" means an Entity that issued, or that has any actual, potential, demonstrated, or alleged liabilities, duties, or obligations under, or with respect to, any Insurance Policy, and any third party administrator, parent, subsidiary, affiliate, successor, predecessor, or assign of any of the foregoing, solely in their capacity as such with respect to an Insurance Policy.

**115.** "*Insurance Policies*" means any insurance policies, insurance contracts, binders, certificates, or reinsurance policies, whether currently known or unknown, issued to or that provides coverage (whether as the primary or additional insured or otherwise) at any time to the Debtors or any parent, subsidiary, affiliate, successor, predecessor, or assign of any of the foregoing.

**116.** "*Insurance Proceeds*" means any proceeds recovered from an Insurance Company under, related to, or in connection with an Insurance Policy.

**117.** "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor.

**118.** "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

**119.** "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any of the Debtors, and any other security or equity interest in any of the Debtors, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest or other instrument, evidencing any fixed or contingent ownership interest in any of the Debtors, whether or not transferable and whether fully vested or vesting in the future, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, that existed immediately before the Effective Date, and including any equity interest issued to any of the Debtors' current or former employees and non-employee directors various forms of long-term incentive compensation, including stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares/units, incentive awards, Cash awards, and other stock-based awards."

**120.** "*Interim DIP Order*" means the Interim Order (I) Authorizing the Debtors to Obtain Post-petition Secured Financing Pursuant to Section 364 of the Bankruptcy Code; (II) Authorizing the Debtors to Use Certain Cash Collateral; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Granting Adequate Protection to the Prepetition Secured Parties; (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief, entered by the Bankruptcy Court on February 3, 2026 [Docket No. 49], as such order may be supplemented or extended.

**121.** "*IRS*" means the Internal Revenue Service.

**122.** "*John Muir*" means John Muir Health.

**123.** "*John Muir Secured Claims*" means those secured claims arising under that certain Delayed Draw Term Loan Credit and Guaranty Agreement, dated November 5, 2021, between John Muir and Carbon East Bay Medical, as borrower, and Carbon East Bay Primary, as guarantor.

**124.** "*Judgment Creditor*" has the meaning set forth in Article III.C of this Combined Disclosure Statement and Plan.

**125.** "*Judgment Levy*" has the meaning set forth in Article III.C of this Combined Disclosure Statement and Plan.

**126.** "*Lien*" means a lien as defined by section 101(37) of the Bankruptcy Code.

**127.** "*Liquidation Analysis*" means the Debtors' summary of the best estimate of recoveries by holders of Claims if the Chapter 11 Cases were converted to a case under chapter 7 as set forth on **Exhibit C**.

**128.** "*Marketing Process*" has the meaning set forth in Article III.D.3 of this Combined Disclosure Statement and Plan.

**129.** "*MIP*" has the meaning set forth in Article XI.C.4 of this Combined Disclosure Statement and Plan.

**130.** "*MIP Equity*" has the meaning set forth in Article XI.C.4 of this Combined Disclosure Statement and Plan.

**131.** "*New Board*" means the initial board of directors of Reorganized CHTI as provided in the Plan Supplement.

**132.** *"New Corporate Governance Documents*" means the certificate of incorporation, certificate of formation, bylaws, limited liability company agreements, shareholder agreement (if any), operating agreement or other similar organizational or formation documents, as applicable, which shall be acceptable to the Debtors, the Prepetition Agent and the DIP Agent.

**133.** "*New Equity Interests*" means the equity interests in the Reorganized Debtors.

**134.** "*NOL*" has the meaning set forth in Article VII.B of this Combined Disclosure Statement and Plan.

**135.** "*Official Bankruptcy Forms*" means the Official and Procedural Bankruptcy Forms, prescribed by the Judicial Conference of the United States, in accordance with Bankruptcy Rule 9009.

**136.** "*Other Secured Claim*" means any Secured Claim other than a Claim held by a Prepetition Lender, Debtor or a Governmental Unit.

**137.** "*Patient Claim*" means a claim submitted for reimbursement to any Third Party Payor of a patient of one of the Debtors that is subject to refund, reimbursement, clawback, repayment, adjustment, or any other reconciliation as a result of adjustments sought by such Third Party Payor which such payments the Debtors are not entitled to retain under applicable law, and all related paid deductibles, co-payments, co-insurance, or amounts paid in connection therewith by a Debtor's patients.

**138.** "*Permitted Asset Disposition*" means a sale or liquidation of less than all or substantially all of the Debtors' assets in accordance with the Bidding Procedures and with the prior written consent of the DIP Agent and Prepetition Agent.

**139.** "*Person*" means a person as defined in section 101(41) of the Bankruptcy Code.

**140.** "*Petition Date*" means February 2, 2026.

**141.** "*Physician Owned Debtors*" means those entities listed on **Exhibit B** annexed hereto.

**142.** "*Plan*" has the meaning set forth in Article I of this Combined Disclosure Statement and Plan.

**143.** "*Plan Commitment Letter*" means that certain Plan of Reorganization Commitment Letter, dated March 3, 2026, from Future Solution Investments LLC, in its respective capacities as DIP Agent, DIP Lenders, Prepetition Agent, and Prepetition Lenders, to CHTI.

**144.** "*Plan Supplement*" means the compilation of documents and form of documents, schedules and exhibits, including the Financial Projections, the Assumption Schedule, the Trust Agreement, and the Restructuring Transactions Memorandum to be Filed on or before seven (7) days prior to the Voting Deadline and which may be amended from time to time until the Effective Date with the consent of the DIP Agent and Prepetition Agent.

**145.** "*Plan without Third-Party Sale Toggle*" means pursuit of confirmation of the Plan premised on a debt-for-equity exchange.

**146.** "*Post-Sale Reserve*" means, in the event of a Third-Party Sale Transaction, a reserve of an amount to be agreed by the Debtors, the DIP Agent, and the Prepetition Agent to fund the reasonably anticipated costs necessary for the wind down of the Wind Down Estates, including an estimated amount of reasonable fees and expenses that may be incurred by professionals for services rendered after the Effective Date and statutory fees, which shall be funded into a segregated account on the Effective Date.

**147.** "*Potential Alleged Non-Debtor Defendants*" has the meaning set forth in Article XIII.B.1 of this Combined Disclosure Statement and Plan.

**148.** "*Prepetition Agent*" means Future Solution Investments LLC, as lender and agent for itself and the other lenders or entities thereto under the Prepetition Loan Documents.

**149.** "*Prepetition Borrower*" means Carbon Health Technologies, Inc.

**150.** "*Prepetition Lenders*" means the lenders under the Prepetition Loan Documents.

**151.** "*Prepetition Loan and Security Agreement*" means that certain Loan and Security Agreement, dated as of November 14, 2025, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

**152.** "*Prepetition Loan Documents*" means the Prepetition Loan and Security Agreement and all other related documents, guarantees, and agreements, including security agreements, mortgages, pledge agreements, assignments, financing statements, and other agreements, documents, instruments, or certificates executed in connection with the Prepetition Loan and Security Agreement.

**153.** "*Prepetition Secured Claims*" means all Claims held by the Prepetition Agent and the Prepetition Lenders pursuant to the Prepetition Loan Documents.

**154.** "*Prime Health*" means Prime Healthcare Services Inc.

**155.** "*Prime Health Secured Claim*" means those secured claims arising under that certain Credit Agreement, dated October 20, 2021, between Prime Health (as lender) and Carbon Health Alpha Medical Group of Florida, P.A., Carbon Health Alpha Primary Care of Florida, P.A., Carbon Health Alpha Medical Group of California, P.C., Carbon Health Alpha Primary Care of California, P.C., Carbon Health Alpha Medical Group of Kansas, P.A., and Carbon Health Alpha Primary Care of Kansas, P.A.

**156.** "*Priority Claim*" means any Priority Non-Tax Claim or Priority Tax Claim.

**157.** "*Priority Non-Tax Claim*" means a Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim, or Administrative Expense Claim.

**158.** "*Priority Tax Claim*" means a secured or unsecured Claim of a Governmental Unit of the kind specified in sections 502(i) or 507(a)(8) of the Bankruptcy Code.

**159.** "*Privileged Information*" means any privileged information of the Debtors, including information protected or purportedly protected by the attorney-client privilege or attorney work product doctrine, including information shared pursuant to any joint defense, common interest, or confidentiality agreement among the Debtors and any Affiliate or Insider, and any Common-Interest Communications.

**160.** "*Professional*" means a Person or Entity employed pursuant to a Final Order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Confirmation Date, pursuant to sections 327, 328, 330, 331, 503, or 1103 of the Bankruptcy Code, or for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

**161.** "*Professional Fee Amount*" means the aggregate amount of unpaid Professional Fee Claims that the Professionals estimate they have incurred or will incur in rendering services in connection with the Chapter 11 Cases prior to and as of the Effective Date that remain unpaid as the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in Article XV.B of this Plan.

**162.** "*Professional Fee Claim*" means any Claim for fees and expenses (including hourly, transaction and success fees) for services rendered by Professionals in the Chapter 11 Cases.

**163.** *"Professional Fee Claim Bar Date"* has the meaning set forth in Article VIII.C of this Combined Disclosure Statement and Plan.

**164.** "*Professional Fee Escrow Account*" means an escrow account funded by the Debtors with Cash as soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date in an amount equal to the Professional Fee Amount, which escrow shall include any amounts funded into the Funded Reserve Account (as defined in the DIP Orders), and which amounts in the Funded Reserve Account shall first be used to fund the Professional Fee Amount.

**165.** "*Proof of Claim*" has the meaning set forth in Bankruptcy Rule 3001.

**166.** "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in such Class.

**167.** "*Qualified Physician Owner*" means, with respect to each Reorganized Physician Owned Debtor, a physician duly licensed in each state in which such Reorganized Physician Owned Debtor operates, to the extent required by such applicable state law for the ownership of such Reorganized Physician Owned Debtor.

**168.** "*Quarterly Distribution Date*" means (i) the first Business Day that is ninety (90) days after the Effective Date and (ii) each subsequent Business Day that is ninety (90) days thereafter.

**169.** "*QSF Documents*" means (a) the Confirmation Order, the Plan, Exhibits to the Trust Agreement, and the Abuse Claims Protocol, including, but not limited to, the Exhibits 2 and 2.1. In the event of any ambiguity or conflict of terms, the QSF Documents shall control in the following order: Confirmation Order, the Plan, Exhibit 2.1 of the Liquidation Trust Agreement, and the Abuse Claims Protocol.

**170.** "*Released Party*" or "*Released Parties*" means, subject to any exclusions expressly set forth in the Plan solely with respect to the Debtor releases contained in Article XVI.F hereof, each of the Debtors, DIP Lenders, the DIP Agent, each of the Prepetition Lenders, each of the Prepetition Agent, and the Independent Director, and each of their respective successors and current or continuing control persons, trustees or beneficiaries, direct or indirect shareholders or members, officers, directors, employees, affiliates, principals, and agents (and each of their respective attorneys, consultants, financial advisors, investment

bankers, accountants, and other retained professionals), in each case solely in their capacities as such.

**171.** "*Reorganization Transaction"* means a Restructuring Transaction premised on a debt-for-equity exchange in the event of a Plan without Third-Party Sale Toggle, as described herein. For avoidance of doubt, a Reorganization Transaction does not include a Third-Party Sale Transaction or a Permitted Asset Disposition.

**172.** "*Reorganized CHTI*" means CHTI from and after the Effective Date, acting in the capacity as such.

**173.** "*Reorganized Debtors*" means the Debtors from and after the Effective Date, acting in the capacity as such, including Reorganized CHTI and the Reorganized Physician Owned Debtors.

**174.** "*Reorganized Physician Owned Debtors*" means the Physician Owned Debtors from and after the Effective Date, acting in the capacity as such.

**175.** "*Required Effective Date Payments*" means the (i) an amount equal to the estimated Professional Fee Claims not yet funded into the Professional Fee Trust Account (as defined in the Final DIP Order), (ii) the Administrative Expense Claims to be paid on or about the Effective Date, (iii) the Priority Claims to be paid on or about the Effective Date, (iv) any cure claims required to be paid on account of the Assumption Schedule, (v) Trust Funding Amount, and (vi) an amount equal to the estimated unpaid U.S. Trustee fees.

**176.** "*Restructuring Transactions*" means the transactions described in Article XI.

**177.** "*Restructuring Transactions Memorandum*" means a document to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions, including any corporate restructuring or reorganization to be consummated in connection therewith, and which may be amended from time to time until the Effective Date with the consent of the DIP Agent and Prepetition Agent.

**178.** "*Retained Causes of Action*" has the meaning set out in Article XVIII of this Combined Disclosure Statement and Plan.

**179.** "*RPT Settlement Motion*" has the meaning set out in Article III.C of the Combined Disclosure Statement and Plan.

**180.** "*Sale Order*" means the Order or Orders entered by the Bankruptcy Court approving a sale of Acquired Assets pursuant to a Third-Party Sale Transaction.

**181.** "*SA Plaintiffs*" has the meaning set out in Article III.E of this Combined Disclosure Statement and Plan.

**182.** "*Sale Process*" has the meaning set forth in Article III.D.3 of this Combined Disclosure Statement and Plan.

**183.** "*Schedules*" mean the schedules of assets and liabilities and the statement of financial affairs that were or will be Filed by the Debtors in accordance with section 521 of the Bankruptcy Code, the Official Bankruptcy Forms, and the Bankruptcy Rules, as they may be amended and supplemented from time to time.

**184.** "*Secured Claim*" means (a) any Claim to the extent reflected in the Schedules or upon a Proof of Claim as a Secured Claim, that is secured by a Lien on Collateral, which Lien is valid, perfected and enforceable under applicable law or by reason of a Final Order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of such Collateral as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) any Claim Allowed under this Plan as a Secured Claim, including the Prepetition Secured Claims.

**185.** "*Solicitation Package*" has the meaning set forth in Article IV.C of this Combined Disclosure Statement and Plan.

**186.** "*Stanford Health*" means Stanford Health Care.

**187.** "*Stanford Health Secured Claims*" means those secured claims arising under that certain Delayed Draw Term Loan Credit and Guaranty Agreement, dated May 23, 2022, between Stanford Health and Carbon Health South Bay Medical Group, P.C. as borrower, and Carbon Health South Bay Primary Care, P.C., as guarantor.

**188.** "*Subordinated Claims*" means a Claim subject to subordination pursuant to Bankruptcy Code section 510, including any and all Claims subject to subordination pursuant to section 510(b) and any Claim arising from the rescission of a purchase or sale of a security of the Debtors, for damages arising from the purchase or sale of such security, or for reimbursement or contribution allowed under Bankruptcy Code section 502 on account of any such Claim (other than a Claim or interest that would otherwise constitute an Equity Interest).

**189.** "*SVB*" has the meaning used in Article III.C of this Combined Disclosure Statement and Plan.

**190.** "*Third-Party Bids*" mean bids from one or more third parties to acquire all or substantially all of the Debtors' assets.

**191.** "*Third Party Payor*" means any Federal Health Care Program, commercial insurance plan, health maintenance organization, or any capitated payment relationship with any person other than an individual patient.

**192.** "*Third-Party Sale Toggle*" means a sale of all or substantially all of the Debtors' assets to a third-party pursuant to a purchase and sale agreement under section 363 of the Bankruptcy Code.

**193.** "*Third-Party Sale Transaction*" means a sale of all or substantially all of the Debtors' assets with Third-Party Sale Transaction Proceeds sufficient to pay, in Cash, the full amount of all Allowed DIP Claims and Allowed Prepetition Secured Claims, *plus* the amount of the Trust Funding Amount, if applicable, *plus* an amount estimated (such amount to be agreed by the Debtors, Prepetition Agent and DIP Agent) to be sufficient to pay, in Cash, the full

amount of all Allowed Administrative Expense Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, and the Post-Sale Reserve. For avoidance of doubt, a Third-Party Sale Transaction shall not include a Permitted Asset Disposition.

**194.** "*Third-Party Sale Transaction Proceeds*" means the proceeds of any Third-Party Sale Transaction.

**195.** "*Third-Party Successful Bidder(s)*" means a third party or parties with a successful Third-Party Bid for a Third-Party Sale Transaction in accordance with the Bidding Procedures Order.

**196.** "*Treasury Regulations*" means title 26 of the Code of Federal Regulations.

**197.** "*Trust*" means the litigation trust established on the Effective Date, in accordance with the Plan and Trust Agreement, for the benefit of the Trust Beneficiaries, to which the Trust Assets will be transferred and liquidated in accordance with the terms of this Plan and the Trust Agreement; for avoidance of doubt, the Trust shall conduct no business and shall qualify as a liquidating trust pursuant to Treas. Regs. § 301.7701-4(d), except that the segregated escrow account established as the Abuse Claims QSF shall not be part of the liquidating trust under such Treasury Regulations but shall instead be subject to the Treas. Reg Section 1.468B-1

**198.** "*Trust Advisory Committee*" means the committee for the Trust to be appointed in accordance with **Error! Reference source not found.** of this Plan.

**199.** "*Trust Agreement*" means the trust agreement (in form and substance acceptable to the Debtors, the Committee and the Prepetition Agent) among the Debtors and the Trustee that, among other things, creates and establishes the Trust, describes the powers, duties and responsibilities of the Trustee, and provides for the liquidation and distribution of proceeds of the Trust Assets, which trust agreement shall be substantially in the form Filed in the Plan Supplement.

**200.** "*Trust Assets*" means (i) the Trust Causes of Action, (ii) the Trust Funding Amount, (iii) the Abuse Insurance Rights, and (iv) the Data Transfer Documents.

**201.** "*Trust Beneficiaries*" means each Holder of a Trust Interest.

**202.** "*Trust Causes of Action*" means (a) the D&O Claims, (b) the Insider Claims, (c) the Avoidance Actions (not including the Excluded Avoidance Actions), (d) all defenses to any General Unsecured Claim, including all defenses under section 502 of the Bankruptcy Code, and (e) any Estate Causes of Action arising prior to the Petition Date from any General Unsecured Claim for setoff, reimbursement, indemnity, contribution, subrogation, breach of warranty, breach of contract, or otherwise.

**203.** *"Trust Documents"* means, the Confirmation Order, the Plan, the Trust Agreement, and the QSF Documents. In the event of any ambiguity or conflict of terms, the

Trust Documents shall control in the following order: Confirmation Order, the Plan, the Trust Agreement, and the Abuse Claims Protocol.

**204.** "*Trust Funding Amount*" means $12 million to be allocated per the terms of the Plan and the Trust.

**205.** "*Trust Interest*" has the meaning set forth in the Trust Agreement.

**206.** "*Trustee*" means the Person or Entity selected as trustee for the Trust and identified in the Plan Supplement, which Person or Entity shall be approved by the Bankruptcy Court in the Confirmation Order prior to or simultaneous with the Effective Date. The Trustee shall also serve in the capacity as "Abuse Claims Administrator" of the Abuse Claims QSF, and references to the Trustee herein shall include "Abuse Claims Administrator" as the context requires.

**207.** "*Unimpaired*" means, with respect to a Class of Claims, a Claim that is not Impaired.

**208.** "*U.S. Trustee*" means the Office of the United States Trustee of the Southern District of Texas.

**209.** "*Voting Agent*" means Kroll Restructuring Administration LLC and any successor thereto.

**210.** "*Voting Deadline*" means the deadline to vote on the Plan as set by the Bankruptcy Court.

**211.** "*Voting Record Date*" means the date as of which the identity of Holders of Claims is set for purposes of determining the Persons and Entities entitled to receive and vote on the Plan.

**212.** "*Wind Down*" means, following the closing of any Third-Party Sale Transaction, the process to wind down, dissolve, and liquidate the Estates (as applicable) and distribute any remaining assets in accordance with the Plan.

**213.** "*Wind Down Estates*" means, solely with respect to a Third-Party Sale Transaction, the Estates to Wind Down pursuant to and under the Plan on or after the Effective Date.

## ARTICLE III.

## BACKGROUND

### A. *General Background*

The Debtors provide a fully integrated primary and urgent care system to over 800,000 patients each year. The Debtors utilize a proprietary software platform, CarbyOS, to execute a digital strategy that enhances patient engagement and drives operating efficiency. The CarbyOS

platform enables the Debtors to provide a flexible range of services tailored to patient needs across locations while maintaining consistent and efficient operations.

CHTI was founded in San Francisco in 2015 and is currently headquartered in Sunnyvale, California. CHTI began as a software platform and mobile application development company for medical records, tele-health, doctor-patient messaging and scheduling. At the time, CHTI's goal was to build software for medical practices.

Soon after being founded, CHTI expanded into clinic care for patients. In 2017, the Debtors launched their first urgent care clinics in the San Francisco Bay Area. In the years that followed, through a series of strategic partnerships and geographic expansion, the Debtors grew an extensive network of clinics in the United States, currently consisting of approximately 93 clinics across eight states with approximately 480 health care providers and approximately 1,400 employees. The Debtors seek to grow by expanding the number of providers using CHTI's technology to operate clinics more efficiently, while delivering high-quality patient care on a sustainable and profitable basis.

B. *Capital Structure and Financing*

The Prepetition Borrower, the Prepetition Agent and the Prepetition Lenders, are party to the Prepetition Loan and Security Agreement, under which the Prepetition Lenders originally lent CHTI an initial term loan in the original principal amount of $10,000,000. On November 24, 2025, the Prepetition Borrower, certain of the Physician Owned Debtors, the Prepetition Agent and the Prepetition Lenders amended the Prepetition Loan and Security Agreement, to provide for an initial delayed draw term loan facility in the original principal amount of $61,926,948.67, the proceeds of which were used to pay off CHTI's secured credit facility with Fearless Capital Management, LLC (as successor to Hercules Capital, Inc.) as administrative agent and collateral agent. On January 20, 2026, CHTI, certain of the Physician Owned Debtors, the Prepetition Agent and the Prepetition Lenders further amended the Prepetition Loan and Security Agreement to provide for an additional delayed draw term loan facility in the original principal amount of $6,000,000.

The payment obligations of the Prepetition Borrower under the Prepetition Loan Documents are guaranteed by certain of the Physician Owned Debtors, which guaranty is secured by first priority liens on specified assets of certain of the Physician Owned Debtors, all as set forth in that certain Unconditional Secured Guaranty Agreement, dated as of November 14, 2025, as amended, restated, supplemented or otherwise modified from time to time.

The obligations under the Prepetition Loan Documents are secured by first priority liens on certain of the Prepetition Borrower's assets, including, but not limited to, goods, accounts, equipment, inventory, investment property, general intangibles (including intellectual property), cash, deposit accounts, and rights to payment and proceeds from the sale, licensing or disposition of all or any part, or rights, in, intellectual property, all as set forth in the Prepetition Loan Documents.

As of the Petition Date, the outstanding principal obligations under the Prepetition Loan Documents total approximately $78 million.

C. *Events Leading to the Commencement of the Chapter 11 Cases*

During 2020 and 2021, the Debtors expanded their operations in response to increased demand for accessible healthcare services in the communities they serve. This expansion included investments in technology, clinical footprint, and personnel to support efficient delivery of care, including—but not limited to—Covid-related testing and vaccinations. These efforts were undertaken to meet community needs and to validate and scale the Debtors' broader care delivery model.

Beginning in 2022, as pandemic-related demand subsided and capital markets tightened significantly for healthcare growth companies, the Debtors experienced a material decline in revenue and access to external financing. In response, the Debtors implemented cost-reduction initiatives, including workforce reductions, clinic closures, and the discontinuation of certain service lines. Despite these measures, the Debtors continued to face liquidity constraints as the scale of the business no longer aligned with available capital. Ongoing operating losses and limited financing alternatives ultimately led to the present liquidity challenge.

The Debtors' financial condition continued to worsen as a result of a certain Writ of Garnishment, dated January 2, 2026, issued to Silicon Valley Bank ("SVB") by the Circuit Court in the Fifteenth Judicial Circuit in and for Palm Beach County, Florida Civil Division, in favor of RPT Realty, L.P., a Delaware limited partnership (the "Judgment Creditor") and received by SVB on January 5, 2026, SVB froze the sum of approximately $1.9 million in a bank account (the "Frozen Funds") maintained in the name of Debtor CHTI (the "Judgment Levy"). The Judgment Creditor is a former landlord of certain Debtors.

On January 12, 2026, the Prepetition Agent delivered a letter to SVB (with a copy to the Judgment Creditor) challenging the Judgment Levy on the basis that the Frozen Funds constitute the identifiable cash proceeds of the Prepetition Agent's collateral on which it has a prior perfected security interest.

The Debtors also submit that the Judgment Levy was executed within the 90 days prior to the Petition Date and such execution constitutes an avoidable preferential transfer. The Debtors are prepared to bring an adversary proceeding against the Judgment Creditor in order to avoid the Judgment Levy. The Debtors therefore dispute that the Judgment Creditor has any valid or enforceable lien against the Frozen Funds and asset that the Frozen Funds should be released either consensually or through Court adjudication. The Prepetition Agent has also asserted that its liens on the Frozen Funds are perfected and senior to the liens of the Judgment Creditor as identifiable cash proceeds of the Prepetition Agent's collateral.

On February 23, 2026, the Debtors filed the *Emergency Motion Debtors' Emergency Motion for Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement With RPT Realty, L.P. and Authorizing Actions Consistent Therewith* [Docket No. 158] (the "RPT Settlement Motion"). By the RPT Settlement Motion, the Debtors entered into a settlement agreement with RPT Realty, L.P. regarding the release of the lien resulting from the Judgment Levy in exchange for a $75,000 payment, an Allowed General Unsecured Claim in the amount of $375,000, and the release of the Frozen Funds. On March 12, 2026, the Bankruptcy Court

entered an order approving the RPT Settlement Motion [Docket No. 307]. On or about March 23, 2026, the funds were released from the bank.

Faced with multiple challenges, including the Judgment Levy, the Debtors have developed a strategy to restructure and preserve their businesses and assets for the benefit of the creditors. The Debtors prioritize continuing to provide excellent care to their patients.

To that end, over the past several months, the Debtors have: (a) retained the services of financial advisors to help develop strategies to manage its cash position and assess liquidity needs in the future; (b) consulted with restructuring counsel in order to explore options to strengthen the Debtors' financial condition and operations; (c) participated in a robust process to identify and evaluate strategic transactions and other financing options in the best interest of the Debtors and all of their stakeholders; (d) negotiated both out-of-court and Court-approved acquisition transaction models; and (e) engaged in extensive discussions with the Prepetition Agent in an effort to give the Debtors relief from liquidity constraints and provide sufficient capital to fund its operations while it pursues a potential transaction.

Ultimately, the Debtors commenced these Chapter 11 Cases to effectuate a value-maximizing debt-for-equity Plan and concurrent marketing and sale process that will benefit all stakeholders.

D. *Investigation by California Attorney General*

On January 29, 2024, the CAG served an investigative subpoena for the production of documents and interrogatories on CHTI. The subpoena and interrogatories seek documents and information related to CHTI's corporate structure and business, advertisements, billing and insurance, and consumer complaint processes. On February 18, 2026, the CAG also stated its position that CHTI is in current noncompliance with various state laws, including prohibitions on the corporate practice of medicine and that a purchaser is not immunized against enforcement for post-sale violations. CHTI is cooperating with the CAG, and has expended, and may continue to expend financial and managerial resources in connection with responding to the subpoena and interrogatories and any related investigation or any other future requests for information.

E. *Litigation Against the Debtors*

**1.** Sex Abuse Claims

Beginning in August 2024, eleven women ("SA Plaintiffs") filed nine lawsuits in the Philadelphia Court of Common Pleas against Ramon Garcia, a former medical assistant employed at various of the Pennsylvania urgent care clinics of CHMG Florida and certain other defendants, including, in some of the actions, against CHTI (collectively, with CHMG Florida, the "Carbon Defendants").

The SA Plaintiffs' claims against Mr. Garcia revolve around his alleged sexual assault of the SA Plaintiffs between November 2023 and March 2024 while they were patients at two of CHMG Florida urgent care clinics located in Pennsylvania. CHMG Florida terminated Mr. Garcia upon his arrest in March 2024. In March 2025, after pleading guilty to the sexual assault

of multiple female patients, Mr. Garcia was sentenced to 5-10 years in state prison and required to register as a sex offender.

The SA Plaintiffs' claims against the Carbon Defendants vary slightly but they generally concern the Carbon Defendants' alleged negligent hiring, training, retention, and supervision of Mr. Garcia, the vicarious liability for Mr. Garcia's alleged actions, and corporate negligence. As of the Petition Date, the parties had engaged in certain discovery and numerous depositions had been conducted.

**2.** Wage & Hour Class Action

On or around June 3, 2025, certain individual plaintiffs filed a wage and hour class action in Los Angeles County Superior Court against Carbon Health Medical Group of Florida, P.A. (*Dukes et al v. Carbon Health*). The complaint asserts claims for: (1) failure to pay minimum wages; (2) failure to pay overtime wages; (3) failure to provide rest periods and premiums; (4) failure to provide meal periods and premiums; (5) failure to maintain employment records; (6) failure to pay wages timely; (7) failure to pay all wages at separation; (8) failure to indemnify business expenses; (9) failure to furnish accurate itemized wage statements; and (10) unfair business practices.

**3.** Privacy Action

On February 5, 2024 a class action lawsuit was filed against CHTI alleging (1) violation of the California Invasion of Privacy Act; (2) violation of the California Confidentiality of Medical Information Act; and (3) invasion of privacy under California's Constitution. CHIT and the plaintiffs participated in court-ordered mediation in June 2025 but were unable to resolve the matter. However, the parties continued settlement discussions, and eventually reached a settlement. CHTI was not able to execute the settlement because it was concerned about entering into an agreement that it did not believe in good faith could fully perform in light of its need to restructure its balance sheet and operations.

F. *The Debtors' Insurance Policies*

**1.** Debtors' Insurance Policies

An index of the Debtors' current Insurance Policies (as of the Petition Date) is annexed hereto as **Exhibit D**, with the terms of the Insurance Policies summarized. The Insurance Policies themselves contain a complete description of terms. In prior years, the Debtors maintained a similar insurance program with similar terms.

**2.** D&O Policies

The Debtors currently have overall D&O Policies for potentially as much as $20,000,000, drawn from six separate policies issued by six different surplus line insurers. The D&O Policies are claims made policies (as opposed to occurrence policies) and expire on November 15th, 2026, so notice of a claim must be made before that expiration date. The primary policy, issued by Ascot Specialty Insurance Company, provides the Debtors pay $175,000 per claim on any claim the Debtors tenders before the insurer must pay anything; however, the retention does not

apply to individual insureds. It also provides limitations on coverage that the excess carriers above the primary policy also have, for example, standard exclusions claims for intentional conduct, fraud or personal profit; claims based upon wrongful conduct reported during a prior policy year; professional services claims; and employment claims. Claims concerning prior litigation commenced before July 31, 2025 are subject to $1,000,000 limit. Each of the excess D&O Policies also contain exclusions for claims relating to litigation pending prior to November 15, 2025. There are potential coverage issues that may arise with claims noticed to the primary and excess insurers, and the collection of proceeds of D&O Policies cannot be assured. The Debtors also purchase a six-year extended reporting period by way of the D&O Tail Coverage.

**3.** Professional Liability and Other Insurance Policies

The Debtors maintain professional liability policies that cover, on a claims made basis, the negligent provision of professional services. Currently the Debtors' coverage for the policy term ending August 15, 2026 is for $1,000,000 per claim and $5,000,000 in the aggregate. However, certain claims, for example, sexual abuse claims may have lower sublimits and may be subject to self-insured retentions or deductibles that may have to be paid before insurance is triggered.

The Debtors also possess standard insurance coverage for the following risks, cyber, auto, workers compensation, property damage, with varying levels of coverage and varying types of policies (occurrence vs. claims made). *See* **Exhibit D**.

**4. Abuse Insurance Policies**

The Debtors purchased a Miscellaneous Medical Professional Liability Claims Made and Reported Insurance policy (W23C92230601) with a policy period from August 15, 2023 to August 15, 2024, issued by Beazley Excess and Surplus Insurance, Inc. ("Beazley"). Beazley was put on notice of eight lawsuits alleging sexual abuse by a former employee of the Debtors, with the abuse allegedly spanning a period from November 20, 2023 through March 9, 2024. The Professional Liability Limit for this policy is $1,000,000 per claim, a $5,000,000 aggregate limit, and a deductible of $100,000 per claim to be paid by the Debtors. However, Beazley states that its coverage obligations under this policy for the alleged sexual abuse is limited to $250,000 per claim and $500,000 aggregate sublimits. The Debtors are subject to the same deductible of $100,000 per clam, the payment of which Beazley asserts is a condition precedent to any coverage. This policy issued by Beazley is the only policy under which the Debtors sought coverage for the above-referenced alleged sexual abuse and Debtors are currently unaware of any other insurance policies available to cover these claims.

G. *The Chapter 11 Cases*

The following is a brief description of certain material events that have occurred during the Chapter 11 Cases.

### 1. First Day and Other Early Relief

In order to facilitate the Chapter 11 Cases, minimize disruption to the Debtors' affairs, and preserve the value of the Estate, the Debtors filed motions with the Bankruptcy Court on or shortly after the Petition Date sought and obtained the following relief:

- **Cash Management Motion.** *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Maintenance of Existing Bank Accounts; (II) Authorizing Continuance of Existing Cash Management System; (III) Granting Limited Waiver of Section 345(b) Deposit Requirements; (IV) Authorizing Continued Performance of Intercompany Transactions and Funding; and (V) Granting Related Relief* [Docket No. 5] and Order [Docket No. 40].

- **Wages Motion.** *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to (I) Pay and/or Honor Prepetition Wages, Salaries, Incentive Payments, Employee Benefits, and Other Compensation; (II) Remit Withholding Obligations and Deductions; (III) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests* [Docket No. 6] and Order [Docket No. 41].

- **NOL Motion.** *Debtors' Emergency Motion for Entry of Orders (I) Establishing Notification Procedures and Approving Restrictions on (A) Certain Transfers of Interests In Debtors and (B) Certain Worthless Stock Deduction Claims; (II) Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Claims Against Debtors; and (III) Granting Related Relief* [Docket No. 7] and Order [Docket No. 43].

- **Patient Programs Motion.** *Debtors' Emergency Motion for the Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Patient Programs and Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief* [Docket No. 8] and Order [Docket No. 44].

- **Utilities Motion.** *Debtors' Emergency Motion for the Entry of an Order (I) Approving the Proposed Adequate Assurance Deposit for Future Utility Services, (II) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Services, (III) Approving the Proposed Adequate Assurance Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief* [Docket No. 9] and Order [Docket No. 45].

- **Insurance Motion.** *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Honor and Renew the Premium Financing Agreement Entered Into Prepetition and Satisfy Obligations Related Thereto, and (C) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies; and (II) Granting Related Relief* [Docket No. 10] and Order [Docket No. 46].

- **Creditors Matrix and Noticing Motion.** *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (II) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (III) Granting Related Relief* [Docket No. 11] and Order [Docket No. 48].

- **Schedules and SOFA's Motion.** *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Executory Contracts and Unexpired Leases, (C) Statements of Financial Affairs, and (D) Bankruptcy Rule 2015.3 Reports, and (II) Granting Related Relief* [Docket No. 12] and Order [Docket No. 41].

- **Claims Agent Retention Motion**. *Debtors' Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent* [Docket No. 4] and Order [Docket No. 24].

- **Tax Motion**. *Motion for Approval Debtors' Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* [Docket No. 109] and Order [Docket No. 295].

- **Lease and Contract Rejection Motion**. *Motion to Reject Lease or Executory Contract Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Reject Certain Unexpired Leases and Executory Contracts Pursuant to 11 U.S.C. § 365, (II) Authorizing Abandonment of Personal Property Located at Leased Premises, and (III) Granting Related Relief* [Docket No. 207] and Order [Docket No. 439].

### 2. DIP Financing and Milestones

On February 2, 2026, the Debtors entered into the DIP Financing Agreement in exchange for a commitment of $19.5 million in debtor-in-possession financing from the DIP Agent and DIP Lenders, as further described in the DIP Motion. In the DIP Financing Agreement, the Debtors agreed to certain milestones, including:

- By February 12, 2026, the entry of a Bidding Procedures Order to govern any potential Third-Party Sale Transaction or Permitted Asset Disposition;

- By March 6, 2026, subject to the Bidding Procedures Order entered by the Court, the deadline for the submission of bids for a potential Third-Party Sale Transactions or Permitted Asset Disposition;

- By March 9, 2026, entry of the Final DIP Order;

- By March 24, 2026,[6] the entry of an order conditionally approving the adequacy of information in the Combined Disclosure Statement and Plan;

- By March 25, 2026, the entry of an order confirming any sale of Acquired Assets to any Third-Party Successful Bidder(s);

- By May 1, 2026, the closing of any sale of the Acquired Assets to any Third-Party Successful Bidder(s); and

- By May 1, 2026, provided the Debtors' sale process did not result in a successful Third-Party Successful Bidder, the entry of an order confirming a Plan.

Thus, the DIP Financing Agreement, as well as the Plan, contemplates a comprehensive financial restructuring through the Plan that will be premised on ***either*** (i) a sale of all or substantially all of the Debtors' assets, in an amount sufficient to pay the DIP Claims and Prepetition Secured Claims in full in Cash in addition to certain other costs (as further described below); ***or*** (ii) a debt-for-equity exchange.

Accordingly, as further described below, the Debtors will continue the Marketing Process (as defined below), pursuant to which any and all bids for all or substantially all of the Debtor's assets will be evaluated as a precursor to confirmation of the chapter 11 plan. The Marketing Process provides a public and competitive forum in which the Debtors seek bids or proposals for potential transactions that, if representing higher or otherwise better value for Creditors of the Debtors than the Reorganization Transaction, will be pursued in lieu of the Reorganization Transaction. In the event that (a) no binding Third-Party Bids for a Third-Party Sale Transaction would be sufficient to pay, in full in Cash, the DIP Claims and the Prepetition Secured Claims, together with certain other Administrative Expenses of and Claims against the Estates, following the completion of the Sale Process (or such earlier time as may be determined by the Debtors with the approval of the Prepetition Agent or the DIP Agent), or (b) any such binding Third-Party Bids, prior to the hearing on Confirmation of the Plan, are withdrawn or modified such that they no longer fit the definition of a Third-Party Successful Bid, the Debtors will seek confirmation of the Plan without Third-Party Sale Toggle premised on a debt-for-equity exchange as further described herein. The Debtors may seek confirmation of the Plan without Third-Party Sale Toggle following the closing of one or more Permitted Asset Dispositions.

On February 2, 2026, the Debtors filed the DIP Motion. On February 3, 2026, the Bankruptcy Court entered the Interim DIP Order granting the relief requested and allowing the Debtors to draw up to $9 million under the DIP Financing Agreement, with the proceeds under

[6] This milestone is March 19, 2026 under the Final DIP Order. The DIP Lender agreed to extend this date through March 24, 2026.

the DIP Financing Agreement used to pay fees and expenses related to the Chapter 11 Cases and to fund the operating expenditures and any other amounts owed by the Debtors. The obligations under the DIP Financing Agreement are secured by a first priority priming security interest and lien in all of the Debtors' assets, including any assets not securing the Prepetition Secured Claims and all assets securing the Prepetition Secured Claims, in each case as more fully described in and subject to the terms, conditions, limitations, priorities, and exclusions set forth therein and in the Final DIP Order. The Bankruptcy Court scheduled a hearing on February 27, 2026 to consider entry of the Final DIP Order. On February 27, 2026, the Bankruptcy Court, following a hearing, entered the Final DIP Order, allowing the Debtors to access the full amount extended under the DIP Financing Agreement.

### 3. Debtors' Marketing Process and Bid Procedures

The Debtors, with the assistance of their professional advisors, launched a marketing process prior to the Petition Date (the "Marketing Process") to solicit interest in one or more sale transactions for the all or substantially all of the Debtor's assets. The Marketing Process is being led by the Debtors' investment banker, Stifel, who has, among other things, developed comprehensive marketing materials and created a confidential electronic data room (the "Data Room") to permit potential third-party buyers to conduct due diligence. Consistent with the Marketing Process, the Debtors and their advisors developed the Bidding Procedures for the marketing and sale of their business in the Chapter 11 Cases in an orderly and value-maximizing manner.

On February 3, 2026, the Debtors filed the Bidding Procedures Motion. On February 10, 2026, the Bankruptcy Court entered the Bidding Procedures Order.

As of the date of this Combined Disclosure Statement and Plan, and over the past several weeks, Stifel has contacted 127 parties identified as potential third-party bidders, including both financial and strategic parties, 47 of which executed confidentiality agreements and received access to the Data Room.

Pursuant to the Bidding Procedures, the Debtors shall conduct a sale process consistent with terms described in the Bidding Procedures (the "Sale Process") to solicit offers for a potential Third-Party Sale Transaction with one or more Third-Party Successful Bidders. Any Third-Party Sale Transaction will be subject to the approval of the Bankruptcy Court, which approval, if any, shall be sought in connection with the Confirmation of the Plan at the Confirmation Hearing. The Debtors will not close any Third-Party Sale Transaction if the same is not confirmed by the Bankruptcy Court. ***For avoidance of doubt, the Debtors shall not enter into a transaction(s) with a Third-Party Bidder(s) if the proceeds of such a transaction(s) would be insufficient to pay, in Cash, the full amount of all Allowed DIP Claims and Allowed Prepetition Secured Claims, plus an amount estimated (such amount to be agreed by the Debtors, Prepetition Agent and DIP Agent) to be sufficient to pay, in Cash, the full amount of all Allowed Administrative Expense Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed Other Secured Claims, and the Post-Sale Reserve.***

Pursuant to the Bidding Procedures, the Debtors, with the prior written consent of the DIP Agent and Prepetition Agent, may sell less than all or substantially all of the Debtors assets to a third-party prior to the Effective Date, such transaction, a Permitted Asset Disposition. The proceeds of any Permitted Asset Disposition shall be applied consistent with the Bidding Procedures, the Final DIP Order, and any sale order approving such Permitted Asset Disposition.

The Bidding Procedures describe, among other things: (i) the procedures to submit Third-Party Bids; (ii) the manner in which Third-Party Bidders and Third-Party Bids become Qualified Bidders and Qualified Bids (each as defined in the Bidding Procedures); (iii) the process for negotiating the bids received; (iv) the conduct of the Auction (as defined in the Bidding Procedures) if Qualified Bids are received; (v) the procedure for the selection of any Third-Party Successful Bidder(s); (vi) the process through which the Debtors will seek the Bankruptcy Court's approval of a Third-Party Sale Transaction if there is a Third-Party Successful Bidder(s); and (vii) the manner in which the Sale Process may be terminated.

Through the Bidding Procedures, interested parties have the opportunity to submit competing bids for Acquired Assets, and to participate in an Auction, if necessary, to be conducted by the Debtors. The key dates for the Sale Process are set forth below. Such dates may be extended or otherwise modified by the Debtors with the prior written consent of the Prepetition Agent and DIP Agent, by filing notice of such extension or modification on the Bankruptcy Court's docket; *provided*, *however*, that any such extension or modification shall not by itself extend any milestone or deadline in the DIP Financing Agreement:

| Date | | Event |
|---|---|---|
| **March 6, 2026, at 5:00 p.m. (prevailing Central Time)** | | • Bid Deadline |
| | | |
| **March 9, 2026** | | • Deadline to notify Qualified Bidders of which bids qualify as Qualified Bids<br>• Deadline to notify Qualified Bidders of Auction<br>• Deadline to file Assumption and Assignment Notice (with Contracts List) |
| **March 11, 2026, at 12:00 p.m. (prevailing Central Time)** | | • Auction (Cancelled) |

### 4. Overview of Bids Received

As of the March 6, 2026 bid deadline, the Debtors received eight bids, seven of which were binding and one that was a non-binding indication of interest. All of the bids were for less than substantially all of the Debtors' assets. No single bid or combination of bids provided value in excess of the value of the liens held by the Prepetition Lenders and DIP Lenders. In addition, the proposed asset purchase agreements submitted with the bids contained material deficiencies that required negotiation before the Debtors, Prepetition Lenders, and DIP Lenders would agree to any such offers.

Given the absence of a topping bid, Stifel began outreach to the bidders on March 9, 2026 to determine (i) if there was a path to create a topping bid by combining multiple bids for different assets or (ii) if direct negotiations on select assets could result in a price at which the Prepetition Lenders and DIP Lenders would find acceptable.

After engaging with the bidders and their respective advisors, Stifel was not able to reach terms for a topping bid by combining multiple bids for different assets or on select assts. As a result, the Debtors do not intend to move forward with a sale of substantially all or a portion of their assets to a third party.

#### 5. Appointment of Creditors' Committee

On February 16, 2026, the Office of the United States Trustee appointed the Committee, which is comprised of six members.

#### 6. Retention of Professionals

The Debtors filed applications or motions, as applicable, to employ certain professionals, including Pachulski Stang Ziehl & Jones LLP [Docket No. 144] as bankruptcy counsel in the Chapter 11 Cases; Alvarez & Marsal as their financial advisor [Docket No. 145]; Stifel as their investment banker [Docket No. 264]; Wilson Sonsini Goodrich & Rosati as general corporate counsel [Docket No. 270]; Foley & Lardner LLP as regulatory counsel [Docket No. 267]; and Morgan, Lewis & Bockius LLP as special counsel [Docket No. 269].

The Committee is expected to file applications to employ Brown Rudnick LLP as its bankruptcy counsel and Province, LLC as its financial advisor.

#### 7. Debtors' Schedules and Statements of Financial Affairs

On February 27, 2026, the Debtors filed with the Court their Schedules and Statement of Financial Affairs [Docket Nos. 196-206, 208-254].

## ARTICLE IV.

## VOTING AND CONFIRMATION PROCEDURES

### A. *Important Dates and Deadlines*

| Event | Date[7] |
|---|---|
| Voting Record Date | April 8, 2026 |
| Deadline to Solicit Votes | April 15, 2026 |
| Deadline to File and Serve Assumption Notice | April 22, 2026 |
| Deadline for Creditors to File Rule 3018 Motions | April 22, 2026, at 4:00 p.m. (CT) |

[7] All times noted are in prevailing Central Time.

| Event | Date[7] |
|---|---|
| Deadline to Respond to Rule 3018 Motions | April 29, 2026, at 4:00 p.m. (CT) |
| Contract and Cure Objection Deadline | May 13, 2026, at 4:00 p.m. (CT) |
| Combined Disclosure Statement and Plan Objection Deadline | May 13, 2026, at 4:00 p.m. (CT) |
| Deadline to file Amended Plan | May 15, 2026 |
| Deadline to Notify Voting Class of Amended Plan and Extended Voting Deadline | May 15, 2026 |
| Extended Voting Deadline | May 22, 2026, at 4:00 p.m. (CT) |
| Deadline to file Amended Plan Supplement | May 22, 2026 |
| Deadline to File Voting Tabulation Affidavit | May 27, 2026, at 4:00 p.m. (CT) |
| Deadline to File Confirmation Brief and Other Evidence Supporting the Combined Disclosure Statement and Plan | May 27, 2026, at 4:00 p.m. (CT) |
| Confirmation Hearing | May 29, 2026, at 9:00 a.m. (CT) |

B. *Eligibility to Vote on Plan*

Pursuant to section 1126 of the Bankruptcy Code, only the holders of Claims in Classes Impaired by the Plan and receiving a payment or Distribution under the Plan may vote to accept or reject the Plan. Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be Impaired if the Plan alters the legal, equitable, or contractual rights of the holders of such Claims or Interests treated in such Class. Further, subject to the tabulation procedures that were approved by the Disclosure Statement Order, in order to vote on the Plan, you must hold an *Allowed* Claim in any such Impaired Class or be the holder of a Claim that has been temporarily Allowed for voting purposes only pursuant to the approved tabulation procedures or under Bankruptcy Rule 3018(a).

The Holders of Claims not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan. The Holders of Claims or Interests in any Class that will not receive any payment or Distribution or retain any property pursuant to the Plan are deemed to reject the Plan and do not have the right to vote. Finally, the Holders of Claims or Interests whose Claims or Interests are not classified under the Plan are not entitled to vote on the Plan.

Under the Plan, Holders of Claims in Classes 1(a), 2, 3, and 5, and, Classes 10 and 11, if applicable, are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan. Holders of Claims in Classes 1(b), 1(c), 1(d), 4, 6 and 7 are Impaired and entitled to vote on the Plan (the "Voting Classes"). Holders of Claims and Interests in Classes 8 and 9 will not receive any payment or Distribution or retain any property pursuant to the Plan and, therefore, are deemed to reject the Plan and do not have the right to vote.

**ACCORDINGLY, BALLOTS FOR ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED TO HOLDERS OF CLAIMS IN CLASSES 1(b), 1(c), 1(d), 4, 6 AND 7.**

C. *Solicitation Packages*

On April 7, 2026, the Bankruptcy Court entered the Disclosure Statement Order conditionally approving the adequacy of information in the Combined Disclosure Statement and Plan. Holders of Claims who are eligible to vote to accept or reject the Plan received appropriate solicitation materials (collectively, the "Solicitation Package"), including:

(a) the Combined Disclosure Statement and Plan, as approved by the Bankruptcy Court (with all exhibits thereto);

(b) the Disclosure Statement Order (without exhibits thereto);

(c) the Solicitation Procedures;

(d) the Combined Hearing Notice;

(e) an appropriate Ballot with voting instructions and a box to check for voters to opt out of providing the releases described in Article XVI.D, and as needed, a pre-addressed, postage-prepaid return envelope;

(f) a cover letter from the Debtors (1) describing the contents of the Solicitation Package, and (2) recommending the Holders of Claims in the Voting Classes to vote to accept the Plan; and

(g) such other materials as the Court may direct or approve or that the Debtors deem appropriate.

On May 15, 2026, the Debtors filed this amended Plan and served notice thereof and notice of certain extended dates on Holders of Claims eligible to vote to accept or reject the Plan.

D. *Voting Procedures*

The Voting Record Date for determining which holders of Claims in the Voting Classes may vote on the Combined Disclosure Statement and Plan is April 8, 2026. The original deadline to vote on the Plan was May 13, 2026, but such deadline has been extended through **May 22, 2026, at 4:00 p.m., prevailing Central Time**. All votes to accept or reject the Plan must be submitted to the Debtors' Voting Agent.

In order for your Ballot to count, you must (1) complete, date, and properly execute the Ballot and (2) properly deliver the Ballot to the Voting Agent in accordance with the instructions set forth in the Solicitation Procedures and Ballot. More detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan. Instructions for casting a Ballot also will be available on the Voting Agent's website.

Ballots must be submitted in accordance with the instructions set forth in the Solicitation Procedures and Ballots and the Voting Agent must actually receive the Ballots on or before the Voting Deadline. Subject to the tabulation procedures approved by the Disclosure Statement Order, you may not change your vote after the Voting Deadline once a Ballot is submitted electronically or the Voting Agent receives your original paper Ballot unless such withdrawal or change is in accordance with Bankruptcy Rule 3018(a), *provided* that, this provision will not prohibit a voting party from submitting a valid superseding Ballot prior to the Voting Deadline. Subject to the tabulation procedures approved by the Disclosure Statement Order, any Ballot that is timely and properly submitted will be counted and will be cast as an acceptance, rejection, or abstention, as the case may be, of the Plan.

**IF YOU ARE ENTITLED TO VOTE ON THE COMBINED DISCLOSURE STATEMENT AND PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY RETURN YOUR BALLOT IN ACCORDANCE WITH THE INSTRUCTIONS SET FORTH IN THE SOLICITATION PROCEDURES AND YOUR BALLOT. PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE COMBINED DISCLOSURE STATEMENT AND PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN OR PROCEDURES FOR VOTING ON THE COMBINED DISCLOSURE STATEMENT AND PLAN, PLEASE CONTACT THE VOTING AGENT BY TELEPHONE AT: 888.582.4146 (US/CANADA-TOLL-FREE) OR EMAIL AT: CARBONHEALTHINFO@RA.KROLL.COM (WITH "CARBON HEALTH SOLICITATION INQUIRY" IN THE SUBJECT LINE). THE VOTING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

Any Ballot that is properly executed by the Holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted. Ballots received by facsimile or by electronic mail will not be counted. Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one ballot for each Claim held by such Holder (whether by submitting a Ballot on the Voting Agent's online voting platform or by returning a physical Ballot). By executing and returning a Ballot each Holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtors that no other Ballots with respect to such Claim have been cast or, if any other valid Ballots have previously been cast with respect to such Claim, such earlier Ballots are superseded and revoked.

E. *Confirmation Hearing*

On April 7, 2026, the Court entered the Disclosure Statement Order approving the Combined Disclosure Statement and Plan for solicitation purposes only and authorized the Debtors to solicit the Combined Disclosure Statement and Plan. The Confirmation Hearing has been scheduled for **May 29, 2026, at 9:00 a.m. (prevailing Central Time)** to consider (a) final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Combined

Disclosure Statement and Plan pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Debtors without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Court.

F. *Procedures for Objections*

Any objection to final approval of the Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of the Combined Disclosure Statement and Plan must be made in writing and filed with the Court by no later than **May 13, 2026, at 4:00 p.m. (prevailing Central Time)**. **Unless an objection is timely filed and served, it may not be considered by the Court at the Confirmation Hearing.**

G. *Requirements for Confirmation*

The Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among the requirements for confirmation in the Chapter 11 Cases is that the Plan be: (i) accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" against, and is "fair and equitable" with respect to, such Class; and (ii) feasible. The Court must also find that:

(a) the Plan has classified Claims and Interests in a permissible manner;

(b) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and

(c) the Plan has been proposed in good faith.

As described immediately below, the Debtors believe that the Combined Disclosure Statement and Plan complies, or will comply, with all such requirements.

H. *Classification of Claims and Interests*

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a Debtor's creditors and equity interest holders. In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified).

Section 1122 of the Bankruptcy Code requires the Plan to place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such class. The Plan creates separate Classes to deal respectively with Priority Non-Tax Claims, Priority Tax Claims, various Secured Claims, Unsecured Claims, Patient Claims, and Interests. The Debtors believe that the Plan's classifications place substantially similar Claims or Interests in the same Class and, thus, meet the requirements of section 1122 of the Bankruptcy Code.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Plan complies with such standard. If the Court finds otherwise, however, it could deny confirmation of the Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its confirmation. Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

**EXCEPT AS SET FORTH IN THE COMBINED DISCLOSURE STATEMENT AND PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY AND ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by creditors. The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' views as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized herein. The Debtors believe that the consideration, if any, provided under the Plan to holders of Allowed Claims reflects an appropriate resolution of their Allowed Claims taking into account the differing nature and priority of such Claims and Interests. The

Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Court.

I. *Confirmation without Necessary Acceptances; Cramdown*

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of a plan. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, determined without including any acceptance of the plan by any insider holding a claim in that class, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests. Here, because holders of Claims in Classes 8 and 9 are deemed to reject the Plan, the Debtors will seek confirmation of the Plan from the Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code. The Debtors believe that such requirements are satisfied, as no holder of a Claim or Interest junior to those in Classes 8 and 9 is entitled to receive any property under the Plan.

The concept of "unfair discrimination" is not defined in the Bankruptcy Code, but has been suggested in recent case law to arise when a difference in a plan's treatment of two classes of equal priority results in a materially lower percentage recovery for the non-accepting class. Based upon its understanding of existing case law, the Debtors do not believe that the Plan unfairly discriminates against any Class of Claims.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

(a) Secured Creditors. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

(b) Unsecured Creditors. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c) Interests. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such

holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Debtors believe that the distributions provided under the Plan satisfy the absolute priority rule, where required.

J. *Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization). To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared the Financial Projections, which are incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan meets the feasibility requirements of the Bankruptcy Code.

K. *Best Interests Test*

In order to confirm the Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of each Holder of a Claim or Equity Interest in any such impaired Class who has not voted to accept the Plan. Accordingly, if an Impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

L. *Liquidation Analysis*

To calculate the probable distribution to holders of each impaired class of claims and interests if a debtor were liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 case were converted to a case under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the chapter 11 plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

The Debtors, with the assistance of their advisors, have prepared the Liquidation Analysis that summarizes the Debtors' best estimate of recoveries by holders of Claims if the Chapter 11 Cases were converted to a case under chapter 7, which is attached hereto as **<u>Exhibit C</u>**. Based upon the Debtors' current projections, Holders of Allowed Administrative Expense Claims, Priority Tax Claims, Other Secured Claims (if applicable), Secured Tax Claims, Priority Non-

Tax Claims, and Patient Claims will be paid in full under the Plan (subject to the terms of the Plan), while Holders of Allowed Commercial GUC Claims will receive Trust Interests on a Pro Rata basis, and Holders of Allowed Abuse Claims will receive a Pro Rata distribution from the Abuse Claims QSF, and the Holders of Allowed Clinic Secured Claims will receive either (i) their collateral, (ii) the proceeds from the sale of any property encumbered by a valid and perfected lien in favor of such Allowed Clinic Secured Claims clinics, or (iii) a settlement payment in Cash in final satisfaction of such claims.

If the Chapter 11 Cases were converted to chapter 7 cases, a chapter 7 trustee likely would choose to close some or all of the Debtors' clinics. The closure of clinics and cessation of care would cause harm and inconvenience to the communities that rely on those clinics for medical treatment. Further, the Debtors' estates would incur the costs of payment of a statutorily allowed commission to a chapter 7 trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtors believe that such amounts would exceed the amount of expenses that will be incurred in implementing the Plan. The Debtors contemplate an orderly administration and monetization or other disposition of the Estates through the Effective Date by parties that are already familiar with the Debtors, their assets and affairs, and their creditors and liabilities. Such familiarity will allow the Debtors to complete their reorganization and distributions pursuant to the Plan more efficiently and expeditiously than a chapter 7 trustee. Additionally, the Estates would suffer additional delays, as a chapter 7 trustee and his/her counsel took time to develop a necessary learning curve in order to complete the administration of the Estates (including the prosecution of Causes of Action). Also, a new time period for the filing of claims would commence under Bankruptcy Rule 1019(2), possibly resulting in the filing of additional Claims against the Estates. Further, the Estate would not have the benefit of the Trust Funding Amount and formation of the Trust to provide a recovery for general unsecured creditors under the Plan, and thus, general unsecured creditors would likely receive no recovery in a Chapter 7 proceeding.

Based upon the foregoing, the Debtors believe that creditors will receive at least as much or more under the Plan than they would receive if the Chapter 11 Cases were converted to chapter 7 cases.

M. *Compliance with Applicable Provisions of the Bankruptcy Code*

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Debtors have considered each of these issues in the development of the Plan and believe that the Plan complies with all applicable provisions of the Bankruptcy Code.

N. *Acceptance of the Plan*

If you are a holder of a Claim in Classes 1(b), 1(c), 1(d), 4, 6 or 7 , your acceptance of the Plan is important. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan. At least one Impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Plan. The Debtors urge that you vote to accept the Plan.

## ARTICLE V.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords Holders of Claims the potential for the maximum distribution on account of their claims and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, the theoretical alternatives to the Plan would be (a) formulation of an alternative chapter 11 plan, (b) dismissal of the Chapter 11 Cases, or (c) conversion to chapter 7 of the Bankruptcy Code. For the reasons described herein, the Debtors do not believe that any of these alternatives, even if viable, would afford holders of Claims or Interests a greater recovery than what would be provided by the Plan.

If the Plan is not confirmed, then the Debtors or any other party in interest could attempt to formulate a different plan. The additional costs, including, among other amounts, additional professional fees, all of which would constitute Administrative Claims (subject to allowance thereof), however, may be so significant that one or more parties in interest could request that the Chapter 11 Cases be converted to chapter 7. At this time, the Debtors do not believe that there are viable alternative plans available to the Debtors.

If the Chapter 11 Cases were dismissed, creditors would revert to a "race to the courthouse," the result being that creditors would not receive a fair and equitable distribution of the Debtors' remaining assets. Moreover, as set forth above, the Debtors believe the Plan provides a greater recovery to creditors than would be achieved in a chapter 7 case. Therefore, a chapter 7 case is not an attractive or superior alternative to the Plan. Thus, the Plan represents the best available alternative for maximizing returns to creditors.

# ARTICLE VI.

# RISK FACTORS

THE COMBINED DISCLOSURE STATEMENT AND PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING THE RISK FACTORS SET FORTH BELOW. PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED AND ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN. ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

## A. *Risks Relating to Confirmation and Consummation of the Plan*

### 1. Parties in Interest May Object to Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. As further described above, the Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan would not be confirmed or consummated.

To the extent that the Court finds that a different classification is required for the Plan to be confirmed, the Debtors may seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors may, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Court that acceptance of the Plan by any holder of Claims

pursuant to this solicitation will constitute a consent to the Plan's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member. Under the Bankruptcy Rules, the Debtors would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any holder.

### 2. The Debtors May Object to a Claim or Equity Interest

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest under the Plan. The estimates set forth in this Combined Disclosure Statement and Plan cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is or may become subject to an objection, counterclaim or other suit by the Debtors. Thus, any Holder of a Claim or Equity Interest that is or may become subject to an objection may not receive its expected share of the estimated distributions described in this Combined Disclosure Statement and Plan.

### 3. The Debtors May Fail to Satisfy the Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan. However, there can be no assurance that the requisite acceptances to confirm the Plan will be received. In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan, which plan may not have the support of the creditors, or may be required to liquidate the Estates under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative chapter 11 plan or other arrangement would be similar or as favorable to the Holders of Allowed Claims or Equity Interests as those proposed in the Plan.

### 4. Plan May Not Be Accepted, Confirmed, or Consummated

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or Equity Interest might challenge either the adequacy of this Combined Disclosure Statement and Plan or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. As described above, the Debtors believe that all the relevant statutory and legal tests and standards are satisfied and the Plan can be confirmed under a "cramdown" procedure. However, even if the Bankruptcy Court determines that the Combined Disclosure Statement and Plan, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it nevertheless found that any of the statutory requirements for confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy Court.

Moreover, as described further above, there can be no assurance that modifications to the Combined Disclosure Statement and Plan would not be required for Confirmation or that such modifications would not necessitate the resolicitation of votes. If the Plan is not confirmed, it is unclear what distributions holders of Claims ultimately would receive with respect to their Claims in a subsequent plan of liquidation. The Debtors reserve the right to modify the terms

and conditions of the Plan as necessary for confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan. Section 1127 of the Bankruptcy Code permits the Debtors to modify the Plan at any time before confirmation, but not if such modified Plan fails to meet the requirements for confirmation. The Debtors may modify the Plan at any time after confirmation of the Plan and before substantial consummation of the Plan if circumstances warrant such modification and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, but not if such modified Plan fails to meet the requirements for confirmation. The Debtors will comply with the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code with respect to the modified Plan. Any Holder of a Claim or Equity Interest that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within the time fixed by the Bankruptcy Court, such Holder changes its previous acceptance or rejection.

Provided the Plan is confirmed, although the Debtors believe that the Effective Date will occur, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

#### 5. Plan May Impact Insurance Rights and Recoveries

There is no assurance that the insurers who issued the Insurance Policies to the Debtors will not maintain that various terms of the Plan, including but not limited to the treatment of insurance rights under the Plan, release them from their obligations under the Insurance Policies.

### B. *Risks Relating to the Chapter 11 Process*

#### 1. The Debtors' Exclusivity Period May Terminate

At the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing its petition. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' goals.

#### 2. Continuation of the Chapter 11 Cases May Harm the Debtors' Estates

A prolonged continuation of the Chapter 11 Cases may adversely affect the Debtors' Estates. So long as the Chapter 11 Cases continues, the Debtors may be required to incur substantial costs for professional fees and other expenses associated with the proceedings.

#### 3. The Chapter 11 Cases May Be Converted to Cases Under Chapter 7

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be

appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of, among other things, the lack of the Trust and the additional administrative expenses involved in the appointment of a chapter 7 trustee.

C. *Risks Relating to Recoveries Under the Plan*

The projected distributions set forth in this Combined Disclosure Statement and Plan are based upon the Debtors' good-faith estimate of the amount of expenses that will be incurred and total amount of Claims in each Class that will ultimately be Allowed. The actual amount of such expenses could be greater than expected for a variety of reasons, including greater-than-anticipated administrative and litigation costs associated with resolving Disputed Claims. Additionally, the actual amount of Allowed Claims in any class could be greater than anticipated, which would impact the distributions to be made to Holders of Claims.

D. *Risks Relating to the Reorganized Debtors*

**1. The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results**

The Reorganized Debtors may not be able to achieve their projected financial results. The financial projections in the Plan Supplement (the "*Financial Projections*") represent the Debtors' management's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, the value of the New Equity Interests may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

**2. The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness**

The Reorganized Debtors' ability to make scheduled payments on, or refinance its debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including potential borrowings under the Exit Facility.

**3. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: the (a) ability to develop, confirm, and consummate the transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; and (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors. Such risks and uncertainties could affect the Debtors' business and operations in various ways. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

**4. Financial Results May Be Volatile and May Not Reflect Historical Trends**

The Financial Projections are based on assumptions that are an integral part of the projections, including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the New Equity Interests and the ability of the Debtors to make payments with respect to their indebtedness. Lastly, the business plan was developed by the Debtors with the assistance of their advisors. There can be no assurances that the Debtors' business plan will not change, possibly materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan.

## ARTICLE VII.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE FOLLOWING IS INTENDED TO BE ONLY A SUMMARY OF SELECTED FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH, AND RECEIPT OF TAX ADVICE FROM, A TAX PROFESSIONAL. THE SELECTED FEDERAL TAX CONSEQUENCES THAT ARE DESCRIBED HEREIN AND OTHER FEDERAL, STATE AND LOCAL TAX CONSEQUENCES THAT ARE NOT ADDRESSED HEREIN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH TAX CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST.

THE DEBTORS DO NOT INTEND TO REQUEST A TAX RULING FROM THE INTERNAL REVENUE SERVICE OR ANY OTHER TAXING AUTHORITY WITH RESPECT TO ANY OF THE TAX CONSEQUENCES OF THE PLAN. CONSEQUENTLY, THE INTERNAL REVENUE SERVICE OR ANOTHER TAXING AUTHORITY MAY DISAGREE WITH AND MAY CONTEST ONE OR MORE OF THE TAX CONSEQUENCES DESCRIBED HEREIN TO THE DEBTORS, HOLDERS OF CLAIMS, AND/OR HOLDERS OF INTERESTS. THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY, IS NOT INTENDED TO BE AND IS NOT TAX ADVICE, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY ADVISED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED DISCLOSURE STATEMENT AND PLAN.

A. *Certain U.S. Federal Income Tax Consequences*

The following discussion is a summary of certain material U.S. federal income tax consequences of the Plan to the Debtors and to certain holders (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) of Claims. The following summary does not address the U.S. federal income tax consequences to holders of Claims or Interests not entitled to vote on the Plan. This summary is based on the Internal Revenue Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect. No legal opinions have been requested or obtained from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to any of the issues discussed below. The discussion below is not binding upon the IRS or the courts. No assurance, guarantees, or warranties can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain holders of Claims in light of their individual circumstances, nor does the discussion deal with tax issues with respect to holders of Claims or Interests subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies; banks or other financial institutions; brokers, dealers, or traders in securities; real estate investment trusts; governmental authorities or agencies; tax-exempt organizations; retirement plans; individual retirement or other tax-deferred accounts; certain expatriates or former long-term residents of the United States; small-business investment companies; regulated investment companies; S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes and their owners; persons whose functional currency is not the U.S. dollar; persons who use a mark-to-market method of accounting; persons required to report income on an applicable financial statement; persons holding Claims or Interests as part of a straddle, hedge, constructive sale, conversion transaction, or other integrated transaction; and persons who are not U.S. Holders (as defined below)). Furthermore, this discussion generally assumes that a holder of a Claim holds such claim as a "capital asset" within the meaning of section 1221 of the Internal Revenue Code (generally property held for

investment), except as otherwise specifically discussed below. This discussion does not address any U.S. federal non-income (including estate or gift), state, local, or foreign taxation, alternative minimum tax, or the Medicare tax on net investment income of certain holders.

"U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the U.S. for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the U.S. or any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (4) a trust (A) if a court within the U.S. is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person. Non-U.S. Holders should consult their own advisors concerning the tax consequences of the Plan to them.

If a partnership (or other entity or arrangement classified as a partnership for U.S. federal income tax purposes) is a holder of Claims or Interests, the U.S. federal income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership. A holder of a Claim or Interest that is a partnership and the partners in such partnership should consult their tax advisors with regard to the U.S. federal income tax consequences of the Plan.

B. *Tax Consequences in Relation to the Debtor*

As of December 31, 2024, the Debtors had a consolidated federal income tax net operating loss ("*NOL*") carryforward of approximately $724 million, in addition to substantial other tax attributes (including capitalized R&D expense). The majority of the losses ($705.6 million) were incurred in 2020-2024: 2020 ($29.2 million); 2021 ($126.6 million); 2022 ($255.8 million); 2023 ($153.8 million); and 2024 ($140.2 million). The Debtors expect that it generated an additional NOL and other tax attributes in the approximate amount of $60 million for the tax year ending December 31, 2025. The Debtors' ability to utilize these NOLs may be limited under section 382 of the Tax Code, however the Debtors are not aware of any section 382 limitations which have been triggered due to an ownership change under section 382 for taxable years 2025 or prior. While the Debtors file a consolidated group, these NOLs reside within specific legal entities. Consequently, limitations on inter-company tax sharing may prevent the group from utilizing the full value of these losses.

In general, cancellation of debt income ("*COD*") realized by a debtor on the discharge of debts in the context of a bankruptcy proceeding will not result in taxable income to the debtor, although it will cause the reduction in certain of the debtor's tax attributes (such as NOLs, capital loss carryforwards, tax credits, and tax basis in assets). The amount of COD realized equals the excess of the adjusted issue price of indebtedness discharged over the sum of the amount of cash, the issue price of any debt instrument and the fair market value of any other property given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the cancelled debt would have given rise to a tax deduction). If advantageous, the borrower can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes. Where a debtor (such as the Debtors) joins in the filing of a consolidated U.S. federal income tax return, applicable

Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group also be reduced.

The Debtors may realize COD in connection with the implementation of the Plan as a result of the satisfaction of certain Claims that qualify as indebtedness for federal income tax purposes at a discount or for no consideration. As a result, the Debtors expect that their tax attributes will be reduced following the implementation of the Plan.

Any reduction in tax attributes under the COD rules does not occur until after such attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the tax year in which the COD is realized.

To the extent the Debtors have NOLs remaining after implementation of the Plan, the Debtors' ability to utilize those NOLs may be limited under section 382 of the Tax Code. Section 382 contains certain rules limiting the amount of NOLs a corporate taxpayer can utilize in each taxable year following an "ownership change." In general, an "ownership change" occurs whenever the percentage of the stock of a corporation owned, directly or indirectly, by "5-percent stockholders" (within the meaning of section 382) increases by more than 50 percentage points over the lowest percentage of the stock of such corporation owned, directly or indirectly, by such 5-percent stockholders at any time over the preceding three-year period. Certain special rules under section 382 apply to corporations that experience an ownership change in connection with a bankruptcy proceeding and allow for conversion of qualifying debt to equity without causing an ownership change.

It is possible that the consummation of the Plan will not result in an ownership change under section 382 because new equity interests are being received in exchange for qualifying debt and the Debtors are in a chapter 11 proceeding. The Debtors, however, have not evaluated whether the Plan would result in an ownership change, nor the potential impact of section 382 (including certain relief provisions of section 382 that may apply to an ownership change resulting from a bankruptcy restructuring) on their ability to utilize the NOLs that will remain following the implementation of the Plan and the application of the attribute reduction rules discussed above. For purposes of this Combined Disclosure Statement and Plan, however, the Debtors do not dispute that the NOLs will be available to the Reorganized Debtors as a deduction to reduce future taxable income of the Debtors or Reorganized Debtors, as applicable, subject to the limitation set forth in section 172(a)(2) of the Tax Code.

C. *Tax Consequences for U.S. Holders of Certain Claims*

Generally, a holder of a Claim should in most, but not all, circumstances recognize gain or loss equal to the difference between the "amount realized" by such holder in exchange for its Claim and such holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under a plan of reorganization in respect of a holder's Claim. The tax basis of a holder in a Claim will generally be equal to the holder's cost therefor. To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Claim in the holder's hands, the purpose and

circumstances of its acquisition, the holder's holding period of the Claim, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the holder has held such Claim for more than one year.

A creditor who receives Cash in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is treated as a payment in respect of accrued but unpaid interest. A creditor who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, generally will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such creditor realizes an overall gain or loss as a result of surrendering its Claim. A creditor who previously included in its income accrued but unpaid interest attributable to its Claim may be entitled to recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such creditor realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.

Under the Plan, the holders of certain Claims, including Commercial GUC Claims in Class 6 and Abuse Claims in Class 7, will likely receive only a partial distribution of their Allowed Claims. Whether the applicable holder of such Claims will recognize a loss or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the holder and its Claims. Creditors should consult their own tax advisors concerning this issue.

D. *Tax Consequences in Relation to the Trust*

As of the Effective Date, the Trust will be established for the benefit of the Trust Beneficiaries. The tax consequences of the Plan in relation to the Trust and the beneficiaries thereof are subject to uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law.

The Trust is intended to qualify as a liquidation trust for federal income tax purposes, except that the segregated escrow account established as the Abuse Claims QSF shall not be part of the liquidating trust under such Treasury Regulations but shall instead be subject to Treas. Reg. Section 1.468B-1. In general, a liquidation trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994.28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan and Trust Agreement, and in conformity with Revenue Procedure 94-45, *supra*, all parties (including the Trustee and the Trust Beneficiaries) are required to treat, for federal income tax purposes, the Trust as a grantor trust of which the Trust Beneficiaries are the owners and grantors. While the discussion herein assumes that the Trust would be so treated for federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the Trust as a grantor trust, nor do the Debtors or Reorganized Debtors seek to request one. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Trust as a grantor trust. If the IRS were to challenge successfully such

classification, the federal income tax consequences to the Trust and the beneficiaries thereof could materially vary from those discussed herein. Holders of Claims or Interests should consult their own tax advisors concerning the tax consequences to them if the Trust were not to qualify as a grantor trust for U.S. federal income tax purposes.

In general, each creditor who is a beneficiary of the Trust will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such beneficiary in satisfaction of its Allowed Claim, and (ii) such beneficiary's adjusted tax basis in such Claim. The "amount realized" by a Trust Beneficiary will equal the sum of cash and the aggregate fair market value of the property received by such party pursuant to the Plan (such as a beneficiary's undivided beneficial interest in the Commercial GUC Fund assets transferred to the Trust). Where gain or loss is recognized by a beneficiary in respect of its Allowed Claim, the character of such gain or loss (*i.e.*, long-term or short-term capital, or ordinary income) will be determined by a number of factors including the tax status of the party, whether the Claim constituted a capital asset in the hands of the party and how long it had been held, whether the Claim was originally issued at a discount or acquired at a market discount and whether and to what extent the party had previously claimed a bad-debt deduction in respect of the Claim.

After the Effective Date, any amount that a creditor receives as a distribution from the Trust in respect of its beneficial interest in the Trust should not be included, for federal income tax purposes, in the party's amount realized in respect of its Allowed Unsecured Claim, but should be separately treated as a distribution received in respect of such party's beneficial interest in the Trust.

In general, a beneficiary's aggregate tax basis in its undivided beneficial interest in the Commercial GUC Fund assets transferred to the Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the beneficiary's holding period in such assets will begin the day following the Effective Date. Distributions to any Trust Beneficiary will be allocated first to the original principal portion of the beneficiary's Allowed Claim as determined for federal tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.

For all federal income tax purposes, all parties (including the Trustee and the holders of beneficial interests in the Trust) will treat the transfer of assets to the Trust, in accordance with the terms of the Plan and Trust Agreement, as a transfer of the Commercial GUC Fund assets directly to the holders of the applicable Allowed Claims followed by the transfer of such assets by such holders to the Trust. Consistent therewith, all parties will treat the Trust as a grantor trust of which such holders are to be owners and grantors. Thus, such holders (and any subsequent holders of interests in the Trust) will be treated as the direct owners of an undivided beneficial interest in the Commercial GUC Fund assets of the Trust for all federal income tax purposes. Accordingly, each holder of a beneficial interest in the Trust will be required to report on its federal income tax return(s) the holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Trust.

Allocations of taxable income of the Trust (other than taxable income allocable to the Trust's claims reserves) among the Trust Beneficiaries will be determined by reference to the

manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Trust had distributed all of its assets (valued at their tax basis) to the holders of the beneficial interests in the Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Trust. Similarly, taxable loss of the Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining trust assets.

The tax basis of the Trust Assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. Uncertainties with regard to federal income tax consequences of the Plan may arise due to the inherent nature of estimates of fair market value that will impact tax liability determinations.

The federal income tax reporting obligation of a holder of a beneficial interest in the Trust is not dependent upon the Trust distributing any cash or other proceeds. Therefore, a holder of a beneficial interest in the Trust may incur a federal income tax liability regardless of the fact that the Trust has not made, or will not make, any concurrent or subsequent distributions to the holder. If a holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its beneficial interests in the Trust it holds, the holder may be allowed a subsequent or offsetting loss.

The Trustee will file with the IRS returns for the Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The Trust will also send to each holder of a beneficial interest in the Trust a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its federal income tax return.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an IRS private letter ruling if the Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Trustee), the Trustee may (a) elect to treat any trust assets allocable to, or retained on account of, Disputed Claims (the "*Trust Claims Reserve*") as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, any Trust Claims Reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the Trust Assets in such reserves, and all distributions from such reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Trustee and the holders of beneficial interests in the Trust) will be required to report for tax purposes consistently with the foregoing.

Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could also change the federal income tax consequences of the Plan and the transactions contemplated thereunder.

E. *Treatment of Trust for Federal Income Tax Purposes; No Successor-in-Interest*

The Trust shall be established for the primary purpose of liquidating its assets, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Trust. Accordingly, the Trustee shall in an expeditious but orderly manner, liquidate and convert to Cash the Trust Assets, including the Trust Causes of Action, make timely distributions of the proceeds therefrom to the Trust Beneficiaries, as the case may be, and not unduly prolong their duration. The Trust shall not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the Trust Agreement.

The Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Trust Beneficiaries treated as grantors and owners of the Trust. For all federal income tax purposes, all parties (including the Debtors, the Reorganized Debtors, the Trustee, and the Trust Beneficiaries) shall treat the transfer of the Trust Assets by the Debtors to the Trust, as set forth in the Trust Agreement, as a transfer of the Commercial GUC Fund by the Debtors to the Trust Beneficiaries entitled to distributions from the Commercial GUC Fund, followed by a transfer by such beneficiaries to the Trust. Thus, the Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

As soon as practicable after the Effective Date, the Trustee (to the extent that he or she deems it necessary or appropriate in his or her sole discretion) shall value the Trust Assets in the Trust, based on the good faith determination of the Trust, and shall apprise the Trust Beneficiaries of such valuation. The valuation shall be used consistently by all parties (including the Debtors, the Reorganized Debtors, the Trustee and the Trust Beneficiaries) for all federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding the valuation of the Trust Assets.

The right and power of the Trustee to invest the Trust Assets transferred to the Trust, the proceeds thereof, or any income earned by the Trust, shall be limited to the right and power to (a) invest the Trust Assets (pending distributions in accordance with the Plan) in (i) short-term direct obligations of, or obligations guaranteed by, the United States of America, (ii) short-term obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof or (iii) such other investments as the Bankruptcy Court may approve from time to time; or (b) deposit such assets in demand deposits or certificates of deposit at any bank or trust company, which has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000 (collectively, the "*Permissible Investments*"); *provided*, *however*, that the scope of any such Permissible Investments shall be limited to include only those investments that a Trust, within the meaning of Treas. Reg. § 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

Subject to the provisions of this Article XI, the Trustee shall distribute to the Trust Beneficiaries all net Cash income plus all net Cash proceeds from the liquidation of the Trust Assets (including as Cash for this purpose, all Cash equivalents) at such time intervals as decided

by the Trustee in his or her discretion, pursuant to the terms of the Plan and the Trust Agreement. The Trust shall make distributions no less frequently than once per twelve-month period, such period to be measured from the Effective Date; *provided*, *however*, that the Trustee may, in his or her sole discretion, cause the Trust to retain an amount of net Cash proceeds or net Cash income reasonably necessary to maintain the value of its assets or to meet Claims and contingent liabilities (including Disputed Claims). The Trustee may also determine that in a given period or on the anniversary of the Effective Date, there are insufficient assets to make a distribution.

The Trustee shall require, to the extent required by law, any Trust Beneficiary or other party receiving a distribution to furnish to the Trustee in writing his, her, or its Employer or Taxpayer Identification Number as assigned by the IRS and the Trustee may condition any distribution to any Trust Beneficiary or other party receiving a distribution upon receipt of such identification number.

F. *Information Reporting and Withholding*

In connection with the Plan, the Debtors will comply with all applicable withholding and information-reporting requirements imposed by U.S. federal, state, local, and foreign taxing authorities, and all distributions under the Plan will be subject to those withholding and information reporting requirements. Holders of Claims may be required to provide certain tax information as a condition to receiving distributions pursuant to the Plan.

In general, information-reporting requirements may apply to distributions pursuant to the Plan. Additionally, under the backup withholding rules, a holder may be subject to backup withholding with respect to distributions made pursuant to the Plan, unless a U.S. Holder provides the applicable withholding agent with a taxpayer identification number, certified under penalties of perjury, as well as certain other information, or otherwise establishes an exemption from backup withholding. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a credit against a U.S. Holder's U.S. federal income tax liability, if any, and may entitle a U.S. Holder to a refund, provided the required information is timely furnished to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders of Claims or Interests are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holder's tax returns.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S.

FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE VIII.

## TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY TAX CLAIMS

A. *Treatment of DIP Claims*

The DIP Claims shall be deemed Allowed in accordance with the Final DIP Order. The DIP Claims will receive the treatment described below in Article IX.D.7.

B. *Treatment of Administrative Expense Claims & Administrative Bar Date*

(a) On, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date and (ii) the first business day after the date that is forty-five (45) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, distributions to holders of Allowed Administrative Expense Claims shall have commenced, with each holder of an Allowed Administrative Expense Claim to receive, in full and final satisfaction, settlement, release, and discharge of such Claim, (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(b) Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court, or as provided by this Article VIII.B, requests for payment of Administrative Expense Claims, other than requests for payment of Professional Fee Claims, must be filed and served on the Debtors no later than the applicable Administrative Expense Bar Date pursuant to the procedures specified in the Disclosure Statement Order, the Confirmation Order, the notice of entry of the Confirmation Order, and the notice of Effective Date.

(c) Holders of Administrative Expense Claims that are required to file and serve a request for payment and that do not file and serve such a request by the Administrative Expense Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors, Reorganized Debtors, Estates, Wind-Down Estates, the Trust, and the Trustee, as applicable, and their property, and such Administrative Expense Claims shall be deemed compromised, settled, and released without consideration as of the Effective Date.

(d) For the avoidance of doubt, Persons or Entities seeking awards by the Bankruptcy Court for Professional Fee Claims shall not be required to comply with the Administrative Expense Bar Date; instead Professional Fee Claims are governed by Article VIII.C and the Professional Fee Claim Bar Date.

C. *Treatment of Professional Fee Claims*

**1. Professional Fee Claim Bar Date**

Notwithstanding anything herein to the contrary, all Persons or Entities seeking awards by the Bankruptcy Court of Professional Fee Claims for compensation for services rendered or reimbursement of expenses incurred on behalf of the Estates prior to the Effective Date shall file, on or before the date that is thirty (30) days after the Effective Date (the "Professional Fee Claim Bar Date"), their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred. All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Court and the agreed budgets annexed to the Interim DIP Order and Final DIP Order (each as defined in the DIP Financing Agreement and as such budgets may be amended or revised). Upon approval of the fee applications by the Court or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, shall pay applicable Professionals all of their respective accrued and Allowed fees and reimbursement of expenses arising prior to the Effective Date, plus reasonable fees for services rendered, and actual and necessary costs incurred, in connection with the filing, service and prosecution of any applications for allowance of Professional Fee Claims pending on the Effective Date or filed and/or served after the Effective Date.

**2. Committee Professional Fee Cap Amount**

The Professional Fee Claims for the Committee Professionals (i) from the Petition Date through May 8, 2026 shall be subject to a cap of a $4,000,000 and (ii) the Professional Fee Claims for Committee Professionals from May 9, 2026 through the Effective Date shall be subject to a cap of $350,000 (the "**Committee Fee Cap Amount**"). To the extent the Professional Fee Claims of the Committee Professionals exceed the applicable Committee Fee Cap Amount, such Professional Fee Claims shall be apportioned among the Committee Professionals as determined by the Committee.

**3. Budgeted Professional Fees**

If the amount remaining in the Professional Fee Trust Account on the Effective Date (the "**Available Amount**") is insufficient to fund the Allowed Professional Fee Claims, a discount will be applied to the Incurred Fees only and not the Go Forward Fees, such discount (the "**Incurred Fee Discount**") to be applied pro rata to the Debtor Professionals and the Committee Professionals.

The Incurred Fee Discount will be subject to a maximum of seven percent (7%) of the Incurred Fees, with any resulting shortfall to be funded by the DIP Lender and subject to Article XV.B.iii of the Plan.[8]

---

[8] Insofar as Stifel's fees are concerned, the 7% discount only applies to Stifel's monthly fee, not its transaction fees.

### 4. Payment of Allowed Professional Fee Claims

On the Effective Date, all unpaid amounts for the Committee (subject to the Committee Fee Cap Amount), the Debtors Professionals, and all other Professionals will be escrowed in the Professional Fee Escrow Account; *provided*, *however*, the DIP Lender shall deposit an additional $1,000,000 in the Professional Fee Escrow Account before the Effective Date pursuant to an amendment to the Amended DIP Order or Confirmation Order. The Allowed Professional Fee Claims payable from the Professional Fee Escrow Account will be paid on the 15th day following entry of an order by the Bankruptcy Court allowing such Professional Fee Claims.

Subject to the foregoing, the Reorganized Debtors and Trustee are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date by their respective Professionals in the ordinary course of business and without the need for Bankruptcy Court approval.

## ARTICLE IX.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

A. *Summary*

The categories listed below classify Claims against and Equity Interests in the Debtors for all purposes (except as otherwise provided herein), including voting, confirmation, and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.

**For the avoidance of doubt, all rights of the Debtors, the Reorganized Debtors, the Estates, the Wind Down Estates, the Trustee, and all other Persons, as applicable, to object, dispute, challenge, or compromise the enforceability, perfection, priority, avoidability, or validity of all Liens, Interests, and Claims are preserved and fully enforceable prior to, on, and after the Effective Date.**

**Summary of Classification and Treatment of Claims and Equity Interests**

| **Class** | **Claim** | **Status** | **Voting Right** |
|---|---|---|---|
| 1(a) | Other Secured Claims | Unimpaired | Deemed to Accept |
| 1(b) | John Muir Secured Claims | Impaired | Entitled to Vote |
| 1(c) | Prime Health Secured Claims | Impaired | Entitled to Vote |

| **Class** | **Claim** | **Status** | **Voting Right** |
|---|---|---|---|
| 1(d) | Stanford Health Secured Claims | Impaired | Entitled to Vote |
| 2 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |
| 3 | Priority Tax Claims | Unimpaired | Deemed to Accept |
| 4 | DIP Claims and Prepetition Secured Claims[9] | Impaired | Entitled to Vote |
| 5 | Patient Claims | Unimpaired | Deemed to Accept |
| 6 | Commercial GUC Claims | Impaired | Entitled to Vote |
| 7 | Abuse Claims | Impaired | Entitled to Vote |
| 8 | Subordinated Claims | Impaired | Deemed to Reject |
| 9 | Equity Interests | Impaired | Deemed to Reject |
| 10 | Intercompany Claims | Unimpaired / Impaired | Deemed to Accept / Deemed to Reject |
| 11 | Intercompany Interests | Unimpaired / Impaired | Deemed to Accept / Deemed to Reject |

B. *Formation of Debtor Groups for Convenience Only*

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan or Plan Supplement, all Debtors shall continue to exist as separate legal entities.

C. *Separate Classification of Other Secured Claims*

Although the Other Secured Claims have been placed in one Class for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan and receiving Plan Distributions.

[9] The DIP Claims have been placed in Class 4 for administrative convenience and for purposes of nomenclature within the Plan only and the Holders of the DIP Claims are not entitled to vote to accept or reject the Plan. The Prepetition Secured Claims shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan and receiving Plan Distributions.

D. *Classification, Treatment and Voting*

**1. Class 1(a) – Other Secured Claims**

(a) *Classification*: Class 1(a) comprises the Allowed Other Secured Claims.

(b) *Treatment*: Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Claim, at the option of the Debtors or the Reorganized Debtors, as applicable, and with the consent of the DIP Agent and Prepetition Agent, such holder shall receive (i) payment in full in Cash, payable on the later of the Effective Date and the date that is fourteen (14) days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired.

(c) *Voting*: Class 1(a) is Unimpaired and the Holders of Class 1(a) Claims are deemed to have accepted the Plan.

**2. Class 1(b) – John Muir Secured Claims**

(a) *Classification*: Class 1(b) comprises the Allowed John Muir Secured Claims.

(b) *Treatment*: Except to the extent that a holder of a John Muir Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Claim, at the option of the Debtors or the Reorganized Debtors, as applicable, and with the consent of the DIP Agent and Prepetition Agent, such holder shall receive a settlement payment in the amount of $971,420.00 in partial satisfaction of the John Muir Secured Claim with the unpaid balance of such Claim treated as a Class 6 Commercial GUC Claim.

(c) *Voting*: Class 1(b) is Impaired and the Holders of Class 1(b) Claims are entitled to vote to accept or reject the Plan.

**3. Class 1(c) – Prime Health Secured Claims**

(a) *Classification*: Class 1(c) comprises the Allowed Prime Health Secured Claims.

(b) *Treatment*: Except to the extent that a holder of a Prime Health Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Claim, at the option of the Debtors or the Reorganized Debtors, as applicable, and with the consent of the DIP Agent and Prepetition Agent, such holder shall receive a settlement payment in the amount of $351,375.00 in partial satisfaction of the Prime Health Secured Claim with the unpaid balance of such Claim treated as a Class 6 Commercial GUC Claim.

(c) *Voting*: Class 1(c) is Impaired and the Holders of Class 1(c) Claims are entitled to vote to accept or reject the Plan.

**4. Class 1(d) – Stanford Health Secured Claims**

(a) *Classification*: Class 1(c) comprises the Allowed Stanford Health Secured Claims.

(b) *Treatment*: Except to the extent that a holder of a Stanford Health Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Claim, at the option of the Debtors or the Reorganized Debtors, as applicable, and with the consent of the DIP Agent and Prepetition Agent, such holder shall receive a settlement payment in the amount of cash collateral being held on behalf of Stanford Health on the Effective Date in partial satisfaction of the Stanford Secured Claim with the unpaid balance of such Claim treated as a Class 6 Commercial GUC Claim.

(c) *Voting*: Class 1(d) is Impaired and the Holders of Class 1(d) Claims are entitled to vote to accept or reject the Plan.

**5. Class 2 – Priority Non-Tax Claims**

(a) *Classification*: Class 2 comprises the Allowed Priority Non-Tax Claims.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, to the extent such Claim has not already been satisfied pursuant to prior Bankruptcy Court order, each Holder of such Claim shall, in full and final satisfaction of such Claim, at the option of the Debtors or the Reorganized Debtors, as applicable, and with the consent of the DIP Agent and Prepetition Agent, (i) be paid in full in Cash, payable on the later of the Effective Date and the date that is fourteen (14) Days after the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired.

(c) *Voting*: Class 2 is Unimpaired and the Holders of Class 2 Claims are deemed to have accepted the Plan.

**6. Class 3 – Priority Tax Claims**

(a) *Classification*: Class 3 comprises the Allowed Priority Tax Claims.

(b) *Treatment*: Each Holder of an Allowed Priority Tax Claim shall, in full and final satisfaction of such Claim, receive quarterly payments of principal and interest over a five (5) year period from the Petition Date, with interest accruing at the statutory rate of interest, or as otherwise permitted pursuant to Bankruptcy Code section 1129(a)(9)(C) or section 1129(a)(10)(D), as applicable, or as otherwise agreed; provided that the Reorganized Debtors, may prepay such Allowed Claim in full at any time. Payments to Class 3 shall commence on the later of (i) thirty (30) days following

the end of the first calendar month after the Effective Date, and (ii) the first Business Day in the calendar month after such Claim becomes an Allowed Claim.

(c) *Voting*: Class 3 is Unimpaired and the Holders of Class 3 Claims are deemed to have accepted the Plan.

**7. Class 4 – DIP Claims & Prepetition Secured Claims**

(a) *Classification*: Class 4 comprises the DIP Claims and Prepetition Secured Claims. The DIP Claims are included in Class 4 for administrative convenience only.

(b) *Allowance:* The Prepetition Secured Claims shall be Allowed on the Effective Date in the amount of no less than $94,825,453.96, plus all other secured obligations, including unpaid interest, fees, and other expenses arising and payable under the Prepetition Loan Documents, less any repayment of the DIP Claims or Prepetition Secured Claims resulting from a Permitted Asset Disposition.

(c) *Treatment:* Except to the extent that a holder of an Allowed Class 4 Claim agrees to a less favorable treatment, on the Effective Date, each holder of such Claim shall receive, in full and final satisfaction of such Claim:

(i) in the event of a Plan without Third-Party Sale Toggle:

A. each Holder of an Allowed Class 4 Claim shall receive a Pro Rata share of the New Equity Interests in CHTI;

B. the DIP Agent and Prepetition Agent, on account of the Allowed Class 4 Claims, shall designate, in their sole and absolute discretion, a Qualified Physician Owner for each Reorganized Physician Owned Debtor to receive the New Equity Interests of such Reorganized Physician Owned Debtors, as may be further described and set out in the Restructuring Transactions Memorandum; and

C. the Class 4 Claims in respect of the Initial Delayed Draw Term Loan Advance (as defined in the Prepetition Loan Documents), or such lesser amount as determined by the Prepetition Agent in its sole discretion, ("*Rollover Debt*") shall be converted into the Exit Facility, and each Holder of an Allowed Class 4 Claim in respect of the Rollover Debt shall receive a Pro Rata share of the Exit Facility, except as may be provided in the Exit Credit Agreement or as otherwise agreed upon by the Prepetition Agent, the DIP Agent, and the applicable Debtor(s) or Reorganized Debtor(s), as the case may be.

(ii) in the event of a Third-Party Sale Transaction, to the extent the Class 4 Claims remain outstanding, payment in full in Cash on the Effective Date or as soon as practicable thereafter.

(d) Upon (i) the indefeasible payment or satisfaction in full in Cash (in the event of a Third-Party Sale Transaction), or (ii) conversion of the Allowed Class 4 Claims into New Equity Interests and the Exit Facility (in the event of a Plan without Third-Party Sale Toggle), on the Effective Date, all Liens granted to secure the Allowed Class 4 Claims shall be terminated and of no further force and effect, and the Prepetition Loan Documents and the DIP Loan Documents shall be cancelled and discharged without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person or Entity. Notwithstanding anything herein to the contrary, the Liens and security interests securing the Allowed Class 4 Claims shall continue in full force and effect until such time as the Allowed Class 4 Claims have been fully satisfied as set forth above.

(e) *Voting*: The Allowed Prepetition Secured Claims are Impaired and the Prepetition Agent, on account of the Holders of Allowed Prepetition Secured Claims, is entitled to vote on the Plan.

**8. Class 5 – Patient Claims**

(a) *Classification*: Class 5 comprises the Allowed Patient Claims.

(b) *Treatment*: Except to the extent that a Holder of an Allowed Patient Claim agrees to less favorable treatment, to the extent such Claim has not already been satisfied pursuant to prior Bankruptcy Court order, each Holder of such Claim shall, in full and final satisfaction of such Claim, at the option of the Debtors or the Reorganized Debtors, as applicable, and with the consent of the DIP Agent and Prepetition Agent, (i) be paid in full in Cash, payable on the later of the Effective Date and the date that is fourteen (14) days after the date on which such Patient Claim becomes an Allowed Patient Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such other treatment so as to render such holder's Allowed Patient Claim Unimpaired. Because Patient Claims are being addressed in the ordinary course of business, the Debtors or the Reorganized Debtors, as applicable, reserve the right to object to such Patient Claim if the parties are not able to reconcile and resolve the allowance of the Patient Claim.

(c) *Voting*: Class 5 is Unimpaired and the Holders of Class 5 Claims are deemed to have accepted the Plan.

**9. Class 6 – Commercial GUC Claims**

(a) *Classification*: Class 6 comprises the Allowed Commercial GUC Claims.

(b) *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, each Holder of an Allowed Commercial GUC Claim shall receive, in full and final satisfaction of such Claim, a Pro Rata share of the Trust Interests, which shall be distributed on a Pro Rata basis among all Commercial GUC Claims and which shall entitle such Holder of an Allowed Commercial GUC Claim to a Pro Rata share of the distributable assets of the Commercial GUC Fund.

(c) *Voting*: Class 6 is Impaired and the Holders of Claims in Class 6 are entitled to vote to accept or reject the Plan.

**10. Class 7 – Abuse Claims**

(a) *Classification*: Class 7 comprises the Allowed Abuse Claims.

(b) *Treatment*: As of the Effective Date, all Abuse Claims shall automatically and without further act, deed, or court order, be assumed by the Abuse Claims QSF. Subject to the QSF Documents, each Holder of an Allowed Abuse Claim shall be entitled to receive their allocable share of the distributable assets of the Abuse Claims QSF.

(c) *Voting*: Class 7 is Impaired and the Holders of Claims in Class 7 are entitled to vote to accept or reject the Plan.

**11. Class 8 – Subordinated Claims**

(a) *Classification*: Class 8 comprises the Allowed Subordinated Claims.

(b) *Treatment*: On and after the Effective Date, in accordance with Bankruptcy Code section 510, any Subordinated Claim shall be automatically subordinated and receive no distribution on account of any such Claim without further notice, order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person or Entity.

(c) *Voting*: Class 8 is Impaired and pursuant to Bankruptcy Code section 1126(g) is deemed to have rejected the Plan. Therefore, votes from Holders in Class 8 will not be solicited.

**12. Class 9 – Equity Interests**

(a) *Classification*: Class 9 comprises the Equity Interests.

(b) *Treatment*: As of the Effective Date, any and all Equity Interests are cancelled and deemed discharged without any further notice or order. No distributions shall be made under the Plan on account of any Equity Interest.

(c) *Voting*: Class 9 is Impaired and pursuant to Bankruptcy Code Section 1126(g) is deemed to have rejected the Plan. Therefore, votes from Holders in Class 9 will not be solicited.

**13. Class 10 – Intercompany Claims**

(a) *Classification*: Class 10 comprises the Intercompany Claims.

(b) *Treatment:* On or after the Effective Date, all Intercompany Claims shall be adjusted, reinstated, or discharged as determined by the Reorganized Debtors or Debtors, as applicable, subject to the consent of the DIP Agent and the Prepetition Agent, and as may be provided in the Restructuring Transactions Memorandum.

(c) *Voting:* Class 10 is Unimpaired if Intercompany Claims are reinstated or Impaired if Intercompany Claims are cancelled. Holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**14. Class 11 – Intercompany Interests**

(a) *Classification*: Class 11 comprises the Intercompany Interests.

(b) *Treatment:* On the Effective Date, all Intercompany Interests not otherwise extinguished shall be adjusted, reinstated, set off, settled, contributed, merged, diluted, cancelled, released or discharged as determined by the Debtors or Reorganized Debtors, as applicable, subject to the consent of the DIP Agent and Prepetition Agent, and as may be provided in the Restructuring Transactions Memorandum.

(c) *Voting:* Class 11 is Unimpaired if Intercompany Interests are reinstated or Impaired if Intercompany Interests are cancelled. Holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

## ARTICLE X.

## ACCEPTANCE OR REJECTION OF PLAN

A. *Voting Classes*

Classes 1(a), 2, 3, and 5, and Classes 10 and 11, if applicable, are Unimpaired and by operation of Bankruptcy Code section 1126(f) are deemed to have accepted the Plan.

Classes 10 and 11, if applicable, are conclusively presumed to have rejected the Plan pursuant to section 1126(f) of the Bankruptcy Code or are not expected to receive any distribution on account of their Interests. Accordingly, they will not be solicited to vote.

Classes 8 and 9 are deemed to have rejected the Plan because the Holders of Claims and Equity Interests in such Classes not expected to receive any distribution on account of their Claims and Equity Interests, as applicable. Accordingly, they will not be solicited to vote.

The other Holders of Claims in each Impaired Class of Claims, Classes 1(b), 1(c), 1(d), 4, 6 and 7, are entitled to vote as a Class to accept or reject the Plan and are entitled to vote.

B. *Acceptance by Impaired Classes*

An Impaired Class of Claims shall be deemed to have accepted the Plan if the (a) Holders (other than any Holder designated pursuant to section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Claims actually voting in such Class have voted to accept the Plan and (b) Holders (other than any Holder designated pursuant to section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Claims actually voting in such Class have voted to accept the Plan.

C. *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

D. *Failure to Vote*

If the Holders of Claims in a particular Impaired Class of Claims were given the opportunity to vote to accept or reject the Plan, but no Holders of Claims in such Impaired Class of Claims voted to accept or reject the Plan, then such Class of Claims shall be deemed to have accepted the Plan.

E. *Intercompany Claims and Intercompany Interests*

To the extent reinstated under the Plan or Plan Supplement, distributions on account of Intercompany Claims or Intercompany Interests are not being received by Holders of such Intercompany Claims or Intercompany Interests, as applicable, on account of such Claims or Interests but for the purposes of administrative convenience and due to the importance of maintaining or modifying (as the case may be) the prepetition corporate structure for the ultimate benefit of the Holders of New Equity Interests, and in exchange for the Debtors' and the Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims. For the avoidance of doubt, to the extent reinstated pursuant to the Plan, on and after the Effective Date, except as otherwise provided in the Restructuring Transactions Memorandum, all Intercompany Claims and Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Claim or Intercompany Interests, as applicable, immediately prior to the Effective Date.

## ARTICLE XI.

## PROVISIONS FOR IMPLEMENTATION OF PLAN

A. *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Creditor or an Interest Holder may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Allowed Claims, Allowed Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Allowed Claims and Allowed Interests, and is fair, equitable, and reasonable.

B. *Restructuring Transactions*

On, before or concurrently with the Effective Date, the Debtors shall take all actions set forth in the Restructuring Transactions Memorandum, as may be amended on or before the deadline to file the Plan Supplement with the consent and approval of the Prepetition Agent, DIP Agent, and Third-Party Successful Bidder(s) (if any), and enter into any transaction and take any reasonable actions as may be necessary or appropriate to effect the transactions described herein, subject in all respects to the terms set forth herein, including, as applicable: (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (iv) all other actions that the Debtors, Prepetition Agent, DIP Agent, and Third-Party Successful Bidder(s) (if any) determine to be necessary or appropriate in connection with the Plan, including any Reorganization Transaction and/or a Third-Party Sale Transaction, and including, among other things, making filings or recordings that may be required by applicable law in connection with the Plan and including (a) incorporation of new Entities to receive, by assignment or otherwise, Debtor assets under the Plan; (b) vesting of assets currently held by one or more Debtors in one or more other Reorganized Debtors or new Entities; (c) transfer of Interests in one or more Debtors to one or more other Reorganized Debtors or new Entities; and (d) designation of Qualified Physician Owner(s) of any Reorganized Physician Owned Debtor(s).

C. *Reorganization Transaction*

If the Debtors pursue the Reorganization Transaction, the Debtors shall implement the Reorganization Transaction as set forth herein and in the Plan Supplement.

**1. Exit Credit Agreement**

(a) On the Effective Date, the Reorganized Debtors shall be authorized to execute, deliver, and enter into a credit agreement with respect to the Exit Facility (the "Exit Credit Agreement") without further (a) notice to or order or other approval of the Bankruptcy Court, (b) act or omission under applicable law, regulation, order, or rule, (c) vote, consent, authorization, or approval of any Person, or (d) action by the Holders of any Claims or Interests. The Exit Credit Agreement shall constitute legal, valid, binding, and authorized joint and several obligations of the applicable Reorganized Debtors enforceable in accordance with its terms, and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan, or the Confirmation Order. The financial accommodations to be extended pursuant to the Exit Credit Agreement (and other definitive documentation related thereto) are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

(b) The Reorganized Debtors and the Persons granted Liens and security interests under the Exit Facility are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

(c) A portion of the Class 4 Claims in respect of the Initial Delayed Draw Term Loan Advance (as defined in the Prepetition Loan Documents) shall be converted into the Exit Facility, and each Holder of an Allowed Class 4 Claim in respect of the Initial Delayed Draw Term Loan Advance shall receive a Pro Rata share of the Exit Facility, all in accordance with Article IX.D.4 hereof.

**2. Authorization and Issuance of New Equity Interests**

(a) On the Effective Date, the Debtor(s) or Reorganized Debtor(s), as applicable, are authorized to issue or cause to be issued and shall issue the New Equity Interests in accordance with the terms of the Plan, the Plan Supplement, the Restructuring Transactions Memorandum, and the New Corporate Governance Documents without the need for any further corporate, stockholder, or other equity

holder action. All of the New Equity Interests issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid and, as applicable, non-assessable.

(b) Pursuant hereto, the New Corporate Governance Documents shall provide for sufficient shares of authorized capital stock to effectuate the issuance of New Equity Interests and the MIP Equity issuable pursuant to the MIP, in each case as contemplated by and in connection with the Plan and the Restructuring Transactions Memorandum, and the Debtor(s) or Reorganized Debtor(s), as applicable, shall issue or reserve for issuance a sufficient number of shares of New Equity Interests to effectuate all such issuances.

(c) The distribution of the New Equity Interests pursuant to the Plan may be made by means of book-entry registration on the books of a transfer agent for shares of New Equity Interests or by means of book-entry exchange through the facilities of a transfer agent reasonably satisfactory to the Debtors and the Prepetition Agent, in accordance with the customary practices of such transfer agent, as and to the extent practicable.

(d) Upon the Effective Date, (i) the existing board of directors of the Debtors and any remaining officer of the Debtors shall be deemed to have resigned; (ii) the Prepetition Agent and DIP Agent, on account of the Holder(s) of the New Equity Interests, exercising their authority to appoint new directors and officers of the Reorganized Debtors, shall be deemed to have (x) appointed the new directors and officers of the Reorganized Debtors identified in the Plan Supplement, to the extent known at the time of filing, or otherwise set forth in a written consent of the Holder(s) of the New Equity Interests and (y) validly designated Qualified Physician Owners of the Physician Owned Debtors; and (iii) any transfer, assumption or assignment of any Interests or assets of any Debtor(s), as provided in the Restructuring Transactions Memorandum, shall be deemed to have occurred and to constitute a valid and enforceable transfer of such Interests or assets, as applicable. The Reorganized Debtors or the Holder(s) of the New Equity Interests, as applicable, are authorized to make any changes or modifications to their existing by-laws or corporate governance documents to effectuate such change, without any further notice to or approval by the Bankruptcy Court.

**3. Continued Corporate Existence; Effectuating Documents; Further Transactions**

(a) Except as otherwise provided in the Plan and the Plan Supplement, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated, formed, or organized and pursuant to the New Corporate Governance Documents, the Restructuring Transactions Memorandum, or other applicable corporate governance documents.

(b) On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized

Debtor may, in its sole discretion, take such action as permitted by applicable law and the New Corporate Governance Documents or other applicable corporate governance documents, as such Reorganized Debtor may determine is reasonable and appropriate, including causing: (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; (iv) a Reorganized Debtor to convert its form of entity; or (v) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter; and such action and documents are deemed to require no further action or approval (other than any requisite filings required under the applicable state, provincial, federal, and/or foreign law).

(c) On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan and any Restructuring Transaction, including: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Supplement and that satisfy the requirements of applicable law, and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate organizational documents governing the Reorganized Debtors, including the Reorganized Debtors' respective New Corporate Governance Documents, and any amendments or restatements thereto, or any documents governing any Reorganized Debtor's reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law and, as necessary, other constituent documents, including the organizational documents governing non-Debtor subsidiaries or affiliates, as permitted by the laws of their respective states of incorporation; (iv) any Restructuring Transactions on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, making filings or recordings that may be required by applicable law.

**4. Management Incentive Plan**

On or after the Effective Date, but in no event later than one-hundred and twenty (120) days after the Effective Date, the New Board shall adopt a post-emergence management incentive plan(s) (the "MIP"). Up to 25% of the New Equity interests, which may be in the form of profits interests, of each of the New MSO Subsidiary and the New Software and Services Subsidiary (each as defined in the Restructuring Transactions Memorandum), as applicable ("the "MIP Equity"), on a fully diluted basis, will be reserved for issuance in connection with the MIP, with the terms of the MIP to be determined by the New Board. The MIP Equity shall be reserved for issuance made from time to time to directors, officers, or other management and

employees of the Reorganized Debtors or their affiliates with the terms of the MIP to be determined by the New Board.

D. *Third-Party Sale Transaction*

If the Debtors pursue a Third-Party Sale Transaction, the following shall apply.

**1. *Closing of Third-Party Sale Transaction***

On the Effective Date, the Debtors shall be authorized to consummate the Third-Party Sale Transaction with the Third-Party Successful Bidder(s) and, among other things, the applicable Acquired Assets (including executory contracts and unexpired leases assumed and assigned to the Third-Party Successful Bidder(s) pursuant to Article XII hereof) shall be transferred to and vest in the applicable Third-Party Successful Bidder(s) free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the terms of the applicable Acquisition Agreement and Confirmation Order.

E. *Trust*

**1. Establishment of Trust**

On or before the Effective Date, the Trust Agreements shall be executed, and all other necessary steps shall be taken to create the Trust. On the Effective Date, the Trust shall be automatically appointed as representatives of the Debtors' Estate pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code for the purposes set forth in the Trust Agreement. From and after the Effective Date, the Trust shall succeed to all rights, privileges, and powers of the Debtors and their Estate with respect to the applicable Trust Assets, including the Trust Causes of Action and the Abuse Insurance Rights. The Trust shall be substituted and will replace the Debtor, its Estate, and the Committee in all Trust Causes of Action and the Abuse Insurance Rights, whether or not such Trust Causes of Action are pending in filed litigation.

**2. Purpose of Trust**

The purpose of the Trust shall be to (a) hold, manage, protect and monetize the Trust Assets and (b) administer, process and satisfy all General Unsecured Claims, which for the avoidance of doubt shall be submitted exclusively to the Trust and satisfied by the Trust in accordance with the terms, provisions and procedures of the Trust Documents. The Trust shall have the exclusive power and authority to, among other things, in accordance with the Trust Documents (a) hold, manage, protect and monetize Trust Assets, (b) commence, prosecute, transfer, settle, compromise, withdraw, or abandon all Trust Causes of Action and the Abuse Insurance Rights, and (c) perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Trust and carry out the provisions of this Plan relating to the Trust. The Trust shall be administered and implemented by the Trustee, subject to the consent and consultation rights of the Trust Advisory Committee as provided in the Trust Documents.

### 3. Vesting of Trust Assets

As of the Effective Date, the Trust Assets, including the Trust Causes of Action, by way of assignment and/or transfer, shall vest in the Trust free and clear of all Liens, Claims, Encumbrances, charges or other interests to the extent permitted by section 1141 of the Bankruptcy Code. Notwithstanding anything herein to the contrary, the transfer of the Trust Assets to the Trust shall not diminish, and fully preserves, any rights and defenses the Debtors would have if such assets had been retained by the Debtors. The Trust and the Trustee, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce the Trust Causes of Action vested, transferred, or assigned to such entity on behalf of both the Trust. The Trust or the Trustee, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Trust Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, subject to the provisions of this Plan, the Trust Assets will not be deemed property of the Reorganized Debtors.

### 4. Transfer of Trust Funding Amount

The Trust Funding Amount shall be transferred to the Trust and the Abuse Claims QSF, as applicable, contemporaneous with the Effective Date.

### 5. Insurance Rights Transfer

On the Effective Date, the Debtor shall transfer to the Trust all its rights in connection with (a) the Abuse Insurance Rights and (b) all other rights, claims, benefits, or Causes of Action it has with respect to the Abuse Insurance Policies (but not the policies themselves) related to the Abuse Claims.

Except as otherwise expressly provided herein, the Debtor and the Estates will make the Abuse Insurance Rights Transfer to the Trustee as required by this Plan. If any entity or individual is, at any time, legally precluded from transferring its rights, titles, privileges, interests, claims, demands, or entitlements to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, Disputed or undisputed, fixed or contingent, arising under or attributable to the Abuse Insurance Rights subject to the Abuse Insurance Rights Transfer, then that entity or individual will: (a) take such actions reasonably requested by the Trustee to pursue any such Abuse Insurance Rights for the benefit of the Trustee; and (b) promptly transfer to the Trustee any amounts recovered under or on account of any of such Abuse Insurance Rights; provided, however, that while any such amounts are held by or under the control of any entity or individual, such amounts will be held for the benefit of the Trustee.

### 6. Appointment of Trustee

The Trustee shall be identified in the Plan Supplement and shall be selected by the Committee with the consultation of the Debtors and the Prepetition Agent, and approved by the Bankruptcy Court in the Confirmation Order prior to or simultaneous with the Effective Date.

**7. Data Transfer; Preservation of Confidences and Attorney-Client Privilege**

(a) To investigate, prosecute, compromise, or settle the Abuse Insurance Rights and Trust Causes of Action on behalf of the Trust, the Trust and its counsel and representatives require full access to the Data Transfer Documents and must be able to obtain such information from the Debtors or the Reorganized Debtors, as applicable, on a confidential basis and in common interest without being restricted by or waiving any applicable work product, attorney-client, or other privilege. In connection with the Confirmation of the Plan and as soon as practicable after the Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall cooperate in good faith in connection with the Data Transfer, including to determine a mutually agreeable process for effectuating the Data Transfer on or as soon as practicable after the Effective Date. Furthermore, after the Effective Date, the Reorganized Debtors shall, at the Trust's expense, fully and timely cooperate with all reasonable requests for documents and/or information from the Trustee in connection with the Trustee's execution of its duties pursuant to this Plan and the Trust Agreement. Any such documents and/or information provided by the Reorganized Debtors shall be deemed Data Transfer Documents. All Data Transfer Documents shall be Category 2 Documents unless otherwise agreed in writing by the Trustee and the Reorganized Debtors or ordered by the Bankruptcy Court.

For purposes of such cooperation, the Trustee and the Debtors and/or Reorganized Debtors, as applicable, may enter into one or more confidentiality and/or common interest agreements or protective orders in form and substance reasonably acceptable to the Trustee and Reorganized Debtors. Until the termination of the Trust, the Reorganized Debtors shall be bound by and adhere to all legal hold and similar obligations of the Debtors, their agents, and advisors.

(b) If, at any time after the Effective Date, the Reorganized Debtors discover the existence of any Abuse Insurance Policy that provides or may provide coverage for Abuse Claims or other information relating to the Trust Causes of Action, the Person discovering such policy or evidence of the existence of such policy or information relating to the Trust Causes of Action shall promptly inform the Trustee. The Trust shall solely bear the costs or expenses associated with any review or hosting of Data Transfer Documents after the Effective Date.

(c) Given the common interests of the parties and the Trust's position as successor to the Trust Assets, sharing such information in the manner described herein shall not waive or limit any applicable privilege or exemption from disclosure or discovery related to such information. Further, with respect to any privileges, including the attorney-client privilege, work-product privilege, common-interest communications with Insurance Companies, protection or privilege granted by joint defense, common interest, or other privilege or immunity of the Debtors relating, in whole or part, to the Abuse Claims, the Trust Assets (including the Trust Causes of Action), or the Abuse Insurance Rights, on the Effective Date (i) they shall be extended to the Trust and its counsel, retained professionals, and representatives for the limited purpose of allowing the Trustee to perform its duties to administer the Trust and for no other reason, (ii)

they are extended to the Trustee or the Trust, and not any other Person, committee, or subcomponent of the Trust, or any other Person (including counsel and other professionals) who has been engaged by, represents, or has represented any Holder of a Claim or any Person that alleges or may allege a Claim, directly or indirectly, relating to, or arising from, the Debtors' products or operations, (iii) they shall be preserved and not waived except as the Trustee or the Trust, as applicable, may elect to waive such privileges to the extent permitted under the Plan, (iv) any such transfer shall have no effect on any right, claim, or privilege of any Person other than the Debtors (including the board of directors or any committee of the board of directors of the Debtors), and (v) no information subject to a privilege shall be publicly disclosed by the Trustee or the Trust or communicated to any Person not entitled to receive such information or in a manner that would diminish the protected status of any such information, except following a waiver of such privilege permitted under this Plan. Notwithstanding the foregoing, nothing herein shall preclude the Trustee from providing information received pursuant to this Plan to any applicable Insurance Company as necessary to preserve, secure, or obtain the benefit of the applicable Abuse Insurance Rights.

(d) None of the Debtors or the Reorganized Debtor shall be liable for violating any confidentiality or privacy protections as a result of transferring any documents to the Trust in accordance with the terms of the Plan.

(e) All privileges belonging to the Debtors applicable to the Data Transfer Documents shall continue to apply (including the attorney-client privilege, the work-product doctrine, and any other similar protection). Notwithstanding anything in the Plan or the Confirmation Order to the contrary, the Trust and Reorganized Debtors shall be successors of the Debtors with respect to any privilege applicable to Data Transfer Documents and shall share any privileges of the Debtors applicable to such documents.

(f) If the Trustee deems it necessary and appropriate to waive any applicable privilege in order to defend, investigate, or pursue the Trust Assets, the Trustee may request the Reorganized Debtors' written consent to a waiver of any such privilege, which consent shall not be unreasonably withheld. With respect to Category 1 Documents: (i) the Trustee shall not waive any applicable privilege without first giving the Reorganized Debtors at least ten days' advance notice of such waiver, and the Reorganized Debtors shall be deemed to consent to such waiver unless, within such ten-day period, the Reorganized Debtors obtain entry of an order from the Bankruptcy Court precluding such waiver; and (ii) the Reorganized Debtors shall not waive any applicable privilege without the express written consent of the Trustee or an order of the Bankruptcy Court authorizing such waiver. With respect to Category 2 Documents or Privileged Information that is not otherwise a Data Transfer Document: (i) the Trustee shall not waive any applicable privilege without the express written consent of the Reorganized Debtors or an order of the Bankruptcy Court authorizing such waiver; and (ii) the Reorganized Debtors shall not waive any applicable privilege without first giving the Trustee at least fourteen (14) days' advance notice of such waiver, and the Trustee shall be deemed to consent to such waiver unless, within such ten-day period, the Trustee obtains entry of an order from the Bankruptcy Court precluding such

waiver. Any purported waiver not in compliance with the foregoing shall be ineffective. With respect to Category 3 Documents, the Trustee shall not waive any applicable privilege without the express written consent of the Reorganized Debtors.

(g) Any dispute with respect to the Data Transfer, Privileged Information, or any other dispute under this subsection may be brought before and decided by the Bankruptcy Court.

(h) The costs incurred by the Reorganized Debtors in implementing the Data Transfer shall be paid by the Reorganized Debtors; provided, however, after the initial completion of the Data Transfer as set forth in Article X.E.7(a) of the Plan, the costs relating to any further request by the Trust will be at the expense of the Trust.

**8. Document Use**

Subject to section XI.E.5 above, the Trust may disclose a Data Transfer Document or its contents only (a) to the Trust's hired professionals (and only if such professionals have been made aware of and agree to abide by the use and confidentiality restrictions applicable to such documents) and any person who, based on the face of such document, was an author, sender, or recipient of such document, or (b) in the context of litigation of a Trust Causes of Action in accordance with the terms a new protective order entered by the applicable court governing disclosure in such litigation. Following the conclusion of all litigation of the Trust Causes of Action and the winding up of the Trust, the Trust shall return to Reorganized CHTI all copies of previously produced materials and Data Transfer Documents in their possession, custody, or control (including those in the possession of their hired professionals) or, if Reorganized CHTI so requests, confirm that such documents have been deleted or destroyed.

**9. Trustee's Authority and Duty**

From and after the Effective Date, the Trustee shall serve as trustee of the Trust and shall have all powers, rights and duties of a trustee, as set forth in the Trust Agreement. Among other things, the Trustee shall: (a) hold and administer the Trust Assets, (b) have the sole authority and discretion on behalf of the Trust to evaluate and determine strategy with respect to the Trust Assets, and to litigate, settle, transfer, release or abandon and/or compromise in any manner any and all such Trust Assets on behalf of the Trust on any terms and conditions as it may determine in good faith based on the best interests of the Trust Beneficiaries, (c) have the power and authority to retain, as an expense of the Trust, attorneys, advisors, other professionals and employees as may be appropriate to perform the duties required of the Trustee hereunder or in the Trust Agreement, (d) make distributions to the Trust Beneficiaries as provided in the Trust Agreement and the Plan, (e) have the right to receive reasonable compensation for performing services as the Trustee and to pay the reasonable fees, costs and expenses of any counsel, professionals, advisors or employees as may be necessary to assist the Trustee in performing the duties and responsibilities required under the Plan and the Trust Agreement, (f) file, litigate, settle, compromise or withdraw objections to Commercial GUC Claims in Class 6 as set forth in Article XIV.A herein and the Trust Agreement, (g) be considered an estate representative under section 1123 of the Bankruptcy Code with respect to the Trust Assets, (h) have the right to provide periodic reports and updates to the Trust Beneficiaries regarding the status of the

administration of the Trust Assets, including the Trust Causes of Action, and the assets, liabilities and transfers of the Trust and (i) borrow funds or obtain financing from third parties sufficient to commence, prosecute, and settle the Trust Causes of Action and Abuse Insurance Rights and enter into any related loan or security documents. For the avoidance of doubt, the Trust shall not be funded with, and the Trustee shall not have any authority, powers, or duties with respect to any Causes of Actions vested in the Reorganized Debtors. The Trust and the Trustee shall have no obligation to file any tax returns for the Debtors or Reorganized Debtors.

**10. Trust Advisory Committee**

On the Effective Date and pursuant to the Trust Agreement, the Trust Advisory Committee shall be established. The Trust Advisory Committee shall have three (3) members selected by the Committee in consultation with the Debtors. The Confirmation Order shall constitute an order of the Bankruptcy Court appointing the initial members of the Trust Advisory Committee.

**11. Termination of Trust**

The Trust shall terminate as soon as practicable, but in no event later than the fifth (5th) anniversary of the Effective Date; *provided*, *however*, that, on or prior to the date of such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Trust for a finite period, if such an extension is necessary to liquidate such Trust Assets or for other good cause. Notwithstanding the foregoing, multiple extensions may be obtained so long as Bankruptcy Court approval is obtained prior to the expiration of each extended term.

**12. Termination of Trustee**

The duties, responsibilities and powers of the Trustee shall terminate in accordance with the terms of the Trust Agreement.

**13. Exculpation; Indemnification**

The Trustee, and its respective professionals, shall be exculpated and indemnified pursuant to and in accordance with the terms of the Trust Agreement.

**14. Preservation of Records and Documents**

The Debtors, the Reorganized Debtors, and the Trustee, as applicable, shall: (a) take commercially reasonable efforts to preserve all records and documents (including any electronic records or documents) related to the Trust Assets (including the Trust Causes of Action) for a period of three (3) years from the Effective Date or, if actions with respect to any applicable Trust Causes of Action are then pending, until the Trustee notifies the Trust Beneficiaries such records are no longer required to be preserved; and (b) provide the Trust, the Trust Beneficiaries and their respective counsel, agents and advisors, with reasonable access to and the ability to make copies of such records and documents including at a reasonable time and location.

**15. Discovery**

The Trust is authorized pursuant to Bankruptcy Rule 2004 or other applicable discovery rules to seek discovery necessary to satisfy their obligations under this Plan and the Trust Documents. The Trust shall take whatever steps are necessary to enforce such discovery obligations pursuant to Bankruptcy Rules 2004 and 9016, Rule 45 of the Federal Rules of Civil Procedure, other applicable court resolution processes, bankruptcy law, and non-bankruptcy law. Nothing herein shall abridge or affect the rights of the Trust or the Trustee to take discovery in any proceeding or litigation brought by the Trust or the Trustee.

F. *Abuse Claims QSF*

**1. Establishment of Abuse Claims QSF**

On the Effective Date, and in accordance with the Confirmation Order, which shall establish the Abuse Claims QSF, the Debtors and the Trustee, on their own behalf and on behalf of Holders of Allowed Abuse Claims, shall execute the Trust Agreement and shall take all other steps necessary to establish the Abuse Claims QSF, as a separate escrow account, for the benefit of the Holders of Abuse Claim in accordance with the Plan. The Abuse Claims QSF shall assume all liability of the Debtors and the Estates for, and administer, all Abuse Claims, and is intended to constitute a "qualified settlement fund" within the meaning of the Treasury Regulations issued under Section 468B of the Internal Revenue Code. The Plan provides that all parties will be required to treat the Abuse Claims QSF as a qualified settlement fund for all applicable tax reporting purposes. The Bankruptcy Court shall have continuing jurisdiction over the Abuse Claims QSF, provided, however, that the courts of the state in which the Trust is formed, including any federal court located therein, shall also have jurisdiction over the Abuse Claims QSF.

**2. Purposes of Abuse Claims QSF**

The purposes of the Abuse Claims QSF shall be to (a) hold, manage, protect and monetize the Abuse Claim QSF Assets and (b) administer, process and satisfy all Abuse Claims, which for the avoidance of doubt shall be submitted exclusively to the Abuse Claims QSF and satisfied by the Abuse Claims QSF in accordance with the Abuse Claims Protocol. The Abuse Claims Administrator shall have the power and authority to, among other things, hold, manage, protect and monetize Abuse Claim QSF Assets, and perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purposes of the Abuse Claims QSF and carry out the provisions of the Plan relating to the Abuse Claims QSF.

**3. Administration of Abuse Claims QSF**

The Trustee shall serve as Abuse Claims Administrator the "administrator" of the Abuse Claims QSF as such term is used in Treasury Regulation Section 1.468B-2(k)(3) and shall be responsible for filing all tax returns of the Abuse Claims QSF. The Trustee shall administer the costs and expenses of the Trust as well as the costs and expenses of the Abuse Claims QSF and the Trust shall periodically (at least annually) invoice the Abuse Claims QSF for its allocated costs and expenses. The taxable year of the Abuse Claims QSF shall be the calendar year and the Abuse Claims QSF shall use the accrual method of accounting as required by the applicable

Treasury Regulations. The Abuse Claims QSF shall be responsible for the payment of any taxes imposed on Abuse Claims QSF, including estimated and annual U.S. federal income. The Abuse Claims Administrator may request an expedited determination of taxes on the Abuse Claims QSF under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Abuse Claims QSF for all taxable periods through the dissolution of the Abuse Claims QSF. Lastly, the Abuse Claims QSF shall be subject to the continuing jurisdiction of the Bankruptcy Court.

#### 4. U.S. Federal Income Tax Treatment of Abuse Claims

The Plan provides that on the Effective Date, the Abuse Claims QSF shall be established in accordance with the terms of the Plan. The Plan further provides that the Abuse Claims QSF is intended to be treated as a "qualified settlement fund" for U.S. federal income tax purposes. Accordingly, assuming this treatment is respected for U.S. federal income tax purposes, a U.S. Holder of an Abuse Claim generally is not expected to be treated as receiving a distribution from the Abuse Claims QSF unless and until such holder is entitled to receive that distribution directly. The U.S. federal income tax consequences to a U.S. Holder of an Abuse Claim generally will depend upon the nature and origin of the Abuse Claim and the particular circumstances applicable to such holder. Amounts received or treated as received by a U.S. Holder of an Abuse Claim may not be taxable to such holder for U.S. federal income tax purposes to the extent they represent payment for damages received on account of personal physical injuries or physical sickness, within the meaning section 104 of the Tax Code. However, in the event a payment is treated as attributable to medical expense deductions allowed under section 213 of the Tax Code for a prior taxable year, such payment may be taxable as ordinary income to the U.S. Holder. Because the tax consequences under the Plan relevant to U.S. Holders of Abuse Claims will depend on facts particular to each holder, all U.S. Holders of Abuse Claims are urged to consult their own tax advisors as to their proper tax treatment under their particular facts and circumstances.

### G. *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan and the Plan Supplement shall be deemed authorized and approved in all respects, including (as applicable to a Reorganization Transaction or a Third-Party Sale Transaction): (i) the assumption of executory contracts and unexpired leases as provided herein (subject to the Restructuring Transactions Memorandum), (ii) the selection of the managers, directors, or officers for the Reorganized Debtors, (iii) the distribution of the New Equity Interests, if any, (iv) the entry into or execution of the Exit Credit Agreement and definitive documentation related thereto, (v) entry into one or more Acquisition Agreements, if applicable, (vi) implementation and performance under the MIP in accordance with Article XI.C.4 hereof, (vi) designation of a Qualified Physician Owner(s) of a Reorganized Physician Owned Debtor(s), and (viii) all other actions contemplated by the Plan and the Plan Supplement (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof. All matters provided for in the Plan involving the corporate, limited partnership, or limited liability company structure of the Debtors, the Reorganized Debtors, or the Wind Down Estates, as applicable, and any corporate, limited partnership, or limited liability company action required by the Debtors, the Reorganized Debtors, or the Wind Down Estates, as applicable, in connection with the Plan and the Plan

Supplement shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, partners, managers, or officers of the Debtors, the Reorganized Debtors, or the Wind Down Estates, as applicable.

On or before (as applicable) the Effective Date, the appropriate directors, officers, and managers of the Debtors, the Reorganized Debtors, or the Wind Down Estates, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan and/or any Acquisition Agreements (or necessary or desirable to effect the transactions contemplated by the Plan (including the Plan Supplement) and/or any Acquisition Agreements). The authorizations and approvals contemplated by this Article XI.E shall be effective notwithstanding any requirements under nonbankruptcy law.

H. *Sources of Consideration for Plan Distribution*

In the event of a Reorganization Transaction, the Debtors shall fund distributions and satisfy applicable Allowed Claims and Allowed Interests under the Plan with respect to the Reorganization Transaction with Cash on hand, the Exit Facility, and the New Equity Interests.

In the event of a Third-Party Sale Transaction, the Debtors shall fund distributions and satisfy applicable Allowed Claims and Allowed Interests under the Plan with respect to the Third-Party Sale Transaction using Cash on hand, the Third-Party Sale Transaction Proceeds, and the Post-Sale Reserve.

I. *Cancellation of Existing Securities and Agreements*

On the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents evidencing or creating any prepetition Claim or Interest (except with respect to any Intercompany Claim or Intercompany Interest) shall be cancelled and discharged and of no further force and effect, except that each of the foregoing shall continue in effect solely to the extent necessary to (i) allow holders of such Claims or Interests to receive distributions under the Plan; (ii) allow the Debtors, the Reorganized Debtors, the Prepetition Agent, and the DIP Agent, as applicable, to make post-Effective Date distributions or take such other action pursuant to the Plan on account of such Claims or Interests; (iii) allow holders of Claims or Interests to retain their respective rights and obligations vis-à-vis other holders of Claims or Interests pursuant to any such applicable document or instrument; (iv) allow the Prepetition Agent and DIP Agent to enforce their rights, claims, and interests vis-à-vis any party other than the Debtors, including any rights with respect to priority or payment or to exercise charging liens; (v) preserve any rights of the Prepetition Agent and the DIP Agent to payment of fees, expenses and indemnification obligations against money or property distributed to the lenders under the Prepetition Loan Documents and DIP Loan Documents, as applicable, including any rights of enforcement, rights to priority of payment or to exercise charging liens; (vi) allow the Prepetition Agent and the DIP Agent to enforce any obligations owed to them under the Plan; and (vii) permit the Prepetition Agent and the DIP Agent to perform any function necessary to effectuate the foregoing; *provided, however,* that nothing in this section shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan. Notwithstanding the foregoing, any provision in any such

agreement, instrument, note, certificates, indenture, mortgage, security document, or other instrument or document that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this section shall be deemed null and void and shall be of no force and effect.

Except for the foregoing, subsequent to the performance by the Prepetition Agent and the DIP Agent of their respective obligations pursuant to the Plan, the Prepetition Agent, the DIP Agent, and their respective agents shall be relieved of all further duties, obligations, liability, and responsibilities related to the Prepetition Loan Documents and the DIP Financing Agreement, as applicable.

J. *Cancellation of Certain Existing Security Interests*

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors, the Reorganized Debtors, or the Wind Down Estates, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

K. *Binding Effect*

Except as otherwise expressly provided in the Plan, on and after the Effective Date, the Plan shall bind all Holders of Claims and Equity Interests, whether or not the Claims of such Creditors or the Interests of such Interest Holders are impaired under the Plan, and whether or not such Creditors or Interest Holders have accepted or rejected the Plan. All Claims and Debts shall be fixed and adjusted pursuant to the Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, or Governmental Unit or parish in which any instrument related to under the Plan or related to any transaction contemplated under the Plan is to be recorded with respect to any taxes of the kind specified in Bankruptcy Code section 1146(a).

## ARTICLE XII.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A. *Assumption and Rejection of Executory Contracts and Unexpired Leases*

Any executory contract or unexpired lease that has not expired by its own terms on or prior to the Effective Date and that (i) the Debtors have not assumed and/or assigned or rejected with the approval of the Bankruptcy Court prior to the Effective Date, (ii) is not the subject of a motion to assume the same pending as of the Effective Date, or (iii) is not identified in the Assumption Schedule, shall be rejected by the Debtors, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejection pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the executory contracts or unexpired leases as set forth in the Plan or the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, or in the Plan Supplement, assumptions and assignments, if applicable, or rejections of executory contracts and unexpired leases pursuant to the Plan are effective as of the Effective Date. Each executory contract or unexpired lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable Reorganized Debtor or the Third-Party Successful Bidder(s), as the case may be, in accordance with its terms, including in accordance with any amendments executed by the Debtors and the counterparties to the applicable executory contract or unexpired lease during these Chapter 11 Cases and effective upon assumption by the Debtors, except as modified by the provisions of the Plan or order of the Court; *provided* that, prior to the to the Effective Date and in connection with such assumption, any such terms that are rendered unenforceable by the provisions of the Plan or the Bankruptcy Code shall remain unenforceable solely in connection therewith.

The Debtors reserve the right to amend the Assumption Schedule at any time prior to entry of the Confirmation Order, as acceptable to the Prepetition Agent, the DIP Agent, and Third-Party Successful Bidder(s), (i) to delete any executory contract or unexpired lease and provide for its rejection under the Plan or otherwise, or (ii) to add any executory contract or unexpired lease and provide for its assumption and assignment under the Plan. The Debtors will provide notice of any amendment to the Assumption Schedule to the party or parties to those agreements affected by the amendment.

B. *Assumption Notice and Procedures*

In connection with notice of the Confirmation Hearing, the Debtors will file with the Court the Assumption Notice with the list of executory contracts and unexpired leases that may be potentially assumed or assumed and assigned by the Debtor under the Combined Disclosure Statement and Plan. If no cure amount is listed on the Assumption Notice for a particular executory contract or unexpired lease, the Debtors' asserted cure amount for such contract is $0.00. On or before the Assumption Notice Deadline, the Debtors will serve, via email, if available, or first-class mail, the Assumption Notice that contains (i) the list of executory contracts and unexpired leases that may be potentially assumed by the Debtor, (ii) any proposed cure amount(s), and (iii) the procedures for objecting thereto on all counterparties to the executory contracts and unexpired leases (and their respective counsel, if known).

The deadline to object to Assumption Notice is **May 13, 2026, at 4:00 p.m.** (the "Contract Objection Deadline"). Any objection to the Assumption Notice must: (i) be in writing; (ii) state the name and address of the objecting party; (iii) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules, (iv) state, with specificity the grounds for such objection, including, without limitation, the fully liquidated Cure Amount and the legal and factual bases for any unliquidated Cure Amount that the Counterparty believes is required to be paid under sections 365(b)(1)(A) and (B) of the Bankruptcy Code for the applicable Designated Contract, along with the specific nature of and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto;

and (v) be filed with the Court and served on the Objection Notice Parties on or before the Contract Objection Deadline.

C. *Rejection Claims*

If the rejection of an executory contract or unexpired lease results in damages to the counterparty or counterparties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a Proof of Claim that has been timely Filed, shall be forever barred and shall not be enforceable against the Debtors or Reorganized Debtors, the Trust, the Trustee, or their properties, successors or assigns, unless a Proof of Claim is timely Filed with the Voting Agent and served upon the Debtors or Reorganized Debtors and their respective counsel on or before (i) thirty (30) days after the later to occur of (a) the Effective Date and (b) the date of entry of an order by the Bankruptcy Court authorizing rejection of a particular executory contract or unexpired lease, or (ii) such other date as may be ordered by the Bankruptcy Court.

D. *Cure of Defaults*

Any amount that must be paid under Bankruptcy Code section 365(b)(1) to cure a default under and compensate the non-debtor party to an executory contract or unexpired lease to be assumed under the Plan is identified as the "Cure Payment" on the Assumption Schedule. Unless the parties mutually agree to a different date, such payment shall be made in Cash within ten (10) Business Days following the last of: (i) the Effective Date, (ii) entry of a Final Order resolving any disputes regarding (A) the amount of any Cure Payment, (B) the ability of the Reorganized Debtors (or the Third-Party Successful Bidder(s), as the case may be) to provide "adequate assurance of future performance" within the meaning of Bankruptcy Code section 365 with respect to a contract or lease to be assumed, to the extent required, or (C) any other matter pertaining to assumption and assignment, and (iii) the date on which such payment would otherwise be due in the ordinary course of business in accordance with the terms and conditions of the applicable executory contract or unexpired lease. If the Assumption Schedule does not list a Cure Payment for any executory contract or unexpired lease that the Debtors intend to assume or assume and assign, the proposed Cure Payment for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

Pending the Bankruptcy Court's ruling on any such dispute, the executory contract or unexpired lease at issue shall be deemed assumed by the Debtors and vested in the Reorganized Debtors or Third-Party Successful Bidder(s), as applicable, unless otherwise agreed by the parties or ordered by the Bankruptcy Court. Any Person that is a party to an executory contract or unexpired lease that will be assumed and/or assigned under the Plan and that objects to such assumption or assignment (including the proposed Cure Payment) must file with the Bankruptcy Court and serve on parties entitled to notice a written statement and, if applicable, a supporting declaration stating the basis for its objection. This statement and, if applicable, declaration must be Filed and served on or before the deadline established by the Disclosure Statement Order. Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption, assignment (if applicable), or Cure Payment (i) shall be deemed to have assented to such assumption, assignment (if applicable) or Cure Payment, notwithstanding any provision thereof that purports to (1) prohibit, restrict, or condition the transfer or assignment of such contract or lease or (2) terminate or permit the termination of a contract or lease as a result

of any direct or indirect transfer or assignment of the rights of the Debtors under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors, the Reorganized Debtors, and/or the Third-Party Successful Bidder(s), as applicable, or terminating or modifying such contract or lease on account of transactions contemplated by the Plan, and (ii) shall be forever barred, estopped, and enjoined from challenging the validity of such assumption thereafter. Any Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease. In the absence of a timely objection by a person that is a party to an executory contract or unexpired lease, the Confirmation Order shall constitute a conclusive determination regarding the amount of any cure and compensation due under the applicable executory contract or unexpired lease, as well as a conclusive finding that the Reorganized Debtors have demonstrated adequate assurance of future performance with respect to such executory contract or unexpired lease, to the extent required.

The Bankruptcy Court shall determine any Assumption Dispute by entry of an order; *provided*, *however,* that the Debtors, the Reorganized Debtors or the Third-Party Successful Bidder(s), as applicable, may settle any Assumption Dispute without any further notice to any other party or any action, order, or approval of the Bankruptcy Court. If there is an Assumption Dispute, the Debtors, the Reorganized Debtors, or the Third-Party Successful Bidder(s), as applicable, reserve the right to reject or nullify the assumption or assignment of the applicable executory contract or unexpired lease no later than thirty (30) days after an order of the Bankruptcy Court resolving such Assumption Dispute becomes a Final Order.

E. *Employment Arrangements*

In the event of a Plan without Third-Party Sale Toggle, except as otherwise provided in the Plan (including Section XII.A and this Section XII.D of the Plan) or the Plan Supplement, all Employment Arrangements shall be treated as executory contracts under the Plan and, on the Effective Date, shall be assumed, as may be amended, pursuant to sections 365 and 1123 of the Bankruptcy Code. Any assumption of Employment Arrangements pursuant to the terms of the Plan shall be deemed to not trigger (i) any applicable change of control, immediate vesting, or termination provision (or similar provision therein) or (ii) an event of "Good Reason" (or term of like import), in each case as a result of the Plan, the occurrence of the Effective Date or consummation of any Reorganization Transaction, Restructuring Transaction or other transaction contemplated by the Plan or Plan Supplement.

In the event of a Plan without Third-Party Sale Toggle, any Interests, stock options, restricted stock, restricted stock units and other stock-based or equity-based awards granted prior to the Effective Date to a current or former employee, officer, director, or contractor under an Employment Arrangement or otherwise, and any stock-based or equity-based plans, shall be deemed cancelled on the Effective Date. For the avoidance of doubt, if an Employment Arrangement that is assumed under the Plan provides in part for an award or potential award of Interests, stock options, restricted stock units or other stock-based awards in the Debtors, such Employment Arrangement shall be assumed subject to amendments in all respects other than the provisions relating to such awards.

F. *Insurance Policies*

In the event of a Plan without Third-Party Sale Toggle, all Insurance Policies to which any Debtor is a party as of the Effective Date, including any D&O Policy and any Abuse Insurance Policy, shall be treated as non-executory contracts unless otherwise determined by a court of law. All current Insurance Policies with coverage in place (*e.g.*, the policy term has not expired or been extended as of the Effective Date) shall be assumed by the applicable Debtors, Reorganized Debtors, or Wind Down Estates, as applicable, and shall continue in full force and effect thereafter in accordance with their respective terms. All other remaining Insurance Policies' rights and interest shall vest in the Reorganized Debtors or Wind Down Estates, as applicable. Coverage for defense and indemnity under the D&O Policies shall remain available to all individuals within the definition of "Insured" in any D&O Policy. For the avoidance of doubt, the Abuse Insurance Rights on account of Allowed Abuse Claims shall be held by the Trustee solely for the benefit of the Abuse Claims QSF.

G. *Director and Officer Insurance Policies*

The Reorganized Debtors shall not cancel or otherwise reduce the coverage under any D&O Policies (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect on or prior to the Effective Date.

H. *Reservation of Rights.*

Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors, the Reorganized Debtors, the Third-Party Successful Bidder(s), or the Wind Down Estates, as applicable, or their respective affiliates has any liability thereunder. Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors, the Reorganized Debtors, the Third-Party Successful Bidder(s), or the Wind Down Estates, as applicable, under any executory or non-executory contract or unexpired or expired lease. Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, the Reorganized Debtors, the Third-Party Successful Bidder(s), or the Wind Down Estates, as applicable, under any executory or non-executory contract or unexpired or expired lease.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors, the Reorganized Debtors, the Third-Party Successful Bidder(s), or the Wind Down Estates, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE XIII.

## PROVISIONS REGARDING DISTRIBUTIONS

A. *Time and Method of Distributions*

Any distributions and deliveries to be made under this Plan shall be made on the Effective Date or as soon as practicable thereafter, unless otherwise specifically provided for by this Plan. If any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article XIV hereof.

B. *Trust Distributions and Abuse Claims Distributions*

The Trustee, on behalf of the Trust, or such other Person or Entity as may be designated in accordance with the Trust Agreement, will make distributions to Trust Beneficiaries required under the Plan in accordance with the Trust Agreement and the Plan, and administer and liquidate any assets in the Trust. Whenever any distribution to be made under the Plan or the Trust Agreement to the Trust Beneficiaries is due on a day other than a Business Day, such distribution shall be made, without interest, on the immediately succeeding Business Day, but any such distribution will have been deemed to have been made on the date due.

**1. Abuse Claims Protocol and Distributions Thereunder**

For the purpose of liquidating the Abuse Claims through the Abuse Claims QSF by the Abuse Claims Administrator, on the Effective Date, the Abuse Claims Administrator shall implement the Abuse Claims Protocol in accordance with the terms of the QSF Documents. The Allowed Amount of Abuse Claims shall be the amount determined under the Abuse Claims Protocol. Allowed Abuse Claims under the Abuse Claims Protocol shall be legally enforceable against the Trust and Abuse Claims Administrator. Provided, however, that, the Abuse Claims Administrator shall not make any distributions on account of such Allowed Abuse Claims, until all Holders of Allowed Abuse Claims have executed the Abuse Claim Release. The amount of any installment payments, initial payments, or payments based on payment percentages established under the Abuse Claims Protocol, as determined or as actually paid by the Trust, are not the equivalent of any claimant's Allowed amount of their Abuse Claim.

The Allowance of Abuse Claims under the Abuse Claims Protocol shall not determine, and shall not be used to determine, in any respect, the liability of any Released Party other than the Debtors for any Abuse Claim. For any Released Party other than the Debtors, the Claims Determination Process (as defined in the Abuse Claims Protocol) and the determination of any Approved Claim Amount and/or Final Determination (as such terms are defined in the Abuse Claims Protocol) of any Abuse Claim pursuant to, or in connection with, the Abuse Claims Protocol shall not constitute findings as to, or the fixing of, facts or liability concerning the Abuse Claims generally or the Allowed Abuse Claims specifically.

The determination of any qualifications held by Holders of Allowed Abuse Claims, the estimation of Allowed Abuse Claims, and the act of making distributions to Holders of Allowed Abuse Claims, in each case under the Abuse Claims Protocol or any other methodology under the Abuse Claims QSF or otherwise, shall not be construed as an admission of liability by: (a) any of the Debtors; (b) the Reorganized Debtors; and/or (c) any non-Debtor (including, without limitation, any of the Debtors' current and former directors and officers) (together, (b) and (c) the "Potential Alleged Non-Debtor Defendants"). For the Potential Alleged Non-Debtor Defendants, neither the QSF Administrator's (as defined in the Abuse Claims QSF and Abuse Claims Protocol) and/or Abuse Claims QSF's review or determination of qualification of an Abuse Claim under the Abuse Claims Protocol or otherwise, nor the QSF Administrator's and/or Abuse Claims QSF's estimation of an Abuse Claim or the payment of distributions shall: (i) constitute a trial, an adjudication on the merits, or evidence of liability or damages in any litigation with any of the Potential Alleged Non-Debtor Defendants, or (ii) constitute, or be deemed, a determination of the reasonableness of the amount of any Abuse Claim, either individually or in the aggregate with other Abuse Claims, in any litigation with the Potential Alleged Non-Debtor Defendants. The QSF Administrator's and/or Abuse Claims QSF's estimation of Abuse Claims under the Abuse Claims Protocol and payment of distributions under the Abuse Claims QSF does not create an admission of the fact of liability, or the extent of damages, on behalf of any of the Potential Alleged Non-Debtor Defendants.

**2. Institution and Maintenance of Legal and Other Proceedings**

As of the Effective Date, the Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Trust, including the Trust Causes of Action and the Abuse Insurance Rights in accordance with the Trust Documents. Without limiting the foregoing, on and after the Effective Date, the Trust shall be empowered to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all such actions, in the name of the Debtors to the extent deemed necessary or appropriate by the Trust. Furthermore, without limiting the foregoing, the Trust shall be empowered to maintain, administer, preserve, or pursue Abuse Insurance Rights on account of Abuse Claims.

C. *No Postpetition Interest on Claims*

Except as otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

D. *Distribution Record Date*

Except as otherwise provided in a Final Order of the Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the Holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Distribution Record Date. The Debtors and/or Reorganized Debtors, as applicable, shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date.

In making any Distribution with respect to any Claim, the Debtors and/or Reorganized Debtors, as applicable, shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of claim filed with respect thereto or on the Schedules as the Holder thereof as of the close of business on the Distribution Record Date and upon such other evidence or record of transfer or assignment that is known to the Debtors and/or Reorganized Debtors, as applicable, as of the Distribution Record Date. In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

E. *Reserve for Disputed Claims*

The Debtors, Reorganized Debtors, or Trustee, as applicable, may maintain a reserve for any distributable amounts required to be set aside on account of Disputed Claims and shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein and the Trust Agreement, as such Disputed Claims are resolved by Final Order, and such amounts shall be distributable in respect of such Disputed Claims as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date, provided that no interest shall be distributable or accrue with respect thereto.

F. *Manner of Distribution Under Plan and Trust Agreement*

Any distribution in Cash to be issued under the Plan or the Trust Agreement shall, at the election of the issuer, be made by check drawn on a domestic bank or by wire transfer from a domestic bank. Any wire transfer fees incurred in connection with the transmission of a wire transfer shall be deducted from the amount of the recipient holder's distribution.

G. *Delivery of Distributions*

Subject to the provisions of Bankruptcy Rule 2002(g), and except as otherwise provided herein, distributions and deliveries to Holders of record of Allowed Claims shall be made at the address of each such Holder set forth on the Debtors' books and records unless superseded by the address set forth on Proofs of Claim Filed by any such Holders.

H. *Undeliverable Distributions*

**1. Holding of Undeliverable Distributions**

If any distribution to the Holder of an Allowed Claim under the Plan or the Trust Agreement is returned as undeliverable, no further distributions shall be made to such Holder unless and until the issuer of the distribution is notified in writing of such Holder's then-current address. Any Holder ultimately receiving a distribution that was returned as undeliverable shall not be entitled to any interest or other accruals of any kind on such distribution. Nothing contained in the Plan or the Trust Agreement shall require the issuer of any distribution to attempt to locate any Holder of an Allowed Claim.

**2. Failure to Claim Undeliverable Distributions**

Any Holder of an Allowed Claim that does not assert its rights pursuant to the Plan or the Trust Agreement to receive a distribution within three (3) months from and after the date such distribution is returned as undeliverable shall have such Holder's Claim for such undeliverable distribution discharged and shall be forever barred from asserting any such Claim against the Debtors, the Reorganized Debtors, the Trust, the Trustee, and their respective professionals, or the Trust Assets, as applicable. In such case, any consideration held for distribution on account of such Claim shall belong to the Reorganized Debtor for distribution in accordance with the Plan, provided that if such Claim is a General Unsecured Claim, such distribution shall belong to the Trust for distribution by the Trustee to the remaining Trust Beneficiaries in accordance with the terms of the Plan and the Trust Agreement. After final distributions have been made in accordance with the terms of the Plan and the Trust Agreement, if the amount of undeliverable Cash remaining is less than $15,000, the Reorganized Debtors or the Trustee, as applicable, in their sole discretion, may donate such amount to a charity without further notice or order of the Bankruptcy Court.

I. *Tax Identification Numbers*

The Debtor(s) or Reorganized Debtor(s), as applicable, may require any Creditor to furnish its taxpayer identification number as assigned by the Internal Revenue Service by submitting a Form W-8, Form W-9, or other form completed in writing to the Debtor(s) or the Reorganized Debtor(s), as applicable, and may condition any Distribution to any Creditor upon receipt of such completed form. If a Creditor does not timely provide the Debtor(s) or Reorganized Debtor(s) with its taxpayer identification number in the manner and by the deadline established by the Debtor(s) or the Reorganized Debtor(s), as applicable—to be not less than **forty-five (45) days** from the service of the request to the Creditor for its tax identification information—then the Debtor(s) or the Reorganized Debtor(s), as applicable, may set aside the holder's Distribution for a period of **sixty (60) days** following service of the request. If the Creditor of the Distribution set aside provides the information in the manner requested in the 60-day period, the Debtor(s) or the Reorganized Debtor(s), as applicable, shall disburse the set aside Distribution, without interest, to the Creditor. However, if the Creditor fails to provide the requested information within the 60-day period, then the Debtor(s) or Reorganized Debtor(s), as applicable, may irreversibly deem the unresponsive Creditor's Distribution "unclaimed property" and redistribute it in accordance with the provisions of the Plan.

J. *Compliance with Tax Requirements/Allocation*

The issuer of any distribution under the Plan or Trust Agreement shall comply with all applicable tax withholding and reporting requirements imposed by any Governmental Unit, and all distributions pursuant to the Plan or the Trust Agreement shall be subject to any such applicable withholding and reporting requirements. For tax purposes, distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest, if any.

K. *Time Bar to Cash Payments*

Checks issued on account of Allowed Claims shall be null and void if not negotiated within **sixty (60) days** from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the issuer of the check by the Holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made within three (3) months from and after the date of issuance of such check. After such date, all Claims in respect of voided checks shall be discharged and forever barred, and the Trust or the Reorganized Debtors, as applicable, shall be entitled to retain all monies related thereto for distribution in accordance with the terms of the Plan and/or the Trust Agreement, as applicable.

L. *Distributions After Effective Date*

Distributions made after the Effective Date to Holders of Claims that are not Allowed as of the Effective Date, but which later become Allowed, shall be deemed to have been made on the Effective Date. Except as otherwise specifically provided in the Plan or the Trust Agreement, as applicable, no interest shall be payable on account of any Allowed Claim not paid on the Effective Date.

M. *Fractional Dollars; De Minimis Distributions*

Notwithstanding anything contained herein to the contrary, payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under the Plan or the Trust Agreement would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down. No payment shall be made on account of any distribution less than one hundred dollars ($100) with respect to any Allowed Claim unless a request therefor is made in writing to the issuer of such payment on or before thirty (30) days after entry of the Confirmation Order, *provided, however*, the Trustee may make any payment of any amount with respect to any Trust Beneficiary in his or her sole discretion.

N. *No Distribution in Excess of Amount of Allowed Claim*

Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution from the Debtors' Estates in excess of the Allowed Amount of such Claim plus any postpetition interest on such Claim to the extent such interest is permitted by the Plan.

O. *Exemption from Securities Laws*

The issuance and distribution under the Plan of the New Equity Interests shall be exempt from registration under the Securities Act or any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code. Subject to the transfer provisions, if any, and other applicable provisions set forth in the New Corporate Governance Documents with respect to the foregoing securities issued pursuant to section 1145(a) of the Bankruptcy Code, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

None of the Debtors, the Reorganized Debtors, or any other Person shall be required to provide any further evidence other than this Plan or the Confirmation Order with respect to the treatment of the New Equity Interests (if applicable) under applicable securities laws. Any transfer agent (as applicable) shall be required to accept and conclusively rely upon this Plan or the Confirmation Order in lieu of a legal opinion regarding whether the New Equity Interests are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services (to the extent applicable). Notwithstanding anything to the contrary in this Plan, no Person (including any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by this Plan, including whether the New Equity Interests are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

P. *Setoffs/Recoupment*

In no event shall any Holder of a Claim be entitled to set off or subrogate any Claim that such holder has against the Debtors against any Cause of Action of the Debtors, the Reorganized Debtors or the Trust, as applicable, unless such holder filed a motion before the Confirmation Date requesting the right to perform such setoff or subrogation or indicated in an Allowed Proof of Claim filed before the Confirmation Date that such holders asserts, has or intends to preserve, such right of setoff, or subrogation (except with respect to the exercise of any right of setoff, subrogation or recoupment under the terms of any of Debtors' leases of nonresidential real property, the filing of such motion or Proof of Claim is not necessary or required to preserve such rights and remedies consistent with the terms of such leases).

Q. *Claims Paid or Payable by Third Parties*

**1. Claims Paid by Third Parties**

The Debtors, the Reorganized Debtors, or the Trust, as applicable, shall reduce a Claim, and such Claim (or portion thereof) shall be Disallowed without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor, Reorganized Debtor, or Liquidation Trust, as applicable. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim under the Plan or the Trust, as applicable, and also receives payment from a party that is not a Debtor, Reorganized Debtor or the Trust, as applicable, on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Debtor, Reorganized Debtor, or Trust, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan or the Trust, as applicable, exceeds the amount of such Claim as of the date of any such distribution under the Plan or the Trust (as applicable). The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor, Reorganized Debtor, or Trust, as applicable, annualized interest at the interest rate provided under 28 U.S.C. § 1961(a), calculated as of the Petition Date, on such amount owed for each Business Day after the fourteen-day grace period specified above until the amount is repaid.

**2. Claims Payable by Third Parties**

No distributions under the Plan or the Trust shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' Insurance Companies agrees to satisfy in full or in part a Claim against any Debtor, then immediately upon such Insurance Company's agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Court.

If an applicable Insurance Policy has or is subject to a self-insured retention ("SIR"), the Holder of an Allowed Claim that is payable pursuant to such Insurance Policy shall, upon written approval of the Debtors, Reorganized Debtors, or Trustee, as applicable, have an Allowed General Unsecured Claim against the applicable Debtor's Estate up to the amount of the SIR that may be established upon the liquidation of the Claim, and such Holder's recovery from the Debtors, Reorganized Debtors, or Trust, as applicable, shall be solely in the form of its distribution on account of such Allowed General Unsecured Claim under the Plan. Such SIR shall be considered satisfied in full pursuant to the Plan through allowance of the General Unsecured Claim solely in the amount of the applicable SIR, if any; *provided however* that nothing herein obligates the Debtors, the Reorganized Debtors, or Trustee, as applicable, to actually disburse proceeds to satisfy any SIR in full under any Insurance Policy.

Any recovery on account of the Claim in excess of the SIR or deductible established upon the liquidation of the Claim shall be recovered solely from the Debtors' Insurance Policies, if any, and only to the extent of available Insurance Coverage and any proceeds thereof. If an

applicable Insurance Policy has a retrospective premium retention or a deductible, the Holder of an Allowed Claim that is payable pursuant to such Insurance Policy shall have a Claim that can be recovered solely from the Debtors' Insurance Policy, if any, and only to the extent of available Insurance Coverage and any proceeds thereof.

For the avoidance of doubt, nothing in this Plan or the Trust Agreement (a) shall be construed to limit, extinguish, or diminish the Insurance Coverage that may exist or shall be construed as a finding that liquidates any Claim payable pursuant to an Insurance Policy; (b) relieves any obligation to timely file a Proof of Claim by the applicable Claims Bar Date; or (c) constitutes any representation or assurance that coverage under the Insurance Policies may not be affected by the treatment of SIRs or deductibles under this Combined Disclosure Statement and Plan.

**3. No Waiver of Rights**

Except as expressly released by the Plan, nothing contained herein shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including Insurance Companies, under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such Insurance Companies of any rights or defenses, including coverage defenses, held by such Insurance Companies.

R. *Preservation of Subordination Rights by Estate*

Except as otherwise provided herein, all subordination rights and claims relating to the subordination by the Debtors, Reorganized Debtors, or the Trustee of any Allowed Claim shall remain valid, enforceable, and Unimpaired in accordance with section 510 of the Bankruptcy Code or otherwise.

## ARTICLE XIV.

## PROCEDURES FOR RESOLUTION OF DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS

A. *Administration of Abuse Claims*

Notwithstanding anything to the contrary herein, all Abuse Claims shall be administered by the Trustee pursuant to and liquidated in accordance with the Abuse Claims Protocol. The Reorganized Debtors shall have no role whatsoever in the liquidation of any Abuse Claim, except as otherwise provided in Article XI.E.5.

B. *Prosecution of Objections to Disputed Claims*

Upon the Effective Date, the Trustee shall be responsible for pursuing any objection to the allowance of any Disputed Commercial GUC Claims in Class 6 under the Plan with respect to which an objection has been Filed with the Bankruptcy Court and notice thereof has been given to the Holder of the Disputed Claim. The Debtors or Reorganized Debtors, as applicable, shall have the right to object to the allowance of any other Claims with respect to which they dispute liability or allowance in whole or in part. On and after the Effective Date, the (i) Trustee,

shall have the authority to file, settle, compromise or withdraw any objections to Disputed Commercial GUC Claims in Class 6 under the Plan (within any parameters as may be established by the Trust Agreement); and (ii) Reorganized Debtors, shall have the authority to file, settle, compromise, or withdraw any objections to Disputed Claims (other than General Unsecured Claims) without approval of the Bankruptcy Court; *provided*, *however*, that in each case of the Reorganized Debtors and/or the Trustee, the Bankruptcy Court may nevertheless consider motions to approve any compromises and settlements in accordance with Bankruptcy Rule 9019. Notwithstanding the foregoing, in the event a Disputed Claim is not consensually settled or compromised by the Holder of such Disputed Claim and the Reorganized Debtors or Trustee (as applicable) in accordance with the claim reconciliation procedures herein or in the Trust, the Holder of such Disputed Claim shall retain its right to have its Disputed Claim determined in a court of competent jurisdiction after notice and a hearing. Under no circumstance shall the Disputed Claim reconciliation procedures contained herein or in the Trust be deemed to impair, affect, alter, or modify any rights of any Holder of a Disputed Claim under the Bankruptcy Code or applicable non-bankruptcy law.

Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections to Disputed Claims shall be served and Filed by the Claims Objection Deadline, as such may be extended by order of the Court.

C. *Estimation of Claims*

The Debtors, Reorganized Debtors, or the Trustee (in accordance with Article XIV.A hereof and the Trust Agreement), as applicable, may at any time request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors, Reorganized Debtors, or Trustee, previously have objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. Subject to the provisions of section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute the maximum Allowed amount of such Claim. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors, Reorganized Debtors, or Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D. *Disallowance of Claims*

Except as otherwise agreed or ordered by the Court, any and all proofs of claim filed after the Bar Date shall be treated as a Disputed Claim for purposes of Distribution without any further notice or action, and Holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Effective Date the Court has entered an order deeming such Claim to be timely filed; *provided however*, that such Claims' status as disputed shall not prohibit payment of such Claims after complete payment and satisfaction of all timely

Allowed Unsecured Claims. On the Confirmation Date, any Claim that is scheduled by the Debtors in the Schedules as disputed, contingent or unliquidated, or listed at zero and as to which no Proof of Claim has been timely filed (or deemed timely filed by Final Order entered by the Court) shall be deemed a Disallowed Claim without further order of the Court.

E. *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Class of Claims are Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine that controversy before the Confirmation Date.

F. *Payments and Distributions on Disputed Claims*

Notwithstanding any provision hereof to the contrary, the Debtor(s), Reorganized Debtor(s), or the Trustee, as applicable, may, in their discretion, pay the undisputed portion of a Disputed Claim. Notwithstanding the foregoing, the Debtor(s), Reorganized Debtor(s), or the Trustee, as applicable, may set aside for each Holder of a Disputed Claim such portion of Cash it believes solely in its discretion necessary to provide required distributions if that Claim were an Allowed Claim, either based upon the amount of the Claim as Filed with the Bankruptcy Court or the amount of the Claim as estimated by the Bankruptcy Court.

If such time Disputed Claim becomes, in whole or in part, an Allowed Claim, the Debtor(s), Reorganized Debtor(s), or Trustee, as applicable, shall distribute to the Holder thereof the distributions, if any, to which such Holder is then entitled under the Plan. No interest will be paid on Disputed Claims that later become Allowed, or with respect to any distribution in satisfaction thereof to a Holder.

## ARTICLE XV.

## CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE OF THE PLAN

A. *Conditions Precedent to Confirmation*

The following are conditions precedent to confirmation of this Plan that must be satisfied or waived in accordance with Article XV.C below:

(i) The entry of the Confirmation Order by the Bankruptcy Court in form and substance reasonably satisfactory to the Debtors, the Prepetition Agent, and the DIP Agent, and the Committee.

(ii) The Plan Supplement and all of the schedules, documents and exhibits contained therein shall have been Filed in form and substance reasonably satisfactory to the Debtors, the Prepetition Agent, and the DIP Agent and approved by the Bankruptcy Court.

(iii) The Trust Documents shall have been filed in form and substance reasonably satisfactorily to the Debtors, the Committee, the Prepetition Agent, and the DIP Agent, and approved by the Court.

(iv) Each of the Professionals, including the Professionals for the Debtors, shall have submitted to the DIP Agent an estimate of their anticipated Professional Fee Claims through the Effective Date.

(v) The occurrence of the Confirmation Date.

B. *Conditions Precedent to Effective Date of Plan*

The following are conditions precedent to the Effective Date of the Plan that must be satisfied or waived in accordance with Article XV.C below:

(i) Confirmation shall have occurred.

(ii) There shall not be in effect on the Effective Date any (a) Order entered by a U.S. court, (b) any order, opinion, ruling or other decision entered by any other court or governmental entity, or (c) United States or other applicable law staying, restraining, enjoining, or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by the Plan.

(iii) The Administrative Expense Claims and Priority Claims anticipated to be Allowed in the Chapter 11 Cases shall not exceed $75,000 over the aggregate budgeted amounts for such Claims pursuant to the Final DIP Order.

(iv) All other actions and documents necessary to implement the Plan shall have been effected or executed, including execution of the Trust Agreement and other Trust Documents in form and substance satisfactory to the Debtor, the Prepetition Agent, and the DIP Agent.

(v) The Trust Agreement shall have been fully executed and the Trust Assets, including the Trust Funding Amount, shall have been transferred to the Trust.

(vi) The Professionals have provided estimates of unpaid fees and expenses and the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Amount.

(vii) In the event of a Plan without Third-Party Sale Toggle, all conditions precedent to the effectiveness of the Exit Facility shall have been satisfied or duly waived, and the Exit Facility, including all documentation related thereto, shall be in effect.

(viii) In the event of a Third-Party Sale Transaction, all conditions precedent to the closing of such sale under any Acquisition Agreement, other than the effectiveness of the Plan, shall have been satisfied or waived in accordance with

the terms thereof and the closing of such Third-Party Sale Transaction shall occur concurrently with the Effective Date.

(ix) Consummation of any Permitted Asset Dispositions.

(x) The New Corporate Governance Documents, if applicable, shall be in full force and effect.

(xi) All governmental approvals necessary in connection with the Restructuring Transactions and/or the Third-Party Sale Transaction, as applicable, shall have been obtained (other than approvals that are immaterial both individually and in the aggregate), not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on the Restructuring Transactions and/or the Third-Party Sale Transaction, as applicable; provided, that with respect to any immaterial approval not obtained on or prior to the Effective Date, the Reorganized Debtors shall use commercially reasonable efforts to (a) obtain such approvals as promptly as practicable after the Effective Date and, (b) at the request of the Prepetition Agent and DIP Agent, enter into commercially reasonable agreements or arrangements that shall allow the Reorganized Debtors to continue to operate the business (including each operating location at such time) in the ordinary course.

(xii) The DIP Financing Agreement and the other DIP Loan Documents (as defined therein) remain in full force and effect and have not been terminated, and there shall have been no default under the DIP Financing Agreement.

C. *Waiver of Conditions Precedent*

The Debtors or Reorganized Debtors, with the prior written consent of the DIP Agent, Prepetition Agent, and Committee, may waive the conditions listed in Article XV of the Plan, and such waiver may be without notice to parties in interest or the Bankruptcy Court and without a hearing.

D. *Effect of Non-Occurrence of Effective Date*

In the event that the conditions to the occurrence of the Effective Date have not been timely satisfied or waived pursuant to Article XV.C, and upon notification Filed by the Debtors with the Bankruptcy Court, the Confirmation Order shall be vacated and the Debtors and all parties in interest shall be restored to the *status quo ante*. If the Confirmation Order is vacated this Plan shall be null and void in all respects and nothing contained in this Combined Disclosure Statement and Plan shall: (1) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors; (2) prejudice in any manner the rights of the Debtors or any other Person or Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors in any respect.

# ARTICLE XVI.

# SETTLEMENT, DISCHARGE, RELEASE, EXCULPATION, INJUNCTIVE, AND RELATED PROVISIONS

A. *Compromise and Settlement of Claims, Equity Interests, and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of substantially all Claims, Equity Interests, and controversies relating to the contractual, legal, and equitable rights that a Holder of a Claim or Equity Interest may have with respect to any Claim or Equity Interest or any distribution to be made on account of such Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, the Estates, and Holders, and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors or Wind Down Estates, as applicable, may compromise and settle claims against them.

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise, integral to this Plan, of substantially all Claims and controversies among the Debtors, the DIP Lenders, the DIP Agent, the Prepetition Agent, and the Prepetition Lenders, including claims and causes of actions against the DIP Lender, and claims and causes of actions against the Debtors and their Related Parties. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, the Estates, and Holders, and is fair, equitable and reasonable.

B. *Discharge of Claims and Termination of Interests*

Pursuant to sections 1141(a), (c), and (d) of the Bankruptcy Code, and notwithstanding any language to the contrary in such sections, except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge and release of Claims, Equity Interests, and Causes of Action of any nature whatsoever by any Person or Entity, including any interest accrued on any Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtors, the Estates, or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities, and causes of action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Equity Interests relate to services performed by

employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt, right, or Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Equity Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Equity Interest has accepted the Plan, effective as of the Effective Date. Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, the Confirmation Order shall be a judicial determination of the complete and full discharge of all Claims and Equity Interests by any Person or Entity, subject to the Effective Date occurring. Any default or "event of default" by the Debtors or affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. Except as otherwise provided in the Plan, including, for the avoidance of doubt, with respect to the Trust Causes of Action, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all property of the Estates, shall vest in the Reorganized Debtors or Third-Party Successful Bidders, as applicable, free and clear of all Claims, Liens, and Equity Interests of any Person or Entity and with the full and complete discharge of any and all Claims, Liens, Equity Interests, or causes of action of any Person or Entity. For the avoidance of doubt, the Reorganized Debtors shall not assume and will have no liability for any claim for indemnity, contribution, advancement or reimbursement asserted by or on behalf of any officer or director who served in such role prior to the Effective Date.

Each Holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest, and any affiliate of such Holder, shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in the Plan, upon the Effective Date, all such Holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor.

C. *Injunction Against Interference With Plan.*

Except as otherwise provided in the Plan or in the Confirmation Order, upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

D. *Releases by Holders of Claims*

***As of the Effective Date, for good and valuable consideration, unless such Holder elects on its Ballot to opt out of the release provided herein, each Holder of a Claim that is eligible to vote to accept or reject the Plan that has affirmatively voted to accept the Plan, shall***

***be deemed to have unconditionally released and discharged the Released Parties from any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any claims or causes of action that have been or could be asserted by or on behalf of the Debtors or the Estates or that are derivative or duplicative of any such claims or causes of action, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that such Holder of a Claim could have been legally entitled to assert in its own right (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, in any way relating or pertaining to (i) the purchase or sale, or the rescission of a purchase or sale, of any security of the Debtors, (ii) the Debtors or the operation or conduct of the business of the Debtors, (iii) the Chapter 11 Cases or the sale or other disposition of the Debtors' assets and/or (iv) the negotiation, formulation, and preparation of the Plan, or any related agreements, instruments, or other documents; <u>provided</u> that these releases will have no effect on the liability of any Released Party arising from any act, omission, transaction, agreement, event, or other occurrence, constituting fraud, criminal conduct, gross negligence, or willful misconduct. The releases set forth in this paragraph shall be binding upon and shall inure to the benefit of the Reorganized Debtors and the Trustee and any other successor to the Debtors or the Estates and each Released Party. Each Ballot will have a place for a party to opt out of the release provided herein. Nothing in the foregoing or elsewhere in the Plan constitutes a waiver or release of any right to receive distributions from the Reorganized Debtors or the Trustee, as applicable or of any portion of a Claim supporting such right. For the avoidance of doubt, the Holders of Patient Claims are not providing the releases contemplated by this provision because they are not voting under the terms of the Plan. Notwithstanding the foregoing, nothing herein releases the Debtors or their Estate or the Trustee or the Abuse Claims QSF from liability otherwise subject to insurance recovery.***

E. *Injunction*

***Except as otherwise expressly provided for herein or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Persons and Entities that have held, hold, or may hold claims, interests, obligations, suits, judgments, damages, demands, debts, rights, remedies, actions, or causes of actions that have been released or exculpated under the Plan or Confirmation Order are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, any of the Released Parties or the Exculpated Parties (collectively, the "Enjoined Matters"): (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Enjoined Matters; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Released Parties and the Exculpated Parties on account of or in connection with or with respect to any Enjoined Matters; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against the Released Parties and the Exculpated Parties on account of or in connection with or with respect to Enjoined Matters; (4) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Released Parties and the Exculpated Parties or their property on account of or in connection with or with respect to any Enjoined Matters unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date or has Filed a Proof of Claim or proof***

***of Equity Interest indicating that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise (except with respect to the exercise of any right of setoff, subrogation or recoupment under the terms of any of Debtors' leases of nonresidential real property, the filing of such motion or Proof of Claim is not necessary or required to preserve such rights and remedies consistent with the terms of such leases); (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Enjoined Matters; and (6) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest or otherwise. Notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin the enforcement of any obligations arising on or after the Effective Date of any Person or Entity under the Plan (including the Debtors' obligations pursuant to the Plan or the Confirmation Order).***

***The Trust Causes of Actions constitute assets of the Debtors' Estates, and from and after the Effective Date, the terms of this Plan and any Confirmation Order, constitute Trust Assets to be prosecuted, settled, dismissed, or otherwise resolved in accordance with the provisions of this Plan and the Trust Agreement and any other Person is stayed and enjoined from proceeding with such Trust Causes of Actions pursuant to the provisions of Section 362 of the Bankruptcy Code.***

***Notwithstanding anything to the contrary in this Section, the foregoing injunction shall not enjoin or impair (a) the rights of Holders of Abuse Claims to assert such Claims against the Trust in accordance with this Plan, the Trust Agreement, and the Abuse Claims Protocol, (b) the Trust from enforcing its rights under this Plan and the Confirmation Order, (c) the rights of the Trust to prosecute any action against an Insurance Company, (d) the rights of the Trust to prosecute any Trust Causes of Action, and (e) the rights of Holders of General Unsecured Claims to seek recovery on account of their General Unsecured Claims or any other claim or Cause of Action from any Person, Entity, or Governmental Unit that is not the Debtors, the Reorganized Debtors, the Estates, or the Trust.***

F. *Releases by the Debtors and its Estate*

***As of the Effective Date, for good and valuable consideration, the Debtors and their Estates shall unconditionally release the Released Parties from any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any claims or causes of action that have been or could be asserted by or on behalf of the Debtors or the Estates or that are derivative or duplicative of any such claims or causes of action, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that the Debtors or the Estates could have been legally entitled to assert in their own right (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, in any way relating or pertaining to (i) the purchase or sale, or the rescission of a purchase or sale, of any security of the Debtors, (ii) the Debtors or the operation or conduct of the business of the Debtors, (iii) the Chapter 11 Cases (iv) the negotiation, formulation and preparation of the Plan, or any related agreements, instruments, or other documents, (v) any Permitted Asset Dispositions, and/or (vi) the Third-Party Sale Transaction; provided that these releases will have no effect on the liability of any Released***

***Party arising from any act, omission, transaction, agreement, event, or other occurrence, constituting fraud, criminal conduct, gross negligence, or willful misconduct.***

***Entry of the Confirmation Order shall constitute the Court's approval of the Debtor/Estate Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Court's finding that the Debtor/Estate Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; and (e) a bar to any of the Debtor/Estate Releasors asserting any Claim or Cause of Action released pursuant to the Debtor/Estate Release.***

G. *Abuse Insurance Provision*

Nothing in this Plan, the Plan Documents, the Confirmation Order, any finding of fact or conclusion of law with respect to the Confirmation of this Plan, any order or opinion entered on appeal from the Confirmation Order, or any valuation of Claims (either individually or in the aggregate) in the Chapter 11 Cases shall, with respect to any Insurance Company (i) constitute any adjudication, judgment, trial, hearing on the merits, finding, conclusion, other determination establishing the coverage obligation of any such Insurance Company for any Abuse Claim, or (ii) limit the right of any such Insurance Company to assert any Abuse Insurance Coverage Defense; provided, however, that with, respect to (i) and (ii), (y) the transfer of rights to the Trust pursuant to the Abuse Insurance Rights Transfer shall be valid and enforceable, and (z) the discharge or release of any party from any Abuse Claims under this Plan shall not affect the liability of any such Insurance Company. The establishment of any claim in litigation against the Trust in its capacity as the Debtor's representative shall be deemed the establishment of a claim against the Debtors for the purpose of triggering any available Abuse Insurance Policy. Neither this Plan nor the Plan Documents shall in any way reduce, limit, discharge or release any Insurance Company.

H. *Necessity and Approval of Releases and Injunctions*

The releases and injunctions set forth in this Article XVI are integral and critical parts of the Plan and the settlements implemented pursuant to the Plan, the approval of such releases pursuant to the Confirmation Order is a condition to the occurrence of the Effective Date, and all the Released Parties have relied on the efficacy and conclusive effects of such releases and injunctions and on the Bankruptcy Court's retention of jurisdiction to enforce such releases and injunctions when making concessions pursuant to the Plan and by agreeing to, accepting, and supporting the settlement and treatment of their respective Claims, causes of action and other rights under the Plan.

I. *Exculpation*

***The Exculpated Parties shall neither have nor incur any liability to any Person or Entity (including any Holder of a Claim or Equity Interest) for any post-petition act taken or omitted to be taken in connection with or related to the formulation, negotiation, preparation, dissemination, implementation, administration, confirmation, or occurrence of the Effective***

***Date, the Combined Disclosure Statement and Plan, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with, or in contemplation of, the restructuring of the Debtors, the Chapter 11 Cases, or the sale or other disposition of the Debtors' assets (including, for the avoidance of doubt, any Third-Party Sale Transaction or Permitted Asset Disposition); provided that in the case of the Debtors' directors and officers, this exculpation provision applies only to the directors and officers who served in such capacity on and after the Petition Date for allegedly wrongful acts occurring after the Petition Date; provided however, that any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan, and such reasonable reliance shall form a defense to any such claim, Cause of Action, or liability. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections of Section 1125(e) of the Bankruptcy Code.***

J. *Survival of Exculpation and Indemnification*

All rights of the Persons exculpated and indemnified pursuant hereto shall survive confirmation of the Plan.

K. *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

L. *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any entity based on any of the following: (i) the insolvency or financial condition of a Debtor; (ii) the commencement of the Chapter 11 Cases; (iii) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation; or (iv) the Restructuring Transactions.

## ARTICLE XVII.

## PRESERVATION OF CERTAIN CAUSES OF ACTION

In accordance with section 1123(b) of the Bankruptcy Code, each Reorganized Debtor or the Trust, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Estate Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' or Trust's, as applicable, rights to commence, prosecute, or settle such retained Causes of Action (other than the Avoidance Actions or any other Estate

Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article XVI hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date) shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of the Plan to the contrary (collectively, the "**Retained Causes of Action**").

**The Reorganized Debtors or the Trust, as applicable, may pursue such Retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Person or Entity may rely on the absence of a specific reference in this Plan or Disclosure Statement or the Plan Supplement to any Cause of Action against it as any indication that the Debtors, the Reorganized Debtors, or the Trust, as applicable, will not pursue any and all available Retained Causes of Action of the Debtors against it. The Debtors, the Reorganized Debtors, and the Trust expressly reserve all rights to prosecute any and all Retained Causes of Action against any Entity. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Schedule of Retained Causes of Action must be Filed with the Bankruptcy Court on or before thirty days after the Effective Date. Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor or the Trust, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors or the Trust, as applicable, may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Schedule of Retained Causes of Action that remains unresolved by the Debtors or the Reorganized Debtors, as applicable, and the objecting party for thirty days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, assigned or settled under this Plan or a Final Order, the Trust and the Reorganized Debtors expressly reserve all such Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation of this Plan, the consummation of this Plan or the Effective Date.

The Reorganized Debtors and the Trust, as applicable, reserve and shall retain the Retained Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors or the Litigation Trust, as applicable. The applicable Reorganized Debtors or the Trust, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Retained Causes of Action. The Reorganized Debtors or the Trust, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court except as otherwise released in this Plan.

## ARTICLE XVIII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over any matter arising under the Bankruptcy Code, or arising in or related to the Chapter 11 Cases or the Plan after Confirmation and after the Effective Date, and any other matter or proceeding that is within the Bankruptcy Court's jurisdiction pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157, or 28 U.S.C. § 1367, including jurisdiction to:

(a) Allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of Claims;

(b) Hear and determine any applications for allowance of Professional Fee Claims;

(c) Resolve any matters related to the assumption, assumption and assignment, cure, or rejection of any executory contract or unexpired lease to which the Debtors are party or with respect to which the Debtors may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

(d) Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions hereof;

(e) Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, including Causes of Action and objections to or estimations of Claims or Equity Interests, and grant or deny any applications involving the Debtors that may be pending on the Effective Date, or that, pursuant to the Plan, may be instituted by (a) the Trustee or the Trust or (b) the Reorganized Debtors or any other Person or Entity after the Effective Date, *provided, however*, that the Trustee and the Trust shall reserve the right to prosecute the Trust Causes of Action in all proper jurisdictions;

(f) Enter such orders as may be necessary or appropriate to implement or consummate the provisions hereof and of all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Trust Agreement;

(g) Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Trust Agreement, all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, or any Person's or Entity's obligations incurred in connection with the Plan or the Trust Agreement including those relating to determining the scope and extent of the Trust Assets;

(h) Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation or enforcement of the Plan, except as otherwise provided herein;

(i) Resolve any cases, controversies, suits or disputes with respect to the releases, injunctions, and other provisions contained in Article XVI hereof and enter any orders that may be necessary or appropriate to implement and enforce such releases, injunctions, and other provisions;

(j) Enter and implement any orders that are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(k) To modify any provision of the Plan to the extent permitted by the Bankruptcy Code and to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(l) Determine any other matters that may arise and enter such orders as may be necessary or appropriate in connection with or related to this Combined Disclosure Statement and Plan, the Confirmation Order, the Trust Agreement, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Combined Disclosure Statement and Plan or the Trust Agreement;

(m) Resolve any issues that arise in connection with the administration of and distributions from the Trust; and

(n) Enter an order and/or Final Decree concluding the Chapter 11 Cases.

Notwithstanding any other provision in this article to the contrary, nothing herein shall prevent the Trustee from commencing and prosecuting any Trust Causes of Action before any other court or judicial body which would otherwise have appropriate jurisdiction over the matter and parties thereto, and nothing herein shall restrict any such courts or judicial bodies from hearing and resolving such matters.

## ARTICLE XIX.

## MISCELLANEOUS PROVISIONS

A. *Immediate Binding Effect*

Subject to Article XV hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, the Trust, and any and all Holders of Claims or Equity Interests (irrespective of whether their Claims or Equity Interests accepted the Plan), all Persons or Entities that are parties to or are subject to the settlements, compromises, releases, discharges,

and injunctions described in the Plan, each Person or Entity acquiring property under the Plan, and any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors.

B. *Plan Supplement*

The Plan Supplement may be inspected in the office of the Bankruptcy Clerk or its designee during normal business hours. Holders of Claims and Equity Interests may obtain a copy of the Plan Supplement by contacting the Voting Agent or by visiting: https://restructuring.ra.kroll.com/CarbonHealth. The documents contained in the Plan Supplement are an integral part of the Plan and shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

C. *Dissolution of the Committee.*

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Cases, except in connection with (i) final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto); and (ii) any appeals of the Confirmation Order. The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fee Claims pending on the Effective Date or filed and served after the Effective Date.

D. *Payment of Statutory Fees and Provision of Reports*

All fees payable pursuant to section 1930(a) of Title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first, responsibility for which after the Effective Date shall belong to the Trustee or the Reorganized Debtors (as applicable). Further, the Trustee or Reorganized Debtors (as applicable) shall be responsible for filing post-Confirmation quarterly reports with the U.S. Trustee until the Chapter 11 Cases are converted, dismissed or closed. No post-Confirmation quarterly report shall be required with respect to the Reorganized Debtors.

E. *Plan Modification/Amendment*

Subject to the limitations contained in the Plan:

(i) The Plan may be amended or modified with the consent of the Debtors, the DIP Agent, the Prepetition Agent, and Committee (a) before the Confirmation Date, to the extent permitted by section 1127 of the Bankruptcy Code; (b) after the Confirmation Date and prior to substantial consummation of the Plan, as defined in section 1101(2) of the Bankruptcy Code, to the extent the Debtors institutes proceedings in the Bankruptcy Court, pursuant to section 1127(b) of the Bankruptcy Code, to remedy any defect or omission or reconcile any

inconsistencies in the Plan or the Confirmation Order or to accomplish such matters as may be necessary or appropriate to carry out the purposes and effects of the Plan; *provided* that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or Orders of the Bankruptcy Court; or (c) after the entry of the Confirmation Order, upon order of the Bankruptcy Court in accordance with section 1127(b) of the Bankruptcy Code.

(ii) The Debtors reserve the right to modify or amend the Plan upon a determination by the Bankruptcy Court that the Plan is not confirmable pursuant to section 1129 of the Bankruptcy Code. To the extent permissible under section 1127 of the Bankruptcy Code without the need to resolicit acceptances, the Debtors reserve the right to sever any provisions of the Plan that the Bankruptcy Court finds objectionable. Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

(iii) The Debtors, in consultation with the DIP Agent, the Prepetition Agent, and Committee, may, without notice to all Holders of Claims or Interests, insofar as it does not materially and adversely affect Holders of Claims, correct any defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable to expedite the execution of the Plan.

F. *Revocation of Plan*

The Debtors, with the prior written consent of the DIP Agent and Prepetition Agent, reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization or liquidation. If the Debtors revoke or withdraws the Plan, or if Confirmation or the Effective Date does not occur, then (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto, shall be deemed null and void, and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Person or Entity, (b) prejudice in any manner the rights of the Debtors or any other Person or Entity, or (c) constitute an admission of any sort by the Debtors or any other Person or Entity.

G. *Successors and Assigns*

The rights, benefits and obligations of any Person or Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person or Entity.

H. *Reservation of Rights*

Except as expressly set forth herein, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of this Combined

Disclosure Statement and Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to this Combined Disclosure Statement and Plan or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Equity Interests prior to the Effective Date. In the event that the Plan is not confirmed or fails to become effective, neither the Combined Disclosure Statement and Plan and Plan nor any statement contained in the Combined Disclosure Statement and Plan and Plan may be used or relied upon in any manner in any suit, action, proceeding, or controversy within or without the Chapter 11 Cases involving the Debtors, except with respect to Confirmation of the Plan.

I. *Implementation*

Upon Confirmation, the Debtors shall be authorized to take all steps and execute all documents necessary to effectuate the provisions contained in the Plan.

J. *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed substantially consummated under Bankruptcy Code Sections 1101 and 1127(b).

K. *Waiver of Fourteen-Day Stay.*

The Debtors request as part of the Confirmation Order a waiver from the Court of the 14-day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the 14-day stay of Bankruptcy Rule 6004(g).

L. *Good Faith*

Confirmation of the Plan shall constitute a conclusive determination that: (i) the Plan, and all the transactions and settlements contemplated thereby, have been proposed in good faith and in compliance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules; (ii) the solicitation of acceptances or rejections of the Plan has been in good faith and in compliance with all applicable provisions of Bankruptcy Code, and the Bankruptcy Rules; and, (iii) in each case, all the Released Parties have acted in good faith in connection therewith.

M. *Section 1146 Exemption*

Pursuant to section 1146(a) of the Bankruptcy Code, under this Plan, (i) the issuance, distribution, transfer, or exchange of any debt, equity security or other interest in the Debtors; (ii) the creation, modification, consolidation or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iii) the making, assignment, or recording of any lease or sublease; or (iv) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan shall not be subject to any document recording tax, mortgage recording tax, stamp tax, or similar government assessment, and the appropriate state or local government official or agent shall be directed by the Bankruptcy Court to forgo the collection of any such tax

or government assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or government assessment.

All subsequent issuances, transfers, or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtors in the Chapter 11 Cases, whether in connection with a sale pursuant to section 363 of the Bankruptcy Code or otherwise, shall be deemed to be or have been done in furtherance of this Plan.

N. *Request for Expedited Determination of Taxes*

The Debtors or Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

O. *Further Assurances*

The Holders of Claims receiving distributions hereunder and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Trust Agreement.

P. *Service of Documents*

Any pleading, notice or other document required by the Plan to be served on or delivered upon the Debtors shall be sent by first class U.S. mail, postage prepaid, as follows:

*To the Debtors:*

Pachulski Stang Ziehl & Jones LLP
One Sansome Street, Suite 3430
San Francisco, CA 94104
Attn: Debra I. Grassgreen
John W. Lucas
Email: dgrassgreen@pszjlaw.com
jlucas@pszjlaw.com
Phone: (415) 263-7000

*To the United States Trustee:*

Jayson B. Ruff
Ha Nguyen
Trial Attorney
U.S. Department of Justice
Office of the United States Trustee
515 Rusk Street, Suite 3516

Houston, TX 77002
Email: jayson.b.ruff@usdoj.gov
Ha.Nguyen@usdoj.gov
Phone: (713) 718-4650

*To the Prepetition Agent and DIP Agent*:

KTBS Law LLP
1801 Century Park East, 26th Floor
Los Angeles, CA 90067
Attn: Nir Maoz, Esq.
Email: nmaoz@ktbslaw.com
Phone: (310) 407-4010

Q. *Transactions on Business Days*

If the date on which a transaction may occur under this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

R. *Filing of Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and provisions hereof. All exhibits attached to the Combined Disclosure Statement and Plan and the Plan Supplement are, by this reference, hereby incorporated herein. The Debtors, in consultation with the DIP Agent and the Prepetition Agent, reserve the right to make non-substantive changes and corrections to such Exhibits in advance of the Confirmation Hearing. If any Exhibits are changed or corrected, the replacement Exhibits will be filed with the Court prior to the commencement of the Confirmation Hearing.

S. *Post-Effective Date Fees and Expenses*

From and after the Effective Date, the Trustee, on behalf of the Trust, shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Trust and the Reorganized Debtors, and any professionals retained by such Trust or the Reorganized Debtors, as applicable, related to the consummation and to the implementation of this Plan, except as otherwise provided in the Trust Agreement.

T. *Severability*

In the event that, prior to the Effective Date, any term or provision of the Plan is held by any court to be invalid, void, or unenforceable, the Court shall, with the consent of the Debtors, the DIP Agent, and Prepetition Agent, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such

term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

U. *Conflicts*

To the extent any provision of the Trust Agreement or any documents executed in connection with the Confirmation Order (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing) conflicts with, or is in any way inconsistent with, the terms of this Combined Disclosure Statement and Plan, the terms and provisions of the Combined Disclosure Statement and Plan shall govern and control, and to the extent any provision of the Combined Disclosure Statement and Plan conflicts with, or is in any way inconsistent with, the terms and provisions of the Confirmation Order, the terms and provisions of the Confirmation Order shall govern and control.

V. *Term of Injunctions or Stays*

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and still extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order), shall remain in full force and effect until the closing of the Chapter 11 Cases in accordance with Article XIX.X of the Plan. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

W. *Entire Agreement*

This Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

X. *Closing of the Chapter 11 Cases*

The Reorganized Debtors shall promptly, upon the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by the Bankruptcy Rules and any applicable orders of the Bankruptcy Court to close the Chapter 11 Cases. Bankruptcy Rules and any applicable orders of the Bankruptcy Court to close the Chapter 11 Cases. Furthermore, the Voting Agent is authorized to destroy all paper/hardcopy records related to this matter two (2) years after the Effective Date has occurred.

Y. *Change of Control Provisions*

Any acceleration, vesting or similar change of control rights under any employment, benefit, or other arrangements triggered by the consummation of this Plan shall be waived or otherwise cancelled under this Plan.

## ARTICLE XX.

## RECOMMENDATION

The Debtors and the Committee strongly recommend that all creditors receiving a Ballot vote in favor of the Plan. The Debtors and the Committee believe that the Plan is in the best interests of creditors. The Plan as structured, among other things, allows creditors with Allowed Claims to participate in distributions believed to be in excess of those that would otherwise be available were the Chapter 11 Cases dismissed or converted under chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to creditors.

**FOR ALL THE REASONS SET FORTH IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN, THE DEBTORS AND THE COMMITTEE BELIEVE THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES. THE DEBTORS URGE ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY 4:00 P.M. CENTRAL TIME ON MAY 22, 2026.**

Dated: May 27, 2026

Respectfully submitted,

CARBON HEALTH TECHNOLOGIES, INC. AND ITS DEBTOR AFFILIATES

*/s/ Kerem Ozkay*
Kerem Ozkay

*/s/ Sujal Mandavia*
Sujal Mandavia

# EXHIBIT A

**(List of Debtor Entities)**

Carbon Health Technologies, Inc.
Carbon Health Alpha Medical Group of California, P.C.
Carbon Health Alpha Medical Group of Florida, P.A.
Carbon Health Alpha Medical Group of Kansas, P.A.
Carbon Health Alpha Primary Care of California, P.C.
Carbon Health Alpha Primary Care of Florida, P.A.
Carbon Health Alpha Primary Care of Kansas, P.A.
Carbon Health East Bay Medical Group, P.C.
Carbon Health East Bay Primary Care, P.C.
Carbon Health Medical Group of California, P.C.
Carbon Health Medical Group of Florida, P.A.
Carbon Health Medical Group of Kansas, P. A.
Carbon Health Medical Group of Massachusetts, P.C.
Carbon Health Medical Group of New Jersey, P.A.
Carbon Health Medical Group of Sunnyvale, Inc.
Carbon Health Medical Group of Texas, PLLC
Carbon Health Medical Group of Wisconsin, S.C.
Carbon Health Primary Care of California, P.C.
Carbon Health Primary Care of Florida, P.A.
Carbon Health Primary Care of Kansas, P.A.
Carbon Health Primary Care of New Jersey, P.A.
Carbon Health Primary Care of Wisconsin, S.C.
Carbon Health South Bay Medical Group, P.C.
Carbon Health South Bay Primary Care, P.C.
Central Jersey Urgent Care Limited Liability Company
Djavaherian Medical Practice, PLLC
Hillcrest Urgent Care of Alabama P.C.
Ritecare Medical Center, LLC
Treat Medical, Inc.

# EXHIBIT B

## (Physician Owned Debtor)

Carbon Health Alpha Medical Group of California, P.C.
Carbon Health Alpha Medical Group of Florida, P.A.
Carbon Health Alpha Medical Group of Kansas, P.A.
Carbon Health Alpha Primary Care of California, P.C.
Carbon Health Alpha Primary Care of Florida, P.A.
Carbon Health Alpha Primary Care of Kansas, P.A.
Carbon Health East Bay Medical Group, P.C.
Carbon Health East Bay Primary Care, P.C.
Carbon Health Medical Group of California, P.C.
Carbon Health Medical Group of Florida, P.A.
Carbon Health Medical Group of Kansas, P. A.
Carbon Health Medical Group of Massachusetts, P.C.
Carbon Health Medical Group of New Jersey, P.A.
Carbon Health Medical Group of Sunnyvale, Inc.
Carbon Health Medical Group of Texas, PLLC
Carbon Health Medical Group of Wisconsin, S.C.
Carbon Health Primary Care of California, P.C.
Carbon Health Primary Care of Florida, P.A.
Carbon Health Primary Care of Kansas, P.A.
Carbon Health Primary Care of New Jersey, P.A.
Carbon Health Primary Care of Wisconsin, S.C.
Carbon Health South Bay Medical Group, P.C.
Carbon Health South Bay Primary Care, P.C.
Central Jersey Urgent Care Limited Liability Company
Djavaherian Medical Practice, PLLC
Hillcrest Urgent Care of Alabama P.C.
Ritecare Medical Center, LLC
Treat Medical, Inc.

# EXHIBIT C

## (Liquidation Analysis)

**Carbon Health Technologies, Inc.**
Liquidation Analysis

| Distributable Value Summary ($ in 000s) | Notes | Chapter 7 Liquidation | | | Chapter 11 Plan of Reorganization | | |
|---|---|---|---|---|---|---|---|
| **Assets & Other Sources of Value** | [1] | **Pro Forma BS (5/30)** | **Recovery Estimate (%)** | **Recovery Estimate ($)** | **Pro Forma BS (5/30)** | **Recovery Estimate (%)** | **Recovery Estimate ($)** |
| Plan Value / Sale Proceeds | [2] | n/a | n/a | 15,000 | n/a | n/a | 131,497 |
| Cash & Cash Equivalents | | 3,396 | 100% | 3,396 | 3,396 | 100% | 3,396 |
| Restricted Cash | | 1,154 | 42% | 483 | 1,154 | 42% | 483 |
| Accounts & Other Receivables | | 13,371 | 80% | 10,703 | 13,371 | – | – |
| Prepaid Expenses & Other Current Assets | | 5,414 | – | – | 5,414 | – | – |
| Other Assets | | 55,562 | – | – | 55,562 | – | – |
| Furniture and equipment | | 1,301 | 15% | 198 | 1,301 | – | – |
| Property and leasehold improvements | | 42,226 | – | – | 42,226 | – | – |
| Due From Affiliates - Current | [3] | – | – | – | – | – | – |
| Investments in Subsidiaries | | 76,142 | – | – | 76,142 | – | – |
| Investments in Securities | | 500 | – | – | 500 | – | – |
| Intangible Assets | | 94,001 | – | – | 94,001 | – | – |
| Preference Recoveries | [4] | n/a | n/a | 3,251 | n/a | n/a | 3,251 |
| **Gross Distributable Value** | | **293,068** | **11%** | **33,031** | **293,068** | **47%** | **138,628** |
| **Less: Liquidation Costs & Administrative Claims** | | | | | | | |
| Chapter 7 Trustee Fee | | | | 619 | | | – |
| Chapter 7 Professional Fees | | | | 2,200 | | | – |
| Wind Down Costs | | | | 1,671 | | | – |
| Litigation Trust | | | | – | | | 500 |
| **Total Liquidation Costs & Administrative Claims** | | | | **4,490** | | | **500** |
| **Net Distributable Value** | | **293,068** | **10%** | **28,541** | **293,068** | **47%** | **138,128** |

| Claims Recovery Summary ($ in 000s) | Notes | Chapter 7 Liquidation | | | Chapter 11 Plan of Reorganization | | |
|---|---|---|---|---|---|---|---|
| | | **Estimated Claim** | **Recovery Estimate (%)** | **Recovery Estimate ($)** | **Estimated Claim** | **Recovery Estimate (%)** | **Recovery Estimate ($)** |
| **Net Distributable Value** | | | | **28,541** | | | **138,128** |
| Administrative Claims and Transaction Costs | | | | | | | |
| **Total Administrative Claims and Transaction Costs Recovery** | | **5,040** | **0%** | **–** | **10,429** | **100%** | **10,429** |
| **Proceeds Available After Administrative Claims and Transaction Costs** | | | | **28,541** | | | **127,699** |
| Class 1(a)(b)(c)(d) - Other Secured Claims (except Prepetition Secured Claims) | | | | | | | |
| Other Secured Claims | | – | n/a | – | – | n/a | – |
| John Muir Partnership Secured Loan | | 3,911 | 0% | 2 | 3,911 | 25% | 971 |
| Prime Partnership Secured Loan | | 7,572 | 0% | 26 | 7,572 | 5% | 351 |
| Stanford Partnership Secured Loan | | 3,874 | 10% | 406 | 3,874 | 12% | 476 |
| **Total Class 1(a)(b)(c)(d) Recovery** | | **15,357** | **3%** | **433** | **15,357** | **12%** | **1,798** |
| **Proceeds Available After Other Secured Claims (except Prepetition Secured Claims)** | | | | **28,108** | | | **125,900** |
| Class 2 - Priority Non-Tax Claims | | | | | | | |
| **Total Class 2 Recovery** | | **–** | **n/a** | **–** | **–** | **n/a** | **–** |
| **Proceeds Available After Priority Non-Tax Claims** | | | | **28,108** | | | **125,900** |
| Class 3 - Priority Tax Claims | | | | | | | |
| **Total Class 3 Recovery** | | **645** | **65%** | **422** | **645** | **100%** | **645** |
| **Proceeds Available After Priority Tax Claims** | | | | **27,686** | | | **125,255** |
| Class 4(a) - DIP Claims | | | | | | | |
| **Total Class 4(a) Recovery** | | **26,524** | **100%** | **26,524** | **26,524** | **100%** | **26,524** |
| **Proceeds Available After DIP Claims** | | | | **1,162** | | | **98,731** |
| Class 4(b) - Prepetition Secured Claims | | | | | | | |
| **Total Class 4(b) Recovery** | | **94,980** | **1%** | **1,162** | **94,980** | **100%** | **94,980** |
| **Proceeds Available After Prepetition Secured Claims** | | | | **–** | | | **3,751** |
| Class 5 - Patient Claims | | | | | | | |
| **Total Class 5 Recovery** | | **2,000** | **0%** | **–** | **–** | **n/a** | **–** |
| **Proceeds Available After Patient Claims** | | | | **–** | | | **3,751** |
| Class 6 - Commercial General Unsecured Claims | | | | | | | |
| **Total Class 6 Recovery** | [5] | **61,315** | **0%** | **–** | **43,885** | **9%** | **3,751** |
| **Proceeds Available After Commercial General Unsecured Claims** | | | | **–** | | | **–** |
| Class 7 - Abuse Claims | | | | | | | |
| **Total Class 7 Recovery** | [5] | **–** | **n/a** | **–** | **–** | **n/a** | **–** |
| **Proceeds Available After Abuse Claims** | | | | **–** | | | **–** |
| Class 8 - Subordinated Claims | | | | | | | |
| **Total Class 8 Recovery** | | **–** | **n/a** | **–** | **–** | **n/a** | **–** |
| **Proceeds Available After Subordinated Claims** | | | | **–** | | | **–** |
| Class 9 - Equity Interests | | | | | | | |
| **Total Class 9 Recovery** | | **–** | **n/a** | **–** | **–** | **n/a** | **–** |
| **Proceeds Available After Equity Interests** | | | | **–** | | | **–** |
| Class 10 - Intercompany Claims | | | | | | | |
| **Total Class 10 Recovery** | [3] | **–** | **n/a** | **–** | **–** | **n/a** | **–** |
| **Proceeds Available After Intercompany Claims** | | | | **–** | | | **–** |
| Class 11 - Intercompany Interest | | | | | | | |
| **Total Class 11 Recovery** | | **–** | **n/a** | **–** | **–** | **n/a** | **–** |
| **Proceeds Available After Intercompany Interest** | | | | **–** | | | **–** |

**Notes**

**[1]** No value has been assessed for estate Litigation Claims, except for Preference Recoveries.
**[2]** In a Liquidation, it is anticipated that the CarbyOS Technology would potentially lead to a recovery (approximately $15 million - this estimate is based on the low end of the range for bids received during the sale process).
**[3]** Intercompany Asset is offset against an equal Intercompany Liability resulting in a $0 balance.
**[4]** The estimate for Preference Recoveries is preliminary and subject to further analysis and revision.
**[5]** The estimates here do not include contingent, unliquidated, and/or disputed litigation or other claims which, while disputed, have been filed in aggregate amounts that exceed $1.9 billion. The allowance of those disputed litigation claims will reduce the recoveries to other unsecured creditors. Given the large face value of the asserted litigation claims with little or no substantiation, there is no estimate assigned to those claims.

# EXHIBIT D

**(Insurance Policies)**

**Carbon Health Technologies, Inc**
**Schedule of Insurance**

| Coverage | Underwriting Company | Policy Term | Policy Number | Limits of Liability | | Deductible/Retention | | Premium |
|---|---|---|---|---|---|---|---|---|
| Property | Hartford Fire Insurance Company | 08/15/2025 – 08/15/2026 | 57UUNBD7M0G | $119,414,100 | Blanket Business Personal Property (All Locations) | $100,000 | Policy Deductible | $180,772 |
| | | | | $50,500,000 | Blanket Business Income and Extra Expense(All Locations) | 72 Hours | Policy Waiting Period | |
| | | | | | | 72 Hours | Blanket Business Income And Extra Expense - Waiting Period | |
| | | | | $1,125,000 | Business Personal Property(all locations except the following ones) | $100,000 | Equipment Breakdown | |
| | | | | $1,220,000 | Loc#1 | 72 Hours | Equipment Breakdown - Waiting Period | |
| | | | | $1,175,000 | Loc#8,11,32,45,59,60,63,87,88,89,95,98,99,100,101 | $100,000 | Earthquake Sprinkler Leakage - California/Mountain/New Madrid/Pacific Northwest/South Carolina | |
| | | | | $1,275,000 | Loc#30 | $100,000 | Earthquake Sprinkler Leakage - AOS | |
| | | | | $1,181,300 | Loc#31,46,91,93 | 72 Hours | Earthquake Sprinkler Leakage - California/Mountain/New Madrid/Pacific Northwest/South Carolina - Waiting Period | |
| | | | | $1,225,000 | Loc#34 | 72 Hours | Earthquake Sprinkler Leakage - AOS - Waiting Period | |
| | | | | $1,338,800 | Loc#61 | | | |
| | | | | $3,097,500 | Loc#76 | $100,000/ | Windstorm or Hail | |
| | | | | $940,000 | Loc#86 | 72 hours | Windstorm or Hail (Loc#18,20,22,29,31,34,37,40,41,42,44,45,59,62,68,69,70,72,79,82,86,95,96,97,98) | |
| | | | | $1,233,800 | Loc#92,94 | | | |
| | | | | $450,000 | Business Income(all locations except the following ones) | $5,000 | Windstorm or Hail - Waiting Period | |
| | | | | $225,000 | Loc#84,85,86,87 | | (Loc#18,20,22,29,31,34,37,40,41,42,44,45,59,62,68,69,70,72,79,82,86,95,96,97,98) | |
| | | | | $50,000 | Extra Expense(all locations except the following ones) | | | |
| | | | | $25,000 | Loc#84,85,86,87 | | | |
| | | | | $5,000,000 | Earthquake Sprinkler Leakage - Policy Annual Aggregate | | | |
| | | | | $5,000,000 | Earthquake Sprinkler Leakage - California/Mountain/New Madrid/Pacific Northwest/South Carolina | | | |
| | | | | $5,000,000 | Earthquake Sprinkler Leakage - AOS | | | |
| | | | | $100,000 | Equipment Breakdown - Hazardous Substances | | | |
| | | | | $100,000 | Equipment Breakdown - Spoilage | | | |
| | | | | $100,000 | Equipment Breakdown - Expediting Expenses | | | |
| | | | | | **Crime** | | | |
| | | | | $25,000 | Forgery or Alteration | | | |
| | | | | $25,000 | Money Orders and Counterfeit Currency | | | |
| | | | | $50,000 | Employee Theft | | | |
| | | | | $10,000 | Claim Expenses | | | |
| Commercial General Liability & Employee Benefits Liability | Hartford Accident and Indemnity Company | 08/15/2025 – 08/15/2026 | 57UENAZ0UWP | | **General Liability** | N/A | | $173,538 |
| | | | | $1,000,000 | Each Occurrence | | | |
| | | | | $1,000,000 | Damage to Premises Rented to You - Any One Premises | | | |
| | | | | $10,000 | Medical Payments | | | |
| | | | | $1,000,000 | Personal and Advertising Injury | | | |
| | | | | $2,000,000 | General Aggregate (other than Products-Completed Operations) | | | |
| | | | | $2,000,000 | Products - Completed Operations Aggregate | | | |
| | | | | | **Employee Benefits Liability** | | | |
| | | | | $1,000,000 | EBL - Each Claim | | | |
| | | | | $2,000,000 | EBL - Aggregate | | | |
| | | | | | Amendment of General Aggregate Subject to Maximum Annual Aggregate Limit - Per Location | | | |
| | | | | $2,000,000 | General Aggregate Limit | | | |
| | | | | $2,000,000 | Location General Aggregate Limit | | | |
| | | | | $5,000,000 | Maximum Annual Aggregate Limit | | | |
| Auto Liability | Trumbull Insurance Company | 08/15/2025 – 08/15/2026 | 57UENBB8310 | $1,000,000 | Limit - Per Accident (Symbol 08, 09) | $1,000 | Physical Damage Comprehensive Coverage (Symbol 08) | $10,440 |
| | | | | Actual Cash Value or Cost of Repair, whichever is less | Physical Damage Comprehensive Coverage (Symbol 08) | $1,000 | Physical Damage Collision Coverage (Symbol 08) | |
| | | | | Actual Cash Value or Cost of Repair, whichever is less | Physical Damage Collision Coverage (Symbol 08) | | | |
| Umbrella Liability | Hartford Casualty Insurance Company | 08/15/2025 – 08/15/2026 | 57RHUAZ0WU5 | $5,000,000 | Umbrella Limit | $10,000 | Self-Insured Retention | $43,445 |
| Workers' Compensation - CHMG | Multiple Companies (Hartford) | 08/15/2025 – 08/15/2026 | 57WEAN0LR0 | Statutory | Workers Compensation | N/A | | $339,068 |
| | | | | | **Employers Liability** | | | |
| | | | | $1,000,000 | Bodily injury by Accident - each accident | | | |
| | | | | $1,000,000 | Bodily injury by Disease - policy limit | | | |
| | | | | $1,000,000 | Bodily injury by Disease - each employee | | | |
| Workers' Compensation - CHT | Multiple Companies (Hartford) | 08/15/2025 – 08/15/2026 | 57WEAN0MEJ | Statutory | Workers Compensation | N/A | | $34,255 |
| | | | | | **Employers Liability** | | | |
| | | | | $1,000,000 | Bodily injury by Accident - each accident | | | |
| | | | | $1,000,000 | Bodily injury by Disease - policy limit | | | |
| | | | | $1,000,000 | Bodily injury by Disease - each employee | | | |

**Carbon Health Technologies, Inc**
**Schedule of Insurance**

Alliant

| Coverage | Underwriting Company | Policy Term | Policy Number | Limits of Liability | Deductible/Retention | Premium |
|---|---|---|---|---|---|---|
| Foreign Package | Hartford Fire Insurance Company | 08/15/2025-08/15/2026 | 57CPKBC9438 | **General Liability**<br>$1,000,000 Each Occurrence Limit<br>$1,000,000 Damage to Premises Rented to You Limit -Any One Premises<br>$10,000 Medical Expense Limit -Any One Person<br>$1,000,000 Personal and Advertising Injury Limit<br>$2,000,000 General Aggregate Limit, (other than Products-Completed Operations)<br>Excluded Products-Completed Operations Aggregate Limit<br>**Employee Benefits Liability**<br>$1,000,000 Each Claim<br>$2,000,000 Aggregate<br>**Foreign Excess/DIC Automobile Liability**<br>$1,000,000 Liability - Symbol 2,8,9<br>$25,000 Auto Medical Payments - Symbol 8<br>$60,000 Hired Auto Physical Damage - Symbol 8<br>**Employers Responsibility**<br>**Part One - Foreign Voluntary Workers Compensation**<br>Covered U.S/Canadians<br>Covered Local Nationals<br>Covered Third Country Nationals<br>**Part Two - Employers Liability Limits**<br>$1,000,000 Bodily injury by Accident - Each Accident<br>$1,000,000 Bodily injury by Disease - Policy Limit<br>$1,000,000 Bodily injury by Disease - Each Employee<br>**Part Three - A. Medical Relocation & Repatriation Expenses**<br>$1,000,000 Per Employee Limit<br>$1,000,000 Annual Aggregate Limit<br>**Part Three - B. Emergency Political, Security or Natural Disaster Relocation and Repatriation Expenses**<br>$3,000 Per Employee Limit<br>$20,000 Annual Aggregate Limit<br>**Business Travel Accident**<br>$1,500,000 Business Travel Accident Annual Aggregate Limit<br>**Coverage A: Accidental Death and Dismemberment**<br>$50,000 Benefit Amount<br>$500,000 Accident Aggregate Limit<br>**Coverage B: Medical Expense**<br>$10,000 Medical Expense Accident Limit<br>**Kidnap, Ransom, or Extortion**<br>$250,000 Kidnap, Ransom, or Extortion<br>$250,000 Expense<br>$250,000 Related Defense Expenses<br>$250,000 Crisis Response Expenses<br>$250,000 Custody and Delivery<br>$10,000 Personal Incidental Loss - Loss Limit<br>$100,000 Personal Incidental Loss - Maximum Limit<br>$500,000 Per Event Maximum Limit<br>$1,500,000 | **Business Auto**<br>$1,000 Hired Auto Physical Damage - Symbol 8 - Each Auto | $2,118 |
| Virtual Care Package - Professional Liability & Technology Liability | Beazley Excess and Surplus Insurance Inc | 08/15/2025 – 08/15/2026 | D23C9225080 | $5,000,000 Aggregate Limit<br>$1,000,000 Professional Liability - Each Claim<br>$1,000,000 Sexual Physical Misconduct Each Claim Sublimit<br>$5,000,000 Professional Liability - Aggregate<br>$1,000,000 Sexual Physical Misconduct Aggregate Sublimit<br>$1,000,000 Technology Liability - Each Claim<br>$5,000,000 Technology Liability - Aggregate | $100,000 Professional Liability<br>$100,000 Technology Liability | $646,500 |

**Carbon Health Technologies, Inc**
**Schedule of Insurance**

Alliant

| Coverage | Underwriting Company | Policy Term | Policy Number | Limits of Liability | Deductible/Retention | Premium |
|---|---|---|---|---|---|---|
| Cyber | Arch Specialty Insurance Company<br>Aspen Specialty Insurance Company<br>Fireman's Fund Indemnity Corporation<br>Fortegra Specialty Insurance Company<br>Vantage Risk Specialty Insurance Company (Coalition) | 08/15/2025-08/15/2026 | C-4LQG-091775-CYBER-2025 | $5,000,000 Aggregate Policy Limit of Liability/Per Event Limit of Liability<br>**First Party Liability Coverages**<br>$5,000,000 Breach Response Costs<br>$5,000,000 Ransomware and Cyber Extortion<br>$5,000,000 Data Recovery and Computer Replacement Costs<br>Not erode the aggregate limit Rapid Response Services<br>8 Hours Business Interruption<br>1 Hour Direct Business Interruption - Waiting Period<br>Direct Business Interruption - Reduced Waiting Period<br>$5,000,000<br>$5,000,000 Security Failure<br>$5,000,000 Systems Failure<br>Voluntary Shutdown<br>8 Hours Contingent Business Interruption<br>$5,000,000 Waiting Period<br>$5,000,000 IT Provider Security Failure<br>$5,000,000 IT Provider Systems Failure<br>$5,000,000 Non-IT Provider Security Failure<br>$5,000,000 Non-IT Provider Systems Failure<br>$5,000,000 Voluntary Shutdown<br>$250,000 Reputational Harm Loss<br>Proof of Loss Preparation<br>$500,000 Cyber Crime Coverages<br>$250,000 Funds Transfer Fraud and Social Engineering<br>$250,000 Service Fraud Including Cryptojacking<br>$250,000 Impersonation Repair<br>Invoice Manipulation<br>**Third Party Liability Coverages**<br>$5,000,000 Cyber Liability Coverages<br>$5,000,000 Network Security and Privacy Liability<br>$5,000,000 Regulatory Actions<br>$5,000,000 PCI Fines and Assessments<br>Funds Transfer Liability<br>N/A Technology E&O and Media Liability Coverages<br>$5,000,000 Technology Errors and Omissions<br>Media Liability<br>**Additional Benefits**<br>$25,000 Court Attendance<br>$250 Total Limit<br>$25,000 Per Day, per person limit<br>$5,000 Criminal Reward<br>Prevention and Mitigation Costs | **First Party Liability Coverages**<br>$100,000 Breach Response Costs-$0 - computer forensic services provided by Coalition Incident Response<br>Ransomware and Cyber Extortion<br>$100,000 Data Recovery and Computer Replacement Costs<br>$100,000 Rapid Response Services<br>Not subject to retention Business Interruption<br>Security Failure<br>$100,000 Systems Failure<br>$100,000 Voluntary Shutdown<br>$100,000<br>Contingent Business Interruption<br>IT Provider Security Failure<br>$100,000 IT Provider Systems Failure<br>$100,000 Non-IT Provider Security Failure<br>$100,000 Non-IT Provider Systems Failure<br>$100,000 Voluntary Shutdown<br>$100,000 Reputational Harm Loss<br>$100,000 Proof of Loss Preparation<br>$100,000 Cyber Crime Coverages<br>Funds Transfer Fraud and Social Engineering - $25,000 Reduced FTF Retention<br>$50,000 Service Fraud Including Cryptojacking<br>$100,000 Impersonation Repair<br>$100,000 Invoice Manipulation<br>$100,000<br>**Third Party Liability Coverages**<br>Cyber Liability Coverages<br>Network Security and Privacy Liability<br>$100,000 Regulatory Actions<br>$100,000 PCI Fines and Assessments<br>$100,000 Funds Transfer Liability<br>$100,000<br>Technology E&O and Media Liability Coverages<br>Technology Errors and Omissions<br>N/A Media Liability<br>$100,000<br>**Additional Benefits**<br>Court Attendance<br>$0 Criminal Reward<br>$0 | $ 92,676 |
| Management Liability | Ascot Specialty Insurance Company (R-T Specialty) | 11/15/2024-11/15/2026 | MLPC2410001745-01 | $3,000,000 Policy Aggregate Limit of Liability for all Coverage Parts<br>**Directors and Officers Liability**<br>$3,000,000 Limit of Liability<br>$250,000 Derivative Demand Investigation Costs Sublimit<br>$1,000,000 Directors and Officers Side-A Excess Limit<br>**Fiduciary Liability**<br>$1,000,000 Limit of Liability<br>$250,000 HIPAA Violations Coverage Sublimit<br>$250,000 Voluntary Compliance Loss Coverage Sublimit<br>$250,000 Patient Protection and Affordable Care Act Coverage Sublimit<br>$250,000 Plan Value Change Coverage Sublimit<br>$250,000 Settlor Coverage Sublimit | **Directors and Officers Liability**<br>$0 Insuring Agreement A<br>$175,000 Insuring Agreement B<br>$175,000 Insuring Agreement C<br>**Fiduciary Liability**<br>$5,000 Retention<br>$5,000 HIPAA Violations Coverage Sublimit<br>$0 Voluntary Compliance Loss Coverage Sublimit<br>$5,000 Patient Protection and Affordable Care Act Coverage Sublimit<br>$0 Plan Value Change Coverage Sublimit<br>$5,000 Settlor Coverage Sublimit | $85,070 Premium +<br>$46,250 Endt - Increase Limit to $3M<br>$154,220 Endt - Extended to 11.15.26 Premium<br>$285,540 Total Premium |
| Excess Director's and Officers Liability | RSUI Indemnity Company | 7/31/2025-11/15/2026 | NHS715916 | $2,000,000 xs $3,000,000 | $0 | $40,000 Premium +<br>$92,595 Endt - Extended to 11.15.26 Premium<br>$132,595 Total Premium |

**Carbon Health Technologies, Inc**
**Schedule of Insurance**

Alliant

| Coverage | Underwriting Company | Policy Term | Policy Number | Limits of Liability | Deductible/Retention | Premium |
|---|---|---|---|---|---|---|
| Excess Director's and Officers Liability | Starr Indemnity & Liability Company | 11/15/2025 - 11/15/2026 | TMS1005129251 | $2,500,000 xs $5,000,000 | $0 | $72,290 Premium |
| Excess Director's and Officers Liability | Wesco Insurance Company | 11/15/2025 - 11/15/2026 | EUW207996700 | $2,500,000 xs $7,500,000 | $0 | $60,000 Premium |
| Excess Director's and Officers Liability | Ascot Specialty Insurance Company | 11/15/2025 - 11/15/2026 | VTG-EXS-1000006 | $5,000,000 xs $10,000,000 | $0 | $107,500 Premium |
| Excess Director's and Officers Liability | Mt. Hawley Insurance Company | 11/15/2025 - 11/15/2026 | EPG0055339 | $5,000,000 xs $15,000,000 | $0 | $50,000 Premium |
| Crime | Berkley Insurance Company | 11/15/2024 - 05/16/2026 | BCCR-45006036-20 | $1,000,000 Employee Theft<br>$1,000,000 Forgery Or Alteration<br>$1,000,000 Inside The Premises - Theft Of Money And Securities<br>$1,000,000 Inside The Premises - Robbery Or Safe Burglary Of Other Property<br>$1,000,000 Outside The Premises<br>$1,000,000 Computer And Funds Transfer Fraud<br>$1,000,000 Money Orders And Counterfeit Money<br>$100,000 Corporate Deception Fraud | $25,000 Employee Theft<br>$25,000 Forgery Or Alteration<br>$25,000 Inside The Premises - Theft Of Money And Securities<br>$25,000 Inside The Premises - Robbery Or Safe Burglary Of Other Property<br>$25,000 Outside The Premises<br>$25,000 Computer And Funds Transfer Fraud<br>$25,000 Money Orders And Counterfeit Money<br>$25,000 Corporate Deception Fraud | $4,988<br>$1,550 Endt - Extended to 2.15.26 Premium<br>$1,400 Endt - Extended to 5.16.26 Premium<br>$7,938 Total Premium |

This chart is provided to you for informational purposes only. This document does not reflect the terms, conditions, limitations and exclusions detailed in the actual insurance contracts. Nor does this document detail any change, amendment or endorsement that might alter the contracts listed herein. The terms and conditions of the insurance policies to which this document refers are found only in the insurance policies themselves. This document is not to be accepted or interpreted as a contract of insurance.

# EXHIBIT E

**(Projections)**

**Carbon Health**
**Projections 2026(PT) - FY2030**

| | FY 2026 (PT) Jun-Dec | FY 2027 | FY 2028 | FY 2029 | FY 2030 | TOTAL FY 2026 (PT)-2030 |
|---|---|---|---|---|---|---|
| Revenue: | | | | | | |
| Urgent Care Services | $72,651,202 | $133,421,446 | $138,766,141 | $144,325,851 | $150,109,244 | $639,273,884 |
| Primary Care Services | 10,027,873 | 23,174,706 | 27,676,852 | 28,426,512 | 28,983,569 | 118,289,512 |
| Management Service | 773,157 | 1,344,887 | 1,373,328 | 1,402,401 | 1,432,121 | 6,325,893 |
| Software | 780,253 | 1,403,168 | 1,482,697 | 1,560,099 | 1,645,477 | 6,871,695 |
| Clinical Research | 1,366,649 | 2,617,808 | 3,220,750 | 4,049,500 | 4,832,250 | 16,086,957 |
| **Total Revenue** | **$85,599,134** | **$161,962,015** | **$172,519,769** | **$179,764,363** | **$187,002,661** | **$786,847,942** |
| | | | | | | |
| Operating Expenses: | | | | | | |
| Cost of Care Delivery | $56,727,619 | $101,705,565 | $105,964,198 | $108,734,819 | $111,405,104 | $484,537,304 |
| SG&A Comp + Benefits + T&E | 13,271,040 | 22,738,575 | 23,316,254 | 23,718,882 | 24,186,691 | 107,231,442 |
| Facility & Office Expenses | 11,150,631 | 19,490,679 | 19,887,540 | 20,292,562 | 20,705,915 | 91,527,328 |
| Professional Services & Marketing | 5,068,730 | 8,582,592 | 9,513,295 | 10,624,517 | 11,979,122 | 45,768,256 |
| IT + Software | 3,784,328 | 5,902,551 | 6,079,612 | 6,261,985 | 6,449,829 | 28,478,305 |
| Other Corporate Expenses | 2,434,984 | 4,240,257 | 4,359,177 | 4,481,499 | 4,607,321 | 20,123,237 |
| **Total Expenses** | **$92,437,332** | **$162,660,219** | **$169,120,077** | **$174,114,264** | **$179,333,982** | **$424,217,628** |
| | | | | | | |
| **Cash Balance at Start of Period** *(1)* | $3,396,490 | $1,661,802 | $963,598 | $4,363,290 | $10,013,389 | $3,396,490 |
| Projected Bankruptcy Exit Costs | (11,438,314) | - | - | - | - | (11,438,314) |
| FSI Funding Exit Costs (2) | 8,041,824 | - | - | - | - | 8,041,824 |
| Cash from Operations (Revenue-Opex) | (6,838,198) | (698,204) | 3,399,692 | 5,650,099 | 7,668,680 | 9,182,069 |
| FSI Capital Contribution for Operations | 8,500,000 | - | - | - | - | 8,500,000 |
| **Cash Balance at End of Period** | **$1,661,802** | **$963,598** | **$4,363,290** | **$10,013,389** | **$17,682,069** | **$17,682,069** |

**Note:**
(1) Assumes emergence from Bankruptcy in June 2026
(2) FSI Plan Commitment Letter (refer to Docket 274)

# EXHIBIT B

**(Second Amendment)**

**EXECUTION VERSION**

**SECOND AMENDMENT TO**
**SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION**
**FINANCING AGREEMENT**

THIS **SECOND AMENDMENT TO SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION FINANCING AGREEMENT** (this "**Amendment**"), dated as of May 29, 2026, is entered into by and among CARBON HEALTH TECHNOLOGIES, INC., a Delaware corporation ("**Carbon Health**"), as a borrower, debtor and debtor in possession under Chapter 11 of the Bankruptcy Code, the other borrowers signatory hereto, each as a borrower, debtor and debtor in possession under Chapter 11 of the Bankruptcy Code (the "**Medical Group Borrowers**" and together with Carbon Health, the "**Borrowers**" and each, a "**Borrower**"), certain lenders from time to time party hereto (collectively, the "**Lenders**", and each, a "**Lender**"), and Future Solution Investments LLC, a Wyoming limited liability company, as administrative and collateral agent for the Lenders (in such capacities, the "**Agent**").

RECITALS

**WHEREAS**, Borrowers have entered into that certain Senior Secured Superpriority Debtor-In-Possession Financing Agreement, dated as of February 2, 2026, as approved by the Final DIP Order [Docket No. 104] entered February 27, 2026, as amended by that certain First Amendment to Senior Secured Superpriority Debtor-in-Possession Financing Agreement, dated as of April 27, 2026, as approved by the Order Approving First Amendment to Senior Secured Superpriority Debtor-in-Possession Financing Agreement [Docket No. 609] entered May 8, 2026 (as further amended, restated, supplemented or otherwise modified prior to the date hereof, the "**Existing DIP Financing Agreement**" and as amended and otherwise modified by this Amendment, and as the same may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**DIP Financing Agreement**"), with the lenders from time to time party thereto (collectively, the "**Lenders**" and each a "**Lender**"), and the Agent;

**WHEREAS**, in accordance with the terms of the DIP Financing Agreement, the parties hereto have agreed to modify certain provisions of the DIP Financing Agreement, including, without limitation, to (i) increase the Total Term Loan Commitments to $63,040,000 from $30,500,000, and (ii) make certain other amendments, as set forth herein.

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

AGREEMENT

**SECTION 1 Definitions; Interpretation.**

(a) **Incorporation of Recitals**. The recitals hereinabove set forth constitute an integral part of this Amendment, evidencing the intent of the parties in executing this Amendment, and describing the circumstances surrounding its execution. Accordingly, said recitals are, by express reference, made a part of the covenants hereof, and this Amendment shall be construed in light thereof.

(b) **Terms Defined in DIP Financing Agreement**. All capitalized terms used in this Amendment (including in the recitals hereof) and not otherwise defined herein shall have the meanings assigned to them in the DIP Financing Agreement.

(c) **Rules of Construction**. The rules of construction that appear in Section 1.2 of the DIP Financing Agreement shall be applicable to this Amendment and are incorporated herein by this reference.

(d) **References Within DIP Financing Agreement**. Each reference in the DIP Financing Agreement to "this Agreement" and the words "hereof," "herein," "hereunder," or words of like import, shall mean and be a reference to the DIP Financing Agreement as amended by this Amendment. This Amendment shall be a Loan Document.

**SECTION 2 Amendments to the Existing DIP Financing Agreement**. Subject to the satisfaction of the conditions set forth in Section 3 of this Amendment, each of the parties hereto agrees that, effective on the Second Amendment Effective Date (as hereinafter defined), the Existing DIP Financing Agreement shall be amended as follows:

(a) Section 1.1 of the Existing DIP Financing Agreement is hereby amended by amending and restating the definition of "Total Term Loan Commitments" as follows:

" '**Total Term Loan Commitments**' means the sum of the amounts of the Lenders' Term Loan Commitments; provided that (a) prior to the Final Facility Effective Date such aggregate amount shall not exceed $9,000,000, (b) on and after the Final Facility Effective Date such aggregate amount shall not exceed $19,500,000, (c) on and after the First Amendment Effective Date, such aggregate amount shall not exceed $30,500,000 and (d) on and after the Second Amendment Effective Date, such aggregate amount shall not exceed $63,040,000. For the avoidance of doubt, the Total Term Loan Commitment amount on the Second Amendment Effective Date includes and is not in addition to the Total Term Loan Commitment amount in effect on the Final Facility Effective Date, the Final Facility Effective Date or the First Amendment Effective Date."

(b) Section 1.1 of the Existing DIP Financing Agreement is hereby amended by adding the following definitions in alphabetical order:

" '**Second Amendment**' means that certain Second Amendment to Senior Secured Superpriority Debtor-In-Possession Financing Agreement, dated as of May 29, 2026, by and among the Borrowers, the Lenders and the Agent.

'**Second Amendment Effective Date**' has the meaning given such term in Section 3 of the Second Amendment."

(c) Section 2.1(a) of the Existing DIP Financing Agreement is hereby amended by deleting "and" at the end of clause (ii), adding "and" at the end of clause (iii), and adding the following as a new clause (iv):

"(iv) from and after the Second Amendment Effective Date up to the Maturity Date, delayed-draw term loans in an aggregate original principal amount up to $30,500,000 in accordance with, and subject to the timing set forth in, the Approved Budget;"

(d) Schedule 1.1(a) *Term Loan Commitments* of the Existing DIP Financing Agreement is hereby replaced in its entirety with the new Schedule 1.1(a) *Term Loan Commitments* attached hereto as Annex A.

**SECTION 3 Conditions of Effectiveness**. The effectiveness of this Amendment (the date of such

effectiveness, the "**Second Amendment Effective Date**") shall be subject to satisfaction of the following conditions:

(a) Agent's receipt of this Amendment, duly executed by the Agent, Lenders and the Borrowers;

(b) entry by the Bankruptcy Court of an order, in form and substance satisfactory to the Agent, approving the terms and conditions of this Amendment and authorizing each Borrower's performance under this Amendment and the DIP Financing Agreement; and

(c) entry by the Bankruptcy Court of the Confirmation Order.

**SECTION 4 Representations and Warranties**. To induce the Agent and Lenders to enter into this Amendment, each Borrower hereby represents and warrants, as of the date hereof (or to the extent such representations and warranties relate to an earlier date, in which case, as of such date), (a) that the representations and warranties made by it in Section 5 of the DIP Financing Agreement and in the other Loan Documents are true and correct in all material respects; *provided*, *however*, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof, (b) no fact or condition exists that would (or would, with the passage of time, the giving of notice, or both) constitute an Event of Default, and (c) no event or condition has occurred that has had or could reasonably be expected to have a Material Adverse Effect.

**SECTION 5 Miscellaneous.**

(a) **Loan Documents Otherwise Not Affected; Reaffirmation**. Except as expressly amended pursuant hereto or referenced herein, the DIP Financing Agreement and the other Loan Documents shall remain unchanged and in full force and effect and are hereby ratified and confirmed in all respects. Except as expressly set forth herein, the waiver herein shall not be deemed a waiver of any breach by any Borrower of any representations, warranties, covenants or agreements contained in the DIP Financing Agreement or any of the other Loan Documents with respect to any other transaction or matter or a waiver of any Default or Event of Default or any modification of, or a departure from the requirements of, any other term or condition of the DIP Financing Agreement or any of the other Loan Documents. Lenders' and Agent's execution and delivery of, or acceptance of, this Amendment shall not be deemed to create a course of dealing or otherwise create any express or implied duty by any of them to provide any other or further amendments, consents or waivers in the future. Each Borrower hereby reaffirms the security interest granted pursuant to the Loan Documents and hereby reaffirms that such grant of security in the Collateral granted as of the Closing Date continues without novation and secures all Secured Obligations under the DIP Financing Agreement and the other Loan Documents. Each Borrower hereby agrees that nothing herein contained in any way impairs Agent's or any Lender's existing rights and priority in the Collateral under the DIP Financing Agreement and the other Loan Documents.

(b) **Conditions**. For purposes of determining compliance with the conditions specified herein, each Lender that has signed this Amendment shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless Agent shall have received notice from such Lender prior to the date hereof specifying its objection thereto.

(c) **Approved Budget**. The updated 13-week cash flow forecast attached hereto as Exhibit I has been approved in form and substance by the Agent and constitutes the Approved Budget, as referenced in clause (b) of the definition of "Approved Budget" in the DIP Financing Agreement, and in accordance with the requirements of Section 7.1(b) of the DIP Financing Agreement.

(d) **No Reliance**. Each Borrower hereby acknowledges and confirms to Agent and Lenders that such Borrower is executing this Amendment on the basis of its own investigation and for its own reasons without reliance upon any agreement, representation, understanding or communication by or on behalf of any other Person.

(e) **Costs and Expenses**. Each Borrower jointly and severally agrees to pay to Agent the reasonable out-of-pocket costs and expenses of Agent and Lenders party hereto, and the fees and disbursements of counsel to Agent and Lenders party hereto, in each case, as described in Section 10.11 of the DIP Financing Agreement.

(f) **Binding Effect**. This Amendment binds and is for the benefit of the successors and permitted assigns of each party.

(g) **Governing Law**. This Amendment and the other Loan Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, applicable to contracts made and to be performed in the State of New York, except as governed by the Bankruptcy Code.

(h) **Complete Agreement; Amendments**. This Amendment and the Loan Documents represent the entire agreement about this subject matter and supersede prior negotiations or agreements with respect to such subject matter. All prior agreements, understandings, representations, warranties, and negotiations between the parties about the subject matter of this Amendment and the Loan Documents merge into this Amendment and the Loan Documents.

(i) **Severability of Provisions**. Each provision of this Amendment is severable from every other provision in determining the enforceability of any provision.

(j) **Counterparts**. This Amendment may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, is an original, and all taken together, constitute one Amendment. Delivery of an executed counterpart of a signature page of this Amendment by facsimile, portable document format (.pdf) or other electronic transmission will be as effective as delivery of a manually executed counterpart hereof.

*[Remainder of page intentionally left blank.]*

IN WITNESS WHEREOF, each of the parties has signed this Amendment as of the day and year first above written, which Amendment shall be made effective as of the Second Amendment Effective Date.

**CARBON HEALTH TECHNOLOGIES, INC.**

By: ________________________
Name:
Title:

**CARBON HEALTH MEDICAL GROUP OF CALIFORNIA, P.C.**

By: ________________________
Name:
Title:

**CARBON HEALTH PRIMARY CARE OF CALIFORNIA, P.C.**

By: ________________________
Name:
Title:

**CARBON HEALTH MEDICAL GROUP OF FLORIDA, P.A.**

By: ________________________
Name:
Title:

**CARBON HEALTH PRIMARY CARE OF FLORIDA, P.A.**

By: ________________________
Name:
Title:

**CARBON HEALTH MEDICAL GROUP OF NEW JERSEY, P.A.**

By: ________________________
Name:
Title:

**CARBON HEALTH PRIMARY CARE OF NEW JERSEY, P.A.**

By: ________________________
Name:
Title:

**CENTRAL JERSEY URGENT CARE LIMITED LIABILITY COMPANY**

By: ________________________
Name:
Title:

**DJAVAHERIAN MEDICAL PRACTICE, PLLC**

By: ________________________
Name:
Title:

**CARBON HEALTH MEDICAL GROUP OF MASSACHUSETTS, P.C.**

By: ________________________
Name:
Title:

**CARBON HEALTH MEDICAL GROUP OF KANSAS, P.A.**

By: ________________________
Name:
Title:

**CARBON HEALTH PRIMARY CARE OF KANSAS, P.A.**

By: ________________________
Name:
Title:

**CARBON HEALTH MEDICAL GROUP OF SUNNYVALE, INC.**

By: ________________________
Name:
Title:

**CARBON HEALTH MEDICAL GROUP OF TEXAS, PLLC**

By: ________________________
Name:
Title:

**HILLCREST URGENT CARE OF ALABAMA PC**

By: ________________________
Name:
Title:

**RITECARE MEDICAL CENTER, LLC**

By: ________________________
Name:
Title:

**TREAT MEDICAL, INC.**

By: ________________________
Name:
Title:

**CARBON HEALTH SOUTH BAY MEDICAL GROUP, P.C.**

By: ________________________
Name:
Title:

**CARBON HEALTH SOUTH BAY PRIMARY CARE, P.C.**

By: ________________________
Name:
Title:

**CARBON HEALTH MEDICAL GROUP OF WISCONSIN, S.C.**

By: ________________________
Name:
Title:

**CARBON HEALTH PRIMARY CARE OF WISCONSIN, S.C.**

By: ________________________
Name:
Title:

**CARBON HEALTH ALPHA MEDICAL GROUP OF CALIFORNIA, P.C.**

By: ________________________
Name:
Title:

**CARBON HEALTH ALPHA MEDICAL GROUP OF FLORIDA, P.A.**

By: ________________________
Name:
Title:

**CARBON HEALTH ALPHA MEDICAL GROUP OF KANSAS, P.A.**

By: ________________________
Name:
Title:

**CARBON HEALTH ALPHA PRIMARY CARE OF CALIFORNIA, P.C.**

By: ________________________
Name:
Title:

**CARBON HEALTH ALPHA PRIMARY CARE OF FLORIDA, P.A.**

By: ________________________
Name:
Title:

**CARBON HEALTH ALPHA PRIMARY CARE OF KANSAS, P.A.**

By: ________________________
Name:
Title:

**CARBON HEALTH EAST BAY MEDICAL GROUP, P.C.**

By: ________________________
Name:
Title:

**CARBON HEALTH EAST BAY PRIMARY CARE, P.C.**

By: ________________________
Name:
Title:

**AGENT:**

**FUTURE SOLUTION INVESTMENTS LLC**

By: ______________________________
Name: Michael F. Solomon
Title: Managing Director

**LENDER:**

**FUTURE SOLUTION INVESTMENTS LLC**

By: ________________________________
Name: Michael F. Solomon
Title: Managing Director

**ANNEX A**

**Restated Schedule 1.1(a)**

**TOTAL TERM LOAN COMMITMENTS**

**Total Term Loan Commitments on Second Amendment Effective Date**

| Lender | Term Loan Commitment |
|---|---|
| Future Solution Investments LLC | $63,040,000.00 |
| **Total** | **$63,040,000.00** |

**EXHIBIT I**

**Approved Budget**

**(see attached)**

**Carbon Health**
**DIP Budget**

| *Actuals/Forecast (USD $000s)* | *Actuals* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Total FCST* | *Additional* |
|---|---|---|---|---|---|---|---|
| MFY | May 26 | May 26 | May 26 | Jun 26 | Jun 26 | Jun 26 | **DIP Funding** |
| FCST Period | - | 1 | 2 | 3 | 4 | 4 | |
| Period End | 5/15/26 | 5/22/26 | 5/29/26 | 6/5/26 | 6/12/26 | 6/12/26 | |
| **Receipts** | | | | | | | |
| Operating Collections | 2,710 | 2,445 | 2,008 | 2,352 | 2,358 | 9,164 | - |
| DIP Funding | - | 5,500 | - | 5,500 | - | 11,000 | 32,540 |
| **Total Receipts** | **$ 2,710** | **$ 7,945** | **$ 2,008** | **$ 7,852** | **$ 2,358** | **$ 20,164** | **$ 32,540** |
| **Operating Disbursements** | | | | | | | |
| Payroll + Benefits | (283) | (4,133) | (459) | (4,486) | (766) | (9,844) | - |
| Vendor Payments | (881) | (138) | (7,490) | (2,702) | (1,463) | (11,793) | - |
| Rent | - | - | - | (1,361) | - | (1,361) | - |
| CH Colombia/Turkey | - | (311) | - | - | - | (311) | - |
| **Operating Disbursements** | **(1,164)** | **(4,582)** | **(7,948)** | **(8,549)** | **(2,229)** | **(23,308)** | **-** |
| **Non-Operating Disbursements** | | | | | | | |
| Notice Plan | - | - | (214) | - | (214) | (428) | - |
| Professional Fees | (609) | - | (4,870) | (1,405) | (1,167) | (7,441) | - |
| Exit Fees | - | - | - | - | - | - | (32,540) |
| **Non-Operating Disbursements** | **(609)** | **-** | **(5,084)** | **(1,405)** | **(1,381)** | **(7,869)** | **(32,540)** |
| **Liquidity** | | | | | | | |
| Beginning Cash Balance | 11,870 | 12,806 | 16,169 | 5,145 | 3,044 | 12,806 | 1,792 |
| Net Cash Flow | 936 | 3,363 | (11,023) | (2,102) | (1,251) | (11,014) | 0 |
| **Ending Cash Balance** | **12,806** | **16,169** | **5,145** | **3,044** | **1,792** | **$ 1,792** | **$ 1,792** |
| Letters of Credit | (670) | (670) | (670) | (670) | (670) | (670) | (670) |
| Restricted Account | (399) | (399) | (399) | (320) | (320) | (320) | (320) |
| Utility Deposit | (135) | (135) | (135) | (135) | (135) | (135) | (135) |
| Rent Reserve | (400) | (400) | (400) | (400) | (400) | (400) | (400) |
| **(Less) Restricted Cash** | **(1,605)** | **(1,605)** | **(1,605)** | **(1,526)** | **(1,526)** | **$ (1,526)** | **$ (1,526)** |
| **Net Available Cash** | **11,201** | **14,564** | **3,540** | **1,518** | **267** | **$ 267** | **$ 267** |
| **DIP Funding** | | | | | | | |
| Beginning Balance | 19,500 | 19,500 | 25,000 | 25,000 | 30,500 | 19,500 | 30,500 |
| +Draw/(Repay) | - | 5,500 | - | 5,500 | - | 11,000 | 32,540 |
| **Ending Balance** | **$ 19,500** | **$ 25,000** | **$ 25,000** | **$ 30,500** | **$ 30,500** | **$ 30,500** | **$ 63,040** |

**Carbon Health**
**Summary of Proposed DIP Commitment**

| *(USD $000s)* | **Amounts** |
|---|---|
| **DIP** | |
| **Current DIP Commitment** | **30,500** |
| **Additional DIP Funding at or current to the Effective Date** | |
| **Additional DIP Budget Items** | |
| Pre-petition taxes | 488 |
| Accrued Payroll & Benefits | 4,000 |
| Executory Contract Vendor Cure, net of Critical vendor reserve | 650 |
| Executory Contract Landlord Cure, net of landlord rent reserve | 1,103 |
| KERP | 1,110 |
| KEIP | 1,195 |
| Utility deposit | (135) |
| US Trustee | 500 |
| Attorney General Settlement | 375 |
| Litigation Trust | 12,000 |
| M&A / Restructuring Transaction Fee | 1,146 |
| DIP Transaction Fee | 250 |
| Post-petition taxes | 618 |
| IRS taxes | 2,442 |
| CSC replacement equipment | 1,000 |
| Camber post-petition expense | 1,200 |
| John Muir Partnership settlement | 971 |
| Prime Partnership settlement | 351 |
| Landlord Legal fees | 200 |
| UCC supplement fees | 2,275 |
| Keen Lease Settlement Fees | 800 |
| **Subtotal of Additional DIP Funding** | **32,540** |
| **Total DIP Funding** | **63,040** |